**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. **09-cv-386-JLK-KMT** (consolidated with **09-cv-525-JLK-KMT**)

In re Oppenheimer **Champion Fund** Securities Fraud Class Actions

*This document relates to BOTH actions.*

---

**CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ...................................................................................................1

    A. Claims of the Securities Class..................................................................1

    B. The Staggering Losses .............................................................................3

    C. Lead Plaintiffs' Claims ............................................................................4

II. JURISDICTION AND VENUE ..............................................................................4

III. PARTIES .................................................................................................................4

    A. Lead Plaintiffs..........................................................................................4

    B. Defendants ................................................................................................5

        1. The Corporate Defendants .............................................................5

        2. The Individual Defendants..............................................................6

        3. Control Allegations ........................................................................7

IV. FACTUAL ALLEGATIONS ...................................................................................7

    A. Introduction to the Fund...........................................................................7

    B. The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund ..........................................................................................................8

    C. The Misstatements of Material Fact and Material Omissions Contained in the Fund's Registration Statements and SEC-Filed Prospectus Materials .........................9

    D. The Core Misrepresentations in All Written Materials...............................13

        1. The Fund became highly leveraged due to speculative bets on complex and risky derivative instruments known as total-return swaps and credit-default swaps..........................................................................14

        2. The Fund violated its promise that no more than 10% of its net assets would be invested in illiquid securities............................................18

        3. During the midst of the market crisis, the Fund made a bet on risky mortgage-backed securities..............................................................19

        4. The Fund had inadequate internal controls to prevent Defendants from taking excessive risk and mispriced assets. ....................................20

        5. The Fund's omissions and misrepresentations were material..........................22

    E. Defendants' Misconduct Causes Huge Losses ...........................................22

010109-11 331747 V1

V.      CLASS ACTION ALLEGATIONS ........................................................................26

COUNT I  VIOLATIONS OF SECTION 11 OF THE 1933 ACT AGAINST ALL
      DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ............................................27

COUNT II  VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT AGAINST ALL
      DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ............................................28

COUNT III  VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE CONTROL
      GROUP DEFENDANTS ON BEHALF OF THE SECURITIES CLASS .............................30

PRAYER FOR RELIEF ...............................................................................................................31

JURY DEMAND ..........................................................................................................................31

Lead Plaintiffs Thomas H. Goodman and Errol G. O'Steen, on behalf of themselves and all others similarly situated allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their undersigned Counsel, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, the analysis of an industry expert, and other publicly available materials.

## I. INTRODUCTION

1.      Lead Plaintiffs bring this action against members of the Oppenheimer Funds family on behalf of persons who bought shares in the Oppenheimer Champion Income Fund (the "Fund").  The Fund sold five classes of shares, A, B, C, N, and Y, under the NASDAQ ticker symbols OPCHX, OCHBX, OCHCX, OCHNX, and OCHYX.

2.      Lead Plaintiffs assert that Defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., and the Fund's Trustees violated the federal securities laws in registering, marketing and selling the Fund as a conservative high income fund that was not dramatically riskier than its high income/intermediate fund peer group.  Defendants also portrayed the Fund as a diversified, higher-yielding fund that may be appropriate as part of a retirement plan portfolio.  However, the Fund was substantially more risky than represented because it took huge gambles on illiquid derivatives and mortgage-backed securities that caused the Fund to crash.  Those risks were not disclosed to investors.

3.      Lead Plaintiffs seek to certify a "Securities Class" as defined below.  (*See* ¶89 *infra*.)  This complaint uses "Relevant Time Period" to refer to the time period January 1, 2006 to December 31, 2008.  The claims of the Securities Class are summarized below.

**A.      Claims of the Securities Class**

4.      The Registration Statements and Prospectuses, and Statements of Additional Information dated August 7, 2006, January 26, 2007, and January 28, 2008, as well as other prospectus materials such as notes, circulars, and other written communications, made

- 1 -

fundamental and core representations to investors that the Fund was diversified and did not take any undue risks.  By way of example, these representations included statements that:

- "The Fund's primary objective is to seek a high level of current income by investing mainly in a <u>diversified portfolio</u> of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the 'Manager'), believes <u>does not involve undue risk</u>."  (Emphasis added.)

- "Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called 'junk' bonds."

- "The Fund also uses certain derivative investments to try to enhance income <u>or to try to manage investment risks</u>."  (Emphasis added.)

- "<u>In selecting securities for the Fund, the overall strategy is to build a broadly diversified portfolio to help moderate the special risks of investing in high-yield debt instruments</u>."  (Emphasis added.)

- "The Fund is intended to be a long-term investment <u>and may be appropriate as a part of a retirement plan portfolio</u>."  (Emphasis added.)

5.    The foregoing representations, as with other representations made by Defendants to the Securities Class, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not be misleading, or omitted material facts required to be stated therein for the following reasons:

- The Fund did not invest mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that did not involve undue risk.  Instead, it became a hedge fund-like investment fund that took extreme risks in search of highly speculative, large returns.  Among other things, it sold credit default swaps and other high-risk derivative instruments to Wall Street firms, promising to pay and insure those Wall Street firms if they lost money as a result of defaults in corporate bonds, CDX indices, ABX indices, and CMBX indices.  These were

- 2 -

high-risk bets that were plainly inappropriate for this Fund, especially in the heavy concentrations the Fund utilized. The leverage within the portfolio that resulted from these derivative bets was excessive, reaching more than 3.8 times the value of Fund assets by the end of 2008.

- For these same reasons, the Fund did not seek to avoid undue risk or use derivatives to try to manage risk as it represented in its Prospectuses. To the contrary, the Fund invested in these speculative devices in order to try to pump-up its returns as the performance of high-yield bonds eased during 2007, and Defendants either misrepresented or failed to disclose the risks presented by the speculative devices used by the Fund.

- The Fund also took on an undue amount of liquidity risk due to the illiquid nature of a large portion of the Fund's portfolios and also violated the promise not to borrow money in excess of 33 1/3% of the value of its total assets.

- The Fund made substantial gambles on volatile mortgage-backed securities at a time when that market was severely distressed.

- The Fund had inadequate internal controls to prevent Defendants from taking excessive risk and frequently mispriced its assets.

## B.  The Staggering Losses

6.      The Fund's assets as of September 20, 2007 were over $2.5 billion. This dropped to just over $2 billion on March 31, 2008, and then plunged to $638 million on December 31, 2008, <u>an almost $2 billion drop in assets in 15 months' time</u>. This decline was a result of the undisclosed risks to the Fund materializing during the Class Period.

7.      And the losses are not the result of an overall market decline. As a *Morningstar* analyst noted, the Fund lost a "stunning 79% and also <u>trailed 99% of its peers</u>." The *Morningstar* analyst also confirmed that investors did not receive adequate disclosures:

> This horrendous performance resulted from heavy exposure to risky mortgage-related securities that blew up in the crisis, exposure that was magnified by economic leverage via swaps. What's worse, because most of this leverage came via off-balance sheet derivatives, it wasn't apparent even to investors who took the

- 3 -

> time to look at the funds' financial statements. Oppenheimer
> didn't violate any rules, and we certainly don't think it intended to
> mislead anybody, <u>but its disclosure on this issue was clearly
> inadequate. This problem isn't confined to Oppenheimer by any
> means; other fund shops that use similar methods have similarly
> poor disclosure, but they weren't burned as badly as Oppenheimer
> was because they weren't taking as many risks</u>.

(Emphasis added.)

**C.**     **Lead Plaintiffs' Claims**

8.      Lead Plaintiffs bring claims under and pursuant to §§ 11, 12(a)(2) and 15 of the

Securities Act of 1933 ("1933 Act") (15 U.S.C. §§ 77k, 77l and 77o).

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under § 22 of the

Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants do

business in this District. Further, many of the acts giving rise to the violations of law

complained of herein occurred in this District, including manager meetings and the preparation

and dissemination to shareholders of the Registration Statements and Prospectuses. The Fund

has its Principal Executive Offices in this District at 6803 South Tucson Way, Centennial,

Colorado.

11.      In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## III.      PARTIES

**A.**     **Lead Plaintiffs**

12.      Lead Plaintiff Thomas H. Goodman purchased shares of the Fund during the

Relevant Time Period pursuant to or traceable to a registration statement and prospectus at issue

in this complaint and has been damaged thereby.

- 4 -

13.     Lead Plaintiff Errol G. O'Steen purchased shares of the Fund during the Relevant Time Period pursuant to or traceable to a registration statement and prospectus at issue in this complaint and has been damaged thereby.

14.     In its Order Consolidating These "Champion Fund" Cases and Granting Motion for Appointment of Lead Plaintiff and Approval of Counsel (Dkt. No. 76), the Court appointed both Mr. Goodman and Mr. O'Steen as Lead Plaintiffs pursuant to 15 U.S.C. § 77z-1(a)(3)(B).

**B.      Defendants**

15.     The Defendants are all affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name, which is one of the largest asset management organizations in the United States.

**1.      The Corporate Defendants**

16.     Defendant OppenheimerFunds, Inc. (the "Manager") is the manager and investment advisor of the Fund and chooses the Fund's investments and handles its day-to-day business.  It is a holding company that engaged in securities brokerage, banking services and related financial services through its subsidiaries.  OppenheimerFunds, Inc. is headquartered at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008.  The Manager carries out its duties, subject to the policies established by the Fund's Board of Trustees, under an investment advisory agreement.  As compensation for its services, OppenheimerFunds, Inc. receives a management fee.

17.     Defendant OppenheimerFunds Distributor, Inc. (the "Distributor"), located at Two World Financial Center, 225 Liberty Street, New York, New York 10281-1008, is a subsidiary of the Manager and was, during the Relevant Time Period, the principal underwriter and distributor for shares of the Fund, was the trust agent for the purpose of the continuous public offering of the Fund's shares, and helped draft and disseminate the offering documents.

010109-11 331747 V1

## 2. The Individual Defendants

18.     Defendant William L. Armstrong is Chairman of the Board of Trustees and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

19.     Defendant Robert G. Avis was a Trustee and signed or authorized the signing of the August 7, 2006 and January 26, 2007 Registration Statements.

20.     Defendant George C. Bowen is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

21.     Defendant Edward L. Cameron is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

22.     Defendant Jon S. Fossel is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

23.     Defendant Sam Freedman is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

24.     Defendant Beverly L. Hamilton is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

25.     Defendant Robert J. Malone is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

26.     Defendant F. William Marshall, Jr., is a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

27.     Defendant John V. Murphy is President and Principal Executive Officer of the Fund and a Trustee and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

28.     Defendant Brian W. Wixted is Treasurer and Principal Financial and Accounting Officer of the Fund and signed or authorized the signing of each Registration Statement effective during the Relevant Time Period.

010109-11 331747 V1

29.     The persons identified above in ¶¶ 18-28 are collectively referred to as the "Individual Defendants."

### 3.     Control Allegations

30.     The Manager, the Distributor, and the Individual Defendants, directly or indirectly, control the Fund, both individually and collectively.

31.     Defendant OppenheimerFunds, Inc. controlled the Fund as the manager and investment advisor of the Fund and by virtue of choosing the Fund's investments and handling its day-to-day business. OppenheimerFunds, Inc. also controlled the Distributor, its subsidiary.

32.     OppenheimerFunds Distributor, Inc. controlled the Fund by being the principal underwriter and distributor for shares of the Fund, the trust agent for the purpose of the continuous public offering of the Fund's shares, and by helping draft and disseminate the offering documents.

33.     The Individual Defendants controlled the Fund by virtue of their officer or trustee positions. As the Statements of Additional Information dated August 7, 2006, January 26, 2007, and January 28, 2008 admit, the Fund "is governed by a Board of Trustees, which is responsible for protecting the interests of shareholders under Massachusetts law. The Trustees meet periodically throughout the year to oversee the Fund's activities, review its performance, and review the actions of the Manager." In addition to being Trustees, Individual Defendants John Murphy and Brian Wixted also controlled the Fund in their capacities as President and Principal Executive Officer of the Fund and Treasurer and Principal Financial and Accounting Officer of the Fund, respectively.

## IV.     FACTUAL ALLEGATIONS

### A.     Introduction to the Fund

34.     The Oppenheimer Champion Income Fund (the "Fund") is an open-ended, fixed income mutual fund managed and marketed by Defendant Oppenheimer Funds. The Fund sold five classes of shares, A, B, C, N, and Y, under the NASDAQ ticker symbols OPCHX, OCHBX, OCHCX, OCHNX, and OCHYX.

010109-11 331747 V1

35.     The Fund was marketed to the investing public through other brokerage firms such as Wachovia, Merrill Lynch, Linsco Private Ledger LPL, Citigroup Smith Barney, ING, and UBS.

**B.      The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund**

36.     Defendants annually filed nearly identical Registration Statements and Prospectuses throughout the Relevant Time Period in connection with the continuous offerings of the Fund's shares.  The Fund's shares were issued to investors pursuant to the following series of Registration Statements filed with the SEC and made effective during the Relevant Time Period (collectively referred to as the "Registration Statements"):

- Registration Statement filed pursuant to Form N-1A on August 7, 2006;

- Registration Statement filed pursuant to Form N-1A on January 26, 2007; and

- Registration Statement filed pursuant to Form N-1A on January 28, 2008.

37.     The Fund was marketed and sold to investors pursuant to the following series of Prospectuses:

- Prospectus dated August 7, 2006 (the "2006 Prospectus");

- Prospectus dated January 26, 2007 (the "2007 Prospectus"); and

- Prospectus dated January 28, 2008 (the "2008 Prospectus").

38.     These Prospectuses also explicitly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations.  These SAIs include the following:

- Statement of Additional Information dated August 7, 2006;

- Statement of Additional Information dated January 26, 2007; and

- Statement of Additional Information dated January 28, 2008;

39.     Each of the foregoing documents was materially false and misleading as described below.

**C.    The Misstatements of Material Fact and Material Omissions Contained in the Fund's Registration Statements and SEC-Filed Prospectus Materials**

40.    From the August 7, 2006, Registration Statement and Prospectus onward throughout the entire Relevant Time Period, Defendants issued and offered for sale shares of the Fund.  Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the Relevant Time Period and continued to offer and sell the Fund's newly issued securities.

41.    The Registration Statements, Prospectuses, and SAI's used throughout the Relevant Time Period to register and offer the Fund to Lead Plaintiffs and the Class contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.  While the Prospectuses issued during the Relevant Time Period were not perfectly identical, they did contain many of the same materially untrue statements and were rendered materially misleading by the same omissions.  These include the following statements:

a.    From the **August 7, 2006** Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES?  The Fund's primary objective is to seek a high level of current income by investing <u>mainly in a diversified portfolio</u> of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes <u>do not involve undue risk</u>.  The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN?  The Fund invests mainly in a variety of high-yield fixed-income debt securities of domestic and foreign issuers for high current income. These securities primarily include:
   o   Lower-grade bonds and notes of corporate issuers.
   o   Foreign corporate and government bonds.
   o   "Structured" notes.

       Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds.  Lower-grade debt securities are those rated below "Baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poor's Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organizations (or, in the case of unrated securities, determined by the Manager to be comparable to securities rated below investment grade).  See Appendix A to the Statement of Additional Information for a description of bond ratings.

- 9 -

The remainder of the Fund's assets may be held in other debt securities, cash or cash equivalents, in rights or warrants, or invested in common stocks and other equity securities when the Manager believes these investments are consistent with the Fund's objectives. Investments in high-yield securities and equity securities may provide opportunities for capital growth while also providing income to the Fund.

The Fund's foreign investments currently focus on debt securities of issuers in developed markets. The Fund also uses certain derivative investments, primarily "structured notes," to try to enhance income <u>or to try to manage investment risks</u>. These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different market sectors, industries and countries. <u>The overall strategy is to build a broadly diversified portfolio of debt securities to help moderate the special risks of investing in high-yield debt instruments</u>. The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power and also consider the factors below (which may vary in particular cases and may change over time), looking for:

- o Changes in the business cycle that might affect corporate profits,
- o Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
- o Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
- o Securities or sectors <u>that will help the overall diversification of the portfolio</u>, and
- o Issuers with improvements in relative cash flows and liquidity to help them meet their obligations.

The portfolio managers monitor changes in the factors listed above and any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income debt securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations that are typical for a fund that invests mainly in high-yield domestic and foreign fixed-income debt securities, which also have special credit risks. Since the Fund's income level will fluctuate, it is not designed for investors needing an assured level of current income. The Fund is intended to be a long-term investment <u>and may be appropriate as a part of a retirement plan portfolio</u>. The Fund is not a complete investment program.

- 10 -

*     *     *

Illiquid and Restricted Securities. Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price. Restricted securities may have terms that limit their resale to other investors or may require registration under applicable securities laws before they may be sold publicly. <u>The Fund will not invest more than 10% of its net assets in illiquid or restricted securities</u>. The Board can increase that limit to 15%. Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to that limit. The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.

(Emphasis added.)

        b.     The **January 26, 2007**, and **January 28, 2008**, Prospectuses contained

disclosures similar to the 2006 Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary objective is to seek a high level of current income by investing mainly in a <u>diversified portfolio</u> of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes <u>does not involve undue risk</u>. The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN? The Fund invests in a variety of high-yield, fixed-income securities and related instruments. These investments primarily include:
   o  Lower-grade corporate bonds.
   o  Foreign corporate and government bonds.
   o  Swaps, including single name and index-linked credit default swaps.

     Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds. Lower-grade debt securities are those rated below "Baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poors Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organizations (or, if unrated, debt securities determined by the Manager to be comparable to securities rated below investment grade). See Appendix A to the Statement of Additional Information for a description of bond ratings. Investments in high-yield securities may provide opportunities for capital growth while also providing income to the Fund.

- 11 -

The remainder of the Fund's assets may be invested in other debt securities, common stocks (and other equity securities), or cash equivalents when the Manager believes these investments are consistent with the Fund's objectives.

The Fund may invest in securities of foreign issuers. The Fund currently focuses on debt securities of foreign issuers in developed markets. The Fund also uses certain derivative investments to try to enhance income or to try to manage investment risks. These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, the overall strategy is to build a broadly diversified portfolio to help moderate the special risks of investing in high-yield debt instruments. The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power. The Fund's portfolio managers also analyze the overall investment opportunities and risks in different market sectors, industries and countries. The Fund's portfolio managers consider some or all of the factors below (which may change over time):

- o Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
- o Issuers with improvements in relative cash flows and liquidity to help them meet their obligations,
- o Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
- o Changes in the business cycle that might affect corporate profits, and
- o Securities or sectors that will help the overall diversification of the portfolio.

The portfolio managers monitor changes in the factors listed above. Any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations and the special credit risks that are typical for a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Since the Fund's income level will fluctuate, it is not designed for investors needing an assured level of current income. The Fund is intended to be a long-term investment and may be appropriate as a part of a retirement plan portfolio. The Fund is not a complete investment program.

\*    \*    \*

Illiquid and Restricted Securities. Investments may be illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price. Restricted securities may have terms that limit their resale to other investors or may require registration under applicable securities laws before they may be sold publicly. The Fund will not invest more than 10% of its net assets in illiquid or restricted securities. The Board can increase that limit to 15%. Certain restricted securities that are eligible for resale to qualified institutional purchasers may not be subject to that limit. The Manager monitors holdings of illiquid securities on an ongoing basis to determine whether to sell any holdings to maintain adequate liquidity.

Emphasis added.

42. SAIs issued **August 7, 2006**, **January 26, 2007**, and **January 28, 2008** made the following statement:

> The Fund cannot borrow money in excess of 33 1/3% of the value of its total assets. The Fund may borrow only from banks and/or affiliated investment companies and only as a temporary measure for extraordinary or emergency purposes. The Fund cannot make any investment at a time during which its borrowings exceed 5% of the value of its assets. With respect to this fundamental policy, the Fund can borrow only if it maintains a 300% ratio of assets to borrowings at all times in the manner set forth in the Investment Company Act.

43. The foregoing representations were false for the reasons stated in ¶¶ 44-77.

## D. The Core Misrepresentations in All Written Materials

44. During the Class Period, the true material facts, or material facts omitted which were necessary to make the statements made not misleading, or omitted material facts required to be stated therein, were:

a. The Fund was not adhering to its objectives of (i) investing mainly in a diversified portfolio of higher-yield, lower-grade, fixed income securities, and (ii) not taking any undue risk, such as investing heavily in risky derivatives;

b. The Fund took on an undue amount of liquidity risk due to the illiquid nature of a large portion of the Fund's portfolios;

- 13 -

c.     Defendants failed to disclose, and indeed concealed, the extent of the Fund's risk exposure to derivatives and other high risk instruments;

d.     Defendants misstated the extent of the Fund's leverage exposure;

e.     Defendants misstated that the Fund would not borrow money in excess of 33 1/3% of the value of its total assets; and

f.     The Fund's internal controls were inadequate to prevent Defendants from taking excessive risk.

45.     The Fund was a typical conservative high income fund, until the beginning of 2006. Thereafter, and during the Class Period, the Fund altered investment policies and took on excessive risk in the hopes of seeking higher returns as the returns on high-yield bonds generally began to wane. This included dramatically increasing the Fund's reliance on illiquid securities and risky derivative instruments. Unknown to investors during the Class Period, the Fund became a *de facto* hedge fund, investing heavily in extraordinarily risky derivatives that were highly illiquid.

**1.     The Fund became highly leveraged due to speculative bets on complex and risky derivative instruments known as total-return swaps and credit-default swaps.**

46.     An example of taking excessive risks that are inconsistent with the represented objectives of the Fund came in the form of the Fund's trading in <u>total-return swaps</u>. Total-return swaps can be highly illiquid, speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities or a particular index performs. Fund managers increased their bet on commercial mortgage-backed securities and, therefore risk, by entering into total return swaps on commercial real estate indices. This was a highly leveraged and speculative bet that the commercial mortgage-backed securities market, which had suffered a significant widening of spreads (that is, the difference in yields between commercial mortgage-backed securities and similar term government bonds), would rally in 2008, causing spreads to narrow and generating large returns for the Fund.

- 14 -

47.    An industry expert retained by Counsel has calculated the "net notional" value of the Fund's total-return swap transactions in the table set forth in this paragraph ("notional" refers to the value of the underlying assets or liabilities represented by the derivative).[1]  As shown, the Fund's total-return swap transactions steadily increased from third quarter 2007 onward, peaking in the third quarter of 2008 at over $1 billion.

| 09/30/07 | 12/31/07 | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|---|---|
| $79,500,000 | $442,732,000 | $1,028,982,000 | $1,028,210,000 | $1,050,250,000 | $851,680,000 |

48.    The magnitude of these total-return swap transactions was inconsistent with representations that the Fund was a diversified portfolio of higher-yield, lower-grade, fixed income securities that did not take any undue risk.

49.    The Fund managers' gambling continued through other transactions known as credit-default swaps.  Credit-default swaps are essentially insurance contracts that insure against the default on debt securities such as corporate bonds.  In a credit default swap, two parties enter into a private contract whereby the buyer of the protection agrees to pay the seller premiums over a set period of time, which is typically four or five years.  In exchange, the seller agrees to pay the buyer in the event a particular pre-defined credit event occurs, such as a default on the underlying security.  A credit-default swap thus functions as an insurance policy:  the buyer can use the swap to hedge an existing position in a particular security, and the seller receives a regular insurance premium in the hope of not having to pay an insurance "claim."

50.    The Fund entered into a significant number of credit default swaps, but not as a buyer of credit protection to hedge existing holdings, but as a seller, essentially writing insurance on corporate bonds.  This had the effect of adding leverage to the Fund, because the Fund was in the position to realize the full impact of price declines in the bonds it was insuring, even though it did not actually own those bonds.

---

[1] Many of the calculations presented in this complaint were performed by an industry expert retained by Counsel and are not calculations that most investors would be able to perform based on a review of the Fund's SEC filings.  In addition, the calculations presented herein may be refined once Defendants produce all of the transaction data for the Fund.

010109-11 331747 V1

51.     The Fund sold credit default swaps on companies such as AIG, Merrill Lynch,

Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford, which

were big gambles considering the then-concurrent market events.  At the time the Fund entered

these transactions, the troubles at AIG, Washington Mutual, Lehman Brothers, Merrill Lynch,

Citigroup, Tribune, General Motors, and Ford were known to Defendants, <u>meaning that the Fund</u>

<u>knowingly made very risky bets on these investments</u>.  Indeed, in the wake of the collapse of the

subprime mortgage market, the credit default swap market began to show signs of distress by

summer 2007.  But despite the risks associated with these types of investments, the Fund

continued selling swaps throughout 2007 and 2008 and increased its use of them until the third

quarter of 2008 when AIG and Lehman collapsed.  The Fund's losses on selling credit default

swaps were massive.

52.     An industry expert retained by Counsel has calculated the "net notional" value of

the Fund's credit default swap sale transactions in the table below.  As with the total-return swap

transactions, the Fund's credit default swap transactions increased throughout 2007 and into

2008; they topped out at $<u>1.575 billion</u> in March 2008.

| 12/31/06 | 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
|---|---|---|---|---|
| $123,645,000 | $556,032,000 | $741,362,000 | $1,304,318,000 | $1,437,957,000 |

| 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|
| $1,574,826,000 | $1,516,194,000 | $1,076,690,000 | $619,445,000 |

53.     The magnitude of these credit default swap transactions was inconsistent with

representations that the Fund was a diversified portfolio of higher-yield, lower-grade, fixed

income securities that did not take any undue risk.

54.     The total return swap and credit default swap derivatives utilized by the Fund, in

addition to interest rate swaps, added a tremendous amount of leverage to the Fund and allowed

the Fund to bet on more securities than it actually held in the portfolio.  "Leverage" refers to the

utilization of "borrowed" money. The use of leverage can increase returns when values rise but also exacerbate losses when values decline. It thus has a two-edged effect: leverage allows a fund to participate in the gains and losses on a pool of assets that is greater than the amount of dollars actually invested in the fund. Any gains on those extra assets flow directly to the shareholders, but any losses come directly out of the investors' capital. Simply put, leverage amplifies risk, and it was the realization of this undisclosed risk that was a contributing cause to the Fund's loss of value.

55.     The Fund's leverage position – constructed through total-return swaps, credit default swap and interest rate swap transactions – was extreme. Based on preliminary data, an industry expert retained by Counsel has calculated the "net notional" value of the Fund's swap transactions as follows:

| 12/31/06 | 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
| --- | --- | --- | --- | --- |
| $270,529,657 | $432,907,672 | $1,190,961,553 | $1,274,135,381 | $1,463,239,312 |

| 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
| --- | --- | --- | --- |
| $3,240,610,796 | $2,942,479,530 | $2,339,559,612 | $1,666,215,000 |

Leverage thus increased dramatically to over $1.4 billion dollars by the end of 2007 and reached more than $3.2 billion in March 2008.

56.     The staggering magnitude of this leverage is highlighted by comparing leverage values to the Fund's total net assets under management. For example, in September 2007, when the Fund had over $2.5 billion in assets, the net notional value of leverage was almost $1.275 billion. By March 2008, the net notional value of leverage was over $3.2 billion, greatly exceeding net Fund assets of $2 billion. In other words, by the end of March 2008, the approximate $2 billion Fund was exposed to the performance of *an additional $3.2 billion* in

- 17 -

assets *that it did not actually own*.  Based on preliminary calculations by an industry expert

retained by Counsel, the Fund's net leverage[2] during the Relevant Time Period was as follows:

| 12/31/06 | 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
|---|---|---|---|---|
| 1.0344 | 1.1438 | 1.4476 | 1.4877 | 1.5865 |

| 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|
| 2.3593 | 2.2861 | 2.3545 | 3.2980 |

57.     The magnitude of this leverage was inconsistent with representations that the Fund

was a diversified portfolio of higher-yield, lower-grade, fixed income securities that did not take

any undue risk.

58.     Further, this magnitude of leverage violated promises that the Fund would not

borrow money in excess of 33 1/3% of the value of its total assets.

59.     Thus, Fund managers used derivative transactions as vehicles to make the Fund

highly-leveraged in order to make speculative bets on particular sectors and names in the bond

market.  These excessively leveraged and speculative bets significantly altered the risk profile of

the Fund in derogation of the Fund's investment objectives.  Furthermore, the leverage values

reported in the table above also violated the Fund's 33 1/3% borrowing limit.

**2.      The Fund violated its promise that no more than 10% of its net assets would be invested in illiquid securities.**

60.     Liquidity risk is generally defined as the risk that a given security or asset cannot

be traded quickly enough in the market to prevent a loss (or make the required profit).  The Fund,

in promising that it would not invest more than 10% of its net assets in illiquid or restricted

securities, conveyed that it would carefully control for this risk and ensure that the Fund's

investments would be, in the aggregate, liquid.

61.     As the Prospectuses explain, certain "[i]nvestments may be illiquid because they do

not have an active trading market, making it difficult to value them or dispose of them promptly at

---

[2] "Net leverage" is the market value of long positions less the market value of short positions divided by net asset value.

an acceptable price." Annual Reports also explain that a security can be illiquid "if its valuation has not changed for a certain period of time."

62.     Applying these tests to the Fund demonstrates that, throughout 2006, 2007, and 2008, the Fund invested more than 10% of its net assets in illiquid securities, despite representations in the Prospectuses that it would not.

63.     An industry expert retained by Counsel calculated the percentage of the Fund's net assets that were illiquid over time as follows:

| 03/31/06 | 06/30/06 | 09/30/06 | 12/31/06 |
|----------|----------|----------|----------|
| 21.83%   | 24.14%   | 26.94%   | 27.08%   |

| 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
|----------|----------|----------|----------|
| 25.96%   | 24.15%   | 24.94%   | 23.63%   |

| 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|----------|----------|----------|----------|
| 22.88%   | 22.51%   | 23.24%   | 18.99%   |

**3.      During the midst of the market crisis, the Fund made a bet on risky mortgage-backed securities.**

64.     Mortgage-backed securities or "MBS" are bonds backed by pools of mortgage loans.  Mortgage-backed securities are riskier than other fixed income assets due to their complex structure and multiple risk sources, including not only interest rate risk but also prepayment risk, default risk, and liquidity risk.

65.     Throughout 2006 and in the first half of 2007, the Fund had few if any positions in mortgage-backed securities.  During the third quarter of 2007, the Fund made its first substantial investments in mortgage-backed securities, representing about 3.8% of net assets.  This number remained roughly constant until the second quarter of 2008, when net assets invested in risky mortgage-backed securities ballooned to 11.2% with a peak of 12.7% by the end of 2008.

66.     U.S. short-term interest rates began to rise from low levels in 2004, with the "prime rate" climbing steadily throughout 2005 and 2006 from 4% to 8.25% in June 2006.  As key short-

term and the prime rates rose, other interest rates rose as well, including those for commercial and residential mortgage loans.

67.     Thus, Defendants chose to gamble on mortgage-backed securities during a time period in which it was well known that the real estate market was in a free-fall and, along with it, the mortgage-backed securities tied to that market.  The Fund essentially "doubled down" on falling mortgage-related bonds during late-2007 and 2008.  During this time period, the Fund purchased substantial stakes in mortgage-backed securities tied to commercial real estate – referred to as commercial mortgage-backed securities – despite the massive deterioration in the residential mortgage market and the overall crisis in the real estate market that began in 2007 and accelerated in 2008

68.     These substantial investments of mortgage-backed securities in the portfolio made the Fund's share price more volatile and the Fund much more susceptible to changes in interest rates and fixed income market dislocations.  The timing and magnitude of these mortgage-backed securities transactions was inconsistent with representations that the Fund was a diversified portfolio of higher-yield, lower-grade, fixed income securities that did not take any undue risk.

### 4.     The Fund had inadequate internal controls to prevent Defendants from taking excessive risk and mispriced assets.

69.     The Fund had inadequate internal controls to manage the extreme risks that the Fund managers were taking.

70.     As an example, the Fund reported the same prices in consecutive reporting periods for certain investments when, given the changes in prevailing market interest rates that occurred between those periods, it was simply impossible for the investments' prices not to change.

71.     Examples of such mispricing of assets compiled by an industry expert retained by Counsel include the following:[3]

NC Finance Trust, CMO, Home Equity Pass-Through Certificates, Series 1999-I, Cl. ECFD, 1.079%, 1/25/29 1
AK Steel Corp.: 7.875% Sr. Unsec. Nts., 2/15/09
Compton Petroleum Finance Corp.: 7.625% Sr. Nts., 12/1/13

---

[3] These are only examples and are not intended to be an exhaustive inventory of all instances in which the Fund mispriced assets.

010109-11 331747 V1

Copano Energy LLC, 8.125% Sr. Unsec. Nts., 3/1/16
DaVita, Inc.: 6.625% Sr. Unsec. Nts., 3/15/13
Dobson Communications Corp.: 8.85% Sr. Unsec. Nts., 10/15/12 7
Frontier Oil Corp., 6.625% Sr. Unsec. Nts., 10/1/11
Georgia Gulf Corp., 10.75% Sr. Sub. Nts., 10/15/16
Gray Television, Inc., 9.25% Sr. Sub. Nts., 12/15/11
Hertz Corp.: 10.50% Sr. Sub. Nts., 1/1/16 3
Horizon Lines LLC, 9% Nts., 11/1/12
Inergy LP/Inergy Finance Corp., 8.25% Sr. Nts., 3/1/16 3
Iron Mountain, Inc.: 7.75% Sr. Sub. Nts., 1/15/15
Lyondell Chemical Co.: 10.50% Sr. Sec. Nts., 6/1/13
MSW Energy Holdings LLC/MSW Energy Finance Co., Inc., 8.50% Sr. Sec. Nts., 9/1/10
MSW Energy Holdings LLC/MSW Energy Finance Co. II, Inc., 7.375% Sr. Sec. Nts., Series B, 9/1/10
Midwest Generation LLC, 8.75% Sr. Sec. Nts., 5/1/34
Milacron Escrow Corp., 11.50% Sr. Sec. Nts., 5/15/11
Mirant Americas Generation LLC, 8.30% Sr. Unsec. Nts., 5/1/11
Newfield Exploration Co.: 6.625% Sr. Unsec. Sub. Nts., 9/1/14
Nordic Telephone Co. Holdings ApS, 8.875% Sr. Nts., 5/1/16 4
Orion Network Systems, Inc., 12.50% Sr. Unsub. Disc. Nts., 1/15/07 2
Playtex Products, Inc.: 8% Sr. Sec. Nts., 3/1/11
RBS Global & Rexnord Corp.: 9.50% Sr. Nts., 8/1/14 1
Smithfield Foods, Inc., 8% Sr. Nts., Series B, 10/15/09
US Unwired, Inc., 10% Sr. Sec. Nts., 6/15/12 1
United Components, Inc., 9.375% Sr. Sub. Nts., 6/15/13
Vertis, Inc.: 10.875% Sr. Unsec. Nts., Series B, 6/15/09
Visteon Corp.: 8.25% Sr. Unsec. Nts., 8/1/10
Visteon Corp.: 7% Sr. Unsec. Nts., 3/10/14
Williams Holdings of Delaware, Inc., 6.50% Nts., 12/1/08
Windstream Corp.: 8.125% Sr. Nts., 8/1/13 4,7
Pratama Datakom Asia BV, 12.75% Gtd. Nts., 7/15/05 1,2

72.     Examples of mispricing are found as far back as second quarter 2006, and there are multiple examples throughout 2007 and 2008.

73.     A fund's ability to accurately track the values of its assets is critical to risk management control, particularly in a fund – like Champion Income – that has substantial exposure to risky derivatives.  The Fund's mispricing of assets is but one example of inadequate internal controls.

74.     This mispricing of assets led to an overstatement of net asset values.  This, in turn, resulted in Fund shares being incorrectly priced and investors purchasing and redeeming Fund shares at prices that benefited redeeming investors at the expense of remaining and new investors.

- 21 -

75.     The lack of internal controls was inconsistent with representations that the Fund did not take any undue risk.

**5.     The Fund's omissions and misrepresentations were material.**

76.     The foregoing is dramatically at odds with Defendants' representations that the Fund was a conservative high income fund or a fund that was not riskier than the high income/intermediate fund peer group.  The foregoing is dramatically at odds with Defendants representations that the Fund was a diversified, higher-yielding Fund that may be appropriate as part of a retirement plan portfolio.

77.     A reasonable investor would have viewed these undisclosed facts, severally and jointly, as having materially altered the total mix of information available to him or her. Moreover, a reasonable investor would understand that the facts described herein, but never disclosed, would cause the Fund to undertake a materially increased investment risk during the Relevant Time Period because the Fund was investing in securities that were materially more risky than disclosed.

**E.     Defendants' Misconduct Causes Huge Losses**

78.     Due to Defendants' positive, but misleading or untrue statements, and the omissions described above, billions of dollars poured into the Fund.

79.     But Defendants' misrepresented and omitted practices ultimately triggered staggering losses in net asset value as reflected in the following graph:



80.     Overall, the Fund experienced an 82 percent drop in net asset value, one of the worst showings among the roughly 150 U.S. high-yield debt funds.

81.    The magnitude of this drop was not the result of a downtrend in the market but a direct result of Defendants' misstatements and omissions of material fact. In other words, Defendants' violations of the federal securities laws caused the net asset value of the Fund to plummet.

82.    For context, the average high-yield bond fund was down much less than the Fund in 2008, as reflected in the following graph comparing the Fund with the *Morningstar* High Yield Bond category:

Growth of $10,000





83.    By September 20, 2007, the Fund's assets reached over $2.5 billion then plummeted to under $400 million by the end of March 2009 as reflected in the following table:

| Date | Net Assets |
|---|---|
| 3/31/09 | 388,489,446 |
| 9/30/08 | 1,583,291,035 |
| 3/31/08 | 2,051,426,196 |
| 9/30/07 | 2,553,283,947 |
| 3/31/07 | 2,773,519,687 |
| 9/30/06 | 1,310,790,821 |
| 3/31/06 | 1,387,057,905 |
| 9/30/05 | 1,483,322,066 |
| 3/31/05 | 1,606,132,698 |
| 9/30/04 | 1,704,128,854 |

- 23 -

84.     On February 4, 2009, *Morningstar* included the Fund on its list of "The Eight Most Shocking Losses of the Past 12 Months," noting that "the managers tried to make a killing in mortgages by scooping them up at depressed prices in January 2008," which was "[n]ot only . . . a really bad bet, but it was made much worse by the use of tremendous leverage."  In another article dated February 5, 2009, *Morningstar* explained that Fund managers "fail[ed] to appreciate the risks they were taking," and that Oppenheimer "also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary."

85.     On February 6, 2009, *Morningstar* gave the Fund an "F" for "failing investors," noting that "the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect" and that "<u>no attempt was made to communicate to shareholders that these funds were taking on additional risk</u>."  (Emphasis added.)

86.     Another *Morningstar* article took the Fund managers to task for not disclosing the Fund's heavy reliance on complex, off-balance-sheet derivatives:

> Because most of the additional market exposure came from off-balance-sheet derivatives, the funds' portfolios didn't *look* highly leveraged.  And while they may have been only somewhat leveraged in what we might call a conventional accounting sense – by borrowing money against your net assets and investing it – they were heavily leveraged as mutual funds go, in an *economic sense*.…
>
> How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to *figure out why*, much less an actual *explanation*?
>
> * * *
>
> I'm sorry to be glib, but this strains credulity.  Here's a news flash, Oppenheimer:  If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for your shareholders.  Not doing so is patently unacceptable and comes awfully close to dishonesty by omission.  While most of your competitors haven't taken on anywhere near this much risk, many use similar portfolio techniques and are just as guilty of these omissions.  I can think of numerous ways this can all happen without intent, but we're way past the honeymoon period now that these tools have been around for quite a while.  It's time for this to stop all around.

- 24 -

* * *

> [I]t seems that Manioudakis and his crew were overly focused on trees that appeared to be incredible bargains. They backed up all of their trucks and even used a few of their neighbors'. Sadly, it seems that they couldn't see that the forest was on fire.

December 17, 2008, *Morningstar*, "Oppenheimer Bond Funds Missed the Forest Fire for the Trees" (italicized emphasis in original; underline emphasis added).

87.     On February 5, 2009, *Morningstar* again reported on the Fund in an article entitled "Fund Companies Falling Short on Stewardship." The article provided in part:

> If you step back and think about it, it's not hard to be a good steward of capital. Mutual funds simply have to care for fundholders' capital the same way they'd want their own money to be run: with sensible strategies, fair prices, and reasonable, straightforward explanations as to why things go well – and not so well.
>
> Some funds – those that receive As for corporate culture as part of Morningstar's Stewardship Grades for funds, for example – seem to have an easy time putting shareholders first. But other firms have apparently lost sight of their mission. What follows are examples of recent fund moves that are disrespectful to the shareholders they're serving.

* * *

> **Hypocrisy Stings Oppenheimer**
>
> In May 2006, John Murphy, president of OppenheimerFunds, gave the welcoming remarks to the annual ICI General Membership Meeting.... The theme was "Creating Shareholder Value" and two of his suggestions were a) "Offering competitive investment returns at an appropriate level of risk," and b) "Supplying clear, concise, and relevant information and tools that investors need to make informed investment decisions."
>
> We wish Murphy had followed his own advice. In 2008, Oppenheimer Champion Income lost a nearly inconceivable 78% and sibling Core Bond declined 36%, primarily because the bond funds took on plenty of risk. Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds. When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed. Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary. Longtime fixed-income head Jerry Webman has stepped in to try and right the ship at both offerings, but the damage has already been done.

- 25 -

88.     On December 12, 2008, Manioudakis, who headed the Fund's management team, resigned from his position.  During the relevant period, his team managed more than $16 billion in individual investor fund assets, including the Fund.

## V.     CLASS ACTION ALLEGATIONS

89.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following "Securities Class:"[4]

> All persons or entities who acquired shares of the Fund traceable to a false and misleading Registration Statement and Prospectus for the Fund and who were damaged thereby.  The time period for this class is January 1, 2006 to December 31, 2008.

90.     Excluded from the Class are Defendants, their Officers and Directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands if not tens-of-thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Registrant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

---

[4] Lead Plaintiff reserves the right to modify the proposed class period based on information obtained during discovery.

010109-11 331747 V1

94.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

  a.  whether the 1933 Act was violated by Defendants' acts as alleged;

  b.  whether statements made by Defendants to the investing public in the Registration Statements and Prospectuses misrepresented or omitted material facts; and

  c.  whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**VIOLATIONS OF SECTION 11 OF THE 1933 ACT**
**AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS**

96.     Lead Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 11, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 11 Defendants, other than strict liability or negligence.

97.     This Count is brought on behalf of the Securities Class against all Defendants pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k.

98.     The Registration Statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, or omitted to state material facts required to be stated therein.

99.     The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

100.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

101.     By reasons of the conduct herein alleged, each Defendant violated, or controlled a person who violated Section 11 of the 1933 Act.

102.     Lead Plaintiffs acquired Fund shares pursuant to the Registration Statements.

103.     Lead Plaintiffs and the Class have sustained damages. The value of the Fund shares has declined substantially subsequent to and due to Defendants' violations.

104.     At the time of their purchases of the Fund shares, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to February 2009. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which the original complaint in this action was filed in February 2009. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time at which the original complaint in this action was filed in February 2009.

## COUNT II

### VIOLATIONS OF SECTION 12(a)(2) OF THE 1933 ACT
### AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS

105.     Lead Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 12, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 12 Defendants, other than strict liability or negligence.

010109-11 331747 V1

106. This Count is brought on behalf of the Securities Class pursuant to Section 12 of the 1933 Act, 15 U.S.C. § 77l. It is asserted against all Defendants, because they were all participants in the distribution of the Fund's shares.

107. The Section 12 Defendants "solicited" purchases of the Fund's shares by means of a prospectus or were controlling persons of the Fund or of those who solicited purchases of the Fund's shares. By way of example, the solicitations were carried out as follows:

a. As the Manager and investment advisor of the Fund that chose the Fund's investments and handled it day-to-day business, as well as being the parent corporation to the Distributor, Defendant OppenheimerFunds, Inc. solicited purchases of the Fund's shares to serve its own financial interests.

b. As the Distributor and principal underwriter for shares of the Fund, Defendant OppenheimerFunds Distributor, Inc. solicited purchases of the Fund's shares to serve its own financial interests.

c. As the Trustees of the Fund, the Individual Defendants governed the Fund, including all communications, and thereby solicited purchases of the Fund's shares to serve their own financial interests. The Individual Defendants also solicited purchases by virtue of signing the Registration Statements accompanying the Prospectuses, which are considered solicitation documents.

108. The Prospectuses contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the Section 12 Defendants knew, or in the exercise of reasonable care the Section 12 Defendants would have known, were false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

109. Lead Plaintiffs did not know that the representations made in connection with the distribution to them by the Section 12 Defendants regarding the matters described above were untrue and did not know the above described material facts that were not disclosed.

- 29 -

110.    As a result of the matters set forth herein, pursuant to Section 12(a)(2) of the Securities Act, Lead Plaintiffs and Class members are entitled to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

111.    Lead Plaintiffs and putative Class members who do not opt out, hereby tender their shares in the Fund.

112.    The Section 12 Defendants are liable to Lead Plaintiffs and Class members pursuant to Section 12(a)(2) of the Securities Act, as sellers of the Fund's shares.

## COUNT III

### VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST THE CONTROL GROUP DEFENDANTS ON BEHALF OF THE SECURITIES CLASS

113.    Lead Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 15, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 15 Defendants, other than strict liability or negligence.

114.    This Count is brought on behalf of the Securities Class against all Defendants pursuant to Section 15 of the 1933 Act, 15 U.S.C. § 77o.

115.    Each of these Defendants was a control person of the Fund or the Manager or Distributor by virtue of his or her position as a trustee and/or senior officer of the Fund or the Oppenheimer entities.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the Manager and Distributor and the Fund.

116.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12 of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the

- 30 -

process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

E.      Awarding rescissionary damages; and

F.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.


Dated:  October 13, 2009

**THE SHUMAN LAW FIRM**
s/ Kip B. Shuman
Kip B. Shuman
Rusty Glenn
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone:  (303) 861-3003
Facsimile:  (303) 484-4886
E-Mail:  kip@shumanlawfirm.com

*Liaison Counsel for the Class*

010109-11 331747 V1

**LABATON SUCHAROW LLP**
Christopher J. Keller
Mark S. Arisohn
Alan I. Ellman
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Errol Glynn O'Steen and Thomas*
*Goodman and Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
Sean R. Matt
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Additional Counsel for Plaintiffs*

010109-11 331747 V1