**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. **09-cv-00386-JLK-KMT** (consolidated with **09-cv-00525-JLK-KMT**)

In re Oppenheimer **Champion Fund** Securities Fraud Class Actions

*This document relates to BOTH actions.*

---

## OPPENHEIMER DEFENDANTS' MOTION TO DISMISS

---

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iv

TABLE OF EXHIBITS ............................................................................... xiii

TABLE OF APPENDICIES ......................................................................... xv

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 4

I.      OVERVIEW OF MUTUAL FUNDS ................................................. 4

II.     THE CHAMPION FUND .................................................................. 6

        A.      The Champion Fund's Objectives And Investments ............... 6

        B.      The Intended Investor In The Champion Fund ...................... 7

        C.      Limitations On The Manager's Discretion ............................ 8

III.    UNPRECEDENTED MARKET CONDITIONS CAUSED THE FUND'S
        LOSSES ........................................................................................... 10

        A.      The Panic of 2008 ............................................................... 10

        B.      The Unprecedented Panic Devastated The Fund ................. 12

IV.     PLAINTIFFS AND THEIR CLAIMS ............................................. 15

        A.      Overview Of Plaintiffs' Theory ........................................... 15

        B.      The Claims Plaintiffs Assert ............................................... 16

ARGUMENT ............................................................................................... 17

I.      THE FUND'S INVESTMENT OBJECTIVE WAS NOT MATERIALLY
        MISLEADING ................................................................................. 17

        A.      In Light Of The Fund's Comprehensive And Detailed Disclosures,
                No Investor Would Have Been Misled By The Investment Objective .... 19

        B.      The Fund's Risk Disclosures Did Not Contain Material
                Misstatements of Fact ........................................................ 22

                1.      The Fund Disclosed That It Was A Risky High-Yield Fund ....... 22

                2.      The Fund Made Extensive Disclosures Regarding Swaps .......... 23

                        a.      The Fund Explained The Swaps And That It Could
                                Invest In Them To Enhance Income ............................... 24

b. The Fund Disclosed The Risks Associated With Swaps . 26

c. The Fund Disclosed The Amount Of Its Investments In the Swaps .................................................................. 28

3. The Fund Made Extensive Disclosures Regarding Mortgage-Backed Securities ........................................................ 30

C. Plaintiffs Do Not Allege That The Manager Subjectively Believed That The Fund Had Taken On "Undue Risk." ......................... 33

D. Plaintiffs' Claims Allege Only Mismanagement At Best, Which Is Not Cognizable Under The Federal Securities Laws ............... 35

II. NONE OF THE OTHER DISCLOSURES IDENTIFIED IN THE COMPLAINT WAS MATERIALLY MISLEADING ................................................ 37

A. The Investment Objective's Reference To A "Diversified Portfolio" Was Not Materially Misleading ................................................ 38

B. The Statement That The Fund "May Be Appropriate As Part Of A Retirement Plan Portfolio" Was Not Materially Misleading .......... 39

C. Plaintiffs' Allegations That The Fund Violated Its Borrowing Policy Fail To State A Claim .................................................. 40

D. Plaintiffs' Allegations Regarding Illiquidity Do Not State A Claim ....... 41

E. Plaintiffs' Allegations About Inadequate Internal Controls Fail To State A Claim ................................................................ 43

1. The Fund Had No Duty To Disclose Alleged Mismanagement .. 43

2. Plaintiffs Plead No Facts Showing That The Fund Lacked Adequate Internal Controls ......................................... 44

3. Plaintiffs' Allegations Are As Consistent With Proper Valuation As With Improper Valuation ...................................... 46

III. PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLEGED MISREPRESENTATIONS DID NOT CAUSE PLAINTIFFS' LOSSES ................................................................ 47

IV. PLAINTIFF O'STEEN'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ......................................................................... 55

A. Claims Under The Securities Act Must Be Brought Within One Year After A Plaintiff Is On Notice Of Them ................................ 56

B.    O'Steen Was On Inquiry Notice Of His Claims More Than One Year
      Before The Earliest Complaint Was Filed ................................................ 58

    1.    Plaintiffs Admit That The Fund Disclosed Its Extensive
          Investments In Swaps More Than  One Year Before
          They Filed Suit........................................................................... 60

    2.    Plaintiffs Admit That The Fund Disclosed The Facts
          Underlying Their Leverage Claim More Than One
          Year Before They Filed Suit....................................................... 61

    3.    Plaintiffs Admit That The Fund Disclosed The Facts
          Underlying Their Illiquidity Claim More Than One
          Year Before They Filed Suit....................................................... 62

    4.    Plaintiffs Admit That The Fund Disclosed The Facts
          Underlying Their Internal Controls Claim More Than
          One Year Before They Filed Suit ................................................ 63

V.    PLAINTIFFS DO NOT ALLEGE THAT THE MANAGER OR ANY
      INDIVIDUAL DEFENDANT WAS A "SELLER" OF FUND SECURITIES .. 63

VI.   PLAINTIFFS' SECTION 15 CLAIM SHOULD BE DISMISSED .................... 64

CONCLUSION............................................................................................................. 64

# TABLE OF AUTHORITIES

**PAGE**

## CASES

In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................................................34

Akerman v. Oyrx Commc'ns, Inc.,
  609 F. Supp. 363 (S.D.N.Y. 1984), *aff'd,* 810 F.2d 336 (2d Cir. 1987) ...............51, 54, 55

Albert Fadem Trust v. Am. Elec. Power Co.,
  334 F. Supp. 2d 985 (S.D. Ohio 2004) ...........................................................................44

In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.,
  No. 95-0330, 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) ...........................................20

In re Am. Mut. Funds Fee Litig.,
  No. 04-5593, 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005) ..........................................51

Andropolis v. Red Robin Gourmet Burgers, Inc.,
  505 F. Supp. 2d 662 (D. Colo. 2007) ..................................................................35, 36, 44

Anixter v. Home-Stake Production Co.,
  977 F.2d 1549 (10th Cir. 1992) .......................................................................................57

Ashcroft v. Iqbal,
  129 S. Ct. 1937 (2009) ....................................................................................................46

Barnum v. Millbrook Care Ltd. P'ship,
  850 F. Supp. 1227 (S.D.N.Y. 1994) ............................................................................7, 22

Basic Inc. v. Levinson,
  485 U.S. 224 (1988) .........................................................................................................48

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) ..............................................................................................42-43, 46

Brumbaugh v. Princeton Partners,
  985 F.2d 157 (4th Cir. 1993) ...........................................................................................60

Burks v. Lasker,
441 U.S. 471 (1979)...............................................................................................4

In re Cable & Wireless, PLC Sec. Litig.,
321 F. Supp. 2d 749 (E.D. Va. 2004) ................................................................36

Castillo v. Dean Witter Discover & Co.,
No. 97-1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998) .........................51, 52

In re Charles Schwab Corp. Sec. Litig.,
257 F.R.D. 534 (N.D. Cal. 2009).......................................................................53

Ciresi v. Citigroup,
782 F. Supp. 819 (S.D.N.Y. 1991)......................................................................37

In re Citigroup, Inc. Sec. Litig.,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................37

In re Citigroup Inc. S'holder Derivative Litig.,
964 A.2d 106 (Del. Ch. 2009).......................................................................36, 37

DeBruyne v. Equitable Life Assurance Soc'y of the United States,
920 F.2d 457 (7th Cir. 1990) .........................................................................57, 60

DeBenedictis v. Merrill Lynch & Co.,
492 F.3d 209 (3d Cir. 2007).......................................................................... 57-58

Dodds v. Cigna Sec., Inc.,
12 F.3d 346 (2d Cir. 1993)..................................................................................60

In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig.,
7 F.3d 357 (3d Cir. 1993) ...................................................................................36

Donovan v. Am. Skandia Life Assurance Corp.,
96 Fed. Appx. 779 (2d Cir. 2004)......................................................................40

Dreiling v. Am. Exp. Co.,
458 F.3d 942 (9th Cir. 2006) ................................................................................6

Dura Pharm. v. Broudo
    544 U.S. 336 (2005)............................................................................................54

Eckstein v. Balcor Film Investors,
    8 F.3d 1121 (7th Cir. 1993) ..............................................................................57

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
    No. 01-3624, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008)..............................54

In re Exabyte Corp. Sec. Litig.,
    823 F. Supp. 866 (D. Colo. 1993)....................................................................17

In re FBR Inc. Sec. Litig.,
    544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) ................................................44

Flinn Found. v. Petro-Lewis Corp.,
    No. 84-2413, 1985 WL 358 (D. Colo. Nov. 8, 1985)........................................56

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)...............................................................46

Friedlob v. Trs. of the Alpine Mut. Fund Trust,
    905 F. Supp. 843 (D. Colo. 1995).....................................................................58

Gasner v. Bd. of Supervisors,
    103 F.3d 351 (4th Cir. 1996) ............................................................................19

Geisenberger v. John Hancock Distributors, Inc.,
    774 F. Supp. 1045 (S.D. Miss. 1991)...............................................................51

Great N. Ry. Co. v. Weeks,
    297 U.S. 135 (1936).........................................................................................11

Grossman v. Novell, Inc.,
    120 F.3d 1112 (10th Cir. 1997) ...............................................................19, 38

Grubka v. WebAccess Int'l, Inc.,
    445 F. Supp. 2d 1259 (D. Colo. 2006)........................................................57, 58

Hanley v. First Investors Corp.,
 793 F. Supp. 719 (E.D. Tex. 1992) ..................................................................... 51

In re Harmonic, Inc. Sec. Litig.,
 No. 00-2287, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ............................... 34

Herman &  MacLean v. Huddleston,
 459 U.S. 375 (1983) ............................................................................................ 55

Hunt v. Alliance N. Am. Gov't Income Trust,
 159 F.3d 723 (2d Cir. 1998) ................................................................................ 34

J & R Mktg., SEP v. Gen. Motors Corp.,
 549 F.3d 384 (6th Cir. 2008) ......................................................................... 19, 21

Joseph v. Wiles,
 223 F.3d 1155 (10th Cir. 2000) ........................................................................... 15

Kapps v. Torch Offshore, Inc.,
 379 F.3d 207 (5th Cir.  2004) .............................................................................. 19

Kimberlin v. DeLong,
 637 N.E.2d 121 (Ind. 1994) ................................................................................ 55

Kowal v. Hofher,
 436 A.2d 1 (Conn. 1980) ..................................................................................... 55

Landy v. Mitchell Petroleum Tech. Corp.,
 734 F. Supp. 608 (S.D.N.Y. 1990) ...................................................................... 60

Lapidus v. Hecht,
 No. 98-3130, 2002 WL 1034042 (N.D. Cal. May 17, 2002) ............................... 41

Manasfi v. Malone,
 No. 06-00280, 2007 WL 891871 (D. Colo. Mar. 22, 2007) ............................... 58

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ............................................................ 11, 47

Miller v. Lazard, Ltd.,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)...........................................................................7, 22

Minzer v. Keegan,
    218 F.3d 144 (2d Cir. 2000).........................................................................................35

In re Morgan Stanley Tech. Fund Sec. Litig.,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009)..........................................................................55

In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,
    No. 03-8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...........................................51

Naye v. Boyd,
    No. C83-771R, 1986 WL 198 (W.D. Wash. Oct. 20, 1986)............................................36

In re New York Cmty. Bancorp, Inc. Sec. Litig.,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ...........................................................................21

Noble Asset Mgmt. v. Allos Therapeutics, Inc.,
    No. 04-cv-1030, 2005 WL 4161977 (D. Colo. Oct. 20, 2005).........................................17

Nolte v. Capital One Fin. Corp.,
    390 F.3d 311 (4th Cir. 2004) ........................................................................................34

Olkey v. Hyperion 1999 Term Trust,
    98 F.3d 2 (2d Cir. 1996)................................................................................................19

Pine River Irrigation Dist. v. United States,
    No. 04-01463, 2009 WL 3011223 (D. Colo. Sept. 18, 2009)..........................................53

Pinter v. Dahl,
    486 U.S. 622 (1988).................................................................................................63, 64

Piper Acceptance Corp. v. Slaughter,
    600 F. Supp. 169 (D. Colo. 1985).................................................................................56

Procacci v. Drexel Burnham Lambert, Inc.,
    No. 89-0555, 1989 WL 121984 (E.D. Pa. Oct. 16, 1989) ................................................11

Rubke v. Capital Bancorp Ltd.,
  551 F.3d 1156 (9th Cir. 2009) ........................................................................34, 35, 42, 46

In re Salomon Analyst Level 3 Litig.,
  373 F. Supp. 2d 248 (S.D.N.Y. 2005)................................................................................46

In re Salomon Smith Barney Mut. Fund Fees Litig.,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006)......................................................................... 50-51

Sante Fe Indus. v. Green
  430 U.S. 462 (1977)............................................................................................................35

In re Semgroup Energy Partners, L.P., Sec. Litig.,
  No. 08-1989, 2009 WL 3713524 (N.D. Okla. Nov. 4, 2009) .............................................6

Sheppard v. TCW/DW Term Trust 2000,
  938 F. Supp. 171 (S.D.N.Y. 1996)............................................................................... 17-18

Shields v. Citytrust Bancorp, Inc.,
  25 F.3d 1124 (2d Cir. 1994)...............................................................................................34

Simmons v. Prudential Ins. Co. of Am.,
  641 F. Supp. 675 (D. Colo. 1986)......................................................................................53

Sterlin v. Biomune Sys.,
  154 F.3d 1191 (10th Cir. 1998) ..............................................................................56, 57, 59

Stumpf v. Garvey,
  No. 03-1352, 2005 WL 2127674 (D.N.H. Sept. 2, 2005)..................................................35

In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.,
  941 F. Supp. 326 (S.D.N.Y. 1996)......................................................................................20

Tabankin v. Kemper Short-Term Global Income Fund,
  No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) ...............................................20, 21

Tabankin v. Kemper Short-Term Global Income Fund,
  No. 93-5231, 1994 WL 319185 (N.D. Ill. June 23, 1994)..................................................21

Tafoya v. U.S. Dep't of Justice,
    748 F.2d 1389 (10th Cir. 1984) ........................................................................55

Tal v. Hogan,
    453 F.3d 1244 (10th Cir. 2006) ..........................................................................6

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)............................................................................................6

Third Nat'l Bank in Nashville v. Impac Ltd., Inc.,
    432 U.S. 312 (1977)..........................................................................................11

Virginia Bankshares, Inc. v. Sandberg,
    501 U.S. 1083 (1991)................................................................. 33-34, 42, 46

Versyss, Inc. v. Coopers & Lybrand,
    982 F.2d 653 (1st Cir. 1992)............................................................................55

In re Williams Sec. Litig. - WCG Subclass,
    558 F.3d 1130 (10th Cir. 2009) .......................................................................48

Young v. Gen. Motors Inv. Mgmt. Corp.,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008)..............................................................60

Young v. Nationwide Life Ins. Co.,
    183 F.R.D. 502 (S.D. Tex. 1998)......................................................................50

Zobrist v. Coal-X, Inc.,
    708 F.2d 1511 (10th Cir. 1983) .......................................................................58

**FEDERAL STATUTES AND REGULATIONS**

15 U.S.C. § 77................................................................5, 16, 17, 30, 47, 56

15 U.S.C. § 78................................................................................................54

15 U.S.C. § 80..............................................................5, 6, 9, 39, 45, 49

17 C.F.R. § 239.15A ......................................................................................5

17 C.F.R. § 230.495 ....................................................................................................5

17 C.F.R. § 270 ..................................................................................................45, 49

**MISCELLANEOUS**

Campbell R. McConnell & Stanley L. Brue, ECONOMICS:  PRINCIPLES, PROBLEMS, &
    POLICIES (13th ed. 1996)............................................................................48

Chairman Ben Bernanke, Four Questions about the Financial Crisis,
    http://www.federalreserve.gov/newsevents/speech/bernanke 20090414a.htm
    (Apr. 14, 2009)........................................................................................ 11-12

Chairman Ben Bernanke, Reflections on a Year of Crisis,
    http://www.federalreserve.gov/newsevents/speech/bernanke 20090821a.htm
    (Aug. 21. 2009)....................................................................................... 10-11

H.R. Rep. No. 73-85, 73rd Cong., 1st Sess. (May 4, 1933)..........................................52

Inv. Co. Act Rel. No. 5847, 35 Fed. Reg. 19989 (Oct. 21, 1969) .................................45

Inv. Co. Act Rel. No. 6295, 35 Fed. Reg. 19986 (Dec. 23, 1970).................................45

Improving Descriptions of Risk by Mutual Funds and Other Investment Companies,
    60 Fed. Reg. 17172 (Apr. 5, 1995) ....................................................................5

J. William Hicks, *International Dimensions of U.S. Securities Laws* § 5:50 .................39

Lingling Wei and Serena Ng, *Treasurys Gain and Bonds Feel Pain—Spreads Hit Record
    on Corporate Debt; CMBS Prices Dive*, Wall Street Journal (Nov. 21, 2008) .................14

Restatement (Second) of Torts § 435B ........................................................................55

S. Rep. No. 1775, 76th Cong., 3d Sess. (June 6, 1940) .................................................49

SEC Form N1-A ...........................................................................................................5

**TABLE OF AUTHORITIES**
(Continued)

**Page**

Schonfeld & Kerwin, <u>Organization of a Mutual Fund</u>, 49 Bus. Law. 107 (1993) .........................4

**TABLE OF EXHIBITS**

EXHIBIT

September 2006 Champion Fund Prospectus ..............................................................................A

September 2006 Champion Fund Statement of Additional Information ......................................B

September 2006 Champion Fund Annual Report .......................................................................C

December 2006 Champion Fund Form N-Q ..............................................................................D

January 2007 Champion Fund Prospectus..................................................................................E

January 2007 Champion Fund Statement of Additional Information.......................................... F

March 2007 Champion Fund Semiannual Report ......................................................................G

May 2007 Champion Fund Statement of Additional Information...............................................H

June 2007 Champion Fund Form N-Q........................................................................................ I

September 2007 Champion Fund Annual Report........................................................................J

December 2007 Champion Fund Form N-Q ..............................................................................K

January 2008 Champion Fund Prospectus...................................................................................L

January 2008 Champion Fund Statement of Additional Information..........................................M

March 2008 Semiannual Report ................................................................................................N

June 2008 Champion Fund Form N-Q........................................................................................O

September 2008 Champion Fund Annual Report........................................................................ P

December 2008 Champion Fund Form N-Q ..............................................................................Q

*Morningstar's Take* (Mar. 13, 2008) .......................................................................................R

*Morningstar's Take* (Aug. 14, 2008) ....................................................................................... S

Credit Default Swap Chart.........................................................................................................T

**TABLE OF EXHIBITS**
(Continued)

**EXHIBIT**

Total Return Swap Chart ............................................................................................................U

Net Notional Value Chart ...........................................................................................................V

## TABLE OF APPENDICIES

**APPENDIX**

Portions of Fund Disclosures that Relate to the General Risks of Investing In the Fund........... A-1

Portions of Fund Disclosures that Relate to the Fund Manager's Discretion............................. A-2

Portions of Fund Disclosures that Relate to Credit Default Swaps and Their Risks.................. A-3

Portions of Fund Disclosures that Relate to Total Return Swaps and Their Risks..................... A-4

Portions of Fund Disclosures that Relate to Swaps Generally and Their Risks ........................ A-5

Portions of Fund Disclosures that Relate to Derivatives Generally and Their Risks ................ A-6

Portions of Fund Disclosures that Relate to Mortgage-Backed Securities and Their Risks....... A-7

Portions of Fund Disclosures that Relate to Leverage............................................................... A-8

Portions of Fund Disclosures that Relate to Illiquidity............................................................. A-9

Defendants OppenheimerFunds, Inc. ("OFI" or the "Manager"), OppenheimerFunds Distributor, Inc. ("OFDI"), John V. Murphy, and Brian W. Wixted (collectively, the "Oppenheimer Defendants") respectfully move this Court for an Order dismissing with prejudice the Consolidated Class Action Complaint and Jury Demand ("Complaint" or "CCAC").

## INTRODUCTION

Oppenheimer Champion Income Fund (the "Champion Fund" or the "Fund") is a mutual fund that seeks high current income by investing mainly in high-yield, lower-rated fixed income securities. In both common parlance and in the language of its prospectus, the Fund is a "junk bond" fund that seeks to invest a minimum of 60% of its assets in junk bonds. The higher risk associated with the Fund often brought higher returns; the portfolio managers for the Fund were successful for many years in selecting high-yield securities, achieving a peak annual return that topped 25% in 2003.

The Fund was devastated by the enormous credit crisis that gripped the country and the world in the fall of 2008 – widely described as the largest financial disaster since the Great Depression. Investor panic led to an unprecedented "flight to quality" as investors all over the world moved their assets into U.S. Treasury securities in record numbers. As investors fled investments perceived to bear any risk associated with the financial markets or financial institutions, lower-grade securities suffered particularly dramatic price declines. Fears created by the sub-prime residential mortgage crisis spilled into the commercial mortgage market, devastating related investments. In this market, the value of the Fund's assets plummeted, and the Fund was forced to sell assets into an already depressed market, compounding its problems

and locking in large losses. When the dust settled, the Fund had lost approximately 80% of its peak asset value.

In hindsight, it is obvious that the unprecedented market conditions of late 2008 had an especially severe impact on the Fund and that the Fund's portfolio managers had not anticipated those conditions. Plaintiffs Thomas Goodman and Errol O'Steen ("Plaintiffs"), however, cast the blame on alleged misrepresentations in the Fund's registration statements, asserting claims under Sections 11 and 12(a)(2) of the Securities Act of 1933. The Fund's extensive disclosures of the material investment risks, and its detailed reports of its portfolio holdings, refute those charges and leave Plaintiffs with a claim that boils down to a failure to predict and disclose the extraordinary market conditions that devastated the worldwide economy. While Defendants may not have foreseen the global credit crisis, such a failure does not afford Plaintiffs a right to recover under the federal securities laws. Those laws instead require a misstatement of material fact, which Plaintiffs do not and cannot allege in light of the disclosures that the Fund indisputably made.

To begin with, the very facts that Plaintiffs recite as supporting their non-disclosure charges are taken directly from the Fund's disclosures. Plaintiffs assert that the Fund engaged in "risky" swap transactions and invested in mortgage-backed securities; that the Fund's portfolio was not, in their judgment, "diversified;" and that the Fund's holdings were subject to leverage and illiquidity risks. But they support these claims almost exclusively with facts taken directly from the Fund's disclosures, demonstrating that no investor could have been unaware of the Fund's investments. The Fund's swap transactions and mortgage-backed securities holdings in

particular were continuously disclosed, as were the risks they presented.  Plaintiffs do not – and cannot – allege otherwise.

Instead, Plaintiffs' claim is bottomed on the contention that the Fund took on "undue risk."  This theory, however, is predicated solely on their after-the-fact disagreement with the Manager's investment decisions.  Indeed, Plaintiffs do not and cannot allege that the Fund took on risks that were not disclosed or that violated any representation made by the Fund.  Plaintiffs' *post hoc* disagreement with the judgments of the portfolio managers over how much risk was "undue" would at most be pertinent to claims of mismanagement, not misrepresentation claims under the federal securities laws.

Plaintiffs seek to sidestep this fundamental defect in their claims by ignoring the vast majority of the Fund's disclosures and by repeatedly misstating others.  Plaintiffs posit representations that nowhere appear in the registration statements (*e.g.*, that the Fund was "conservative") and disregard context that defines the very words they assert are misleading (*e.g.*, omitting the language showing that the reference to "undue risk" related to the subjective belief of the investment manager that the Fund's investments did not involve "undue risk").

Even when read liberally, drawing all inferences in the Plaintiffs' favor, the deficiencies of the Complaint represent not mere pleading defects but an irreparable failure to state a claim.  The legal bankruptcy of the purported misrepresentation claims is compounded by the inescapable lack of loss causation.  Specifically, as a matter of law, Plaintiffs cannot recover under the 1933 Act, which limits investors to losses that "result from" misrepresentations, as opposed to losses that "result from" the operation of market forces.  And, as to Plaintiff O'Steen, the Complaint itself demonstrates that his claims are barred by the applicable statute of

limitations because this suit was not brought within one year after the Fund's disclosures put him on inquiry notice of his allegations.

For all of these reasons, as more fully set forth below, the Oppenheimer Defendants respectfully request that the Complaint be dismissed with prejudice.

## BACKGROUND

### I.      OVERVIEW OF MUTUAL FUNDS.

Open-end investment management companies, *i.e.*, mutual funds, allow retail investors to invest in pools of assets. Mutual funds allow investors to diversify their investments, obtain professional money management, and enjoy economies of scale on brokerage and other services. *See* Schonfeld & Kerwin, *Organization of a Mutual Fund*, 49 Bus. Law. 107 (1993).

Mutual funds are fundamentally different than traditional public companies in at least three important ways relevant to the issues here. First, mutual fund shares are not traded on an exchange; instead, fund shares are bought and sold from the fund directly or through broker-dealers, at a price that is set according to statute or regulation based upon the value of the fund's investments. Thus, unlike traditional operating companies, what funds say to investors cannot influence the price at which their shares are offered; rather, the value of mutual fund shares depends on the portfolio of assets held by the fund on a given day and the market conditions at that time.

Second, a mutual fund is essentially a "pool of assets." *Burks v. Lasker*, 441 U.S. 471, 480 (1979). These assets consist of securities that the Fund's managers buy and sell based on the same public information available to every other investor. Thus, a fund simply does not possess the type of secret, "inside" information that gives rise to the typical federal securities law claim.

Third, mutual funds are subject to the Securities Act of 1933, the Investment Company Act of 1940, and the SEC's implementing regulations. These provisions impose more tailored and detailed disclosure requirements than the laws that apply to most public corporations, and courts therefore have consistently looked to them to determine the scope of mutual fund disclosure obligations. *See* 15 U.S.C. §§ 77(f), 77(g), 77(j); 15 U.S.C. §§ 80a-24(a), 80a-29. A mutual fund's registration statement is filed annually on SEC Form N1-A, which, during the relevant period, was comprised of a prospectus and statement of additional information (the "SAI"). *See* 17 C.F.R. §§ 239.15A, 230.495(a).

The prospectus is intended to provide "essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares . . . ." Form N1-A, General Instructions, Section C(2)(a). The SAI is incorporated into the prospectus. It provides "additional information about [a fund] that the Commission has concluded is not necessary or appropriate in the public interest for the protections of investors to be in the prospectus, but that some investors may find useful." *Id.* § C(2)(b).[1]

In addition to filing registration statements, funds file with the SEC (and provide to investors) Annual and Semiannual Reports. 15 U.S.C. § 80a-29(e). These reports provide investors with a host of information, including information about the fund's performance and about the fund's investment portfolio (hereafter, the "Statement of Investments"). Among other

---

[1] Notably, however, neither the Investment Company Act nor SEC regulations require a mutual fund to quantify the amount of risk in its portfolio. Indeed, in 1995 the SEC requested public comment on whether it should require mutual funds to include quantitative risk measures in their disclosures. *See Improving Descriptions of Risk by Mutual Funds and Other Investment Companies*, 60 Fed. Reg. 17172 (Apr. 5, 1995). After numerous commentators explained that no single measure could accurately characterize the riskiness of a fund, the SEC abandoned the effort.

things, the Statement of Investments discloses every investment in the fund's portfolio and its

individual value. *See id.* § 80a-29(e)(2). Funds also file Statements of Investments with the SEC

for the two quarters not covered by their Annual and Semiannual Reports. These reports are

readily accessible on the SEC's website.

## II.    THE CHAMPION FUND.

### A.    The Champion Fund's Objectives And Investments.

The Champion Fund invests in a variety of high-yield, fixed-income securities and

related instruments. *See, e.g.*, January 2007 Prospectus at 3.[2] The Champion Fund's primary

investment objective is to "seek a high level of current income by investing mainly in a

diversified portfolio of high-yield lower grade fixed income securities that the Fund's investment

---

[2]    All of the Fund's prospectuses, SAIs, Annual and Semi-Annual Reports, and Form N-Qs
for the period August 2006 – December 2008 are attached to this motion as Exhibits A –
Q. Plaintiffs allege that, among others, the prospectus and SAI dated August 7, 2006 was
materially misleading. *See* CCAC ¶¶ 36-37. Although these documents were filed with
the SEC, they were never distributed to shareholders, so no formatted versions of these
documents exist. But, the Fund did format and distribute a prospectus and SAI dated
September 1, 2006, and these documents are the same in all relevant respects to the
prospectus and SAI dated August 7, 2006. Therefore, copies of the September 1, 2006
prospectus and SAI are attached. The August 7, 2006 prospectus and SAI are available
on the SEC's website at
http://www.sec.gov/Archives/edgar/data/820120/000072888906000719/0000728889-06-
000719.txt

This Court may, of course, take judicial notice of the contents of these documents
because they were referred to in the complaint or filed with the SEC. *See Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Tal v. Hogan*, 453 F.3d 1244,
1265 n.24 (10th Cir. 2006); *In re Semgroup Energy Partners, L.P., Sec. Litig.*, No. 08-
1989, 2009 WL 3713524, at *1-2 (N.D. Okla. Nov. 4, 2009); *see also Dreiling v. Am.
Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (explaining that courts "may consider
documents referred to in the complaint or any matter subject to judicial notice, such as
SEC filings"); *see, e.g.*, CCAC ¶¶ 36-38 (identifying the Fund's registration statements
and SEC-filed prospectus materials).

manager, OppenheimerFunds, Inc. (the "Manager") believes does not involve undue risk." (the "Investment Objective"). *Id.* The Fund's "secondary objective" is to seek "capital growth when consistent with its primary objective." *Id.*

Consistent with these objectives, the Fund disclosed that, under normal circumstances, it would invest "at least 60% of its total assets in high-yield, lower-grade, fixed income securities, commonly called 'junk' bonds." *Id.* There was no maximum limit on the percentage of Fund assets that could be invested in junk bonds. The Fund also disclosed that it invested in "mortgage related securities" and "swaps, including single name and index-linked credit default swaps." *Id.* The Fund's portfolio holdings were "made publicly available no later than 60 days after the close of each of the Fund's fiscal quarters." *Id.* at 16.

**B.      The Intended Investor In The Champion Fund.**

One linchpin of Plaintiffs' claims is that the Fund represented itself as a "conservative high income fund." CCAC ¶¶ 2, 45. This charge is false.[3] The Fund told investors that it was an especially risky fund designed for investors willing to assume "greater risks" and that it was not designed for those who need "an assured level of current income":

> **WHO IS THE FUND DESIGNED FOR?**  The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income securities.  Those ***investors should be willing to assume the greater risks*** of short-term share price fluctuations and the special credit risks that are typical for a fund that invests mainly in lower-grade domestic and foreign fixed-income securities.  Since the Fund's income level will fluctuate, ***it is not designed for***

---

[3]      It is well-settled that on a motion to dismiss this Court may ignore any allegations that contradict the very disclosure documents upon which Plaintiffs base their claims. *See, e.g.*, *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007); *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994).

> ***investors needing an assured level of current income.***  The Fund
> is intended to be a long-term investment and may be appropriate as
> a part of a retirement plan portfolio.  The Fund is not a complete
> investment program.

January 2007 Prospectus at 4 (emphases added); *see also* Appendix A-1 (collecting portions of

Fund disclosures that relate to the general risks of investing in the Fund).[4]  The Fund also

disclosed that "[i]n the OppenheimerFunds spectrum, the Fund is likely to be more volatile and

has more risks than funds that focus on investing in U.S. government securities and investment-

grade bonds."  January 2007 Prospectus at 6.

### C.    Limitations On The Manager's Discretion.

Within certain disclosed constraints, the Manager had wide discretion to select

investments for the Fund.  Those constraints – not any after-the-fact assessment that certain

investments were too "risky" – set the limit on the types and amounts of securities that the Fund

could hold.

As the Fund's prospectus stated:  "The allocation of the Fund's portfolio among different

types of investments will vary over time based upon the Manager's evaluation of economic and

market trends."  January 2007 Prospectus at 10; *see also* Appendix A-2 (collecting portions of

Fund disclosures that relate to the Manager's discretion).[5]  The Fund's prospectus and SAI

---

[4]     As Plaintiffs acknowledge, the Fund repeated the relevant risk disclosures throughout the class period.  *See* CCAC ¶ 41.  The body of this brief provides one citation for each quote.  Portions of the Fund's extensive disclosures are collected in Appendices A-1 to A-9, which are organized by topic and disclosure document.

[5]     The prospectus states that the Manager will use a "bottom up" approach to selecting individual securities, "focusing on the performance of individual securities before considering industry trends."  January 2007 Prospectus at 3.  The prospectus also explained that this approach included evaluating a wide range of financial and economic factors that may change over time.  *Id.* at 3-4.

identified a number of investing strategies and techniques available to the Manager to try to achieve the Fund's objectives, including investments in junk bonds, mortgage-backed securities, and derivatives. January 2007 Prospectus at 10-14; May 2007 SAI at 2-31. However, the Fund was "not required to use all of the investment techniques and strategies . . . at all times in seeking its goals. It may use some of the investment techniques and strategies at some times or not at all." May 2007 SAI at 2.

These and other similar disclosures made clear to investors that the success of the Fund, and the investment risks presented by the portfolio of Fund assets, would be primarily dependent upon the exercise of professional investment judgment by the portfolio managers. *See, e.g.,* January 2007 Prospectus at 4 (explaining that investors faced the risk that "poor security selection by the Manager will cause the Fund to underperform other funds having similar objectives"). Investors were also informed of a number of specific restrictions on that discretion that also served to define risk boundaries for the Fund. These restrictions included:

- The Fund was to be "diversified" within the meaning of the federal securities laws. That meant the Fund could not buy securities issued or guaranteed by any one issuer if more than 5% of its total assets would be invested in securities of that issuer or if it would own more than 10% of that issuer's voting securities. This restriction applied to 75% of the Fund's total assets. *See* May 2007 SAI at 32; 15 U.S.C. § 80a-5(b).

- The Fund could not invest 25% or more of its total assets in any one "industry," as defined by the Fund. *See* May 2007 SAI at 32.

- The Fund could not borrow money from a bank in excess of 33 1/3% of its total assets. *Id.*

- The Fund could not invest more than 10% of its net assets in illiquid or restricted securities. January 2007 Prospectus at 15.

Plaintiffs nowhere allege facts showing that these representations about how the Fund would be managed, and how risk would be built into the portfolio, were inaccurate. Nor do they allege a violation of the legal limits on the Manager's discretion. The Complaint therefore rests almost entirely on the untenable proposition that the Fund violated the securities laws by taking on "undue risk" through "too many" swaps and mortgage-backed securities. Those allegations do not state a claim.

## III.    UNPRECEDENTED MARKET CONDITIONS CAUSED THE FUND'S LOSSES.

The Champion Fund's aggressive strategy produced generally positive – and highly volatile – returns for many years prior to the subprime mortgage crisis that began to unfold in 2007. Specifically, the Fund produced returns of 25.92% in 2003, 9.21% in 2004, 2.66% in 2005, 9.19% in 2006, and -.10% in 2007.

In the fall of 2008, however, the worldwide economy experienced an unprecedented downturn and the markets experienced gyrations outside of any historical pattern. Investors became unwilling to invest in anything other than the safest of investments, liquidity dried up, and panic ruled the day. As a result of these unexpected market events, the Fund's disclosed portfolio holdings did not perform as expected and the Fund was unable to sell its investments except at depressed prices. Plaintiffs allege that the Champion Fund sustained over an 80% loss. *See* CCAC ¶ 80.

### A.    The Panic of 2008.

In the fall of 2008, the "world [went] through the most severe financial crisis since the Great Depression." Chairman Ben S. Bernanke, Reflections on a Year of Crisis, August 21,

2009, Federal Reserve Bank of Kansas City Annual Economic Symposium.[6]  This market-wide

collapse was as unexpected as it was severe.  As Chairman of the Federal Reserve, Ben

Bernanke, explained:

> **What we could not fully appreciate [in August of 2008]** was that
> the economic and policy environment was about to become vastly
> more difficult.  In the weeks that followed, several systematically
> critical financial institutions would either fail or come close to
> failure, activity in some key financial markets would virtually
> cease, and the global economy would enter a deep recession.

*Id*.  "[T]here was little to suggest that market participants saw the financial situation as about to

take a sharp turn for the worse."  *Id*.[7]

As Chairman Bernanke explained, the unexpected downturn in October of 2008 was the

result of market-wide "panic":  "Overall, the role played by panic helps to explain the

remarkably sharp and sudden intensification of the financial crisis last fall, its rapid global

spread, and the fact that ***abrupt deterioration in financial conditions was largely unforecasted

by standard market indicators***."  *Id*. (emphasis added).  Among other things, "[i]nvestors,

stunned by losses on assets they had believed to be safe, began to pull back from a wide range of

credit markets, and financial institutions – reeling from severe losses on mortgages and other

---

[6]     The Court may take judicial notice of the economic crisis of 2008.  *See, e.g.*, *Great N. Ry. Co. v. Weeks*, 297 U.S. 135, 149 (1936) (taking notice "that late in 1929 there occurred a great collapse of values of all classes of property"); *Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 317 (1977) (noticing that "1873 was the year of a financial panic"); *Procacci v. Drexel Burnham Lambert, Inc.*, No. 89-0555, 1989 WL 121984, at *2 n.3 (E.D. Pa. Oct. 16, 1989) (noticing the "general decline of the market" associated with the "October 19, 1987 crash"); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (noticing the "internet bubble and its subsequent crash").

[7]     A transcript of Chairman Bernanke's August 21, 2009 speech is available at http://www.federalreserve.gov/newsevents/speech/bernanke20090821a.htm.

loans – cut back their lending."  Chairman Ben S. Bernanke, Four Questions about the Financial

Crisis, April 14, 2009, Morehouse College, Atlanta, Georgia.  Ultimately, "the failure or near

failure of several major financial institutions caused many financial and credit markets to freeze

up."  *Id.*[8]

**B.      The Unprecedented Panic Devastated The Fund.**

Like nearly everyone else, the Fund's investment managers did not foresee the financial

meltdown that crippled the Fund in October 2008.  Nevertheless, as early as 2007, the Fund's

portfolio managers explained to investors that they were "transition[ing] the Fund to favor

higher, rather than lower, credit quality, when possible."  March 2007 Semiannual Report at 8;

*see also* September 2007 Annual Report at 8.  Consistent with this disclosure, the average credit

rating of the Fund's investments increased throughout 2007 and 2008.  *Compare* March 2007

Semiannual Report at 11 *with* September 2008 Annual Report at 9.

Similarly, the portfolio managers' strategy of continued investments in mortgage-backed

securities and swap transactions was completely transparent to investors.  In the March 31, 2008

Semiannual Report (sent to shareholders in May 2008)**,** the Fund's managers explained that

> With certain yield spreads at levels that we deem to be too wide,
> we strongly believe that some areas of the non-Treasury markets
> hold viable and potentially lucrative opportunities . . . . ***Despite***
> ***what we believe to be short-term struggles for both commercial***
> ***and residential mortgage-backed securities, we are convinced***
> ***that the fundamentals underlying these two sectors remain solid,***
> ***and their attractive yields relative to like-duration Treasuries***
> ***offer ample compensation for their risks.***

---

[8]      A transcript of Chairman Bernanke's April 14, 2009 speech is available at
http://www.federalreserve.gov/newsevents/speech/bernanke20090414a.htm.

Management Commentaries and 2008 Semiannual Report at 7-8 (emphasis added).  Moreover, they told investors:

> Within the high-yield arena, we remain convinced that longer-term, higher-quality *financial* bonds offer attractive risk/return characteristics in light of their actual fundamentals.  ***We believe that relative to industrial bonds, for example, these types of financial bonds currently hold meaningfully less default risk, even though yield spreads do not currently reflect this disparity.***

*Id.* at 8 (emphases added).

The Statement of Investments in this Semiannual Report showed all investors that the Fund was making the exact investments that the managers' statements suggested and about which Plaintiffs now complain.  For example, as of March 31, 2008, 6.4% of the Fund's net assets were invested in mortgage-backed obligations and the Fund had entered into 29 total return swaps based on a commercial mortgage-backed securities index.  *Id.* at 14, 37-41.  Likewise, the Statement of Investments disclosed that the Fund had invested 11.6% of its net assets in financial sector bonds and, through credit default swaps, had sold credit protection on financial sector bonds, including bonds issued by Citigroup, Ford Motor Credit, GMAC, Countrywide, Lehman Brothers, Washington Mutual, and Merrill Lynch.  *Id.* at 20, 28-36.

Needless to say, the markets did not perform as the Fund's managers predicted.  During the panic of October 2008, many investors unexpectedly became unwilling to invest in securities other than U.S. Treasuries, regardless of credit rating.  As a result, the higher credit quality of the Fund's investments did not insulate it from the market panic, and the value of its assets plunged.  As the Fund's 2008 Annual Report explained:

> [A]s data continued to indicate that conditions in the housing and labor markets were worsening, investors shunned virtually all perceived risk and flocked to Treasuries.  This drove the prices on

> virtually all non-Treasury, or "spread" securities lower, do to the
> sharp reduction in demand.

Management Commentaries and 2008 Annual Report at 6; *accord, e.g.*, Lingling Wei and Serena

Ng, *Treasurys Gain, and Bonds Feel Pain --- Spreads Hit Record On Corporate Debt; CMBS*

*Prices Dive*, Wall Street Journal, Nov. 21, 2008, at C1 ("Credit markets were at crisis levels, as

investors flocked to U.S. Treasurys while prices of commercial real-estate bonds and corporate

debt tumbled to lows.").

These market forces had a dramatic effect on credit spreads, *i.e.*, the difference between

the yields on Treasury securities and other, riskier securities. As the Fund explained, "bond

prices generally move in the opposite direction of their yields." Management Commentaries and

2008 Annual Report at 6. Thus, increased investor demand for Treasury securities drove their

prices up and pushed down their yields. Conversely, the dramatic decline in demand for non-

Treasury securities drove their prices down and pushed up their yields, creating a dramatic and

unanticipated increase (or "widening") of credit spreads. Unfortunately, the Fund had significant

holdings of investments whose performance depended upon an anticipated decrease (or

"narrowing") of credit spreads – including the Fund's total return swap investments. The value

of these investments plummeted. *Id*. at 8 ("the unprecedented and unanticipated widening of

credit spreads during portions of the period after September 30th had a negative impact on the

Fund's positions in total return swaps while at the same time the Fund's bond portfolio was also

declining in value.") (November 25, 2008 Update).

In short, the Fund was not immune to the same unexpected market panic that brought

down some of the nation's leading financial institutions and forced others to the brink. The Fund

suffered the same consequences as every other investor holding the same classes of widely-held

securities. To be sure, it suffered more than other funds, but only because of its larger holdings in those asset classes – all of which were continuously and accurately disclosed to investors.[9]

## IV. PLAINTIFFS AND THEIR CLAIMS.

### A. Overview Of Plaintiffs' Theory.

Plaintiffs' allegations are materially different than those advanced in most securities actions. Unlike the typical case, Plaintiffs do not allege that material information was withheld during the putative class period and only revealed through some purported "corrective disclosure." *See, e.g.*, *Joseph v. Wiles*, 223 F.3d 1155, 1157 (10th Cir. 2000). Indeed, Plaintiffs do not allege that *any* material facts were misrepresented. They do not complain that the Fund failed to disclose the fact of its swap transactions or its mortgage-backed securities investments; do not complain that the Fund misrepresented the actual amount of those investments; and do not even allege that the Fund misrepresented the principal risks of swaps or mortgage-backed

---

[9]    Plaintiffs devote a large portion of their Complaint to *Morningstar*'s after-the-fact coverage of the Fund's decline. *See* CCAC ¶¶ 84-87. But, they conceal the fact that *before* the market panic *Morningstar endorsed* the Fund's investment strategy. In March 2008, *Morningstar* noted that the Fund had been increasing its exposure to commercial mortgage-backed securities and said this strategy "reflects a smart focus on fundamental value." Andrew Gunter, *Morningstar's Take* (Mar. 13, 2008), attached as Exhibit R. Similarly, in August 2008, *Morningstar* noted that the Fund had suffered from its investments in "high-quality issues," such as "investment-grade financial corporate debt and nonagency mortgage bonds," but told investors that "these calls may yet pay off." Miriam Sjoblom, *Morningstar's Take* (Aug. 14, 2008), attached as Exhibit S. *Morningstar*'s opinions of the Fund, good or bad, are just that and add nothing to the legal analysis or viability of Plaintiffs' allegations. Moreover, *Morningstar* had access to the same Statements of Investments that were available to investors, so it could have determined precisely what the Fund's investments were at the time. No doubt *Morningstar* is embarrassed by the failures of a strategy it had embraced before the credit crisis; but its hindsight attack on the Fund is little more than an effort to point fingers at others who also failed to predict the credit crisis.

securities.  This is remarkable because the Securities Act prohibits only misrepresentations of "material *fact*."  15 U.S.C. §§ 77k(a), 77*l*(a)(2) (emphasis added).

Plaintiffs instead allege that the Fund's Investment Objective was misleading. Curiously, though, Plaintiffs' purported evidence of this is information that the Fund itself disclosed.  Specifically, Plaintiffs claim that the Fund violated its Investment Objective, not by engaging in swap transactions and investing in mortgage-backed securities (since there were detailed disclosures notifying them that the Fund intended to and did make such investments), but rather by investing in too many of them – taking what Plaintiffs now say was "undue risk." Thus, stripped of Plaintiffs' attempt at artful pleading, Plaintiffs do not really complain about the Fund's disclosures; they just disagree with the Manager's decisions in implementing the very methods identified by the Fund as the means for achieving the Investment Objective.  As discussed below, Plaintiffs' allegations do not state a claim under the federal securities laws.

**B.      The Claims Plaintiffs Assert.**

Plaintiffs purport to bring this case on behalf of "all persons or entities who acquired shares of the Fund traceable to a false and misleading Registration Statement and Prospectus for the Fund and who were damaged thereby."  CCAC ¶ 89.  The putative class period is January 1, 2006 to December 31, 2008.  *Id*.  Plaintiffs name as defendants:  (1) the Manager; (2) OFDI, a subsidiary of the Manager and the distributor for the Fund; (3) John V. Murphy, President and Principal Executive Officer of the Fund and a Fund Trustee; (4) Brian W. Wixted, Treasurer and Principal Financial and Accounting Officer of the Fund; and (5) all of the remaining Fund Trustees.  CCAC ¶¶ 16-28.  This brief refers to Murphy, Wixted, and the Fund Trustees as the "Individual Defendants."

Plaintiffs allege that the Fund's registration statements were materially false and misleading in five respects: (1) the Fund misrepresented its Investment Objective by investing in too many swaps and mortgage-backed securities; (2) the Fund misrepresented that it may be appropriate as a part of a retirement plan portfolio; (3) the Fund misrepresented that it would not invest more than 10% of its assets in illiquid assets; (4) the Fund misrepresented that it would not borrow money in excess of 33 1/3% of its total assets; and (5) the Fund failed to disclose that it had inadequate internal controls. Plaintiffs assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act. As discussed below, none of Plaintiffs' allegations states a claim.

## ARGUMENT

### I. THE FUND'S INVESTMENT OBJECTIVE WAS NOT MATERIALLY MISLEADING.

By their own terms, Sections 11 and 12 are violated only where the defendants have misstated a "material *fact*." 15 U.S.C. §§ 77k(a), 77*l*(a)(2) (emphasis added). Thus, these Sections do not impose on Funds (or other issuers) the duty to predict future market events or to assess the likelihood of future recessions. *See, e.g.*, *In re Exabyte Corp. Sec. Litig*., 823 F. Supp. 866, 871-72 (D. Colo. 1993) (Kane, J.) (rejecting plaintiffs' assertion that defendants had a duty to disclose the effect of "general economic conditions" and dismissing Section 10(b) claim). To the contrary, issuers are obligated only to make accurate factual representations about their own operations. *Id.* Accordingly, when "a plaintiff complains that a defendant failed to disclose a material fact necessary to make its statement not misleading, the concealed information must be information known to the defendants that is *not otherwise available to the investing public*." *Noble Asset Mgmt. v. Allos Therapeutics, Inc*., No. 04-cv-1030, 2005 WL 4161977, at *7 (D. Colo. Oct. 20, 2005) (Matsch, J.) (emphasis added); *see also Sheppard v. TCW/DW Term Trust*

*2000*, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) ("Failure to predict a rise in interest rates . . . cannot be the basis for alleging misrepresentations or omissions of material facts.").  Here, Plaintiffs do not identify a single misstatement of *fact*, material or otherwise, in any of the Fund's disclosures.  Rather, they misrepresent and mischaracterize the Fund's goals, and then contend it failed to live up to that description.

Nearly all of Plaintiffs' claims rest on the theory that the Fund's Investment Objective was misleading.  In full, the Fund's primary Investment Objective is

> to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes does not involve undue risk.

*See, e.g.*, January 2007 Prospectus at 3.

While, in hindsight, Plaintiffs may believe that the Manager made poor investment decisions, they have failed to state a *disclosure* claim because the Fund's investment strategy, its portfolio holdings and the risks associated with those holdings were fully and prominently disclosed to investors in the Fund's prospectuses, SAIs and other filings and shareholder communications.  Specifically, the Fund disclosed:

- That it could invest in swaps and mortgage-backed securities, *i.e.*, the very investments Plaintiffs now claim, in hindsight, were inappropriate;

- The risks of swaps and mortgage-backed securities; and

- Detailed financial information about each individual swap and mortgage-backed security in its portfolio.

In light of these disclosures, Plaintiffs' nondisclosure claims fail as a matter of law.

**A.  In Light Of The Fund's Comprehensive And Detailed Disclosures, No Investor Would Have Been Misled By The Investment Objective.**

Plaintiffs' case hinges on the theory that the general phrases of the Investment Objective, standing alone, were materially misleading.  *See* CCAC ¶¶ 46, 48, 53, 57, 68, 75.  This claim violates a basic principle of the securities laws:  Rather than being read in isolation, a disclosure must be read *in context* to determine whether it was misleading in light of the "total mix" of information available to investors.  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120-21 (10th Cir. 1997); *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996) (dismissing a claim that relied on a "few isolated passages in the lengthy Offering Statement" because it "disregarded the 'total mix' of available information").  The relevant context in this case is the Fund's entire registration statement and the Statements of Investments, not the cherry-picked clauses on which Plaintiffs rely.  *See, e.g.*, *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 395 (6th Cir. 2008) ("Materiality is determined by analyzing the statement at issue in the context of the entire document."); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 211 (5th Cir. 2004) (finding a statement not misleading when "read in the context of the prospectus as a whole"); *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996) ("[T]he prospectuses must be read as a whole.").

This rule is particularly important here, because Plaintiffs hang their hat on the general language of the Investment Objective.  The Investment Objective was just that, an objective or goal of the Fund.  And, the Fund warned investors that there was "no assurance the Fund will achieve its objectives."  January 2007 Prospectus at 6.  In particular, the Fund told investors that they faced "the risk that poor security selection by the Manager will cause the Fund to underperform other funds having similar objectives."  *Id.* at 4.

Other courts have rejected identical attempts to ground a disclosure claim on a broadly worded investment objective wrenched out of context. For example, the *In re Alliance North American Government Income Trust, Inc. Securities Litigation* court rejected a securities claim based on an investment objective that contained the phrase "prudent investment risk," because that phrase simply announced the fund's goal and was not specific enough to be materially misleading:

> The investment objective announces the goal of the Fund, rather than a promise to investors. The investment objective is not the type of statement that a reasonable investor would consider important in deciding whether or not to invest. Such general, forward looking statements, which make no promise to investors, are not actionable under the securities laws.

No. 95-0330, 1996 WL 551732, at *4 (S.D.N.Y. Sept. 27, 1996) (citation omitted); *see also In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338-39 (S.D.N.Y. 1996) (holding that the fund's objective of "earn[ing] a high level of current income while maintaining relatively low volatility of principal" was "general and indefinite," and thus "simply not the kind of statement which a reasonable investor would consider important in deciding whether or not to invest").

The phrase "undue risk" is no more definite than the phrase "prudent investment risk." Thus, rather than isolate the words "undue risk," the correct approach is to analyze that statement in the context of the entire prospectus and SAI. For example, in *Tabankin v. Kemper Short-Term Global Income Fund*, the fund's investment objective was "to provide as high a level of current income as is consistent with prudent investment management." No. 93-5231, 1994 WL 30541, at *1 (N.D. Ill. Feb. 1, 1994). The court concluded that this general statement was not misleading because "other statements in the Prospectus give meaning" to the objective. *Id.* at *4.

"It is not tenable," the court explained, "to base a securities fraud claim on a general statement of the Fund's objective when the Prospectus clearly states that there is no assurance that the objective will be achieved, goes on to list specific risks associated with the particular Fund, and the plaintiffs' loss results from those very risks." *Id*. at *5; *see also Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 319185, at *2 (N.D. Ill. June 23, 1994) (explaining that because "the investors had the prospectuses which contained explicit risk disclosures . . . they cannot seek to impose liability for the general statements that the investments were 'conservative' and 'prudently managed'"); *J & R Mktg.*, 549 F.3d at 395-96 (holding that the phrase "significant progress" was "too vague and immeasurable" to be material in light of other risk disclosures); *In re New York Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006) (statement that a bank was "risk-averse" was not materially misleading because of the "numerous disclosures" the bank made "regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments").

Plaintiffs' claim is even more attenuated than the claim that failed in *Tabankin*. Just like the plaintiff in *Tabankin*, Plaintiffs here are relying on "a general statement of the Fund's objective." And just as in *Tabankin*, the Fund warned investors that "[t]here is no assurance that the Fund will achieve its objectives." *E.g.*, 2007 Prospectus at 6. Here, the Fund also went on to tell investors that it would invest in the very types of securities that Plaintiffs now claim are "inconsistent" with the Investment Objective. No disclosure claim can exist under these circumstances.

**B.    The Fund's Risk Disclosures Did Not Contain Material
Misstatements of Fact.**

1.    <u>The Fund Disclosed That It Was A Risky High-Yield Fund</u>.

Without citation to any disclosure document, Plaintiffs allege that the Fund portrayed

itself as a "conservative" fund "that was not dramatically riskier than its high

income/intermediate fund peer group."  CCAC ¶ 2.  This allegation simply is not true and should

be ignored in light of the plain text of the Fund's disclosures.  *See Miller v. Lazard, Ltd.*, 473 F.

Supp. 2d 571, 579 (S.D.N.Y. 2007); *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227,

1232-33 (S.D.N.Y. 1994).

To begin with, the Fund never described itself as "conservative."  To the contrary, the

Fund told investors that they "can lose money by investing in the Fund" and that "poor security

selection by the Manager will cause the Fund to underperform other funds having similar

objectives."  *See* January 2007 Prospectus at 4.  The Fund also informed the public that it was a

junk-bond fund that took on additional risks in the pursuit of higher returns.  *E.g.*, January 2007

Prospectus at 3; *see also* Appendix A-1.  In particular, the Fund stated that it could invest

"without limit" in junk bonds and that its risks were greater than funds that invested only in

investment-grade securities:

> **Special Risks of Lower-Grade Securities.**  Because the Fund can
> invest ***without limit*** in securities below investment grade, ***the
> Fund's credit risks are greater*** than those of funds that buy only
> investment-grade securities.  Lower-grade debt securities may be
> subject to ***greater price fluctuations and risks of loss of income
> and principal*** than investment-grade debt securities.  Securities
> that are (or that have fallen) below investment grade are ***exposed to
> a greater risk that the issuers might not meet their debt
> obligations***.  The market for lower-grade securities may be ***less
> liquid***, especially during times of general economic distress, and
> therefore they may be ***harder to value and to sell at an acceptable***

> *price.  These risks can reduce the Fund's share prices and the income it earns.*

*Id.* at 4 (emphases added).  The Fund also noted that it could "invest in securities rated as low as 'C' or 'D' or which may be in default at the time the Fund buys them."  *Id*. at 10.

As noted above, the prospectus also contained a prominent section entitled "**WHO IS THE FUND DESIGNED FOR?**"  This disclosure made clear that the Fund was not intended for investors who seek a "conservative" investment.  *See, e.g.*, *id*. at 4 (Fund investors "should be willing to assume the greater risks" associated with junk bonds).[10]  In light of these disclosures, no investor could have believed that the Fund was "conservative."

### 2.    The Fund Made Extensive Disclosures Regarding Swaps.

Plaintiffs allege that the "magnitude" of the Fund's investments in swaps was "inconsistent" with the Investment Objective.  CCAC ¶¶ 48, 53, 57.  Such a judgment, however, is not a fact and cannot trigger liability under the Securities Act.  Nor, in any event, is the claim consistent with the Fund's actual disclosures.  The Fund:  (1) explained swaps to investors; (2) told investors that swaps would be one of the main building blocks of its portfolio; (3) explained the risks of swaps, including their leveraging effects; and (4) disclosed its actual investments in swaps on a quarterly basis.  In light of these disclosures, an investor simply cannot complain that he was misled by the Investment Objective.

---

[10]    Contrary to Plaintiffs' unsupported allegation, the Fund never compared its risks to the risks of high-yield funds managed by other investment managers.  The only statement about relative risk the Fund made was to explain that, "In the OppenheimerFunds spectrum, the Fund is likely to be ***more volatile*** and has ***more risks*** than funds that focus on investing in U.S. government securities and investment-grade bonds."  *Id*. at 6 (emphases added).

a. The Fund Explained The Swaps And That It Could Invest In Them To Enhance Income.

*First*, the Fund defined both credit default and total return swaps.  The Fund explained that credit default swaps are, as Plaintiffs allege, "essentially insurance contracts that ensure against the default on debt securities such as corporate bonds."  CCAC ¶ 49.  Specifically, the Fund disclosed that a credit default swap "enables an investor to buy or sell protection against a credit event, such as an issuer's failure to make timely payments of interest or principal, bankruptcy or restructuring."  January 2007 Prospectus at 11; *see also* Appendix A-3 (collecting portions of Fund disclosures that relate to credit default swaps and their risks).  The Fund then explained the difference between buying and selling credit protection via a credit default swap, making clear that sellers of credit protection can be liable for paying the par amount of the defaulted bonds:

> If the Fund buys credit protection using a credit default swap, the Fund will make fixed payments to the counterparty.  If a credit event occurs, the Fund will deliver the defaulted bonds underlying the swap and the swap counterparty will pay the par amount of the bonds.  If the Fund sells credit protection using a credit default swap, the Fund will receive fixed payments from the counterparty. If a credit event occurs, the Fund will pay the par amount of the defaulted bonds underlying the swap and the swap counterparty will deliver the bonds.

*Id.*

The Fund also explained that total return swaps are simply an arrangement whereby two parties exchange the returns on two different sets of assets (or indices), and that the returns may be based upon hypothetical, *i.e.*, "notional," investments in the underlying assets or indices:

> A total return swap is an agreement under which a set of future cash flows is exchanged between two counterparties.  One cash flow stream will typically be based on a reference interest rate or

> index and the other on the total return of a reference asset such as a
> security, a basket of securities, or an index. . . . Payments under the
> swap are based on an agreed upon principal amount but since this
> principal amount is not exchanged, it represents neither an asset
> nor a liability to either counterparty, and is referred to as notional.

May 2007 SAI at 139; *see also* Appendix A-4 (collecting portions of Fund disclosures that relate

to total return swaps and their risks).

The Fund's prospectus made clear that swaps would be a major building block of the

Fund's portfolio.  As early as January 2007, swaps were specifically identified as one of three

primary types of fixed-income securities in which the Fund would invest.  *See* January 2007

Prospectus at 3 (disclosing that the Fund's investments "primarily include . . . Swaps, including

single name and index-linked credit default swaps").  Likewise, the section of the Fund's

prospectus entitled "About the Fund's Investments" always identified swaps as one type of Fund

investment. *See, e.g.*, *id.* at 11.

The Fund prominently explained to investors that swaps would be used to enhance

income.  Although Plaintiffs highlight one phrase where the Fund explained that it may use

swaps to hedge risks, they ignore the other half of that very sentence, which also disclosed:  "The

Fund also uses certain derivative investments ***to try to enhance income*** or to try to manage

investment risks."  CCAC ¶¶ 4, 41(a), 41(b) (quoting August 7, 2006 Prospectus; January 26,

2007 Prospectus; and January 28, 2008 Prospectus) (emphasis added).  Numerous other

disclosures made the same point.  *See* Appendix A-5 (collecting portions of Fund disclosures that

relate to swaps generally and their risks); Appendix A-6 (collecting portions of Fund disclosures

that relate to derivatives generally and their risks).  As a result, any investor knew or would have

known that the Manager had discretion to use swap transactions in an effort to enhance the

Fund's returns.

### b. The Fund Disclosed The Risks Associated With Swaps.

*Second*, the Fund disclosed the principal risks of swaps at great length:  (1) it disclosed

the risks of derivatives generally; (2) it disclosed the risks of swaps generally; and (3) it

disclosed the risks of total return swaps and credit default swaps in particular.

To begin with, the Fund repeatedly explained that swaps were a form of derivative

investment on which the "Fund can lose money" and which present many of the same risks as all

other derivatives:

> If the issuer of the derivative does not pay the amount due, ***the Fund can lose money in the investment***.  Also, the ***underlying investment*** on which the derivative is based, and the derivative itself, ***might not perform the way the Manager expected it to perform***.  If that happens, ***the Fund's share prices could decline*** and the Fund could receive less income than expected.  Some derivatives may be ***illiquid***, making it difficult to value them, or sell them at an acceptable price.  Using derivatives can ***increase the volatility of the Fund's share prices***.

2007 Prospectus at 5 (emphases added).

With regard to swaps, the Fund disclosed the precise risks about which Plaintiffs

complain.  The Complaint focuses on three risks inherent in swaps:  (1) swaps can be "illiquid"

(CCAC ¶ 46); (2) swaps can add "leverage" to the Fund's portfolio (*Id.* ¶¶ 46, 50, 54-57); and (3)

the Fund's managers could be wrong about how the assets underlying the swaps will perform.

(*Id.* ¶¶ 46, 49).  The Fund's SAIs concisely captured all three of these risks (among others) in the

following disclosure:

> The use of swap agreements by the Fund entails certain risks.  The swaps market is generally unregulated.  There is no central

> exchange or market for swap transactions and therefore they are
> ***less liquid*** investments than exchange-traded instruments and may
> be considered illiquid by the Fund.  Swap agreements entail credit
> risk arising from the possibility that the counterparty will default. .
> . . The Fund's ***successful use of swap agreements is dependent
> upon the Manager's ability to predict correctly whether certain
> types of investments are likely to produce greater returns than
> other investments***.  ***Swap agreements may effectively add
> leverage to the Fund's portfolio because the Fund would be
> subject to investment exposure on the notional amount of the
> swap***.

May 2007 SAI at 19 (emphases added).

The Fund's specific disclosures about credit default swaps and total return swaps reiterated that these particular forms of swaps posed substantial risks.  For example, the Fund's prospectus stated that:

> Credit default swaps are subject to counterparty credit risk (if the
> counterparty fails to meet its obligations).  They are subject to the
> risk that the Fund will not properly assess the cost of the
> instrument.  If the Fund is selling credit protection, there is a risk
> that a credit event will occur and that the Fund will have to pay par
> value on defaulted bonds.

*E.g.*, January 2007 Prospectus at 11.  Similarly, the Fund's SAI explained that "[t]otal return swaps could result in losses if the underlying asset or reference does not perform as anticipated by the Manager."  May 2007 SAI at 19.  With regard to illiquidity, the Fund stated that "market risk" is one of the "primary risks" of total return swaps.  The Fund defined market risk as the risk that "there is no liquid market for the agreement or unfavorable changes occur in the reference asset."  *Id.* at 139.

Finally, the Fund clearly disclosed that swaps may increase the Fund's leverage.  The Fund told investors:  "Swap agreements may effectively add leverage to the Fund's portfolio because the Fund would be subject to investment exposure on the notional amount of the swap."

*Id.* at 19.  The Notes to the Fund's financial statements also explained, under the heading

"Investments with Off-Balance Sheet Risk," that "The Fund enters into financial instrument

transactions that may have off-balance sheet market risk.  Off-balance sheet market risk exists

when the maximum potential loss on a particular financial instrument is greater than the value of

such financial instrument, as reflected in the Fund's Statement of Assets and Liabilities."  *Id*. at

131.

In short, the Fund disclosed the precise risks that Plaintiffs claim materialized and caused

the Fund to suffer losses.  *See* CCAC ¶¶ 46 (commercial mortgage-backed securities failed to

perform as OFI expected, causing losses on total return swaps), 51 (corporate debt failed to

perform as expected, causing losses on credit default swaps).  That is all that is required under

the Securities Act and SEC disclosure requirements governing mutual funds, neither of which

require funds to prognosticate about whether market forces will cause the risks to materialize.

c.     The Fund Disclosed The Amount Of Its Investments<br>In the Swaps.

*Third*, and significantly, the Fund disclosed its *actual transactions* in swaps on a

quarterly basis in its Statements of Investments.[11]  The Statements of Investments disclosed

detailed information about every swap in the Fund's portfolio, including the Fund's position in

---

[11]    *See* (1) Sept. 30, 2006 Annual Report, filed Nov. 28, 2006, at 20-65 (Exhibit C); (2) Dec. 31, 2006 Form N-Q, filed Feb. 28, 2007 (Exhibit D); (3) March 31, 2007 Semiannual Report, filed May 30, 2007, at 15-62 (Exhibit G); (4) June 30, 2007 Form N-Q, filed Aug. 28, 2007 (Exhibit I); (5) Sept. 30, 2007 Annual Report, filed Nov. 26, 2007, at 21-70 (Exhibit J); (6) Dec. 31, 2007 Form N-Q, filed Feb. 27, 2008 (Exhibit K); (7) March 31, 2008 Semiannual Report, filed May 23, 2008, at 14-41 (Exhibit N); (8) June 30, 2008 Form N-Q-Amended, filed Aug. 28, 2008 (Exhibit O); (9) Sept. 30, 2008 Annual Report, filed Dec. 2, 2008, at F1-F50 (Exhibit P); and (10) Dec. 31, 2008 Form N-Q, filed Feb. 26, 2009 (Exhibit Q).

the swap, *e.g*., buyer or seller of credit protection for credit default swaps; the notional amount of the swap; and the current value of the swap transaction.

The Statements of Investments made clear that the Fund's transactions in swaps had increased over time. For example, the Statements of Investments showed that the number of credit default swaps entered into by the Fund rose from zero as of September 30, 2006 to over 135 on June 30, 2007:

| Period ending date | September 30, 2006 | March 31, 2007 | June 30, 2007 |
|---|---|---|---|
| # of swaps listed | 0 | 90+ | 135+ |

Similarly, the Statements of Investments demonstrated that the number of total return swaps entered into by the Fund increased from two on September 30, 2007 to 29 by March 31, 2008.

| Period ending date | September 30, 2007 | December 31, 2007 | March 31, 2008 |
|---|---|---|---|
| # of swaps listed | 2 | 12 | 29 |

Although Plaintiffs complain about the growth in the Fund's swap transactions, the evidence they cite to make this point is taken entirely from the Fund's own disclosures. Specifically, in Paragraph 52 of the Complaint, Plaintiffs offer the following chart to document the growth in the notional value of the Fund's credit default swaps:

| 12/31/06 | 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
|---|---|---|---|---|
| $123,645,000 | $556,032,000 | $741,362,000 | $1,304,318,000 | $1,437,957,000 |

| 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 |
|---|---|---|---|
| $1,574,826,000 | $1,516,194,000 | $1,076,690,000 | $619,445,000 |

This chart, however, is compiled through simple addition of disclosed numbers. Any investor could calculate the total amount for which the Fund could be liable in connection with its credit default swaps simply by adding the notional value of sell-side swaps. *See, e.g.*, Credit Default Swap Chart, attached as Exhibit T.

Similarly, in Paragraph 47, Plaintiffs once again provide a chart drawn from the Fund disclosures to document the growth in the Fund's total return swap transactions. And once again, any investor could obtain these figures simply by looking at the Statements of Investments and adding the notional value of each total return swap. *See, e.g.*, Total Return Swap Chart, attached as Exhibit U.[12]

3. The Fund Made Extensive Disclosures Regarding Mortgage-Backed Securities.

Much like its disclosures about swaps, the Fund's disclosures about mortgage-backed securities included (1) a concise description of those securities and clear statements that the Fund

---

[12] These charts make clear that the Fund did not increase its credit default swap transactions until early 2007. Section 11, however, provides that disclosures in a registration statement can be actionable only if they were misleading when the registration statement "became effective." 15 U.S.C. § 77k. Thus, nothing the Fund said about credit default swaps in its *2006* registration statement could have been misleading when that document "became effective," and any credit-default-swap claim based on that document should be dismissed. Similarly, these charts show that the Fund did not increase its total return swap transactions until late 2007. The Fund's 2007 registration statement, however, "became effective" in *January* 2007. Thus, any total-return-swap claim under Section 11 based on the Fund's 2006 or 2007 registration statements should be dismissed.

could invest in them; (2) a detailed discussion of the risks inherent in mortgage-backed

securities; and (3) a complete list of the mortgage-backed securities held by the Fund.

*First*, the Fund explained mortgage-backed securities to investors. For example, the May

2007 SAI explains:

> Mortgage-related securities are collateralized by pools of
> commercial or residential mortgages. Pools of mortgage loans are
> assembled as securities for sale to investors by government
> agencies or entities or by private issuers.

May 2007 SAI at 8; *see also* Appendix A-7 (collecting portions of Fund disclosures that relate to

mortgage-backed securities and their risks). The SAI goes on to explain collateralized mortgage

obligations ("CMOs") in more detail, explaining that CMOs are multi-class bonds that are

collateralized either by mortgages or by other securities that are backed by mortgages (known as

"pass-through certificates"). *Id*. at 9-10.

The Fund consistently explained that it could invest in mortgage-backed securities. For

example, the January 2007 Prospectus stated that "[t]he Fund can buy interests in pools of

residential or commercial mortgages, in the form of collateralized mortgage obligations

("CMOs") and other 'pass-through' mortgage securities." January 2007 Prospectus at 13.

*Second*, the Fund's disclosures repeatedly conveyed that mortgage-backed securities

could entail significant risks. For example, the Fund explained in detail the interest rate

volatility associated with CMOs. *See, e.g.*, January 2007 Prospectus at 13 (explaining the effect

of interest rate changes on the prepayment of the underlying mortgages and the effect of

prepayments on the value of the CMO). The Fund also disclosed that "the values of mortgage-

related securities may be affected by changes in the market's perception of the creditworthiness

of the entity issuing the securities or guaranteeing them. Their values may also be affected by changes in government regulations and tax policies." May 2007 SAI at 9.

*Third*, the Fund disclosed its actual investments in mortgage-backed securities.[13] In its Statements of Investments, the Fund provided detailed information about every mortgage-backed security in its portfolio, including the amount of the Fund's initial investment and the security's current value. For example, the following chart illustrates how the Statement of Investments disclosed that the Fund had purchased a commercial mortgage-backed security for $3.49 million:

| MORTGAGE-BACKED OBLIGATIONS | PRINCIPAL AMOUNT | VALUE |
|---|---|---|
| Citigroup/Deutsche Bank 2007-CD4 Commercial Mortgage Trust, Commercial Mtg. Pass-Through Certificates, Series 2007-CD4, Cl. A4, 5.322%, 12/1/49 | 3,490,000 | 3,486,300 |

As with the swaps, the Fund's Statements of Investments disclosed the increase in the Fund's mortgage-backed securities investments. The Statements of Investments clearly stated the percentage of the Fund's total assets invested in mortgage-backed securities. For example, the Statement of Investments as of March 31, 2008 contains a bold-faced entry stating "**Mortgage-Backed Obligations – 6.4%**." March 2008 Semiannual Report at 14. Comparing this simple-to-understand disclosure over time demonstrates that the Fund's investments in mortgage-backed securities increased during the putative class period:[14]

---

[13]     *See* the Statements of Investments cited in note 11, *supra*.

[14]     These disclosures also make clear that the Fund did not increase its investments in mortgage-backed securities until mid-2007. *See also* CCAC ¶ 65 (alleging that "[t]hroughout . . . the first half of 2007, the Fund had few if any positions in mortgage-backed securities). Thus, when they "became effective," the Fund's 2006 and 2007 registration statements cannot have contained materially misleading disclosures about

| Period ending | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 |
|---|---|---|---|---|---|---|
| % of total assets | 0% | 8.0% | 9.2% | 6.4% | 13.4% | 16.1% |

*     *     *

Investors were told that the Fund could invest in swaps and mortgage-backed securities, that it had increasingly done so, what specific investments were made, and what the risks of those investments were. Plaintiffs have not identified a single undisclosed risk relating to these investments. And while they did suffer losses in the Fund, those losses were caused by the actions of the market – not because of any alleged misstatement of material fact.

### C. Plaintiffs Do Not Allege That The Manager Subjectively Believed That The Fund Had Taken On "Undue Risk."

The Fund's Investment Objective was not materially misleading for an additional, independent reason: The Objective is defined by the Manager's subjective belief, but the Complaint does not and cannot allege that the Manager subjectively believed that the Fund's portfolio involved "undue risk." As discussed above, the Investment Objective provides that the Fund would invest "mainly" in a "diversified portfolio of high-yield, lower-grade fixed-income securities" that the Manager "***believes*** does not involve undue risk." Thus, the Investment Objective plainly required the Manager to make a subjective determination about the risks associated with the Fund's portfolio.

As the Supreme Court explained in *Virginia Bankshares, Inc. v. Sandberg*, a representation about what a defendant "believes" is actionable *only* if it is objectively false *and*

---

mortgage-backed securities. Accordingly, any mortgage-backed-securities claim based on those documents must be dismissed. *See* note 12, *supra*.

the defendant did not subjectively believe what he said at the time he made the statement. 501

U.S. 1083, 1093-98 (1991); *see, e.g.*, *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th

Cir. 2009); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004); *Shields v.

Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994). Thus, Plaintiffs must allege that the

Fund's portfolio objectively involved "undue risk" *and* that the Manager subjectively believed

that the Fund's portfolio involved "undue risk."

Plaintiffs *have not even attempted* to allege any facts that show the Manager subjectively

believed that the Fund's portfolio involved "undue risk." That glaring omission is fatal to their

claims. For example, in *Hunt v. Alliance North American Government Income Trust*, the fund's

objective was "to seek the highest level of current income, consistent with what the Fund's

Advisor considers to be prudent investment risk . . . ." 159 F.3d 723, 731 (2d Cir. 1998). In

light of this "subjective" language, the Second Circuit rejected the argument that the phrase

"prudent investment" "must be objectively determined." *Id.* at 732. Instead, the court dismissed

the claim because plaintiffs had "allege[d] no facts that would support a claim that the Fund

Advisor invested in any instrument he considered an imprudent risk." *Id.* at 731; *accord, e.g., In

re Harmonic, Inc. Sec. Litig.*, No. 00-2287, 2006 WL 3591148, at *16 (N.D. Cal. Dec. 11, 2006)

(dismissing Section 11 and 12 claims because the complaint "alleges no facts showing that the

[defendants] did not sincerely believe" the opinion alleged to be misleading); *In re AOL Time

Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 243 (S.D.N.Y. 2004) (similar).

Plaintiffs here are attempting the same sleight-of-hand that failed in *Hunt*. Rather than

grapple with the plainly subjective term "believes," they ask this Court to read the Investment

Objective as creating an objective test for "undue risk." Because Plaintiffs misread the

34

Investment Objective and allege no facts regarding the Manager's subjective beliefs, their claims should be dismissed.[15]

### D. Plaintiffs' Claims Allege Only Mismanagement At Best, Which Is Not Cognizable Under The Federal Securities Laws.

When reduced to their essence, Plaintiffs' allegations – asserted with the benefit of hindsight – are that the Manager made investment decisions that left the Fund highly vulnerable to the market collapse of 2008. Leaving aside the obvious fact that most of the world failed to predict those events, Plaintiffs' allegations do not state a disclosure claim. At best, they assert mismanagement, which is not a claim that is cognizable under Sections 11 or 12 of the Securities Act.

As the Supreme Court explained in *Santa Fe Industries v. Green*, mismanagement claims are "traditionally relegated to state law." 430 U.S. 462, 478-79 (1977). Indeed, Sections 11 and 12(a)(2) are concerned only with whether adequate disclosures have been made; they do "not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Id.* at 479 (quotation marks omitted); *see Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007) ("the Supreme Court held that the federal securities laws were

---

[15] Any allegation that, contrary to the Fund's disclosures, the Manager in fact believed that the Fund's portfolio involved "undue risk" would subject the Complaint to the heightened pleading requirements of Rule 9(b), because a claim that the Fund told investors it would do one thing while it was intending to do something else – such as investing in a portfolio it believed involved undue risk – is a textbook allegation of fraud. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009); *Minzer v. Keegan*, 218 F.3d 144, 151 (2d Cir. 2000); *Stumpf v. Garvey*, No. 03-1352, 2005 WL 2127674, at *17 (D.N.H. Sept. 2, 2005). Although there is no possible basis for such allegations here, were Plaintiffs' allegations to be so interpreted, their Complaint would be subject to dismissal for the further failure to allege such fraud with the specificity required by Rule 9(b).

not intended to create a federal remedy for corporate misconduct traditionally left to state regulation").

Thus, it is settled that "the securities laws do not create liability for breaches of fiduciary duty or mismanagement." *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 376 (3d Cir. 1993); *see, e.g.*, *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004) ("Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives."). As this Court explained in *Andropolis*, it is "now [a] clearly established rule that a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." 505 F. Supp. 2d at 683; *accord, e.g.*, *Naye v. Boyd*, No. C83-771R, 1986 WL 198, at *4 (W.D. Wash. Oct. 20, 1986) (allegations that defendant failed to disclose and "take into account factors which, properly considered, would have led to . . . a higher loan loss reserve" did not state a securities laws violation).

Allegations that the "magnitude" of the Fund's investments in swaps and mortgage-backed securities caused the Fund to take on "undue risk" do nothing more than challenge the Manager's business decisions. As the Investment Objective makes clear, it was the Manager that had the responsibility for determining whether the expected return on the Fund's investments was adequate in light of their risks. *See, e.g.*, *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return."). If investors disagreed with the Manager's investment decisions – which were regularly disclosed – they had

the ability to redeem their shares at any time.  But to now allow investors to state a claim because, in hindsight, they believe the Manager made poor decisions would invite the exact sort of second-guessing and "review of management practices" that the "securities laws were not designed to provide."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); *see also In re Citigroup*, 964 A.2d at 126 ("It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decisions.").

Put another way, Plaintiffs' theory requires this Court to determine exactly how many swaps or mortgage-backed securities were "too many" for the Fund.  Zero obviously cannot be the answer, because the Fund always said it could invest in these securities.  Is it ten fewer credit default swaps?  Twenty?  And which ones were riskiest?  There obviously are no clear answers because the questions require a determination of what is "undue" versus "due" risk in the context of a junk bond fund and in light of the Manager's expectations regarding future returns.  The Fund and its disclosures to investors clearly left such judgments to the Fund's managers; whether they properly exercised such discretion is precisely the sort of determination that is "the hallmark of state fiduciary duty law" and is therefore "not actionable" under the federal securities laws. *Ciresi v. Citigroup*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991).

## II.    NONE OF THE OTHER DISCLOSURES IDENTIFIED IN THE COMPLAINT WAS MATERIALLY MISLEADING.

Once the Plaintiffs' allegations about the Investment Objective are put aside, all that remains is a grab-bag of conclusory allegations about various disclosures in the Fund's prospectuses and SAIs.  None of these claims can be squared with the actual disclosures or the applicable law.

**A.** **The Investment Objective's Reference To A "Diversified Portfolio" Was Not Materially Misleading.**

Throughout the Complaint, Plaintiffs underline the phrase "diversified portfolio" in the Investment Objective, thereby implying that this language is somehow materially misleading. *See, e.g.*, CCAC ¶¶ 4, 41(a). But, the Complaint makes no attempt to explain *why* this phrase is materially misleading, or how the Fund's actual investments departed from Plaintiffs' unstated test for what constitutes a "diversified" portfolio. For those reasons alone, any claim based on the phrase "diversified portfolio" should be dismissed. *See Grossman*, 120 F.3d at 1124 (dismissing a securities claim because "nowhere in the complaint are facts alleged showing that anything about these statements is false").

In any event, Plaintiffs' after-the-fact views of diversification are irrelevant. The Fund was required to – and did – comply with the Investment Company Act's definition of "diversified." Under the ICA definition, which was incorporated into the Fund's prospectus, a fund is "diversified" if

> it meets each of the following conditions with respect to 75% of the value of the fund's total assets:
>
> (1) of the securities so included, the fund may not have more than 10% of the outstanding voting securities of any one company; and
>
> (2) not more than 5% of the fund's assets may be in the securities of any one company.

J. William Hicks, *International Dimensions of U.S. Securities Laws* § 5:50; 15 U.S.C. § 80a-5(b)(1).[16] Plaintiffs do not – indeed, they cannot – allege that the Fund violated either of these conditions.

Lastly, as discussed above, the Fund regularly disclosed the actual contents of its entire investment portfolio. Those disclosures clarified precisely what the Fund meant by a "diversified portfolio" for any investor who was concerned about how the Manager was exercising its discretion in building that portfolio. For all of these reasons, any claim based on the "diversified portfolio" language in the Fund's Investment Objective should be dismissed.

**B.**     **The Statement That The Fund "May Be Appropriate As Part Of A Retirement Plan Portfolio" Was Not Materially Misleading.**

Among the statements that Plaintiffs claim were materially misleading is the statement that the Fund is "intended as a long-term investment *and may be appropriate as part of a retirement plan portfolio*." *See* CCAC ¶¶ 4, 41 (emphasis in Complaint but not in the original disclosures). Plaintiffs again offer no reason why this statement was false or misleading. To the extent Plaintiffs are suggesting that the Fund was representing that it would be appropriate for *current retirees,* their theory represents a profound misreading of the Fund's disclosure.

The sentence Plaintiffs highlight provides that, because the Fund has a long time horizon, it might be appropriate for "retirement plans." Retirement plans are typically set up years, often decades, before retirement. Moreover, the very same paragraph containing this statement makes it crystal clear that the Fund entails significant risks and is not designed for investors who, like most current retirees, need "an assured level of current income":

---

[16]     The Fund incorporated this definition into a "fundamental policy." *See, e.g.*, May 2007 SAI at 31.

> **WHO IS THE FUND DESIGNED FOR?**  The Fund is designed
> primarily for investors seeking high current income from a fund
> that invests mainly in lower-grade domestic and foreign fixed-
> income securities.  Those ***investors should be willing to assume
> the greater risks*** of short-term share price fluctuations and the
> special credit risks that are typical for a fund that invests mainly in
> lower-grade domestic and foreign fixed-income securities.  Since
> the Fund's income level will fluctuate, ***it is not designed for
> investors needing an assured level of current income***.  The Fund
> is intended to be a long-term investment and may be appropriate as
> a part of a retirement plan portfolio.  The Fund is not a complete
> investment program.

January 2007 Prospectus at 4 (emphases added).  Given the Fund's actual disclosures, any claim

based upon the Fund's reference to a "retirement plan" fails.[17]

**C.**     **Plaintiffs' Allegations That The Fund Violated Its Borrowing Policy Fail To
State A Claim.**

In Paragraph 58 of the Complaint, Plaintiffs allege that the "magnitude of leverage"

created by the Fund's swap investments violated "promises that the Fund would not borrow

money in excess of 33 1/3% of the value of its total assets."  CCAC ¶ 58.  This claim fails for

two independent reasons.

First, the limitation on which Plaintiffs rely deals only with *bank borrowing*, not

"leverage."  It provides in pertinent part:

> The Fund cannot ***borrow money*** in excess of 33 1/3% of the value
> of its total assets.  The Fund ***may borrow only from banks and/or
> affiliated investment companies and only as a temporary measure
> for extraordinary or emergency purposes.***

---

[17]     In addition, the phrase highlighted by Plaintiffs says the Fund "*may* be appropriate as part
of a retirement plan portfolio."  No investor would read such conditional language as a
recommendation that the Fund would be appropriate for every retirement plan portfolio.
*See, e.g.*, *Donovan v. Am. Skandia Life Assurance Corp.*, 96 Fed. Appx. 779, 781 (2d Cir.
2004).

May 2007 SAI at 32 (emphases added). Under its plain terms, this limitation deals only with bank borrowing; nothing suggests that it applies to any economic leveraging effect that might be associated with the Fund's investments in swaps. *See Lapidus v. Hecht*, No. 98-3130, 2002 WL 1034042, at *6 (N.D. Cal. May 17, 2002) (rejecting the argument that a limit on "borrowing money" in a Fund's SAI applied to something other than bank borrowing). For this reason alone, Plaintiffs' leverage claim fails.

Second, the Fund disclosed that its investments in swaps had a leveraging effect and could create off-balance sheet risk. *See* May 2007 SAI at 19, 131; *see also* Appendix A-8 (collecting portions of Fund disclosures that relate to leverage). The Fund also disclosed the notional amounts of the swaps – the very information the Plaintiffs point to and aggregate as evidence of the Fund's leverage. *See* CCAC ¶ 55.[18] In light of these disclosures, no investor could have been misled by the Fund's limitation on bank borrowing.

### D. Plaintiffs' Allegations Regarding Illiquidity Do Not State A Claim.

Plaintiffs next allege that the Fund "violated its promise that no more than 10% of its net assets would be invested in illiquid securities." CCAC, pg. 18, heading 2. Plaintiffs base this allegation on their unnamed expert's conclusion that unnamed illiquid securities had an aggregate value greater than 10% of the Fund's total net assets during every quarter of the class period. *See id.* ¶ 63. An unidentified expert's after-the-fact opinion about the liquidity of unspecified assets does not, however, turn the Fund's contemporaneous judgments about liquidity into false statements of fact.

---

[18] Plaintiffs have created a chart reflecting the Fund's purported leverage position. As with their other charts, this chart can be replicated through simple mathematics. *See* Net Notional Value Chart, attached as Exhibit V.

The liquidity of a security is frequently not a cut-and-dried question, particularly with respect to the sort of complex assets in which the Champion Fund invested. The very fact that Plaintiffs had to retain an expert to address the issue demonstrates that it involves a judgment call. Plaintiffs explicitly acknowledge this, noting that the illiquidity test utilized by the Fund required the Manager to make numerous complicated and subjective judgment calls. *See* CCAC ¶ 61 ("Certain 'investments **may be** illiquid because they do not have an active trading market, making it difficult to value them or dispose of them promptly at an acceptable price . . . . [A] security **can be** illiquid 'if its valuation has not changed for a **certain period of time**.'") (emphases added); *see also* Appendix A-9 (collecting portions of Fund disclosures that relate to liquidity).

Under these standards, the Manager was required to determine, among other things, whether particular securities that do not have an active trading market were, in fact, illiquid. It also had to determine whether a security was truly illiquid merely because its valuation had not changed over a period of time. These may be difficult and complicated assessments. Plaintiffs cannot attack them facially as statements of fact but must allege "with particularity that the statements were both objectively and subjectively false or misleading." *Rubke*, 551 F.3d at 1162 (citing *Va. Bankshares, Inc.*, 501 U.S. at 1095-96). In *Rubke*, for instance, the Ninth Circuit held that the defendants' statement that a transaction was "financially fair" constituted an opinion, such that plaintiffs were required to allege that defendants "believed the deal . . . was unfair." *Id.* Because plaintiffs failed to allege facts showing that the defendants did not believe their own statement when made, the court dismissed the Section 11 claim. *Id.*; *see also Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 557 (2007) (holding that "conclusory" allegations are insufficient to state a claim).

Similarly, Plaintiffs here can state a claim only if they allege particularized facts sufficient under Rule 9(b) showing that the Fund did not actually believe its own liquidity determinations when made. *See* note 15, *supra*. Because Plaintiffs make no such factual allegations, and merely offer a different opinion of a purported expert reached with the benefit of hindsight, they fail to state a claim.[19]

### E. Plaintiffs' Allegations About Inadequate Internal Controls Fail To State A Claim.

Plaintiffs allege that the Fund had inadequate internal controls and that the lack of such controls was "inconsistent with representations that the Fund did not take any undue risk." CCAC ¶ 75. This claim fails for three reasons:

#### 1. The Fund Had No Duty To Disclose Alleged Mismanagement.

*First*, the Fund had no duty to disclose any allegedly inadequate internal controls. To begin with, an allegation that a Fund has inadequate internal controls does not state a claim under

---

[19]     Plaintiffs' reliance on an unidentified expert's unexplained opinion is particularly inadequate because the expert's stated methodology appears to be flatly inconsistent with the Fund's disclosures and Plaintiffs' own allegations. In Paragraph 61 of the Complaint, Plaintiffs allege that a security may be illiquid if it does not have an active trading market or its valuation has not changed for a certain period of time. Purportedly "[a]pplying these tests," Plaintiffs' "expert" opines that, for example, as of March 31, 2007, 25.96% of the Fund's net assets were invested in illiquid securities. CCAC ¶¶ 62-63. But, the Fund's Statement of Investments for March 31, 2007 already stated that 47 securities comprising 4.24% of the Fund's net assets were illiquid as of that date. Comparing that Statement of Investments with the Fund's December 31, 2006 Statement of Investments reveals that only an additional 19 securities had prices that were the same on the two dates. Even if these 19 securities are added to the 47 listed by the Fund, the total would yield 66 securities comprising only 7.35% of the Fund's net assets, far below the 25.96% allegedly calculated by Plaintiffs' "expert."

the securities laws. *See, e.g.*, *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008). Moreover, there is no general duty to disclose mismanagement. *See Andropolis*, 505 F. Supp. 2d at 683-84. While a statement that is made can be rendered misleading by omission, the only statement Plaintiffs suggest was rendered materially misleading by the alleged nondisclosure of its purportedly faulty internal controls is the Fund's Investment Objective. *See* CCAC ¶ 75. But, the Investment Objective says nothing at all about internal controls, nor even touches on any subject relevant to internal controls. Accordingly, the Fund's stated Investment Objective cannot create a duty to disclose that the Fund purportedly had inadequate controls. *See, e.g.*, *Albert Fadem Trust v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1018-20 (S.D. Ohio 2004) (dismissing claim regarding alleged failure to disclose the "lack of internal controls" because none of the alleged misstatements discussed internal controls).

      2.      <u>Plaintiffs Plead No Facts Showing That The Fund Lacked Adequate Internal Controls.</u>

Plaintiffs' charge that the Fund lacked adequate internal controls also fails because it is bereft of any facts. *See* CCAC ¶¶ 71-75. First, Plaintiffs do not identify any representation about internal controls, let alone a misleading one. Nor do Plaintiffs allege that any internal control claimed to be present was not adhered to in a way that increased portfolio risk. Plaintiffs also do not identify a specific internal control that could have mitigated relevant portfolio risks, let alone that its absence was something that should have been disclosed.

Second, the only example of management errors that Plaintiffs do allege – which involves the pricing of Fund assets – was never alleged to be a function of any internal control; nor do Plaintiffs allege that any particular internal control was not followed with respect to pricing. The Fund made detailed disclosures regarding its valuation procedures for securities for which

market prices are not readily available.  *See, e.g.*, January 2007 Prospectus at 21; May 2007 SAI at 79-81.  Plaintiffs do not claim that the Fund's disclosures regarding the procedures were misleading, that these procedures were deficient, or that the procedures were not followed.

Moreover, Plaintiffs do not allege facts showing that the Fund's valuation determinations were not honestly believed at the time they were made.  The Investment Company Act makes clear that the "value" of securities for which market prices are not available is their "fair value as determined in good faith . . . "  15 U.S.C. § 80a-2(a)(1)(41); *see also* 17 C.F.R. § 270.2a-4(a)(1).  The SEC has explained that "there can be no automatic formula by which an investment company can value restricted securities in its portfolio."  Inv. Co. Act Rel. No. 5847, 35 Fed. Reg. 19989 (Oct. 21, 1969); *see also* Inv. Co. Act Rel. No. 6295, 35 Fed. Reg. 19986 (Dec. 23, 1970) ("No single standard for determining 'fair value . . . in good faith' can be laid down, since fair value depends upon the circumstances of each individual case").  The SEC has also identified a lengthy, non-exhaustive list of context-specific factors that can affect security valuation.  *Id.*

Consistent with this guidance, the Fund disclosed that "[s]ecurities . . . for which market quotations are not readily available are valued at their fair value. . . ."  *E.g.*, January 2008 SAI at 126; September 2007 Annual Report at 50.  The Fund also warned investors that it was required to "make estimates and assumptions that affect the reported amounts of assets and liabilities" and that "[a]ctual results could differ from those estimates."  *See* January 2008 SAI at 131; September 2007 Annual Report at 55.

In light of the ICA, SEC guidance, and the Fund's own disclosures, it is beyond dispute that the valuation of securities not traded on an exchange "involve[s] the exercise of judgment."

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005).  As the Southern District of New York has explained, "Like other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and not objective facts[.]"  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005).  Accordingly, to plead that the Fund misvalued its assets, Plaintiffs must allege particularized facts sufficient to show that the valuations were not honestly believed when made.  *See Va. Bankshares, Inc.*, 501 U.S. 1083 at 1095-96; *Rubke*, 551 F.3d at 1162.  Here, Plaintiffs do not even attempt to allege that the Fund did not believe its valuations at the time they were made.  They therefore state no claim under the securities laws.

        3.      <u>Plaintiffs' Allegations Are As Consistent With Proper Valuation As With Improper Valuation.</u>

Lastly, Plaintiffs' mispricing allegations fail because they are just as consistent with proper valuation as they are with alleged improper valuation.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Twombly*, 550 U.S. at 570.  The sole allegation Plaintiffs muster in support of this claim is a cherry-picked list of investments that happened to have the same value on the last day of consecutive reporting periods.  *See* CCAC ¶ 70.  Essentially, Plaintiffs contend that, if the Fund engaged in proper pricing, every reported price of every investment had to be different at the end of every consecutive reporting period.

This assertion makes no sense.  Identical valuations for a security at two specific points in time do not mean the security is misvalued.  Indeed, the Fund had hundreds of investments, and a comparison of two consecutive Statements of Investments shows that the vast majority of the Fund's valuations differed at these two points in time.  *See* note 19, *supra*.  As a result, Plaintiffs'

assembly of a cherry-picked list of securities whose values happened to be the same at two different points in time does not remotely suggest that the Fund was systematically misvaluing its assets.  Because Plaintiffs do not make allegations that are more consistent with misconduct than proper conduct, their claim fails.

III.   **PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLEGED MISREPRESENTATIONS DID NOT CAUSE PLAINTIFFS' LOSSES.**

The Fund's risk disclosures aside, Plaintiffs' claims that the investments made by the Manager were "too risky" all fail for a separate and independent reason:  Any losses they allegedly suffered were not the result of the Securities Act violations they assert and, therefore, loss causation is absent.  Sections 11(e) and 12(b) define a plaintiff's maximum potential damages as the decline in value of his securities.  *See* 15 U.S.C. § 77k(e); *id.* § 77*l*(b).  But, these statutes also provide explicitly that Plaintiffs are not entitled to any damages – and thus their claims should be dismissed – if the decline in value of their securities "result[ed] from" something other than the alleged misstatements in the Fund's registration statement:

> [I]f the defendant proves that ***any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement***, with respect to which his liability is asserted, ***not being true or omitting to state a material fact*** required to be stated therein or necessary to make the statements therein not misleading, ***such portion of or all such damages shall not be recoverable***.

15 U.S.C. § 77k(e) (emphases added); *see also id.* § 77*l*(b); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).  Here, Plaintiffs' own allegations establish that none of the "depreciation in value" of their Fund shares could have or

did "result[] from" the misstatements they allege with respect to the Fund's registration statements. Dismissal is thus a function of Plaintiffs' own pleadings.

To explain why, it is helpful to begin with the more common example of a security that trades on a public market. The issuer of these types of securities – for example, General Electric – sells a fixed number of shares to investors, who then trade them on a secondary market, such as the New York Stock Exchange. The price of these securities rises and falls "in concert with the collective expectations for each firm's profits." Campbell R. McConnell & Stanley L. Brue, ECONOMICS: PRINCIPLES, PROBLEMS, & POLICIES at 163 (13th ed. 1996). These "collective expectations" change based on new information: The release of good news increases expectations about future profits, thereby increasing share prices, while the release of bad news decreases expectations about future profits, which causes share prices to fall. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 241-49 (1988).

A misstatement or omission that spreads false "good" news (or omits true "bad" news) about a publicly-traded security can have the same effect: Investors' expectations about the issuer's future profits will increase, driving up the security's price and creating a "fraud premium." *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1134 (10th Cir. 2009). If investors later learn the sobering truth, their collective expectations about the issuer's future profits will fall, which will cause the security's price to decline, thereby "draining . . . the fraud premium." *Id.*

Investor expectations about an open-end mutual fund's future performance, however, play *no* role in determining its share price. The shares of open-end funds do not trade on a secondary market; instead they are purchased directly from the Fund, and investors must sell

their shares back to the Fund, which is obligated by law to repurchase them.  *See* S. Rep. No.

1775 at 2, 76th Cong., 3d Sess. (June 6, 1940) (discussing these "peculiar[]" features of open-end

funds); 15 U.S.C. § 80a-22(e); 17 C.F.R. § 270.22c-1(a).  Investor expectations, and therefore

information that shapes those expectations, have no impact whatsoever on the price of these

purchases or sales.  Instead, to ensure that investors receive a fair and predictable price when

they buy and sell fund shares, the Investment Company Act and its implementing regulations

require open-end funds to price their shares at net asset value ("NAV"), which is computed

according to the following statutory formula:

$$\textbf{NAV = (Assets – Liabilities) / (Shares Outstanding)}$$

*See* 17 C.F.R. § 270.22c-1.  As this formula illustrates, the value of an open-end fund's net assets

– not investor expectations – determine its share price.  In short, investors buy and sell their

shares at their current value.

A simple hypothetical demonstrates the point.  Two open-end funds – Fund A and Fund

B – have identical portfolios and share prices.  Fund A issues a prospectus saying it has a

revolutionary hedging strategy that will produce riskless returns, while Fund B does not make

such a disclosure.  If the shares of open-end mutual funds traded on a public market, the share

price of Fund A might rise relative to the share price of Fund B on the basis of the

representations as to the expected benefits of the hedging strategy.  But, because the funds have

identical portfolios and because shares of open-end mutual funds are *not* priced in their own

market but rather under a mathematical calculation that depends upon the value of the securities

held in their portfolios, Fund A's statements will have *no* effect on the funds' share prices.

Instead, as long as the two funds have the same portfolio holdings, the funds will continue to

have identical share prices because their NAV calculations – net assets divided by shares outstanding – will also remain the same. *See, e.g.*, *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) (stating that an open-end fund's share price cannot be affected by misstatements or omissions).

There is one additional feature of mutual funds that also ensure investors' increased expectations about future performance have no impact on price. Unlike securities that trade on a secondary market, the supply of open-end fund shares is not fixed. Thus, while increased expectations about a publicly-traded security will cause investors to bid up the price of that security, increased investor expectations about an open-end fund's future performance will simply cause the fund to sell more shares *at the NAV price*:



Thus, a misstatement about the riskiness of an open-end fund might affect *the number of shares sold by the Fund*, but it cannot affect the *price* of those shares.[20]

---

[20] Notably, it is well-settled that a misrepresentation that (1) causes an investor to buy Fund shares, but (2) does not affect their price, creates no liability under Sections 11(e) and 12(b). *E.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579,

Neither the statutory language of the Securities Act,[21] nor the functioning and pricing of mutual fund shares under federal law as described above, are subject to any meaningful dispute. The issue raised by this motion is whether, as a matter of law, Plaintiffs' allegations state a claim in light of these principles. They do not.

The recent decision in *In re Morgan Stanley* illustrates the point. In that case, the plaintiffs alleged that the Fund's misstatements about certain fees it paid caused them to "overvalue[e]" the open-end funds' shares. No. 03-8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006). The court squarely rejected this argument because the NAV pricing rules prevented the misstatements from having any effect on the funds' share prices. *Id.* Cases involving publicly-traded securities were distinguishable, the court explained, because they deal with securities whose prices are "not set by statute." *Id.*

Plaintiffs' allegations in this case fit this mold. Specifically, the alleged misstatement at the center of Plaintiffs' claim – that defendants misrepresented the riskiness of the Fund by investing in swaps and mortgage-backed securities – was not one that could or did affect the

---

588-89 (S.D.N.Y. 2006); *see also Akerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 369 (S.D.N.Y. 1984), *aff'd*, 810 F.2d 336 (2d Cir. 1987).

[21]   Defendants' motion is limited to claims brought under the Securities Act, which has a much more specific and narrow loss causation provision than the Exchange Act. *See Akerman*, 609 F. Supp. at 369-70; *cf., e.g.*, *Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL 342050, at *6 (S.D.N.Y. Jun. 25, 1998); *Hanley v. First Investors Corp.*, 793 F. Supp. 719, 720 (E.D. Tex. 1992); *Geisenberger v. John Hancock Distribs., Inc.*, 774 F. Supp. 1045, 1051 (S.D. Miss. 1991). Nor do Defendants address remedies that may be available under state law arising from claimed mismanagement of an open-ended mutual fund, either directly by the Fund or derivatively. *See, e.g.*, *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2005 WL 3989803, at *4 (C.D. Cal. Dec. 16, 2005).

Fund's share price.[22]  At best, Plaintiffs allege that investment decisions made by the Fund

turned out poorly, and, as a result, the Fund's share price declined.  But this decline plainly

"resulted from" the Fund's investment decisions and the subsequent performance of these

securities during the credit crisis, rather than from any alleged misstatements in the Fund's

registration statement.  *See Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL

342050, at *5 (S.D.N.Y. June 25, 1998) (explaining that changes in an open-end fund's share

prices are "related to the success of the investment strategies of that fund").

The legislative history of the Securities Act strongly reinforces the conclusion that the

statute was not intended to provide a remedy for claims like Plaintiffs'.  As the House

Committee Report accompanying the Securities Act makes clear, Congress created nearly strict

liability under Section 11, without any requirement of scienter or reliance by an investor, because

it wanted to provide a remedy when misrepresentations in a registration statement could affect

the market price of the security paid by that investor in the offering:

> ***The statements for which [potential defendants] are responsible***,
> although they may never actually have been seen by the
> prospective purchaser, because of their wide dissemination,
> ***determine the market price of the security,*** which in the last
> analysis reflects those manifold causes that are the impelling
> motive of the particular purchase. . . . Inasmuch as the ***value of the
> security may be affected by the information given in the
> registration statement*** . . . the civil remedies accorded by this
> subsection . . . are given to all purchasers . . . .

H.R. Rep. No. 73-85 at 10, 22, 73rd Cong., 1st Sess. (May 4, 1933) (emphases added).  There are

policy reasons for protecting investors who have never even seen a registration statement if, *but*

---

[22]     Plaintiffs' allegations about leverage, liquidity, and the appropriateness of the Fund as
part of a retirement portfolio are not analytically any different.  Those alleged
misrepresentations had no impact on the value of Fund shares either.

*only if*, the issuer's registration statement had some impact on the price of the securities they purchased. But absent any impact on the purchase price at all, the rationale for recovery without the usual attributes of a securities fraud claim literally evaporates. Here, the unique pricing rules applicable to open-end mutual funds already protect investors from the possibility that they might buy shares at prices that are artificially inflated. Thus, the rationale of the Securities Act, and the concerns that motivated Congress to pass it, simply are not present. Indeed, it would make little or no sense at all to allow Champion Fund investors to sue for damages based on alleged misrepresentations they have never seen and which, by definition and by federal law, had no impact on the price they paid for their shares.

To be sure, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009), recently concluded that misstatements about the riskiness of an open-end fund could lead to compensable – and undefined – damages under the Securities Act. But, that court's holding should not be followed here because the *Schwab* court did not even mention, much less analyze, the plain language of Sections 11(e) and 12(b) or the relevant legislative history. *See, e.g.*, *Pine River Irrigation Dist. v. United States*, No. 04-01463, 2009 WL 3011223, at *16-17 (D. Colo. Sept. 18, 2009) (Kane, J.) (rejecting two "relatively recent" district court opinions because they "cannot be reconciled with the plain language" of the applicable federal statute); *Simmons v. Prudential Ins. Co. of Am.*, 641 F. Supp. 675, 683 (D. Colo. 1986) (Kane, J.) ("That the plain language of any statute must control when unambiguous is a concept too familiar to dote upon.").

The *Schwab* court erred by focusing exclusively on whether the plaintiffs could meet the broader standard for "loss causation" under the Exchange Act.[23]  The Exchange Act's loss causation provision asks what "caused the [plaintiff's] loss," 15 U.S.C. § 78u-4(b)(4), language that incorporates the flexible, common-law notion of proximate cause.  *See Dura Pharm. v. Broudo,* 544 U.S. 336, 344-45 (2005).  Thus, the court's analysis answers the wrong question and does not address whether the plaintiffs could have recovered under the plain text of the Securities Act.  *See, e.g., Akerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 369-70 (S.D.N.Y. 1984), *aff'd*, 810 F.2d 336 (2d Cir. 1987) (explaining that loss causation under the Securities Act is narrower than loss causation under the Exchange Act).  The text of the Securities Act bars recovery if "the depreciation in value of such security resulted from" something other than the alleged misstatement or omission in the registration statement, it does *not* ask more broadly what "caused the plaintiff's loss."[24]  Because the *Schwab* court did not address the Securities Act's language or history, it should not be followed here.

There are settled principles of law that compel respect for the difference between these distinct statutory provisions.  As noted above, the Securities Act, which dispenses with any need to prove scienter and reliance, was premised on the goal of providing a remedy for share prices

---

[23]     Defendants note that the *Schwab* court was not directed by the parties to either the Securities Act's language or legislative history, nor was that court presented with the same argument made here by the Oppenheimer Defendants.

[24]     Courts in other situations do indeed distinguish between the measure of damages allowed under the Securities Act and the Exchange Act.  *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. 01-3624, 2008 WL 4178151, at *3 n.5 (S.D. Tex. Sept. 8, 2008) (awarding inflation-adjusted losses for Exchange Act claims but not Securities Act claims because "Section 11 damages are limited by statute" but the Exchange Act "does not establish a means of measuring damages").

that were artificially inflated due to even innocent misrepresentations in registration statements. The Securities Act is therefore essentially a *strict liability* statute; it does not require the type of willful or malicious conduct that justifies the Exchange Act's expansive notion of proximate cause. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *see also Versyss, Inc. v. Coopers & Lybrand*, 982 F.2d 653, 657 (1st Cir. 1992) (explaining that the Securities Act's "very stringency suggests that, whatever the usual rule about construing remedial securities legislation broadly . . . some care should be taken before section 11 is extended beyond its normal reading"); *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 380 n.10 (S.D.N.Y. 2009) (refusing to read Section 11 broadly because it is a "strict liability" statute).[25] Indeed, under these circumstances, a holding that the statutes provide identical damage remedies, as the *Charles Schwab* court held, would violate the well-settled rule that different language in different statutes ought to be interpreted differently. *E.g.*, *Tafoya v. U.S. Dep't of Justice*, 748 F.2d 1389, 1391-92 (10th Cir. 1984); *Akerman*, 609 F. Supp. at 370 (holding that plaintiffs' reliance on Section 10(b) case law to stretch the plain language of Section 11(e) is "prohibited by the relevant authorities").

## IV. PLAINTIFF O'STEEN'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiff Errol G. O'Steen's ("O'Steen's") claims also fail because he was on notice of them more than one year before this litigation was instituted in February 2009. Indeed, the Fund

---

[25] The Exchange Act covers only *intentional* or *reckless* conduct, and it is well-settled that the concept of proximate cause "should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault." Restatement (Second) of Torts § 435B, cmt. a; *accord, e.g.*, *Kimberlin v. DeLong*, 637 N.E.2d 121, 126 (Ind. 1994); *Kowal v. Hofher*, 436 A.2d 1, 3 (Conn. 1980).

disclosed the very facts Plaintiffs contend support their claims no later than November 2007 –

when the Fund's Statement of Investments for the period ending September 30, 2007 was made

publicly available to investors.

**A.     Claims Under The Securities Act Must Be Brought Within One Year After A Plaintiff Is On Notice Of Them.**

Claims under Sections 11 and 12(a)(2) of the Securities Act must be brought within one

year of the date on which the plaintiff discovered, or reasonably should have discovered, the

facts that give rise to the claims.[26]  *See* 15 U.S.C. § 77m; *see also Piper Acceptance Corp. v.*

*Slaughter*, 600 F. Supp. 169, 172 (D. Colo. 1985) (Kane, J.).  In applying this standard, the Tenth

Circuit has held that inquiry notice triggers an investor's duty to exercise reasonable diligence;

the one-year limitations period begins to run on the date that an investor, in the exercise of that

diligence, should have discovered the facts underlying his claim.  *Sterlin v. Biomune Sys.*, 154

F.3d 1191, 1201 (10th Cir. 1998).

Inquiry notice is triggered by "sufficient storm warnings to alert a reasonable person to

the possibility that there were either misleading statements or significant omissions involved in

the sale."  *Id.* at 1196 (internal brackets and citations omitted).  Thus, a disclosure document

need not "discuss each and every aspect" of the alleged misconduct; rather, inquiry notice is

triggered whenever the disclosure "alert[s] a reasonable investor to the possibility" of a

---

[26]     A plaintiff must affirmatively plead compliance with the statute of limitations.  *Piper Acceptance Corp. v. Slaughter*, 600 F. Supp. 169, 172 (D. Colo. 1985) (Kane, J.); *see also Flinn Found. v. Petro-Lewis Corp.*, No. 84-2413, 1985 WL 358, at *3 (D. Colo. 1985) (Carrigan, J.).  As the Court explained in *Flinn*, "[m]ere conclusory allegations will not suffice.  Plaintiffs must allege with particularity the *facts* on which they rely to avoid this statute of limitations."  *Flinn*, 1985 WL 358, at *3.  Here, Plaintiff does not even attempt to plead *facts* establishing compliance with the statute of limitations.  *See* CCAC ¶ 104.

misstatement.  *Id.* at 1204; *see also Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1267 (D. Colo. 2006).

The purpose of the securities laws "is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."  *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) (quotation marks omitted).  Thus, as the Tenth Circuit has explained, the statute of limitations may begin to run before the plaintiff's shares decline in value:

> We recognize in securities fraud cases the cause of action may accrue at a separate and distinct time from when the plaintiff/investor is injured. That is, a material misrepresentation may far precede plaintiffs' injury. Nevertheless, an aggrieved investor must bring an action once he discovers or should have discovered the fraud.

*Id.* at 1552; *see also Sterlin*, 154 F.3d at 1202 ("purpose behind commencing the one-year limitations period upon inquiry notice is to discourage investors from adopting a wait-and-see approach"); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1128 (7th Cir. 1993) ("Investors must bring their claims as soon as they become aware of misrepresentations or omissions, instead of waiting while avoidable damages accrue.").

Mutual fund investors are presumed to have full knowledge of all information contained within the Fund's publicly-filed documents.  As the Seventh Circuit has explained: "plaintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice."  *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 466 n.18 (7th Cir. 1990).  Thus, for purposes of the statute of limitations, "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments."  *Debenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 216 (3d

Cir. 2007); *see also Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1518 (10th Cir. 1983) ("Thus, it is our view that knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents.").

Courts consistently grant motions to dismiss where the facts showing that the statute of limitations has run are apparent from the face of the complaint or from documents properly considered on such a motion. *See, e.g.*, *Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d at 1267 (Babcock, J.) (dismissing '33 and '34 Act claims on 12(b)(6) motion); *Friedlob v. Trs. of the Alpine Mut. Fund Trust,* 905 F. Supp. 843, 854 (D. Colo. 1995) (Nottingham, J.) (dismissing '33 Act claims pursuant to statute of limitations); *Manasfi v. Malone*, No. 06-00280, 2007 WL 891871, at *2 (D. Colo. Mar. 22, 2007) (Miller, J.) (dismissing '34 Act claims pursuant to statute of limitations).

**B.     O'Steen Was On Inquiry Notice Of His Claims More Than One Year Before The Earliest Complaint Was Filed.**

In the Certification in support of his lead-plaintiff motion, O'Steen avers that he began purchasing Fund shares on October 12, 2006.[27]  O'Steen's claims should be dismissed pursuant to the statute of limitations for at least two reasons.  *First*, the Fund consistently disclosed that it would engage in swap transactions and invest in mortgage-backed securities, and it disclosed numerous risks associated with those securities.  These disclosures were more than sufficient "to

---

[27]     *See* Certification of Errol G. O'Steen at Ex. A (attached to Declaration of Alan I. Ellman in Support of the Motion of Thomas Goodman and Errol Glynn O'Steen for Appointment as Lead Plaintiff and Approval of Selection of Counsel at Ex. A), *Janssen v. OppenheimerFunds, Inc.*, No. 09-cv-386 (D. Colo. Aug. 12, 2009) (Docket Entry No. 70-2).

alert a reasonable person to the possibility" that the Fund would invest in the very securities

about which O'Steen now complains. *See Sterlin*, 154 F.3d at 1196. These disclosures, standing

alone, put O'Steen on notice of his claims more than one year before this suit was filed.[28]

    *Second*, the Fund specifically disclosed the amount of its swap transactions and its

investments in mortgage-backed securities. As discussed above, the Fund's Statements of

Investments consistently disclosed the Fund's entire investment portfolio. Plaintiffs used those

Statements of Investments to construct the very charts in their Complaint that purportedly

support their claims. But, rather than supporting their claims, those tables establish that the

statute of limitations ran on O'Steen's claims well before the first case involving the Fund was

filed. *See Estner v. OppenheimerFunds, Inc., et al.*, No. 09-1327 (S.D.N.Y. Feb. 13, 2009).

    *DeBruyne* is directly on point. In that case, the plaintiffs claimed that the fund had

misrepresented itself as a "balanced fund," because it had not invested enough in debt securities.

The Seventh Circuit held that the claims were time-barred because the plaintiffs "selectively

ignore Equitable's continued and open disclosures as to the percentage composition of the

Balanced Fund." The court explained that, if plaintiffs truly believed that the fund should have

been investing in substantially more debt securities, then "basic logic leads us to the conclusion

that an investor reading with reasonable care would have been suspicious, if not enraged, when

---

[28]    Plaintiffs allege that the class period should begin on January 1, 2006. This allegation is flatly inconsistent with the principal theory of their Complaint, *i.e.*, that the Fund changed from a "conservative" diversified high-yield fund into a "hedge fund" gambling with investor funds. *E.g.*, CCAC ¶ 4. Under this theory, the class period could not reasonably begin before the fourth quarter of 2006 at the earliest (and probably much later). Of course, if Plaintiffs were to argue that the holdings of the Fund demonstrated this hedge fund transformation as early as January 1, 2006, then all of their claims would be time-barred.

Equitable openly stated prior to November 30, 1987, that the Balanced Fund was made up of [a very small amount of debt securities]." *DeBruyne*, 920 F.2d at 466-67; *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) (dismissing complaint and holding that the statute of limitations began to run when investor received prospectus describing the investments as being risky and illiquid); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 163 (4th Cir. 1993) ("when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims . . ."); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 (S.D.N.Y. 2008) (dismissing complaint and holding that the statute of limitations began to run when investor received prospectus disclosing the allegedly imprudent investments); *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 617 (S.D.N.Y. 1990) (finding inquiry notice of claims based solely on offering documents).

Here, the Fund's intent to engage in swap transactions, *and the precise positions the Fund had taken*, were prominently disclosed in public filings during the entire class period. Accordingly, O'Steen, who was on notice of these facts no later than November 2007, cannot recover.

1.      <u>Plaintiffs Admit That The Fund Disclosed Its Extensive Investments In Swaps More Than One Year Before They Filed Suit.</u>

As discussed above, Plaintiffs created charts to support their claim that the Fund had invested too heavily in swaps. Specifically, in Paragraph 47 of the Complaint, Plaintiffs created a chart regarding the notional value of the Fund's total-return swaps:

| 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---|---|---|---|---|---|
| $79,500,000 | $442,732,000 | $1,028982,000 | $1,028,210,000 | $1,050,250,000 | $851,685,000 |

In Paragraph 52, they created a chart regarding the notional value of the Fund's credit default swaps:

| 12/31/06 | 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|---|
| $123,645,000 | $556,032,000 | $741,362,000 | $1,304,318,000 | $1,437,957,000 | $1,574,826,000 | $1,574,826,000 | $1,076,690,000 | $619,445,000 |

CCAC ¶¶ 47, 52. As discussed above, these charts were created by simply adding the notional value of the Fund's total return swaps and sell-side credit default swaps. *See* Exhibits T and U.

Plaintiffs' own charts make clear that the statute of limitations began to run, at the latest, by November 2007, when the Fund's Statement of Investments for the period ending September 30, 2007 was made publicly available to investors. By that time, the notional value of the Fund's swap transactions had grown from $124 million (shortly after O'Steen's purchase) to more than *ten times* that amount. As a result, O'Steen cannot credibly argue that he was not on notice of his claim that the Fund had allegedly acted inconsistently with its Investment Objective by purportedly entering into "too many" swaps.

2.       <u>Plaintiffs Admit That The Fund Disclosed The Facts Underlying Their Leverage Claim More Than One Year Before They Filed Suit.</u>

Identical facts doom O'Steen's leverage claim. Plaintiffs allege that the Fund's swap transactions increased leverage so fundamentally as to render the Fund's Investment Objective materially misleading. *See* CCAC ¶ 5. Once again, however, Plaintiffs' own charts – based on the Fund's own disclosures – doom O'Steen's claim. Plaintiffs include the following chart in the Complaint:

| 12/31/06 | 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|---|---|---|---|---|---|---|---|---|
| $270,529,657 | $432,907,672 | $1,190,961,553 | $1,274,135,381 | $1,463,239,312 | $3,240,610,796 | $2,942,479,530 | $2,339,559,612 | $1,666,215,000 |

CCAC ¶ 55.

Based on this chart, O'Steen purchased his shares before the Fund's leverage had reached $270 million. According to Plaintiffs, that figure ballooned to more than $1.2 billion by September 2007. As such, it is clear that O'Steen was on notice more than one year before this litigation was instituted that the Fund's objectives could be achieved through the use of a significant amount of leverage. Accordingly, any claim asserting the Investment Objective was misrepresented based upon the Fund's leverage is barred by the statute of limitations.

3.     Plaintiffs Admit That The Fund Disclosed The Facts Underlying Their Illiquidity Claim More Than One Year Before They Filed Suit.

O'Steen's illiquidity claim fares no better. In making that claim, Plaintiffs rely on the Fund's disclosures that certain investments "*may* be illiquid because they do not have an active trading market" or "*can* be illiquid if its valuation has not changed for a certain period of time." *Id.* ¶ 61 (emphases added). Plaintiffs contend that "[a]pplying these tests to the Fund demonstrates" that the Fund invested more than 10% of its assets in illiquid securities. *Id.* ¶ 62. Plaintiffs offer, in support, their own estimation of what the Fund's illiquidity levels were from mid-2006 through late 2008. *Id.*

Once again, O'Steen's claim is time-barred. Had O'Steen performed the same exercise in 2007 that Plaintiffs performed now, he would have been able to conclude, albeit wrongly, that the Fund had allegedly violated its limitation on illiquid securities more than one year before this suit was filed.

4. <u>Plaintiffs Admit That The Fund Disclosed The Facts Underlying Their Internal Controls Claim More Than One Year Before They Filed Suit.</u>

Lastly, O'Steen's internal controls claim fails. Plaintiffs base this claim upon the alleged misvaluation of Fund assets. Specifically, Plaintiffs allege that the Fund wrongfully "reported the same prices in consecutive reporting periods for certain investments, when, given the changes in prevailing market interest rates that occurred between those periods, it was simply impossible for the investments' prices <u>not</u> to change." CCAC ¶ 70. (emphasis in original).

The Complaint lists a number of allegedly misvalued securities, all of which were taken from the Fund's disclosures. *Id.* ¶ 71. Plaintiffs go on to claim that "examples of mispricing are found *as far back as second quarter 2006*, and there are *multiple examples throughout 2007* and 2008." *Id.* ¶ 72. There is no reasonable way to interpret these allegations *other* than to conclude that O'Steen, who is charged with knowledge of all public disclosures, was on inquiry notice of the Fund's alleged mispricing errors in 2006 and 2007, more than a year before any Complaint was filed.

## V. PLAINTIFFS DO NOT ALLEGE THAT THE MANAGER OR ANY INDIVIDUAL DEFENDANT WAS A "SELLER" OF FUND SECURITIES.

Liability under Section 12(a)(2) is limited to "sellers" of a security. *See Pinter v. Dahl,* 486 U.S. 622, 641-47 (1988). For the reasons set forth in Part II of the Motion of Independent Trustees to Dismiss Consolidated Amended Class Action Complaint, which is incorporated herein, Plaintiffs do not state a claim against the Manager or any Individual Defendant because they do not allege that these defendants were sellers under Section 12(a)(2). Plaintiffs plead no facts to support their bald allegations that OFI or the Individual Defendants solicited investor purchases of shares "motivated at least in part by a desire to serve his own financial interests or

those of the securities owner." *Id*. at 647. Indeed, Plaintiffs do not allege that OFI had any

relationship whatsoever with purchasers. *See id*. at 649-50. Similarly, Plaintiffs do not allege

that OFI or the Individual Defendants passed title to any purchasers of Fund shares. *See id*. at

642.

## VI. PLAINTIFFS' SECTION 15 CLAIM SHOULD BE DISMISSED.

Plaintiffs assert Section 15 "control person" claims against OFI, OFDI, and the Individual

Defendants. As discussed more fully in Part III of the Motion of Independent Trustees to

Dismiss Consolidated Amended Class Action Complaint, which is incorporated herein, these

claims fail, first, because Plaintiffs have failed to plead a primary violation of Section 11 or

Section 12. They also fail because Plaintiffs fail to allege sufficient allegations of control.

**CONCLUSION**

For the reasons discussed above, the Oppenheimer Defendants respectfully request that

the Court dismiss Plaintiffs' Complaint with prejudice.

Dated this 3rd day of December, 2009.

Respectfully submitted,

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Tel: 303.291.2300
Fax: 303.291.2400
Email: rmiller@perkinscoie.com

-And-

*s/ William K. Dodds*

William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel:  212 698 3500
Fax:  215 698 3599
Email:  william.dodds@dechert.com

Matthew Larrabee
Dechert LLP
One Maritime Plaza, Suite 2300
San Francisco, CA 94111
Tel: 415 262 4500
Fax: 415 262 4555
Email: matthew.larrabee@dechert.com

Michael Doluisio
Dechert LLP
2929 Arch Street
Philadelphia, PA 19147
Tel: 215 994 2325
Fax: 215 994 2222
michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc., John
V. Murphy, and Brian W. Wixted

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on this 3rd day of December, 2009, I electronically filed a true and correct copy of the foregoing **OPPENHEIMER DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net
- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com
- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com
- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Peter G. Rush**
  peter.rush@klgates.com,melissa.neubeck@klgates.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

Respectfully submitted,

*s/ Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorney for Defendants
OppenheimerFunds, Inc.,
OppenheimerFunds Distributor, Inc.,
John V. Murphy, and Brian W. Wixted