IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. 09-cv-386-JLK-KMT (consolidated with 09-cv-525-JLK-KMT)

In re Oppenheimer Champion Fund Securities Fraud Class Actions

---

## DEFENDANTS INDEPENDENT TRUSTEES' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND

---

**K&L GATES LLP**
Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher

70 West Madison Street
Chicago, Illinois 60602
Telephone:   (312) 372-1121
Facsimile:    (312) 827-8000

**DAVIS GRAHAM & STUBBS LLP**
Dale R. Harris

1550 Seventeenth Street
Denver, Colorado 80202
Telephone:   (303) 892-9400
Facsimile:    (303) 893-1379

*Attorneys for Defendants William L. Armstrong,*
*Robert G. Avis, George C. Bowen, Edward L.*
*Cameron, Jon S. Fossel, Sam Freedman, Beverly L.*
*Hamilton, Robert J. Malone and F. William*
*Marshall*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

I.     Overview of Mutual Funds ....................................................................................... 2

II.    Overview of Plaintiffs' Complaint.......................................................................... 4

ARGUMENT ........................................................................................................................... 5

I.     Standards for Rule 12(b)(6) Motion to Dismiss ............................................... 5

II.    The Section 12(a)(2) Claim Against the Independent Trustees Should be
Dismissed For Failing to Allege Those Trustees Sold or Offered to Sell Any
Shares of the Fund ...................................................................................................... 6

III.   The Complaint Fails to Allege Adequately a Section 15 Claim Against the
Independent Trustees .................................................................................................. 10

      A.    The Complaint Does Not Allege an Underlying Securities Act Violation....... 11

      B.    The Complaint Fails to Set Forth the Independent Trustees Had Actual
Control Over a Purported Violator of Section 11 or Section 12(a)(2) ........... 11

IV.   Plaintiffs Cannot State a Misrepresentation Claim for Disclosed Investments
that Sustained Losses ................................................................................................. 14

      A.    The Complaint Asserts Claims of Corporate Mismanagement Not
Actionable Under The Securities Laws.......................................................... 14

      B.    The Fund Disclosed the Precise Risks Now Challenged................................. 17

# **TABLE OF AUTHORITIES**

## **Cases**

*Adams v. Kinder-Morgan, Inc.* 340 F.3d 1083 (10th Cir. 2003) ................................................. 12

*Allison v. Bank One-Denver*, No. 91-1422, 1994 WL 637403 (D. Colo. Jan. 7, 1994). ............... 6

*Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007) ............. 16

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................................... 5

*Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. Oct. 7, 2008).................................... 11

*Byers v. Intuit, Inc.*, No. 07-4573, 2009 WL 948651 (E.D. Pa. March 18, 2009)........................ 18

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1991)......................................................... 11

*Demaria v. Andersen*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) ...................................................... 18

*Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001)........................... 10

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)................. 14

*eSoft, Inc. v. Astaro Corp.*, No. 06-00441, 2006 U.S. Dist. LEXIS 52336 (D. Colo. July
    31, 2006) .................................................................................................................................. 5

*Fagin v. Day*, No. 07-00426, 2007 WL 2990620 (D. Colo. Oct. 11, 2007) ................................. 9

*Gotham Holdings, L.P. v. Health Grades, Inc.*, 534 F. Supp. 2d 442 (S.D.N.Y. 2008)................. 6

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008)........................................ 6

*Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508 (S.D.N.Y. 2000) ............................................ 13

*Harrison v. Rubenstein*, No. 02-9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ................... 16

*Hinerfeld v. United Auto Group*, No. 97-3533, 1998 WL 397852 (S.D.N.Y. July 15,
    1998) ...................................................................................................................................... 17

*In re Alliance Equip. Lease Program Sec. Litig.*, No. 98-2150, 2002 WL 34451621 (S.D.
    Cal. 2002)................................................................................................................................. 6

*In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009)..................... 16

*In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989)......................................... 15

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ............................................... 21

*In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................... 7, 8

*In re Ross Sys. Litig.*, No. 94-0017, 1994 WL 583114 (N.D. Cal. July 21, 1994) ...................... 13

*In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006).................................................................................................................. 10

*Iqbal v. Hasty*, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009) ............................................... 5, 9, 12

*Jackson v. Johns*, 714 F. Supp. 1126 (D. Colo. 1989)..................................................................... 9

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998).............................. 10, 11, 12, 13

*Miller v. New America High Income Fund*, 755 F. Supp. 1099 (D. Mass. 1991) ........................ 20

*Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424 (N.D. Ill. April 17, 1984) .................................................................................................................................. 13

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ........................................... 16

*Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981).................................................... 16

*Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988) ................... 6, 7, 8, 9, 10

*Rosenzweig v. Azurix Corp.*, 332 F. 3d 854 (5th Cir. 2003) ............................................... 6, 7, 8, 9

*Santa Fe v. Green*, 430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977)................................ 15

*Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213 (D. Colo. 1998).......................................... 9

*SEC v. Selden,* 632 F. Supp. 2d 91 (D. Mass. 2009)...................................................................... 6

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ............................................................ 21

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) .......................................... 6, 8, 9, 10

*Smile Care Dental Group v. Delta Dental Plan*, 88 F.3d 780 (9th Cir. 1996) .............................. 5

*Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261 (D. Utah 2002)................................................... 9

**Statutes**

15 U.S.C. § 77k............................................................................................................................... 4

15 U.S.C. § 77l(a)(2)................................................................................................................... 4, 6

15 U.S.C. § 77o........................................................................................................................... 5, 10

15 U.S.C. § 78u-4(b)........................................................................................................................ 6

15 U.S.C. § 80a-15(a) ............................................................................................... 3

15 U.S.C. § 80a-15(a)(2) .......................................................................................... 3

15 U.S.C. § 80a-15(c) ............................................................................................... 3

15 U.S.C. § 80a-2(a)(19) ..................................................................................... 4, 14

17 C.F.R. § 230.405 ............................................................................................... 11

## Other Authorities

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 ........................................................... 14, 19, 20

Lee Gremillion, *A Purely American Invention:   The U.S. Open-End Mutual Fund Industry*, 133-34 (2001) ............................................................................... 3

Victoria E. Schonfeld and Thomas M. J. Kerwin, *Organization of a Mutual Fund*, 49 Bus. Law. 107 (1993) ............................................................................... 2, 3

Defendants, William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall (collectively, the "Independent Trustees") hereby move to dismiss the Consolidated Class Action Amended Complaint and Jury Demand[1] and submit the following Memorandum in support of their Motion.[2]

## PRELIMINARY STATEMENT

With the aid of hindsight the Complaint second-guesses the investment decisions made by the managers of the Oppenheimer Champion Income Fund (the "Fund") in a "market" Plaintiffs admit "sailed off into unchartered mania." In addition to the fact the Securities Act of 1933 provides neither investment insurance nor relief for acts of corporate mismanagement, the Complaint lacks any factual allegation of what the Independent Trustees supposedly did wrong. Rather than facts, the Complaint sporadically provides wholly conclusory assertions that simply parrot the elements of a Securities Act claims. In the end, the Complaint attempts to hold the Independent Trustees liable based on position alone. The Securities Act provides no cause of action against the Independent Trustees under such circumstances.

With regard to the Section 12(a)(2) claim for "seller" liability, the Complaint fails to include the necessary non-conclusory factual allegations to establish the Independent Trustees

---

[1]   The Consolidated Class Action Complaint and Jury Demand shall hereinafter be referred to as "CCAC" or "Complaint."

[2]   Defendants incorporate herein by reference the Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand filed by their Co-Defendants, OppenheimerFunds, Inc., the OppenheimerFunds Distributor, Inc., John Murphy and Brian Wixted (collectively, the "Oppenheimer Defendants"). The Independent Trustees, in the interests of efficiency, have endeavored to avoid repeating the points and authorities set forth by the Oppenheimer Defendants, which provide separate grounds for dismissing Plaintiffs' claims. The Motions of all Defendants should be read together.

were "sellers" -- that is, that they passed title to any shares of the Fund, solicited the purchase of shares of the Fund, or had any motivation to serve their own financial interests or the interests of any securities owner.  As to Plaintiffs' effort to hold the Independent Trustees liable as "control persons" under Section 15, it too fails for lack of necessary allegations.  On top of the failure to allege any underlying primary violations of Sections 11 or 12(a)(2) of the Securities Act, the Complaint wholly fails to allege the Independent Trustees exercised control over an alleged primary violator.

As demonstrated by the Oppenheimer Defendants in their Motion, Plaintiffs fail to allege Defendants made any misrepresentation or omission of a material fact in violation of Sections 11 or 12(a)(2).  The Fund's investments -- including the type, magnitude, reference entity and value of each instrument, as well as the supporting rationale for those investment decisions -- were regularly disclosed in great detail.  These disclosures not only defeat any claim the Fund concealed its actual portfolio, but establish the Fund's Manager actually increased its investments in more highly-rated securities over the relevant period.  In the end, Plaintiffs sue because they lost money when the announced investment strategy for the Fund -- a self-described "junk" bond fund -- failed to pan out.  The federal securities laws do not indemnify against investment loss, hence the Complaint must be dismissed.

## BACKGROUND

### I.      Overview of Mutual Funds

Mutual funds provide a means for investors to invest in pools of securities.  Mutual funds provide various advantages to their shareholders, including diversification of investments, professional money management, and economies of scale on brokerage and other services.  *See* Victoria E. Schonfeld and Thomas M. J. Kerwin, *Organization of a Mutual Fund*, 49 Bus. Law. 107 (1993) ("*Organization of a Mutual Fund*").  Unlike stocks in a publicly-traded company,

2

mutual fund shares do not trade on a public exchange. Shares are priced daily based upon the net asset value of the underlying securities held by the fund. *Id.* at 112-13.

A mutual fund generally has few or no employees. Rather, a mutual fund contracts with third parties for all of its services. The cast of characters relevant to the management and governance of mutual funds includes investment advisers (or managers), distributors, and directors/trustees.

The investment adviser manages and invests the fund's assets pursuant to an advisory contract with the fund. Section 15 of the Investment Company Act of 1940 ("ICA") requires, *inter alia*, that the advisory agreement be approved initially by a majority of the fund's outstanding voting securities and by a majority of the directors who are not parties to such agreement or "interested persons" of any such party. *See* 15 U.S.C. § 80a-15(a), (c). Section 15 also sets forth procedures for the renewal of the advisory agreement. *Id.* at § 80a-15(a)(2). The terms of the advisory agreement, including the compensation to be received by the adviser, are set forth in the fund's Prospectus and Statement of Additional Information.

Most mutual funds additionally enter into a contract with a distributor, or principal underwriter, to purchase and distribute the fund's shares to the public. *See Organization of a Mutual Fund*, 49 Bus. Law. at 132. A fund's distributor is often affiliated with the fund's investment adviser. *Id.* A distributor may distribute shares through its own representatives or through other agents, such as brokers. If a fund's shares are sold through brokers, the distributor generally will enter into selling agreements with each brokerage firm, detailing the responsibilities of the broker in selling the fund's shares to investors and in executing transactions in the fund's shares. *See* Lee Gremillion, *A Purely American Invention: The U.S. Open-End Mutual Fund Industry*, 133-34 (2001) ("*Mutual Fund Industry*").

A mutual fund's board of directors (or trustees) supervises the fund's business operations. A mutual fund's board consists of both "interested" and "non-interested" (or independent) directors/trustees.[3]   The directors/trustees of a mutual fund are responsible for approving and monitoring the advisory agreement.   The directors/trustees are also responsible for reviewing arrangements between a fund and its distributors and other service providers.

## II.   Overview of Plaintiffs' Complaint

The Complaint filed on October 12, 2009 by plaintiffs Thomas H. Goodman and Errol G. O'Steen (collectively, "Plaintiffs") pleads three counts and names as defendants, *inter alia*, individuals alleged to be trustees of the Fund.   Conspicuously absent from the Complaint is any allegation the Independent Trustees engaged in securities fraud.   Rather, the Complaint turns entirely on purported technical disclosure shortcomings.   Count I attempts to assert a claim under Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants for allegedly false and misleading statements in Form N-1A Registration Statements filed with the Securities and Exchange Commission ("SEC") on August 7, 2006, January 26, 2007 and January 28, 2008 (the "Registration Statements").

Count II purports to assert a claim under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against all Defendants as "sellers" for allegedly false and misleading statements in Prospectuses filed on the same dates and incorporated into each concurrent Registration Statement (the "Prospectuses").   The Registration Statements, Prospectuses, Statements of Additional Information, Management Commentaries and Annual Reports, Management

---

[3]   The ICA defines an "interested person" of an investment company to include, among other people:   (1) any affiliated person of an investment company or any immediate family member of any such person; and (2) any interested person of the company's investment adviser or principal underwriter.   *See* 15 U.S.C. § 80a-2(a)(19).

4

Commentaries and Semi-Annual Reports, and Form N-Q Quarterly Schedules shall be referred to collectively as the "Disclosures."

Count III attempts to state a claim for violation of Section 15 of the Securities Act, 15 U.S.C. § 77o, against unidentified "Control Group Defendants" for purported control liability for the alleged misstatements in the Disclosures.

**ARGUMENT**

**I.       Standards for Rule 12(b)(6) Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for two reasons:   (1) lack of cognizable legal theory, or (2) pleading of insufficient facts under a cognizable legal theory. *Smile Care Dental Group v. Delta Dental Plan*, 88 F.3d 780, 783 (9th Cir. 1996).   In considering a motion to dismiss under Rule 12(b)(6), a court must presume only the well-pleaded *facts* set forth in a complaint are true.   The Court thus need not credit legal conclusions or unsupported conclusions of fact. *eSoft, Inc. v. Astaro Corp.*, No. 06-00441, 2006 U.S. Dist. LEXIS 52336, at *2 (D. Colo. July 31, 2006); *Iqbal v. Hasty*, 129 S. Ct. 1937, 1949-50, 173 L.Ed.2d 868, 884 (2009).

To survive a motion to dismiss, the "[f]actual allegations [of a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007).   The Complaint must show entitlement to relief is plausible, not merely that there might exist some set of facts consistent with the allegations of the complaint that would entitle plaintiff to relief. *Twombly*, 127 S. Ct. at 1965-66; *see also Iqbal*, 129 S. Ct. at 1950 (applying the *Twombly* standard to all civil actions and stating "only a complaint that states a plausible claim for relief survives a motion to dismiss").

The *Twombly* standard has been applied to assess the sufficiency of claims pleaded under Sections 11 and 12(a)(2) of the Securities Act. *See, e.g. Grand Lodge of Pa. v. Peters*, 550 F.

5

Supp. 2d 1363, 1376 n.78 (M.D. Fla. 2008) (applying *Twombly* to Section 11 claim and quoting

it for the proposition a complaint cannot avoid dismissal on the "possibility that a plaintiff might

later establish some 'set of [undisclosed] facts' to support recovery"); *Gotham Holdings, L.P. v.*

*Health Grades, Inc.*, 534 F. Supp. 2d 442, 444 (S.D.N.Y. 2008) (citing *Twombly* on motion to

dismiss Section 12(a)(2) claim).

The Complaint fails to set forth any allegations establishing a plausible right to relief on

either the Section 12(a)(2) or Section 15 claims.   The paucity of allegations on necessary

elements for both these claims mandates they be dismissed.

**II.     The Section 12(a)(2) Claim Against the Independent Trustees Should be Dismissed For Failing to Allege Those Trustees Sold or Offered to Sell Any Shares of the Fund**

A Section 12(a)(2) claim may only be asserted against the "seller" of the security.  15

U.S.C. § 77l(a)(2). The Supreme Court has interpreted "seller" to mean the "owner who passed

title," as well as "the person who successfully solicits the purchase, motivated at least in part by

a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486

U.S. 622, 642, 647, 108 S. Ct. 2063, 2076, 2078, 100 L. Ed. 2d 658, 679, 682 (1988).[4]   To

qualify as a "solicitor," a person must, at a minimum, **directly communicate with and actively**

**solicit the buyer**.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v.*

*Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) (*superseded on other grounds by*

*statute*, Private Sec. Lit. Reform Act, 15 U.S.C. § 78u-4(b)(1)-(2), *as recognized in SEC v.*

*Selden,* 632 F. Supp. 2d 91, 99 (D. Mass. 2009)); *In re Alliance Equip. Lease Program Sec.*

*Litig.*, No. 98-2150, 2002 WL 34451621, at *7-8 (S.D. Cal. 2002).   Liability under Section

---

[4]      Although *Pinter* addressed the meaning of "seller" under Section 12(a)(1), courts have
concluded that the definition applies to Section 12(a)(2). *Allison v. Bank One-Denver*, No. 91-
1422, 1994 WL 637403, at *3 (D. Colo. Jan. 7, 1994).

12(a)(2) does not extend to "collateral participants." *Rosenzweig*, 332 F.3d at 871 (*citing Pinter*, 486 U.S. at 650).

Plaintiffs' Section 12(a)(2) claim should be dismissed because it has not pleaded facts giving rise to a plausible claim any Independent Trustee was a "seller" within the meaning of Section 12.  First, the Complaint does not allege any Independent Trustees "passed title" to any securities. *See, e.g., In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003) (dismissing Section 12(a)(2) claim where defendants did not pass title to the security). Instead, the Fund's disclosures make clear its shares can be purchased only: (1) through brokers, dealers, or financial institutions that have selling agreements with OppenheimerFunds Distributor, Inc; or (2) under certain circumstances, through OppenheimerFunds Distributor, Inc. (Jan. 26, 2007 Prospectus at 19 (selected portions[5] attached to the Declaration of Peter G. Rush ("Rush Declaration") filed concurrently herewith as Exhibit A); Jan. 28, 2008 Prospectus at 20 (selected portions attached to Rush Declaration as Exhibit B).  No disclosures state the Independent Trustees passed title to investors. *See also* Oppenheimer Defendants' Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand at Background Section II.B. Plaintiffs make no allegations, nor could they, indicating the Independent Trustees ever passed title to investors.

Nor do Plaintiffs allege any facts demonstrating any Independent Trustee "solicited purchases of the Fund's shares."  Instead, the Complaint affirmatively alleges, "[t]he Fund was

---

[5]   The Oppenheimer Defendants have attached complete versions of the relevant Disclosures to their Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand.  Because these documents are voluminous, and in the interests of efficiency, the Independent Trustees attach only the pages of the Disclosures they specifically refer to in this Motion.

marketed to the investing public through other brokerage firms such as Wachovia, Merrill Lynch, Linsco Private Ledger LPL, Citigroup, Smith Barney, ING, and UBS." (CCAC ¶ 35).

Plaintiffs attempt to assert the Independent Trustees solicited sales of the Fund's shares through the generic allegations that: (1) the Trustees signed the Registration Statements (CCAC ¶¶ 18-26); and (2) "the Individual Defendants governed the Fund, including all communications, and thereby solicited purchases of the Fund's shares to serve their own financial interests." (CCAC ¶ 107c).

With regard to the first allegation, the weight of authority provides simply signing a registration statement fails to amount to soliciting the purchase of securities to serve the financial interests of either the trustee or the security owner. The Supreme Court rejected this type of expansive view at the outset in *Pinter*, stating that "seller" status arises only from a "defendant's relationship with the plaintiff purchaser." 486 U.S. at 649-50. The Supreme Court also emphasized the distinct statutory language for Sections 11 and 12(a)(2): although Section 11 expressly applies to "collateral participants" such as persons who "sign" a registration statement, "[t]here are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.* at 650, n.26.

Subsequent decisions have confirmed one can only be a "seller" based on contractual privity with the purchaser or direct involvement in the solicitation of a purchaser's investment, but not through merely signing a registration statement or prospectus. *See, e.g. Rosenzweig*, 332 F.3d at 871 (dismissing Section 12(a)(2) claim based solely on individual defendants signing the registration statement); *Shaw*, 82 F.3d at 1216 (dismissing Section 12 claim containing allegations of active participation in creation of prospectus and registration statement); *In re Infonet*, 310 F. Supp. 2d at 1101 (dismissing claims against defendants where "their only alleged

acts were serving on the Board of Directors and signing the Prospectus and Registration Statement").[6]

The second set of allegations -- that the Independent Trustees were solicitors because they "governed" the Fund and thereby solicited purchases of shares -- constitute no more than "[t]hreadbare recitals of the elements of [the] cause of action, supported by mere conclusory statements . . . ." *Iqbal*, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 555). There is nothing in the Complaint evidencing any of the Independent Trustees "directly communicate[d] with the buyer[s]" of Fund shares. *Rosenzweig*, 332 F.3d at 871. As a result, the claim against the Independent Trustees must fail. *See Shaw*, 82 F. 3d at 1216 (rejecting use of conclusory "solicitation" label as a legal term of art); *see also Iqbal*, 129 S. Ct. at 1949. Indeed, if Plaintiffs' allegations here proved sufficient, then every trustee of every Fund (and every board member of every corporation) would be liable as a seller. Section 12(a)(2) is not so broad. *See Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1269 (D. Utah 2002) (Section 12(a)(2) claim dismissed for failure to allege "direct and active participation in the solicitation" and "facts that support the conclusion that the individual Defendants solicited the purchases and were motivated by a desire to serve their own financial interests") (citations omitted); *In re Sonus Networks Sec. Litig.*, No

---

[6]     The Independent Trustees acknowledge *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1223 (D. Colo. 1998), where the court held plaintiffs adequately stated a claim under Section 12(a)(2) by alleging the individual defendants "solicited" the sale of stock, "motivated 'at least in part by a desire to serve [their] own financial interest,'" and signed the registration statement. This Court is not bound to follow *Schaffer*, however. *See Fagin v. Day*, No. 07-00426, 2007 WL 2990620, at *1 (D. Colo. Oct. 11, 2007) (one district court in Colorado not bound to follow other Colorado district court decisions); *Jackson v. Johns*, 714 F. Supp. 1126, 1130 (D. Colo. 1989) (same). Nor should the Court follow *Schaffer*, which neglected to consider the Supreme Court's discussion in *Pinter* of the disparity between the language of Section 11 and Section 12(a)(2). The far better rule, and the rule this Court should follow, is that privity or direct involvement in solicitation is required, as opposed to the mere signing of a registration statement.

04-10294, 2006 U.S. Dist. LEXIS 28272, at *34-38 (D. Mass. May 10, 2006) (dismissing Section 12(a)(2) claim containing mere conclusory allegations concerning defendants' participation in the creation and distribution of prospectuses and registration statements without factual allegations pertaining to defendants' solicitation efforts); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 580 (S.D.N.Y. 2001) (Section 12(a)(2) claim dismissed for failure to allege defendant "undertook any activities designed to solicit the sale" of securities).

This same reasoning renders the Section 12(a)(2) claim defective for failing to allege any facts demonstrating any Independent Trustee was motivated by a desire to serve his or her own financial interests or those of the security owner. *See Pinter*, 486 U.S. at 647; *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998). The naked allegation the Independent Trustees must have solicited purchases of the Fund's shares because they "governed" the Fund does nothing to establish the necessary factual predicate for this Count. *See Shaw*, 82 F.3d at 1216.

Because the Complaint fails to establish the Independent Trustees are "sellers" of the Fund's shares under the applicable statutory language and overwhelming case law, the Court should dismiss the Section 12(a)(2) Count as to the Independent Trustees.

**III.   The Complaint Fails to Allege Adequately a
       Section 15 Claim Against the Independent Trustees**

Plaintiffs' Section 15 claim against the Independent Trustees must also be dismissed for failing to allege the necessary prerequisites. Section 15 provides a person who "controls any person liable under [Sections 11 or 12] . . . shall also be liable jointly and severally *with and to the same extent* as such controlled person . . . ." 15 U.S.C. § 77o (emphasis added).[7] *See also*

---

[7]   That is, unless the "control person" was reasonably without knowledge of the basis for the controlled person's liability. 15 U.S.C. § 77o.

*Maher*, 144 F.3d at 1304-05 (under Section 15 "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable *with* the primary violator") (emphasis added).

To state a *prima facie* case of control person liability, Plaintiffs "must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305. Because the Complaint fails to establish either predicate, the Count should be dismissed.

### A.    The Complaint Does Not Allege an Underlying Securities Act Violation

Control person liability cannot be established without proper allegations of a primary violation under Section 11 or 12. *See Maher*, 144 F.3d at 1305; *Cooperman v. Individual, Inc.*, 171 F.3d 43, 52 (1st Cir. 1991) (control person claim dismissed where plaintiffs failed to properly allege underlying violation); *Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192, 1207-08 (N.D. Cal. 2008) (same). As set forth in the Oppenheimer Defendants' Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand and in sections II and IV of the Argument section of this Motion, Plaintiffs have failed to properly allege the requisite underlying violation. Dismissal of the Section 15 claim is therefore required.

### B.    The Complaint Fails to Set Forth the Independent Trustees Had Actual Control Over a Purported Violator of Section 11 or Section 12(a)(2)

To plead adequately "control" over a primary violator of the securities laws, plaintiff must demonstrate defendant had "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See Maher*, 144 F.3d at 1305 (*citing* 17 C.F.R. § 230.405). Dismissal of the complaint is appropriate where "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Id.* at 1306

11

(affirming dismissal of Section 15 claim where plaintiff failed to plead facts sufficient to demonstrate "control" over any primary violator).

The Complaint contains no particularized allegations to demonstrate any "control" by the Independent Trustees over any alleged primary violator. In fact, it is difficult, if not impossible, to discern in this Count just which defendants are being sued and over whom they allegedly exercised control in the first instance. The title to Count III states it is against the "Control Group Defendants," which implies the Count involves a subset of all Defendants. The term "Control Group," however, is never defined in the Complaint. The Complaint then alleges each of the Defendants was a control person of the Fund (which is not a named Defendant in the Complaint), the Manager, or the Distributor, without ever specifying which Defendant assertedly controlled which entity. (CCAC ¶ 115).

The Complaint fails to in any way specify how the Independent Trustees could have controlled any of the Defendant entities, instead merely reciting the Independent Trustees attained control by virtue of their positions as trustees alone and by unspecified "direct and/or indirect business and/or personal relationships" with other (unidentified) parties. (CCAC ¶ 115). The failure to specify the basis for the Independent Trustees' purported exercise of control is fatal to the Section 15 claim. *See Maher*, 144 F.3d at 1306; *see also Iqbal*, 129 S. Ct. at 1949 (mere conclusory allegations without factual support are insufficient to establish a claim for relief).

Furthermore, attempting to establish the Independent Trustees' control over another defendant merely by pointing to their positions as trustees proves unavailing. *See, e.g. Adams v. Kinder-Morgan, Inc.* 340 F.3d 1083, 1106 (10th Cir. 2003) ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually

exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person," and "the district court was correct to dismiss the claim of control person liability . . . ."); *In re Ross Sys. Litig.*, No. 94-0017, 1994 WL 583114, at *5 (N.D. Cal. July 21, 1994) ("courts in this District have required plaintiffs to plead more than the status of an outside director in order to survive a motion to dismiss control person claims.")[8]  Similarly, citation to a "personal relationship" with a purported (and undefined) "controlled person" is insufficient to set forth a Section 15 claim. *See Maher*, 144 F.3d at 1306 (allegation a sibling was an officer of primary violator insufficient to confer control person status).

In addition, to the extent Plaintiffs' control allegations focus on the Independent Trustees' asserted control over the *Fund* (CCAC ¶ 33), those allegations provide no basis for a Section 15 claim because the Fund is not a named defendant. *See Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424, at *8 (N.D. Ill. April 17, 1984) ("[U]nder § 15, no action against the directors of either McCormick or Domicile can be maintained, since neither McCormick or Domicile are parties to this suit, and thus could not be found liable under Section 77k or 77l."); *Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508, 516 (S.D.N.Y. 2000) (similar).

Finally, the very structure of the Fund makes clear Plaintiffs cannot state a plausible claim for control liability against the Independent Trustees. The "Independent Trustees" are just what their title implies -- separate and independent from all the named entity Defendants. The *only* Board the Independent Trustees sit on is the Board of the Fund itself, which is not a party to this case. And there is no allegation -- nor, indeed, could there be -- that the Independent

---

[8]     The control person provisions at Section 15 and Section 20(a) of the Securities Exchange Act of 1934 are interpreted the same. *Maher*, 144 F.3d at 1305 n.7.

Trustees are on the Board of the Defendant Manager or the Defendant Distributor.  Likewise, there is no factual allegation tending to show how any of the Independent Trustees could have asserted control over either the Manager or the Distributor.  Indeed, the ICA prohibits conferring independent trustee status on an "interested person," which is defined to include any "affiliated person" of the investment adviser or principal underwriter.  15 U.S.C. § 80a-2(a)(19).  The lack of any "control" relationship could hardly be more clear.

The failure of the Complaint to properly plead any of the predicates for Section 15 liability as to the Independent Trustees subjects that Count to dismissal.

## IV.     Plaintiffs Cannot State a Misrepresentation Claim for Disclosed Investments that Sustained Losses

Sections 11 and 12(a)(2) base liability on the misrepresentation or omission of material facts.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209, 96 S. Ct. 1375, 1388, 47 L. Ed. 2d 668 (1976).  Here, no disclosure deficiencies exist.  Instead, the Fund's disclosures painstakingly described its investments, the magnitude of the investment, the particular types of securities held and the risks of those investments.

### A.     The Complaint Asserts Claims of Corporate Mismanagement Not Actionable Under The Securities Laws

Plaintiff's dominant allegations challenge, based on hindsight, investment decisions made by managers in a "market" that admittedly "sailed off into unchartered mania."  Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 (attached to Rush Declaration as Exhibit C).  For example, the Complaint alleges:

- The Fund "took huge gambles on illiquid derivatives and mortgage-backed securities that caused the Fund to crash." (CCAC ¶ 2);

- The Fund "became a hedge fund-like investment fund that took extreme risks in search of highly speculative, large returns. Among other things, it sold credit default swaps and other high-

14

risk derivative instruments to Wall Street firms, promising to pay
and insure those Wall Street firms if they lost money as a result of
defaults . . . . These were high-risk bets that were plainly
inappropriate for this Fund, especially in the heavy concentrations
the Fund utilized." (CCAC ¶ 5);

- "The Fund made substantial gambles on volatile mortgage-backed
  securities at a time when that market was severely distressed."
  (CCAC ¶ 5);

- "The Fund's internal controls were inadequate to prevent
  Defendants from taking excessive risk." (CCAC ¶ 44f);

- "Fund managers increased their bet on commercial mortgage-
  backed securities and, therefore risk, by entering into total return
  swaps on commercial real estate indices.   This was a highly
  leveraged and speculative bet that the commercial mortgage-
  backed securities market, which had suffered a significant
  widening of spreads . . . would rally in 2008, causing spreads to
  narrow and generating large returns for the Fund." (CCAC ¶ 46);
  and

- "The Fund sold credit default swaps on companies such as AIG,
  Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune,
  Citigroup, General Motors, and Ford, which were big gambles
  considering the then-concurrent market events.   At the time the
  Fund entered these transactions, the troubles at [these entities]
  were known to Defendants . . . . Indeed, in the wake of the collapse
  of the subprime mortgage market, the credit default swap market
  began to show signs of distress by summer 2007." (CCAC ¶ 51).

Hindsight allegations such as these are essentially grounded in corporate
mismanagement. For more than 30 years, the Securities Act has provided no basis to challenge
the internal management of a corporation. *Santa Fe v. Green*, 430 U.S. 462, 97 S. Ct. 1292, 51
L. Ed. 2d 480 (1977). The securities laws "did not seek to regulate transactions which constitute
no more than internal corporate mismanagement." *Id.* at 479 (internal quotations and citation
omitted). The prohibition against corporate mismanagement claims extends equally to Sections
11 and 12(a)(2) claims. *See, e.g. In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 638 n.14
(3d Cir. 1989) ("the holding and reasoning [of *Santa Fe*] apply equally to claims arising under

15

§11(a) and §12(2).") A "plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) (no actionable securities claim for alleged non-disclosure of inadequacy of financial reporting controls because "[a]t base, this allegation is of mismanagement"). Stated differently, "if the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (*quotations and citation omitted*).

Second-guessing a manager's risk-reward decision-making with the aid of hindsight provides no predicate for liability:

> The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return. Businesses -- and particularly financial institutions -- make returns by taking on risk; a company or investor that is willing to take on more risk can earn a higher return. Thus, in almost any business transaction, the parties go into the deal with the knowledge that, even if they have evaluated the situation correctly, the return could be different than they expected.

> It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision.

*In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009). The Complaint here is subject to this same defect. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7-9 (2d Cir. 1996) (affirming dismissal of Securities Act claim arising from alleged failure to disclose assumptions behind ultimately unprofitable investment decisions and emphasizing "[n]ot every bad investment is the product of misrepresentation"); *Harrison v. Rubenstein*, No. 02-9356, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (dismissing Securities Act claim because allegations of business decisions that turned out to be poor and led

16

to losses are mismanagement claims); *Hinerfeld v. United Auto Group*, No. 97-3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing Securities Act claims because "[t]he failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws").

### B.   The Fund Disclosed the Precise Risks Now Challenged

Plaintiffs' contention the portfolio holdings and investment strategy of the Fund were "undisclosed" is just the type of "bootstrapping" effort rejected by the courts.   As the Oppenheimer Defendants painstakingly demonstrate in their motion, the risks managers may misread the underlying market forces impacting the securities, the risks of owning derivatives, the risks of illiquidity, the risks of utilizing leverage and the risks of erroneous valuation were all expressly described. *See* Oppenheimer Defendants' Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand at Argument Section I for a full analysis of these disclosures.

The Form N-Q Quarterly Schedules and Annual and Semiannual Reports listed the total notional amount of every single swap and mortgage-backed security, the reference entity and the counter-party so that the exact amount of the Fund's potential losses was an open book.   For example, the Champion Income Fund Statement of Additional Information dated January 28, 2008 had a disclosure similar to the following for every credit default swap in the entire Fund portfolio:

**Credit Default Swap Contracts**

| Swap Counterparty | Reference Entity | Buy/Sell Credit Protection | Notional Amount (000s) | Pay/ Receive Fixed Rate | Termination Date | Premium Paid/ (Received) | Value |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Special Financing, Inc. | Beazer Homes USA, Inc. | Sell | $3,015 | 5.0000% | 9/20/08 | $(301,500) | $(228,681) |

Oppenheimer Champion Income Fund, Jan. 28, 2008 Statement of Additional Information at 140 (selected portions attached to Rush Declaration at Ex. D).  That lone SAI disclosed all the above information for *277* separate credit default swaps, *256* of which were "*Sell*" swaps, a disclosure that spanned *seven* full pages.

When the disclosures detail the very risk allegedly leading to plaintiffs' losses, there can be no disclosure action under the Securities Act. *Demaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001).  Indeed, no allegations in the Complaint could possibly control over contradictory statements contained in the Disclosures. *See, e.g., Byers v. Intuit, Inc.*, No. 07-4573, 2009 WL 948651, at *2 (E.D. Pa. March 18, 2009) ("When allegations in a complaint are contradicted by the materials appended to or referenced in the complaint, 'the documents control and the court need not accept as true the allegations of the complaint.'").

As to investment strategy, the Fund repeatedly disclosed to investors the managers selected securities in part based on "[c]orporate sectors that in the portfolio managers' views are currently undervalued in the marketplace . . . ." (Jan. 26, 2007 Prospectus (Ex. A to Rush Declaration) at 4; Jan. 28, 2008 Prospectus (Ex. B to Rush Declaration) at 4.)  Management made no secret of its investment strategy or those sectors it viewed as "undervalued:"

> In general, we maintain our optimistic long-term outlook for both the economy and the financial markets despite investors' expectations for the contrary.  With certain yield spreads at levels that we deem to be too wide, we strongly believe that some areas

18

of the non-Treasury markets hold viable and potentially lucrative opportunities to add alpha in the months to come. Despite what we believe to be short-term struggles for both commercial and residential mortgage-backed securities, *we are convinced that the fundamentals underlying these two sectors remain solid, and their attractive yields relative to like-duration Treasuries offer ample compensation for their risks.*

*       *       *

Within the high-yield arena, we remain convinced that longer-term, higher-quality *financial* bonds offer attractive risk/return characteristics in light of their actual fundamentals. *We believe that relative to industrial bonds, for example, these types of financial bonds currently hold meaningfully less default risk, even though yield spreads do not currently reflect this disparity.* Moreover, we believe that this segment of the market represents a potentially rewarding means of executing our strategy of upgrading the overall credit quality of the Fund's portfolio, a measure that we are confident will best support long-term performance.

Oppenheimer Champion Income Fund, *Management Commentaries and Semiannual Report*, March 31, 2008 at 7-8 (emphasis added) (relevant portions attached to Rush Declaration as Exhibit E).

According to one controlling exhibit to the Complaint, the managers' investment strategy and the portfolio holdings were widely known:

By January 2008, the [management] team had begun packing some of that powder, building positions in four key areas that they felt had become exceedingly cheap. That included AAA rated commercial mortgage-backed securities, nonagency prime (jumbo) mortgages, AA and A rated financial-sector corporate bonds, and very short-maturity high-yield corporates.

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 (Ex. C to Rush Declaration). According to that same controlling exhibit, in advance, management stress tested its disclosed investment strategy under what was then considered "doomsday" scenarios. Like the rest of Wall Street, neither the managers nor their established stress-test models proved perfect prognosticators:

19

> Like many others on Wall Street, the [management] team *had* evaluated those exposures, or "stress tested" them, based on what had previously been rare market scenarios but that proved quaint next to the price movements that actually occurred and which represented market fear of true economic calamity.

(*Id* at 4). In the end, as Plaintiffs themselves acknowledge "the market sailed off into unchartered mania" and wreaked havoc on the managers' investment strategy. (*Id* at 2).

As explained in detail in the Oppenheimer Defendants Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand at Section III, because the Fund's decline plainly resulted from this "unchartered mania" rather than any alleged misrepresentations or omissions in the Disclosures, Plaintiffs cannot show loss causation, and are accordingly not entitled to recover damages.

At bottom, plaintiffs contend the managers should have done a better job of reading the crystal ball. "By using modeling assumptions from observed volatility and loss experience -- in the funds' case with CMBS, for example -- [the managers] both failed to model and plan for the possibility of severe downturns . . . ." Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 (Ex. C to Rush Declaration at p. 2). But securities laws provide no indemnity for investment losses, especially for a self-described "high yield, lower grade . . . 'junk' bond" fund. *See, e.g. Miller v. New America High Income Fund*, 755 F. Supp. 1099, 1107 (D. Mass. 1991) ("I find that the defendants adequately disclosed the risks associated with the common stock: the prospectus itself clearly warned that junk bonds were risky and that an investment in New America was not for everyone. Finally, the federal securities laws do not provide a cause of action for mismanagement or breach of fiduciary duty.")

The Independent Trustees cannot be held liable under the Securities Act for failing to forecast accurately the completely unexpected. Plaintiffs' efforts to do so highlight the fact their

Complaint is really for purported mismanagement of Fund assets, i.e., claiming with the benefit of hindsight the Fund's investment strategy was flawed.[9]

## CONCLUSION

For all the foregoing reasons, defendants William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall respectfully request that this Court dismiss the Complaint with prejudice.

Dated:   December 3, 2009

Respectfully submitted,

**K&L GATES LLP**

By:   */s/ Peter G. Rush*

Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher
70 West Madison Street, Suite 3100
Chicago, IL  60602
Telephone:  (312) 372-1121
Facsimile:   (312) 827-8000
E-Mail:  peter.rush@klgates.com
             jeffrey.petersen@klgates.com
             sara.fletcher@klgates.com

---

[9]     It is well-settled the alleged absence of adequate internal controls states no securities law violation. *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) ("[I]t is not a violation for the securities laws to simply fail to . . . provide sufficient internal controls.") (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992)).

**DAVIS GRAHAM & STUBBS LLP**

Dale R. Harris
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Facsimile: (303) 893-1379
E-Mail: dale.harris@dgslaw.com

*Attorneys for Defendants William L.
Armstrong, Robert G. Avis, George C.
Bowen, Edward L. Cameron, Jon S. Fossel,
Sam Freedman, Beverly L. Hamilton, Robert
J. Malone and F. William Marshall*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of December, 2009, I electronically filed a true and correct copy of the foregoing **DEFENDANTS INDEPENDENT TRUSTEES' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net

- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com

- **Robert J. Dyer, III**
  bob@dyerberens.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Christopher J. Keller**
  ckeller@labaton.com,ejo@labaton.com,aellman@labaton.com,electroniccasefiling@labaton.com

- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com

E-474676 v1

- **Stephanie E. Dunn**
  sdunn@perkinscoie.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

/s/ Peter G. Rush
Peter G. Rush
K&L GATES LLP
70 W. Madison Street
Suite 3100
Chicago, IL  60602
312.372.1121
peter.rush@klgates.com