IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Judge John L. Kane**

Civil Action No. **09-cv-386-JLK-KMT** (consolidated with **09-cv-525-JLK-KMT**)

**IN RE: OPPENHEIMER CHAMPION FUND SECURITIES CLASS ACTIONS**

*This document relates to BOTH actions.*

---

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 3

        A.      The Fund and Its Stated Investment Objective and Strategies. .............................. 3

        B.      The Fund Abandons Its Stated Objective and Strategies and Dramatically
                Enhances Its Risk Profile. ...................................................................................... 3

                1.      The Fund Becomes Excessively Leveraged. ............................................... 4

                2.      The Fund Enhances Its Risk Exposure Through Investments in
                        Mortgage-backed Securities ........................................................................ 6

                3.      The Fund Violates Its Liquidity Risk Limits. ............................................ 7

        C.      The Fund Lacked Internal Controls Over Risk Management. ............................... 8

        D.      The Fund's Massive Losses. .................................................................................. 9

        E.      Defendants' Inadequate Disclosures. .................................................................. 10

III.    ARGUMENT ...................................................................................................... 12

        A.      The Complaint Satisfies the Pleading Standards of Rule 8(a). ........................... 12

        B.      Lead Plaintiffs Allege Material Misstatements and Omissions Under
                Sections 11 And 12(a)(2). ................................................................................... 13

                1.      The Offering Documents Were Not Accompanied By Meaningful
                        Risk Disclosures ........................................................................................ 15

                        (a)      Defendants' disclosures concerning credit default and total
                                 return swaps were inadequate and failed to alert investors
                                 to the heightened risk exposure of the Fund due to leverage ........ 15

                        (b)      Defendants' disclosures concerning mortgage-backed
                                 securities were inadequate and failed to alert Fund investors
                                 to the resulting heightened risk exposure ..................................... 23

                        (c)      Defendants are not protected by the "Bespeaks Caution"
                                 Doctrine ......................................................................................... 25

i

2.      Defendants' Statements About the Fund's Investment Strategies and Policies Were Materially Misleading. ................................................ 26

3.      Lead Plaintiffs' Allegations Show that Reasonable Investors Actually *Were* Misled. .............................................................................. 31

4.      Lead Plaintiffs' Claims Do Not Sound in Corporate Mismanagement. ....................................................................................... 32

5.      Lead Plaintiffs' Allegations About the Fund's Inadequate Internal Controls Are Sufficient to State a Claim for Violations of Sections 11 and 12(a)(2). ........................................................................................ 34

C.      Defendants Are Liable Under Section 12(A)(2) As "Sellers." ............................. 36

D.      Defendants Are Liable Under Section 15 As "Control Persons." ........................ 38

E.      Lead Plaintiffs Have No Duty to Plead Loss Causation and Defendants Cannot Establish Negative Causation. ................................................................ 42

F.      Statute Of Limitations Does Not Preclude Lead Plaintiffs' Claims. ................... 46

IV.     CONCLUSION. ........................................................................................................... 48

## **TABLE OF AUTHORITIES**

### **CASES**

**Page(s)**

*Anixter v. Home-Stake Prod. Co.,*
   977 F.2d 1549 (10th Cir. 1992)..................................................................48

*In re Adams Golf, Inc. Sec. Litig.,*
   381 F.3d 267 (3d Cir. 2004)......................................................................42

*Adams v. Kinder-Morgan, Inc.,*
   340 F.3d 1083 (10th Cir. 2003)..................................................................39

*Akerman v. Oryx Commc'ns,*
   609 F. Supp. 363 (S.D.N.Y. 1984)...........................................................45, 46

*In re Alstom SA Secs. Litig.,*
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..........................................................40

*In re Am. Business Fin. Servs., Inc. Sec. Litig.,*
   2007 U.S. Dist. LEXIS 932 (E.D. Pa. Jan. 9, 2007) .....................................36

*Andropolis v. Red Robin Gourmet Burgers, Inc.,*
   505 F. Supp. 2d 662 (D. Colo. 2007)...........................................................33

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................................... 12-13

*Basic Inc. v. Levinson,*
   485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) ...........................14

*Batwin v. Occam Networks, Inc.,*
   2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ..........................39

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................12

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008)......................................................................18

*California Public Employees' Retirement Sys. v. Chubb Corp.,*
   2002 WL 33934282 (D.N.J. June 26, 2002) ...........................................48

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001)....................................................................44, 45

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D.  534 (N.D. Cal. 2009) ................................................. *passim*

*In re Convergent Techs. Sec. Litig.*,
    108 F.R.D. 328 (N.D. Cal. 1985)..............................................................42

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*,
    2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ....................................19, 26

*DeBruyne v. Equitable Life Assurance Soc'y*,
    920 F.2d 457 (7th Cir. 1990)....................................................................48

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993)......................................................................18

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
    305 F. Supp. 2d 658 (E.D. Tex. 2004) .....................................................38

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005).....................................................35

*Garcia v. Eidal Int'l Corp.*,
    808 F.2d 717 (10th Cir. 1986)..................................................................12

*In re Giant Interactive Group, Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)..........................................19, 42, 43

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985)...................................................................14

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997)..............................................15, 16, 25, 26, 31

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995) ..........................13

*Herman & MacLean v. Huddleston*,
    459 U.S. 375, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983) ..........................13

*Howard v. Everex Systems, Inc.*,
    228 F.3d 1057 (9th Cir. 2000)............................................................41, 42

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994)...........................................................................41

*Kas v. Fin. Gen. Bankshares, Inc.*,
    796 F.2d 508 (D.C. Cir. 1986) ......................................................................33

*Krouner v. The American Heritage Fund, Inc.*,
    1996 U.S. Dist. LEXIS 9783 (S.D.N.Y. July 15, 1996) ....................................22, 29

*Lane v. Page*, ,
    581 F. Supp. 2d 1094 (D.N.M. 2008) ...........................................................32, 33

*In re LDK Solar Sec. Litig*,
    2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ...............................................39, 40

*Lentell v. Merrill Lynch & Co. Inc.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................44

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998)......................................................................36, 41

*McMahon & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990)...........................................................................27

*Mellette v. Branch*,
    2009 WL 651142 (D. Colo. Mar. 12, 2009) ...................................................48

*In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003).............................................................43, 45

*Miller v. Thane Int'l,  Inc.*,
    519 F.3d 879 (9th Cir. 2008)..........................................................................13, 14

*N.J. v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004) ............................................................40

*Nappier v. PricewaterhouseCoopers LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) ...............................................................31, 32

*In re Nat'l Golf Props., Inc. Sec. Litig.*,
    2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ..............................................37

*Olcott v. Delaware Flood Co.*,
    76 F.3d 1538 (10th Cir. 1996)........................................................................47, 48

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ...................................................................................39

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ............................................................................................................36

*Piper Acceptance Corp. v. Slaughter*
   600 F. Supp. 169 (D. Colo. 1985) ......................................................................................47

*In re Qwest Commc'ns Intern., Inc. Sec. Litig.*,
   387 F. Supp. 2d 1130 (D. Colo. 2005) ..........................................................................39, 44

*In re Real Estate Assocs. Ltd. P'ship Litig.*,
   223 F. Supp. 2d 1109 (C.D. Cal. 2002) ..............................................................................21

*In re Rent-Way Secs. Litig.*,
   209 F. Supp. 2d 493 (W.D. Pa. 2002) ................................................................................46

*Rodney v. KPMG Peat Marwick*,
   143 F.3d 1140 (8th Cir. 1998) ......................................................................................19, 29

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ..............................................................................30, 35, 36

*SEC v. Wolfson*,
   539 F.3d 1249 (10th Cir. 2008) ..........................................................................................14

*In re Salomon Analyst Level 3 Litig.*,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004) ................................................................................35

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................................................43

*Santa Fe Industries, Inc. v. Green*,
   430 U.S. 462 (1977) ..............................................................................................32, 33, 34

*Schaffer v. Evolving Sys., Inc.*,
   29 F. Supp. 2d 1213 (D. Colo. 1998) ................................................................................38

*Schwartz v. Celestial Seasonings*,
   124 F.3d 1246 (10th Cir. 1997) ..........................................................................................13

*SEC v. Mozilo*,
   2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ..................................................................21, 47

*Siemers v. Wells Fargo & Co.*,
 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006)................................................................39, 41

*Siracusano v. Matrixx Initiatives, Inc.*,
 585 F.3d 1167 (9th Cir. 2009)........................................................................................18

*In re Sirrom Capital Corp. Sec. Litig.*,
 84 F. Supp. 2d 933 (M.D. Tenn. 1999) ..........................................................................36

*Sterlin v. Biomune Sys.*,
 154 F.3d 1191 (10th Cir. 1998)......................................................................................46

*In re Suprema Specialties, Inc. Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006)...........................................................................................13

*Tabankin v. Kemper Short-Term Global Income Fund*,
 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) .......................................................................29

*In re TCW/DW North American Government Income Trust Sec. Litig.*,
 1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997) ............................................. *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ........................................................................................................12

*TSC Indus. v. Northway*,
 426 U.S. 438 (1976) ........................................................................................................14

*In re Tyco Int'l, Ltd.*,
 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ....................................................................34

*Va. Bankshares, Inc. v. Sandberg*,
 501 U.S. 1083 (1991) ......................................................................................................35

*Warman v. Overland Data*,
 1998 WL 110018 (S.D. Cal. Feb. 20, 1998) ..................................................................37

*In re Westinghouse Sec. Litig.*,
 90 F.3d 696 (3d Cir. 1996)........................................................................................30, 38

*White v. Heartland High-Yield Municipal Bond Fund*,
 237 F. Supp. 2d 982 (E.D. Wis. 2002)......................................................................17, 29

*In re Williams Sec. Litig.*,
 558 F.3d 1130 (10th Cir. 2009)......................................................................................45

*Yuan v. Bayard Drilling Techs., Inc.*,
   96 F. Supp. 2d 1259 (W.D. Okla. 1999) ...................................................................................14

## RULES AND STATUTES

Fed. R. Civ. P. 8(a) ...................................................................................................................2, 13

Fed. R. Civ. P. 9(b) ........................................................................................................................31

Fed. R. Civ. P.  12(b)(6).................................................................................................................12

15 U.S.C. § 77(k) ...........................................................................................................................42

15 U.S.C. § 77(l) ......................................................................................................................13, 42

15 U.S.C. § 77(m) ..........................................................................................................................46

15 U.S.C.§ 77(o) ............................................................................................................................39

17 C.F.R. § 230.405 .......................................................................................................................42

Lead Plaintiffs, Errol Glynn O'Steen and Thomas Goodman, respectfully submit this memorandum of law in opposition to the motions to dismiss filed by defendants: (i) OppenheimerFunds, Inc. ("OFI"), OppenheimerFunds Distributor, Inc. ("OFDI"), John V. Murphy, and Brian W. Wixted (collectively, the "Oppenheimer Defendants");[1] and (ii) William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone, and F. William Marshall, Jr. (collectively, the "Trustee Defendants") (all defendants collectively referred to as "Defendants").[2]

## I.   INTRODUCTION

On December 17, 2008, a *Morningstar* article entitled "Oppenheimer Bond Funds Missed the Forest Fire for the Trees," summarized this case as follows:

> I'm sorry to be glib, but this strains credulity.  Here's a news flash, Oppenheimer:  If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for shareholders.  Not doing so is patently unacceptable and comes awfully close to dishonesty by omission.

Notwithstanding Defendants' 86 pages of briefing and 1,611 pages of exhibits, this is a very simple case.  Defendants, throughout the Relevant Time Period,[3] represented the Oppenheimer Champion Income Fund ("Champion Fund" or the "Fund") as a vehicle that would (i) invest in a "diversified portfolio of high-yield, lower-grade, fixed-income securities" that do not "involve undue risk," and (ii) specifically select securities "to help moderate the special risks of investing in high-yield debt instruments."  Defendants' representations led investors to believe

---

[1] The Oppenheimer Defendants filed a memorandum of law in support of their motion to dismiss on December 3, 2009 [Dkt. No. 87], referred to herein as "Oppenheimer Br."

[2] The Trustee Defendants filed a memorandum of law in support of their motion to dismiss on December 3, 2009 [Dkt. No. 88], referred to herein as "Trustees' Br."

[3] January 1, 2006 to December 31, 2008.  CCAC ¶ 89.

that the Champion Fund was a stable investment that involved no more risk than that inherent with broad-based investments in high-yield debt securities.   Instead of adhering to these principles, however, Defendants proceeded to transform the Fund into a *de facto* hedge fund[4] through complex, highly-leveraged and illiquid, off-balance sheet derivative transactions that dramatically enhanced the Champion Fund's risk exposure.   Defendants' wrongful manipulation of the Fund ultimately caused investors to suffer extraordinary losses totaling hundreds of millions, if not billions, of dollars when the enhanced, yet undisclosed, risks materialized.

Faced with these simple facts, the Defendants attack Lead Plaintiffs' claims by attempting to radically alter the pleading requirements under Rule 8(a) and purport to rewrite the standards for establishing a *prima facie* case under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").   In doing so, Defendants repeatedly cite securities fraud cases brought under the Securities Exchange Act of 1934 (the "Exchange Act") and seemingly insist that Lead Plaintiffs meet the pleading standards set forth under Rule 9(b).   Defendants' arguments are without merit and should be rejected.   Lead Plaintiffs' Consolidated Class Action Complaint ("Complaint" or "CCAC") more than adequately states claims under the Securities Act.

---

[4] A hedge fund is a flexible investment fund for large investors (usually a $1 million minimum investment) that uses high-risk techniques (not allowed for mutual funds) such as short-selling and heavy leveraging.  *See* http://www.thefreedictionary.com/hedge+fund.

II.     **STATEMENT OF FACTS**

A.      **The Fund and Its Stated Investment Objective and Strategies.**

The Fund, first offered in 1987, has five classes of shares outstanding.   CCAC ¶ 1. According to its Offering Documents,[5] the Fund's primary objective is to seek a high level of current income by investing mainly in a "diversified portfolio" of high-yield, lower-grade, fixed-income securities that do not involve "undue risk."  CCAC ¶¶ 4, 41.

Given the inherent risks of investing in high-yield debt instruments, the Offering Documents represented that the "overall strategy" of the Fund is to build a "broadly diversified" portfolio of investments in order to "moderate" these risks.  CCAC ¶¶ 4, 41.  In addition to diversification, the Fund also adopted illiquidity and leverage restrictions on its investments to further hedge against these inherent risks.  CCAC ¶¶ 41-42.  Specifically, the Fund represented that it would not invest more than 10% of its net assets in illiquid or restricted securities, nor would it borrow more than one-third (33 1/3%) of total assets.  CCAC ¶¶ 41-42.  Prior to 2006, it appears that the Fund adhered to its stated investment policies.

B.      **The Fund Abandons Its Stated Objective and Strategies and Dramatically Enhances Its Risk Profile.**

Beginning in 2006, however, and without adequate disclosure to its investors, the Fund altered its investment policies and began significantly increasing its positions in highly leveraged, illiquid, off-balance sheet derivatives in the hopes of achieving higher returns.  CCAC ¶ 45.  In effect, the Fund became a *de facto* hedge fund by investing heavily in "extraordinarily

---

[5] "Offering Documents" refers to the Fund's Registration Statements, Prospectus Materials, Statements of Additional Information ("SAIs"), and Annual Reports referenced in paragraphs 36 through 38 in the Complaint.

risky" credit-default swaps, total-return swaps, and mortgage-backed securities. *Id*. Despite the inherently risky nature of investing in high-yield debt instruments, and notwithstanding its representations to the contrary, the Fund exponentially increased its risk exposure by: (i) borrowing billions of dollars against Fund assets (*i.e.*, leveraging Fund assets) through various swap transactions; (ii) investing heavily in illiquid securities; and (iii) substantially increasing its positions in ultra-risky mortgage-backed securities. CCAC ¶ 44.

### 1. The Fund Becomes Excessively Leveraged.

In direct contrast to the Fund's representations that it would not take on any undue risk, the Fund invested heavily in both total-return swaps and credit-default swaps during the Relevant Time Period, which added a tremendous amount of risk-laden leverage to the Fund. CCAC ¶¶ 47-48; 52-54.

Total-return swaps are speculative, highly illiquid, and complex agreements between parties to exchange cash flows in the future based on how a set of securities or a particular index performs. CCAC ¶ 46. During the Relevant Time Period, the Fund dramatically increased the volume of its total-return swap transactions and exposed its investors to vastly increased, but undisclosed, risk. CCAC ¶ 47. For example, in the third quarter of 2007, the Fund's total-return swaps amounted to $79.5 million, but quickly reached over $1 billion, a 1,200% increase, in the first quarter of 2008, adding multiple layers increased, undisclosed risk. *Id*. Indeed, the Fund's total-return swap transactions averaged nearly $1 billion throughout the remainder of the Relevant Time Period. *Id*.

Credit-default swaps are essentially insurance contracts that insure against the default on debt securities such as corporate bonds. CCAC ¶ 49. As with total-return swaps, the Fund

significantly increased the volume of its credit-default swap transactions during the Relevant Time Period, thereby exposing investors to greatly enhanced, undisclosed risk. CCAC ¶ 52. For example, in the forth quarter of 2006, the Fund's credit-default swap transactions amounted to $123.6 million, but quickly surpassed $1 billion in the second quarter of 2007, and reached a high during the Relevant Time Period of $1.6 billion during the first quarter in 2008 (a 1,225% increase over the fourth quarter of 2006). *Id*.

The sheer magnitude of the sudden increases in swap transactions alone is inconsistent with the Fund's objective to avoid "undue risk," but when the resulting leverage is considered, the undisclosed risk exposure created by these swaps is staggering. CCAC ¶¶ 48, 53-54. "Leverage" refers to the utilization of "borrowed" money. CCAC ¶ 54. The use of leverage can increase returns when values rise but also greatly multiply losses when values decline. *Id*. Here, by investing heavily in the various swap transactions, the Fund was effectively insuring the performance of billions of dollars in risky derivative securities that the Fund did not own, in direct violation of its 33 1/3% borrowing limit.

The staggering magnitude of this leverage is demonstrated by comparing leverage values to the Fund's total net assets under management. CCAC ¶ 56. For example, in September 2007, when the Fund had over $2.5 billion in assets, the net notional value[6] of leverage was about $1.275 billion. *Id*. By March 2008, however, the net notional value of leverage was over $3.2 billion, greatly exceeding net Fund assets of $2 billion. *Id*. In other words, in March 2008, when Fund assets totaled about $2 billion, the Fund was not permitted to borrow more than $667 million (or 33 1/3% of $2 billion), yet this borrowing cap was exceeded by over $2.3 billion.

---

[6] "Notional value" means the total value of a leveraged position's exposure.

The enormity of this leverage clearly violated the Fund's representations that it would not borrow more than one-third of its total assets.  CCAC ¶¶ 42, 59.

### 2. The Fund Enhances Its Risk Exposure Through Investments in Mortgage-backed Securities.

During the midst of the financial market crisis in 2008, the Fund took on "undue risk" through its substantial investment in mortgage-backed securities.  CCAC ¶ 64-65.  Mortgage-backed securities are bonds backed by pools of mortgage loans and are riskier than other fixed income assets due to their complex structure and multiple risk sources, including not only interest rate risk but also prepayment risk, default risk, and liquidity risk.  CCAC ¶ 64.  U.S. short-term interest rates began to rise from low levels in 2004, with the "prime rate" climbing steadily throughout 2005 and 2006 from 4% to 8.25% in June 2006.  CCAC ¶ 66.  As key short-term and the prime rates rose, other interest rates rose as well, including those for commercial and residential mortgage loans.  *Id.*

Throughout 2006 and in the first half of 2007, the Fund had few if any positions in mortgage-backed securities.  CCAC ¶ 65.  During the third quarter of 2007, the Fund made its first substantial investments in mortgage-backed securities, representing about 3.8% of net assets.  *Id.*  This number remained roughly constant until the second quarter of 2008, when net assets invested in risky mortgage-backed securities ballooned to 11.2% with a peak of 12.7% by the end of 2008.  *Id.*  Also, despite the massive deterioration in the residential mortgage market and the overall crisis in the real estate market that began in 2007 and accelerated in 2008, during late-2007 to 2008, the Fund essentially "doubled down" on falling mortgage-related bonds by purchasing substantial stakes in mortgage-backed securities tied to commercial real estate – referred to as commercial mortgage-backed securities.  CCAC ¶ 67.  Moreover, Fund managers

increased their bet on commercial mortgage-backed securities, and therefore increased risk, by entering into total return swaps on commercial real estate indices.  CCAC ¶ 46.

Thus, Defendants chose to gamble on mortgage-backed securities during a time period in which the real estate market was in a free-fall and, along with it, the mortgage-backed securities tied to that market.  CCAC ¶ 67.  These substantial investments in mortgage-backed securities in the portfolio made the Fund's share price more volatile and the Fund much more susceptible to changes in interest rates and fixed income market dislocations.  CCAC ¶ 68.  The timing and magnitude of these mortgage-backed securities transactions was inconsistent with representations that the Fund was a diversified portfolio of higher-yield, lower-grade, fixed income securities that did not take any "undue risk."  *Id*.

### 3.     The Fund Violates Its Liquidity Risk Limits.

In direct contradiction to its representations regarding liquidity risk, the Fund repeatedly held positions in illiquid assets that greatly exceeded 10% of its net assets.  CCAC ¶ 63. "Liquidity risk" is generally defined as the risk that a given security or asset cannot be traded quickly enough in the market to prevent a loss (or make the required profit).  CCAC ¶ 60.  The Fund, in promising that it would not invest more than 10% of its net assets in illiquid or restricted securities, conveyed that it would carefully control for this risk and ensure that the Fund's investments would be, in the aggregate, liquid.  *Id*.  The Fund, however, maintained positions in illiquid securities exceeding the 10% threshold in every quarter during the Relevant Time Period.  CCAC ¶ 63.  In fact, the Fund's illiquid holdings exceeded 20% in every quarter except the fourth quarter of 2008 (18.99%), with a high during the Relevant Time Period of

27.08% in the fourth quarter of 2006. *Id.* The enhanced risk from overinvestment in illiquid securities was not disclosed.

### C. The Fund Lacked Internal Controls Over Risk Management.

The Fund had inadequate internal controls to manage the extreme risks that the Fund managers were taking. CCAC ¶ 69. As an example, the Fund reported the same prices in consecutive reporting periods for certain investments when, given the changes in prevailing market interest rates that occurred between those periods, it was simply impossible for the investments' prices "not" to change. CCAC ¶ 70. Moreover, Defendants failed to disclose that the Fund not only lacked the internal controls necessary to manage Fund risk, but could not even accurately report the prices of the securities it held.

The Fund's mispricing of assets are found as far back as second quarter 2006, and there are multiple examples throughout 2007 and 2008. CCAC ¶¶ 71-72. A fund's ability to track the values of its assets accurately is critical to risk management control, particularly in a fund – like Champion – that has substantial exposure to risky derivatives. CCAC ¶ 73. The Fund's mispricing of assets is but one example of inadequate internal controls. *Id.*

This mispricing of assets led to an overstatement of net asset values. CCAC ¶ 74. This, in turn, resulted in Fund shares being incorrectly priced and investors purchasing and redeeming Fund shares at prices that benefited redeeming investors at the expense of remaining and new investors. *Id.* The lack of internal controls was inconsistent with representations that the Fund did not take any undue risk. CCAC ¶ 75.

### D.      The Fund's Massive Losses.

Defendants' misstatements and omissions concerning the Fund's true objective and strategy resulted in billions of investor dollars pouring into the Fund, but these same misrepresentations ultimately resulted in investors suffering staggering losses in net asset value. CCAC ¶ 78.  During the Relevant Time Period, the Fund experienced an 82% drop in net asset value, one of the worst showings among the roughly 150 U.S. high-yield debt funds.  CCAC ¶ 80.  The magnitude of this drop was not the result of a downtrend in the market, but a direct result of the materialization of the risks that were not disclosed by Defendants' through their misstatements and omissions of material fact.  CCAC ¶ 81.

For context, the average high-yield bond fund dramatically outperformed the Fund in 2008, as reflected in the following graph comparing the Fund with the *Morningstar* High Yield Bond category (the Fund's benchmark index) and the Barclays Capital Aggregate Bond Index (a broad-based index of bonds traded in the U.S.):

Growth of $10,000

Oppenheimer Champion Income A      High Yield Bond      BarCap US Agg Bond TR USD



CCAC ¶ 82.

### E.     Defendants' Inadequate Disclosures.

The Fund's investment decisions were dramatically at odds with Defendants' representations that the Fund's primary objective was to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that do not involve "undue risk."  CCAC ¶¶ 4, 41.  Although Defendants made boilerplate disclosures about the risk and volatility of derivative transactions, such disclosures were wholly inadequate to completely and properly inform investors of the greatly enhanced risk the Fund undertook.  CCAC ¶ 2.  Indeed, many of the riskiest investments were off-balance sheet transactions for which the true risk, especially as compounded by leverage, could not be ascertained by ordinary investors.  CCAC ¶ 7.

The inadequacy of the Fund's risk disclosures to investors is evidenced by the numerous reports from analysts that followed the Fund.  As an analyst with *Morningstar* (the preeminent mutual fund reporting company in the U.S.) noted, the Fund lost a "stunning 79% and also *trailed 99% of its peers*."  The *Morningstar* analyst also confirmed that investors did not receive adequate disclosures:

> This horrendous performance resulted from heavy exposure to risky mortgage-related securities that blew up in the crisis, exposure that was magnified by economic leverage via swaps.  ***What's worse, because most of this leverage came via off-balance sheet derivatives, it wasn't apparent even to investors who took the time to look at the funds' financial statements.***

CCAC ¶ 7 (emphasis added).

Another *Morningstar* article dated December 19, 2008 and entitled, "Oppenheimer Bond Funds Missed the Forest Fire for the Trees," assailed the Fund managers for not disclosing the Fund's heavy reliance on complex, off-balance-sheet derivatives:

> ***Because most of the additional market exposure came from off-balance-sheet derivatives, the funds' portfolios didn't look highly leveraged.*** And while they may have been only somewhat leveraged in what we might call a conventional accounting sense – by borrowing money against your net assets and investing it – they were heavily leveraged as mutual funds go, in an *economic sense....*
>
> ***How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to figure out why, much less an actual explanation?***
>
> * * *
>
> I'm sorry to be glib, but this strains credulity. ***Here's a news flash, Oppenheimer: If your funds are going to use instruments that involve this much portfolio complexity, you have a duty to translate and simplify what that means for your shareholders. Not doing so is patently unacceptable and comes awfully close to dishonesty by omission.***

CCAC ¶ 86 (emphasis added).

On February 4, 2009, *Morningstar* included the Fund on its list of "The Eight Most Shocking Losses of the Past 12 Months," noting that "the managers tried to make a killing in mortgages by scooping them up at depressed prices in January 2008," which was "[n]ot only . . . a really bad bet, but it was made much worse by the use of tremendous leverage."  CCAC ¶ 84.

The next day, *Morningstar* explained in an article entitled, "Fund Companies Falling Short on Stewardship," that Fund managers "fail[ed] to appreciate the risks they were taking," and that Oppenheimer "also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary."  CCAC ¶ 84.  It also reported that day:

> In 2008, Oppenheimer Champion Income lost a nearly inconceivable 78% … primarily because the bond funds took on plenty of risk. Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds. When the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded, the funds got slammed. ***Not only did the managers fail to appreciate the risks they were taking, but Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary.***

CCAC ¶ 87 (emphasis added).

On February 6, 2009, *Morningstar* gave the Fund an "F" for "failing investors," noting that "the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect" and that "***no attempt was made to communicate to shareholders that these funds were taking on additional risk.***" CCAC ¶ 85 (emphasis added).

## III.   ARGUMENT

### A.   The Complaint Satisfies the Pleading Standards of Rule 8(a).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the pleadings should be liberally construed, all well-pleaded factual allegations must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 719 (10th Cir. 1986). The court also "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

A court may not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell*, 550 U.S. at 570).

Securities Act claims that are grounded in negligence are subject only to the liberal notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (Rule 8 applies to Sections 11 and 12(a)(2) claims that are not grounded in fraud).

Taking Lead Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Complaint sets forth a plausible claim to relief. Accordingly, Lead Plaintiffs have satisfied the pleading requirements of Rule 8(a) and Defendants' motions to dismiss should be denied.

## B. Lead Plaintiffs Allege Material Misstatements and Omissions Under Sections 11 And 12(a)(2).

"When alleging a violation of Section 11, a plaintiff who 'purchased a security issued pursuant to a registration statement . . . need only show a material misstatement or omission to establish [a] prima facie case." *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1251 (10th Cir. 1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983) (footnote omitted)). Similarly, Section 12(a)(2) provides a cause of action to a purchaser of a security against one who offers or sells a security "by means of a prospectus or oral communication" for misrepresentations or omissions of a material fact. 15 U.S.C. § 77l; *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995). Both Sections 11 and 12(a)(2) provide for absolute liability, even for innocent misstatements. *Schwartz*, 124 F.3d at 1251 (Section 11 liability "is virtually absolute"); *Miller v. Thane Int'l,*

*Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Section 12(a)(2) is a virtually absolute liability provision").

"A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision." *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); *Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259, 1266 (W.D. Okla. 1999) ("A misrepresentation of a fact is material under sections 11 and 12(a)(2) when an investor would attach importance to it in making an investment decision.").

The materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact. *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976) ("The issue of materiality may be characterized as a mixed question of law and fact. … The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."). "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). When determining whether a statement is material, courts should "adopt[] the perspective of an investor on the date the registration statement containing the prospectus at issue became effective." *Yuan*, 96 F. Supp. 2d at 1266 (internal quotations and citations omitted).

For the reasons that follow, the Fund's failure to disclose the magnitude of the portfolio's risk profile created by the Fund's enormous investments in mortgage-backed securities and swap transactions, as well as its violations of its stated investment strategies and multiple false representations that the Fund's primary objective would not involve "undue risk" would be material to a reasonable investor's decision to purchase shares in the Fund.   Accordingly, Defendants' motions to dismiss Lead Plaintiffs' Section 11 and 12(a)(2) claims should be denied.

**1.     The Offering Documents Were Not Accompanied By Meaningful Risk Disclosures.**

In moving to dismiss Lead Plaintiffs' claims, Defendants do nothing more than erect a "strawman" to challenge the essence of Lead Plaintiffs' allegations that Defendants failed to disclose the enhanced risks created by the Fund's investments in mortgage-backed securities, credit default swaps, and total return swaps in violation of various investment policies of the Fund.   In doing so, Defendants argue that the Fund's disclosure materials are replete with lists of the Fund's investments in mortgage-backed securities and swap transactions, which would have alerted a reasonable investor to the risk profile of the Fund's portfolio.   This strawman argument must fail.   Defendants ignore the essential allegations of Lead Plaintiffs' claims that Defendants failed to disclose the enormously enhanced risk that was created as a result of the sheer volume of the Fund's investments in mortgage-backed securities and swaps – not the plain and simple fact that the Fund's portfolio contained these types of investments.

**(a)     Defendants' disclosures concerning credit default and total return swaps were inadequate and failed to alert investors to the heightened risk exposure of the Fund due to leverage.**

A risk disclosure is insufficient to support a motion to dismiss where the disclosure does not specifically relate to the plaintiff's claims.   *See Grossman v. Novell, Inc.*, 120 F.3d 1112,

1120 (10th Cir. 1997) (not every risk disclosure will be sufficient to immunize statements relating to the disclosures; rather, 'the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions … which the plaintiffs challenge.'").

Defendants identify several statements that they argue sufficiently warned investors of the risks associated with the Fund's investments in swap transactions. *See* Oppenheimer Br. at 19-23. *See also* Oppenheimer Appendices A-3, A-4, A-5, and A-6.[7]  For example, Defendants rely on disclosures about derivatives generally (Oppenheimer Br. at 26) and statements that explain what credit default and total-return swaps are and the difference between buying and selling credit protection (Oppenheimer Br. at 24-26).  Defendants also argue that the following disclosures were sufficiently specific to warn investors of the risky nature of those investments:

> The use of swap agreements by the Fund entails certain risks. The swaps market is generally unregulated. There is no central exchange or market for swap transactions and therefore they are less liquid investments than exchange-traded instruments and may be considered illiquid by the Fund. Swap agreements entail credit risk arising from the possibility that the counterparty will default. . . . The Fund's successful use of swap agreements is dependent upon the Manager's ability to predict correctly whether certain types of investments are likely to produce greater returns than other investments. Swap agreements may effectively add leverage to the Fund's portfolio because the Fund would be subject to investment exposure on the notional amount of the swap.
>
> ***
>
> Credit default swaps are subject to counterparty credit risk (if the counterparty fails to meet its obligations). They are subject to the risk that the Fund will not properly assess the cost of the instrument. If the Fund is

---

[7] The Trustee Defendants and OIF incorporate by reference Section I of the memorandum of law filed by the Oppenheimer Defendants regarding disclosure of the nature, magnitude and risks of the Fund's investments.  Trustees' Br. at 17.  For simplicity, Plaintiff will cite only to the memorandum of law filed by the Oppenheimer Defendants on this issue.

> selling credit protection, there is a risk that a credit event will occur and that the Fund will have to pay par value on defaulted bonds.
>
> ***
>
> Total return swaps could result in losses if the underlying asset or reference does not perform as anticipated by the Manager.

Oppenheimer Br. at 26-27.

With respect to the leveraging effect of swaps, Defendants note that the Fund stated, "Swap agreements may effectively add leverage to the Fund's portfolio because the Fund would be subject to investment exposure on the notional amount of the swap." Oppenheimer Br. at 27. It also identified the following disclosure concerning leverage:

> INVESTMENTS WITH OFF BALANCE SHEET RISK. The Fund enters into financial instrument transactions that *may* have off-balance sheet market risk. Off-balance sheet market risk exists when the maximum potential loss on a particular financial instrument is greater than the value of such financial instrument, as reflected in the Fund's Statement of Assets and Liabilities."

Oppenheimer Br. at 28.

Defendants contend that these disclosures, as well as the notional amounts of the individual swap transactions, fully disclosed the risks of swaps and their leveraging effect, and that they could create off-balance sheet risk. Oppenheimer Br. at 23, 26-28, 41. Defendants' argument, which tellingly fails to cite relevant legal authority, should be rejected for several reasons.

First, these risk disclosures are simply generic statements that are not sufficiently tailored to inform Fund investors of the aggregate risk exposure of the Fund. Rather, they are no more than boilerplate descriptions that are inadequate to support a motion to dismiss. *See White v. Heartland High-Yield Municipal Bond Fund*, 237 F. Supp. 2d  982, 986 (E.D. Wis. 2002)

("boilerplate language which warns generally that 'junk bonds' involve greater risks and limited liquidity … are inadequate to support a motion to dismiss").

Second, a table that itemizes the notional amounts of individual swap transactions and a general disclosure that those transactions *may* have off-balance sheet risk does not warn investors that those investments did in fact have off-balance sheet risk at the time of the offerings, that these risks negated representations that the Fund's primary objective was to seek a high level of current income by investing mainly in a "diversified portfolio" of high-yield, lower-grade, fixed income securities that do not involve "undue risk," and that the Fund would build a "broadly diversified" portfolio of investments in order to "moderate" risks.  Once a defendant chooses to disclose a risk, it assumes a duty to disclose all material information about that risk, including whether the risk has come to fruition.  *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009) (reversing district court's dismissal of Complaint where defendant's disclosure about the risks of product liability claims did not disclose that the risk "may already have come to fruition."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of"); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such thing could happen is a far cry from one stating that this had happened.  The former does not put an investor on notice of the latter.").  While the Fund disclosed that the maximum potential loss on a particular financial instrument *could be greater* than the value of that financial instrument as a result of a swap transaction, the Fund failed to disclose that at the time of the offerings, that risk

already had come to fruition, i.e. the Fund already was heavily leveraged up to more than two times the total value of its net assets.  CCAC ¶ 68.

Third, "warnings of specific risks … do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the ***magnitude*** of the risks described."  *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) (emphasis added); *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) (defendant's cautionary statement fails to alert investors to the heightened extension risk posed by inverse floating collateralized mortgage obligations); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) (motion to dismiss Section 11 and 12(a)(2) claims denied where defendants disclosed the effect of gold farming generally but failed to disclose the scope and impact of its gold farming).  Defendants' disclosure that "off-balance sheet market risk exists when the maximum potential loss on a particular financial instrument is greater than the value of such financial instrument" did not warn investors of the ***magnitude*** of the Fund's overall leverage position (i.e. the total dollar amount of potential losses compared to the Fund's total net assets), which at the time of the offerings far exceeded the dollar value of the total net assets of the Fund, reaching more than 3.2 times the value of the Fund assets by the end of 2008.  *See* CCAC ¶ 56.

A reasonable investor would have considered significant to their investment decision the fact that the Fund's derivative securities were leveraged to an amount two and three times in excess of the net value of the Fund's assets, and thus the potential for the Fund to suffer a financial loss that far exceeded its net worth.  *See In re TCW/DW North American Government Income Trust Sec. Litig.*, No. 95-0167, 1997 U.S. Dist. LEXIS 18485, at *19 (S.D.N.Y. Nov. 20,

1997) ("while the prospectus's disclosures, understood together, clearly and accurately depict the type of risk borne by the Fund, a reasonable investor could find both that the prospectus failed to disclose the extent of the risk and that this failure significantly altered the total mix of information available.").

Finally, a determination of the magnitude of the Fund's leverage would require expert analysis – an analysis that a typical investor would be unable to perform.  As alleged, the Fund's net leverage position was calculated by an industry expert (CCAC ¶¶ 55-56).  Such a calculation is not one "that most investors would be able to perform based on a review of the Fund's SEC filings."  CCAC ¶ 47 n.1.  Defendants' assertion that the Fund's leverage position can be determined through "simple mathematics" (Oppenheimer Br. at 41 n.18) is manifestly unreasonable.  In support of their argument, Defendants attach a chart that shows how the "net notional" value of the Fund's leverage position is calculated.  *See* Oppenheimer Ex. V.  When viewed in context with the general nature of Defendants' risk disclosures, Defendants' chart demonstrates the complexity of performing such an analysis – a practical impossibility for most all investors.

Neither the analysis illustrated by Defendants' chart, nor the "net notional" value of the Fund's leverage position is disclosed in any of the Fund's Offering Documents.  Likewise, the "net leverage" multiplier is not disclosed in the Offering Documents.  Defendants note that the "net notional value" is "[c]alculated as the sum of the notional values of swaps plus the market value of futures bought by the Fund minus the market value of futures sold by the Fund." Oppenheimer Ex. V.  Although Defendants interestingly do not submit a chart that shows how "net leverage" is calculated, net leverage is equal to "the market value of long positions less the

market value of short positions divided by net asset value."  CCAC ¶ 56 n.2.  These complex

formulas are not disclosed and the Fund's investors were given no guidance on how to determine

the net notional value of leverage or net leverage.  Defendants' argument erroneously assumes

that an average investor not only has an understanding of futures, but also is familiar with these

specific mathematical equations and how they evaluate risk.  As *Morningstar*, a sophisticated

research analyst for mutual funds, so aptly summarized:

> How is it possible that a shareholder can go to its Web site, see that Core
> Bond is down nearly 40%, or 80% in the case of Champion Income, and
> yet find no information to use to *figure out why*, much less an actual
> *explanation?*
>
> ***
>
> If your funds are going to use instruments that involve this much portfolio
> complexity, you have a duty to translate and simplify what that means for
> your shareholders.  Not doing so is patently unacceptable and comes
> awfully close to dishonesty by omission."

CCAC ¶ 86.

If a Fund investor must perform such a difficult analysis of data to gain an understanding

of the true risk of his investment, Defendants' disclosures are necessarily insufficient to render

the alleged misstatements immaterial.  *See SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124, at

*10 (C.D. Cal. Nov. 3, 2009) (denying defendants' motion to dismiss where an investor would

have to "decipher complex raw data to understand that [defendants'] prime category included

borrowers with FICO scores below 620); *In re Real Estate Associates Ltd. Partnership

Litigation,* 223 F. Supp. 2d 1109, 1132 (C.D. Cal. 2002) ("the complexity of the REIT

transaction and the length of the Solicitations meant that the calculations and conclusions set

forth in the Solicitations were comprehensible only to those with a high level of expertise and familiarity with the REIT transaction.").

Defendants contend that the sum of the notional values of the Fund's individual swap transactions, which were disclosed every quarter, revealed to investors "the total amount for which the Fund could be liable in connection with its credit default swaps." Oppenheimer Br. at 30. This strawman argument, however, mischaracterizes Lead Plaintiffs' allegations as a failure to disclose the Fund's actual transactions in swaps and ignores the multiplying effect that the Fund's swap transactions had on the net leverage of the portfolio, resulting in vastly enhanced and undisclosed risk, which, as discussed above, cannot be determined by any ordinary investor. Although an investor may have been aware that the Fund invested in swaps, the additional layers of undisclosed risk such investments added to the Fund's portfolio would have been material to an investor. *See Krouner v. The American Heritage Fund, Inc.*, No. 94-7213, 1996 U.S. Dist. LEXIS 9783, at *7 (S.D.N.Y. July 15, 1996) (denying motion to dismiss Section 11 claim where "there is a substantial likelihood that a reasonable investor in the Fund would find that the Fund's excessive investment in illiquid securities to be a material fact, notwithstanding the knowledge that the Fund regularly invests in that type of security"). And, of course, Defendants never explained to investors how the swap transactions vitiated representations that the Fund would build a "broadly diversified" portfolio of investments in order to "moderate" risks.

The Fund also increased its already heightened risk in swap transactions by selling credit default swaps to companies that were in severe financial crisis, such as AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford, several of which were on the verge of bankruptcy. CCAC ¶¶ 51. Defendants state that the Fund disclosed

its investments in bonds issued by these companies.  Oppenheimer Br. at 13.  Defendants do not,

and cannot, however, argue that the Fund disclosed the increased risks associated with bonds

issued by these severely troubled financial companies, because it did not.

> **(b)** **Defendants' disclosures concerning mortgage-backed securities were inadequate and failed to alert Fund investors to the resulting heightened risk exposure.**

Beginning in the third quarter of 2007, at a time of massive deterioration in the residential

mortgage market and an overall crisis in the real estate market, the Fund began investing in

mortgage-backed securities, particularly commercial mortgage-backed securities. CCAC ¶¶ 65-

67.  By about the second quarter of 2008 the Fund's investments in mortgage-backed securities

increased to 11.2% and had peaked by the end of 2008 at 12.7%.  CCAC ¶ 65.  The complex

structure and multiple risk sources of the Fund's concentrated investments in mortgage-backed

securities made the Fund's investments far riskier than its other fixed income assets.  CCAC ¶

64.  As one court duly noted, "[m]ortgage-backed securities have become increasingly

complicated financial products, and now include among their number several mortgage

derivative securities … [such as] the CMO [('Collateralized Mortgage Obligation')]."  *In re

TCW/DW North American Government Income Trust Sec. Litig.*, No. 95-0167, 1997 U.S. Dist.

LEXIS 18485, at *9-*10 (S.D.N.Y. Nov. 20, 1997).  Collateralized mortgage obligations, which

represent interests in pools of residential or commercial mortgages, were one type of mortgage-

backed securities in which the Fund invested.  *See e.g.* September 2006 Prospectus.

In attempting to show that the Fund disclosed all material facts regarding its complicated

investments in mortgage-backed securities, Defendants identify, as they do for the Fund's swap

transactions, general disclosures explaining what mortgage-backed securities are and the Fund's

intention to invest in mortgage-backed securities and collateralized mortgage obligations. Oppenheimer Br. at 30-31. Defendants additionally identify disclosures about interest and prepayment risk applicable to mortgage-backed securities to show that the specific risks to mortgage-backed securities were disclosed. Oppenheimer Br. at 31-32; Oppenheimer Appendix A-7. Like the Fund's swap disclosures, its mortgage-backed securities disclosures also consisted of generic boilerplate language.

Absent from the Fund's disclosures are specific risk disclosures related to the inherent illiquidity of mortgage-backed securities and the collateralized mortgage obligations market. Defendants instead identify generic disclosures. *See* Appendix A-9. For example, the Fund states: "[t]he market for lower-grade securities may be less liquid, especially during times of general economic distress, and therefore they may be harder to value and to sell at an acceptable price. These risks can reduce the Fund's share prices and the income it earns" (*e.g.* September 2006 Prospectus at 4); "[s]ome derivatives may be illiquid, making it difficult to sell them at an acceptable price (*e.g.* September 2006 Prospectus at 5-6); and that "[s]ome derivative investments held by the Fund may be illiquid …." (*e.g.* September 2006 Prospectus at 12). The court in *TCW/DW North American Gov't Income Trust Sec. Litig.* found disclosures like these insufficient to sustain a motion to dismiss. No. 95 Civ. 0167, 1997 U.S. Dist. LEXIS 18485, at *27 (S.D.N.Y. Nov. 20, 1997). In *TCW/DW*, the fund's prospectus disclosed that it would invest at least 65% of the total assets in investment grade fixed-income securities, a substantial portion of which were mortgage-backed securities. *Id*. at *8. Plaintiff alleged that defendants' failure to disclose the inherent illiquidity of the market for collateralized mortgage obligations was material information to an investor. *Id*. at *27. The court held that defendants' illiquidity

disclosure "makes a general observation about all securities in the Fund, because it neither specifically refers to, or even suggests reference to, CMOs." *Id*. The court denied defendants' motion to dismiss plaintiffs' Securities Act claims, refusing to conclude that this omission was immaterial as a matter of law because a reasonable investor may find illiquidity risks particular to the collateralized mortgage obligations market to be material information. *Id*. at *28.

Like the defendants' disclosures in *TCW/DW*, the Fund's disclosures here concerning illiquidity are too general and do not specifically relate to Lead Plaintiffs' claims. Because the illiquidity risks specific to Lead Plaintiffs and the collateralized mortgage obligations market would be material information to a reasonable investor's decision to purchase shares in the Fund, Defendants' motions to dismiss on this ground should be denied. *TCW/DW*, 1997 U.S. Dist. LEXIS 18485, at *28.

The Fund's exposure to the riskier nature of mortgage-backed securities was further multiplied through Defendants' use of speculative total-return swap transactions on commercial real estate indices, which effectively "double-downed" its investments in commercial mortgage-backed securities. CCAC ¶ 46. As discussed, *supra*, although investors may have been aware that the Fund invested in mortgage-backed securities and swaps, Defendants' disclosures did not alert investors to the magnitude of this leveraging effect and thus the aggregate risk profile to which investors were exposed.

### (c)   Defendants are not protected by the "Bespeaks Caution" Doctrine.

Defendants appear to invoke the bespeaks caution doctrine. Oppenheimer Br. at 22-23, 26-28, 31-32. The bespeaks caution doctrine applies only to affirmative, forward-looking statements. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997). It cannot be

applied to shield defendants from liability for statements about "present factual conditions." *Grossman*, 120 F.3d at 1123. Here, the alleged false and misleading statements concern the investment strategies and practices of the Fund employed *at the time* plaintiffs purchased shares in the Fund. For example, the Offering Documents stated that the Fund "invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called 'junk' bonds" and "will not invest more than 10% of its net assets in illiquid or restricted securities." CCAC ¶¶ 41-42. The bespeaks caution doctrine is inapplicable to statements about the Fund's current investment strategies such as these. *Credit Suisse*, WL 300733, at *5 (bespeaks caution doctrine does not apply where the complaint "challenges the disclosures in the Prospectus relating to the nature of [defendant's] business and [defendant's] business strategies in place at the time the Prospectus became effective.").

### 2. Defendants' Statements About the Fund's Investment Strategies and Policies Were Materially Misleading.

Defendants' contention that the representation of the Fund's Investment Objective "to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that the Fund's investment manager … believes do not involve undue risk" is not actionable as a "broad investment goal" (Oppenheimer Br. at 17-21) is meritless. Defendants incorrectly attempt to isolate the Fund's overall strategy and ignore the statement taken together in context with the Fund's other investment strategies and representations.[8]

---

[8] Defendants also argue that the Fund's use of the term "diversification" is not misleading because the Fund incorporates into the Prospectus the definition of "diversified" set forth in the Investment Company Act. Oppenheimer Br. at 38-39. Defendants' argument mischaracterize

*(continued … )*

The central inquiry in determining whether a statement is materially misleading is "whether defendant's representations, *taken together and in context*, would have [misled] a reasonable investor" about the nature of the investment. *McMahon & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). When viewed in context, Defendants' statements made distinct claims about the current posture of the Fund and present methods being employed to achieve results. For example, the Fund's other investment strategies and policies include the following:

- "Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called 'junk' bonds;"

- "The Fund also uses certain derivative investments to try to enhance income or to try to manage investment risks;"

- "In selecting securities for the Fund, the overall strategy is to build a broadly diversified portfolio to help moderate the special risks of investing in high-yield debt instruments;"

- "The Fund will not invest more than 10% of its net assets in illiquid or restricted securities;" and

- "The Fund cannot borrow money in excess of 33 1/3% of the value of its total assets."

CCAC ¶¶ 4, 41-42.

These strategies portrayed operating rules for the Fund that were much more than a mere statement that is so "general and vague" as to be devoid of any meaning that a reasonable investor could factor into investment decisions. Rather, these statements represented an avowed inherent quality of the Fund – that although the Fund incurred greater risks than one that invested primarily in investment-grade securities, it did not take unreasonable or undue market risks and

---

*( ... continued)*
Plaintiffs' allegations, which do not allege that the Fund's definition of the term "diversified" was misleading.

its portfolio included investments that would manage or moderate the risks inherent to junk bonds. CCAC ¶ 4. Accordingly, Defendants marketed the Fund to investors seeking "a long-term investment" as "part of a retirement plan portfolio." CCAC ¶¶ 2, 4. Thus, when viewed in their full context, Defendants' representations presented to investors the false picture that the Fund was structured as a high-income fund that was not dramatically riskier than its high income/intermediate fund peer group. CCAC ¶ 2. Yet, the true extent of the risk to investors was not disclosed.

Throughout the Relevant Time Period, the Fund was far more risky than investors were led to believe, because Defendants heavily invested in mortgage-backed securities and speculative derivatives like credit default swaps and total-return swaps, but failed to disclose the excessive risks these investments added to the Fund's overall risk profile. CCAC ¶¶ 2, 5, 44. These investment practices were inconsistent with and in violation of the Fund's representations and stated investment strategies. CCAC ¶¶ 5, 44, 53, 57, 58, 68. Lead Plaintiffs allege that the Fund's investments in these speculative derivatives: (1) failed to manage risk but instead created undue risk (CCAC ¶¶ 5, 44a, 48, 53, 57, 68); (2) exceeded the Fund's limitation of investing in no more than 10% of its net assets in illiquid or restricted securities (CCAC ¶¶ 5, 44b, 62); and (3) exceeded the Fund's limitation on borrowing 33 1/3% of the value of total assets (CCAC ¶¶ 5, 44e, 58).

Defendants' severe departure from its investment strategies is supported by objective evidence. During the Relevant Time Period, the average high-yield bond fund substantially outperformed the Fund in 2008. CCAC ¶ 82. Thus, when viewed in context, Defendants' departure from the Fund's stated strategies and policies would be material to a reasonable

28

investor.  *See Rodney v. KPMG Peat Marwick,* 143 F.3d 1140, (8th Cir. 1998) (rejecting district court's characterization of the fund's policy on borrowing and illiquid securities as "general statements trumped by the Fund's more specific investment disclosures" and holding that a violation of the fund's stated policies would create an enhanced risk that is material to a reasonable investor; *White*, 237 F. Supp. 2d 982 (denying defendant's motion to dismiss section 11 claims where plaintiff alleged noncompliance with the Fund's stated objective and investment policy to invest no more than 15% of its net assets in illiquid securities); *Krouner*, 1996 U.S. Dist. LEXIS 9783 (same).[9]

Defendants argue that the Fund's swap investments did not violate the 33 1/3% borrowing restriction because that policy was limited to bank borrowing and did not specifically refer to the borrowing inherent in leverage.  Oppenheimer Br. at 40-41.  Defendants' argument, however, only points out further violations of this policy – that the Fund's borrowing effect created by the Fund's swap transactions were from non-banks.  Moreover, Defendants' position that the Fund's borrowing through leverage—which escalated to as much as 230% over the Fund's total assets by the end of the Relevant Time Period—did not violate the represented 33 1/3% cap on borrowing because the borrowing was from non-banks, is disingenuous in the extreme.  CCAC ¶ 56.

---

[9] Defendants' reliance on *Tabankin v. Kemper Short-Term Global Income Fund*, No. 93-5231, 1994 WL 30541 (N.D. Ill. Feb. 1, 1994) is misplaced.  The court in *Tabankin* granted defendants' motion to dismiss because the plaintiffs' complaint showed "that the Funds pursued the very strategies identified in the Prospectus."  *Id*. at *4.  Unlike the plaintiffs in *Tabankin*, Plaintiff here clearly alleges that the Defendants' actual investment practices were inconsistent with the strategies identified in the Offering Documents, truly creating undisclosed enhanced risks.

Defendants' argument that Lead Plaintiffs' allegations are insufficient to show that the Fund violated its limitation on illiquid investments also fails, because Defendants improperly attempt to impose on Lead Plaintiffs the particularity pleading requirements of Rule 9(b). Defendants' reliance on *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009), for the contention that Lead Plaintiffs must allege with particularity that the Fund did not actually believe its own liquidity determinations when made is misplaced, as that case is entirely inapplicable here. In *Rubke*, plaintiffs' claims were brought pursuant to, *inter alia*, Sections 11 and 12(a)(2) of the Securities Act *and* Section 10(b) of the Exchange Act. *Id.* at 1160. The Ninth Circuit held that because the complaint "employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act," plaintiff's section 11 claims "sounds in fraud." *Id.* at 1161. Therefore, the Court held that Rule 9(b) applies to plaintiff's section 11 claims and her complaint "must 'state with particularity the circumstances constituting fraud ....'" *Id.* (quoting Rule 9(b)). Here, Lead Plaintiffs' claims are not based in fraud, nor do Defendants even attempt to argue that they sound in fraud arguably triggering the heightened requirements of Rule 9(b). Accordingly, Lead Plaintiffs are bound only by the "short and plain statement" requirements of Rule 8(a). Lead Plaintiffs have met this burden. *See* CCAC ¶ 5, 44b, 62. To the extent Defendants challenge the methods and conclusions of Lead Plaintiffs' expert, Defendants' argument is inappropriate at the motion to dismiss stage. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) ("Resolution of a battle of expert sources ... is inappropriate on a motion to dismiss."). *See also Nappier v. PricewaterhouseCoopers LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002) ("the

determination of 'what accounting practices comprise GAAP is a question of fact best addressed through expert testimony and thus inappropriate for resolution on a motion to dismiss.'").

Similarly, Defendants' again impermissibly attempt to hold Lead Plaintiffs to the particularized pleading standard of Rule 9(b) by arguing that Lead Plaintiffs failed to allege facts showing how the statement that the Fund "invests at least 80% of its net assets … in investment grade debt securities" was false.  Oppenheimer Br. at 36-37.  Defendants mistakenly rely on *Grossman*, 120 F.3d 1112.  The plaintiffs in *Grossman* asserted claims of fraud under the Exchange Act and the court, accordingly, held plaintiffs to the pleading standards of Rule 9(b).  *Grossman*, 120 F.3d at 1115, 1118.  In holding that the complaint failed to allege facts showing that defendant's statements were false, the court specifically recognized that "*Fed.R.Civ.P. 9(b) requires* that to state a claim for securities fraud, '[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id*. at 1124 (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)) (emphasis added).  As discussed above, Lead Plaintiffs' claims are subject to only the notice pleading requirements of Rule 8(a), with which Lead Plaintiffs comply.

### 3.  Lead Plaintiffs' Allegations Show that Reasonable Investors Actually *Were* Misled.

Lead Plaintiffs here go well beyond the Rule 8(a) pleading requirement by demonstrating that not only *would* a reasonable investor be misled about the nature of the investment, but that a sophisticated mutual fund analyst – *Morningstar* – *was* misled.  CCAC ¶¶ 6, 89-90.  On multiple occasions, *Morningstar* reported on the misleading nature of the Fund's disclosures.  On December 17, 2008, it reported:

> Because most of the additional market exposure came from off-balance-sheet derivatives, the funds' portfolios didn't *look* highly leveraged. And while they may have been only somewhat leveraged in what we might call a conventional accounting sense – by borrowing money against your net assets and investing it – they were heavily leveraged as mutual funds go, in an *economic sense* ….

> How is it possible that a shareholder can go to its Web site, see that Core Bond is down nearly 40%, or 80% in the case of Champion Income, and yet find no information to use to *figure out why*, much less an actual *explanation*?

CCAC ¶ 86.  Later, on February 5, 2009, *Morningstar* reported "the managers bought complex, off-balance sheet swap contracts that created a leveraging effect on the funds" and that "Oppenheimer also did a terrible job communicating the risks of this exposure in shareholder reports and Web commentary" (CCAC ¶ 87).  *Morningstar* similarly reported the next day that "the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect" and that "no attempt was made to communicate to shareholders that these funds were taking on additional risk."  CCAC ¶ 85.  Lead Plaintiffs' allegations thus clearly meet the pleading standard required under Rule 8(a).

### 4.    Lead Plaintiffs' Claims Do Not Sound in Corporate Mismanagement.

Defendants attempt to distort Lead Plaintiffs' allegations as complaining of corporate mismanagement.  Oppenheimer Br. at 35-37; Trustees' Br. at 14-17.  Defendants rely on the Supreme Court's decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), which held that allegations of mere mismanagement are not actionable under the federal securities laws. *Santa Fe*, 430 U.S. at 478-79.  However, Defendants neglect to recognize that *Santa Fe* does not preclude a claim "based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary duty claim."  *Lane v. Page*,

581 F. Supp. 2d 1094, 1106 (D.N.M. 2008) (quoting *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 512 (D.C. Cir. 1986)).  As the court in *Lane* noted, "*Santa Fe* itself declares that 'the existence of a particular state-law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy' under section 10(b)." *Id.* (quoting *Kas*, 796 F.2d at 512 (quoting *Santa Fe*, 430 U.S. at 478)).  In other words, a claim that meets the necessary elements in federal law will not be impermissible just because the claim also may assert a state law claim. *Lane*, 581 F. Supp. 2d at 1113-14.

Defendants mischaracterize Lead Plaintiffs' allegations as complaining about Defendants' decision to invest improperly in risky mortgage-related securities and swap transactions.[10]  Even though Defendants may have mismanaged the Fund, Lead Plaintiffs' allegations go much further than this management decision – Lead Plaintiff alleges that Defendants failed to disclose the aggregate risk profile of the Fund and the extent to which it was exposed to risky mortgage-backed securities and swap transactions. *See* CCAC ¶¶ 2, 5, 6, 49, 75.  For the reasons discussed in Section III.B., Lead Plaintiff has sufficiently pled the necessary elements of his Securities Act claims which therefore are not precluded by *Santa Fe*. *Lane*, 581 F. Supp. 2d at 1113 (rejecting defendants' argument that *Santa Fe* precludes plaintiff's claims where plaintiff's allegations also met the elements of Section 14(a) of the Exchange Act in addition to possible violations of state-law claims for corporate malfeasance).

---

[10] Defendants cite *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007) to assert that Plaintiffs here are merely "bootstrapping" claims of mismanagement to their Securities Act claims.  Oppenheimer Br. at 35, 36, 44.  Again, Defendants rely on a decision that analyzed the sufficiency of the plaintiff's claims under Rule 9(b). *Andropolis*, 505 F. Supp. 2d at 675.

Moreover, the value of the undisclosed risks of the Fund would be material to an investor for reasons other than mismanagement. Lead Plaintiffs' claims thus are based on the concealment of this information concerning mismanagement, rather than the underlying mismanagement itself. *In re Tyco Int'l, Ltd.*, No. 02-1335, 2004 WL 2348315, at \*3-\*4 (D.N.H. Oct. 14, 2004) (rejecting defendants' assertion that *Santa Fe* precludes any claim on a failure to disclose corporate misconduct and holding that plaintiffs' claims are based on concealment of material information concerning corporate misconduct).

>    **5.     Lead Plaintiffs' Allegations About the Fund's Inadequate Internal Controls Are Sufficient to State a Claim for Violations of Sections 11 and 12(a)(2).**

During the Relevant Time Period, key short-term interest rates began to rise from low levels in 2004, with the prime interest rate climbing steadily throughout 2005 and 2006 from 4% to 8.25% in June 2006. CCAC ¶ 66. As key short-term and the prime rates rose, other interest rates rose as well. *Id.* As a result of these significant changes in prevailing interest rates, the price of certain of the Fund's investments would be expected to change accordingly. CCAC ¶ 70. And, given the risky nature of the Fund's investments, its ability to accurately track the value of its investments is critical to risk management control. CCAC ¶ 73. However, the Fund continued to report the *same* price for certain investments in consecutive reporting periods as early as the second quarter in 2006 and throughout 2007 and 2008 – powerful proof that its internal controls with respect to pricing had failed. CCAC ¶¶ 70-73. This inadequacy is just one example of the Fund's failure to manage the extreme risks that Defendants were taking. CCAC ¶¶ 70, 73.

In blatant disregard of those specific allegations, Defendants erroneously argue that Lead Plaintiffs fail to plead any facts showing that the Fund lacked internal controls. Oppenheimer Br. at 44-45. Specifically, Defendants assert that Lead Plaintiffs fail to identify any specific internal control that increased risk by Defendants' failure to adhere to it, allege that the Fund's pricing of its assets is not a function of internal control, and that the Fund's pricing procedures were not deficient or not followed. Oppenheimer Br. at 44-45. As set forth above, Lead Plaintiffs quite clearly allege, as one example, that the Fund's internal controls with respect to pricing were critical to managing the extreme risk of its investments, and that these pricing controls were inadequate to manage that risk. *See* CCAC ¶¶ 69-75.

Moreover, Defendants' attempt to improperly hold Lead Plaintiffs to the heightened pleading standard of Rule 9(b). In addition to arguing that Lead Plaintiffs did not plead *any* facts, which Lead Plaintiffs do, Defendants also explicitly argue that "Plaintiffs must allege *particularized* facts sufficient to show that the valuations were not honestly believed when made." Oppenheimer Br. at 46 (emphasis added). Defendants mistakenly rely on several cases that allege fraud and/or were found to be grounded in fraud, and thus evaluated under the heightened pleading requirements of the PSLRA and Rule 9(b). Oppenheimer Br. at 46 (citing *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 385, 392 (S.D.N.Y. 2005) (alleging violations of Sections 10(b) and 20(a)); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 488 (S.D.N.Y. 2004)(asserting violations of Sections 10(b) and 20(a)); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)(alleging violation of Section 14 of the Exchange Act); *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)

(allegations sounded in fraud, therefore, Rule 9(b) applied to claims under both Sections 11 and 10(b)).

To survive a motion to dismiss, allegations of inadequate internal controls must comply with only the liberal notice pleading requirements of Rule 8(a).  *In re American Business Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 U.S. Dist. LEXIS 932, at *25-*26 (E.D. Pa. Jan. 9, 2007) (denying motion to dismiss where plaintiffs' allegations of inadequate internal controls met the pleading requirements of Rule 8(a)).  Lead Plaintiffs' allegations that the Fund's pricing controls were not sufficient to manage the extreme risks taken by the Fund meet this standard.

**C.      Defendants Are Liable Under Section 12(A)(2) As "Sellers."**

Defendants contest the sufficiency of Lead Plaintiffs' "seller" allegations with respect to each Defendant, except OppenheimerFunds Distributor, Inc.  Oppenheimer Br. at 63; Trustees' Br. at 6-10.  Liability under Section 12(a)(2) "is not limited to the person who passes title to the securities, but extends 'to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"  *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (quoting *Pinter v. Dahl,* 486 U.S. 622 (1988)).[11]

Here, each of the Individual Defendants signed or authorized the signing of the August 7, 2006, January 26, 2007, and/or January 28, 2008 Registration Statements.  CCAC ¶¶ 18-28.  Allegations that a defendant signed a solicitation document, such as a prospectus or registration statement, are sufficient to show that defendants were "sellers" under Section 12(a)(2).  *In re*

---

[11] The Tenth Circuit has observed that "*Pinter's* definition of a statutory seller under § 12(a)(1) has been applied to § 12(a)(2) as well."  *Maher*, 144 F.3d at 1307 n.10.

*Sirrom Capital Corp. Sec. Litig.,* 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) ("Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock."); *In re Nat'l Golf Props., Inc. Sec. Litig.,* No. CV 02-1383, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) (allegations that defendants signed a registration statement on behalf of the issuer, which was also the actual seller, were sufficient to allege active solicitation of purchase of security).   Additionally, Defendants John V. Murphy, as President and Principal Executive Officer, and Brian W. Wixted, as Treasurer and Principal Financial and Accounting Officer, are liable as officers of the Fund.  *Warman v. Overland Data,* No. 97-0833, 1998 WL 110018, at *16-17 (S.D. Cal. Feb. 20, 1998) (allegation that "defendants, as officers, were sellers, offerors and/or solicitors" of sales of shares in IPO was sufficient to state claim under Section 12(a)(2)).

Although these allegations are sufficient to show "seller" liability, Lead Plaintiffs' allegations are not limited to signing the Registration Statements and Fund governance, as the Trustee Defendants contend (Trustees' Br. at 8).  Lead Plaintiffs additionally allege that the Trustee Defendants were actively involved in selling the Fund's shares.  For example, Lead Plaintiffs allege that: each of the Section 12 Defendants, including the Trustee Defendants, "participated in the process which allowed the offerings to be successfully completed, or . . . participated in the offer or sale of the shares of the Fund" (CCAC ¶ 116); "Defendants issued and offered for sale shares of the Fund" (CCAC ¶ 40); and the Trustee Defendants "'solicited' purchases of the Fund's shares to serve their own financial interests" (CCAC ¶ 107c).  This Court previously has held that allegations like these that, "'at a minimum allege facts' that the defendants 'solicited' the purchase of their … stock," are sufficient to make a prima facie case of

Section 12 (a)(2) liability against the defendants. *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1222-23 (D. Colo. 1998). Similarly, in *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009), the court held that allegations that defendants signed the registration statement, "actively solicited the sale of the fund's shares," and were involved in marketing the fund sufficiently pled solicitation.

Furthermore, given the fact-sensitive nature of "seller" allegations, any doubts about whether Lead Plaintiffs can prove defendant acted as a "seller" are not to be resolved on a motion to dismiss. *See e.g., Schwab*, 257 F.R.D. at 550 (whether defendants actually solicited plaintiffs' sales is a factual question for the jury); *Westinghouse*, 90 F.3d at 717 (reversing district court's dismissal of complaint and holding that allegations that defendants solicited plaintiffs to purchase securities and in doing so were motivated by a desire to serve their own financial interests were not "bare legal conclusions," but were instead "factual allegations" that must be proved at trial) (citation omitted); *In re Elec. Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658, 681 (E.D. Tex. 2004) (holding that plaintiffs' complaint "has certainly given fair notice that Plaintiffs intend to prove Defendants' seller status, and the Court will not resolve this claim under 12(b)(6) on the fact-intensive 'seller' status issue").

For the foregoing reasons, Defendants' contention that Lead Plaintiffs' allegations do not amount to a viable Section 12(a)(2) claim should be rejected.

### D.  Defendants Are Liable Under Section 15 As "Control Persons."

Section 15(a) of the Securities Act "imposes joint and several liability upon every person who controls any person liable under Sections 11 or 12." 15 U.S.C.§ 77o. Control-person liability under Section 15(a) requires: (i) a primary violation of the securities laws, and (ii)

"control" over the primary violator by the alleged controlling person.   *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003).   The complaint adequately alleges that the Trustee Defendants are "Control Persons" for purposes of Section 15 liability.

At the pleading stage, allegations that individual defendants are the primary violator's senior executives suffice. *See, e.g., In re Qwest Commc'ns Intern., Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1149 (D. Colo. 2005).   Indeed, courts regularly find that general allegations that individual defendants, by virtue of their executive and managerial positions, had the "power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the" primary violators, are sufficient at the pleadings stage. *Siemers v. Wells Fargo & Co.,* 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006); *see also In re LDK Solar Sec. Litig*, 2008 WL 4369987, at *38 (N.D. Cal. Sept. 24, 2008) (refusing to dismiss control-person claim where complaint alleged that each defendant was a senior manager and undertook typical managerial activities including the signing of the prospectus and financial disclosures) (citing *Siemers*, 2006 WL 2355411, at *14).   Moreover, general allegations such as these give defendants fair notice of the nature of the claims asserted against them. *Cf, Batwin v. Occam Networks, Inc.,* 2008 U.S. Dist. LEXIS 52365, at *80 (C.D. Cal. July 1, 2008) (plaintiffs' Section 20(a) allegations "place the [venture capital] defendants on adequate notice as to the basis for its claims against them"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) ("[n]aked allegations of control, however, will typically suffice to put a defendant on notice of the claims against her").

Here, the Complaint alleges that each Trustee was a control person of the Fund (or the Defendant Oppenheimer entities) by virtue of his or her position as a trustee and/or senior officer

of the Fund or the Oppenheimer entities.  The Individual Defendants -- which include the Trustee Defendants -- each had a series of direct or indirect business or personal relationships with other trustees, officers, or major shareholders of the Oppenheimer entities and the Fund.  CCAC ¶ 115. Further, the Trustee Defendants were trustees of OppenheimerFunds Distributor, Inc., the entity that issued the Fund's shares and a critical underlying violator.  See CCAC ¶¶ 17, 32.  These general allegations easily satisfy the foregoing standards.

In addition, the Complaint alleges that the Trustee Defendants culpably participated in the underlying Section 11 and 12 violations "based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund."  CCAC ¶ 116.  This type of conduct, standing alone, has been deemed sufficient to indicate "activities typical of managers with the ability to control or influence a corporation."  *See LDK Solar*, 2008 WL 4369987, at *12.  And, courts presume that an outside director and audit committee member who signs an SEC filing has the power to control those who write the report, within the meaning of Section 20(a).  *In re Alstom SA Secs. Litig.,* 406 F. Supp. 2d 433, 488 (S.D.N.Y. 2005); *N.J. v. Sprint Corp.,* 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004) (holding that allegation that board members signed SEC filings containing misleading or fraudulent statement raised sufficient inference of control to state claims for control person liability); *see also In re Rent-Way Secs. Litig.,* 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002) (ruling that a complaint was sufficient that alleged, among other indicia of control, that individual defendants "signed one or more statements filed with the SEC that were eventually restated, and . . . had the ability to control the contents of these various statements").  Further, the

determination of who is a controlling person is generally an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000)(quoting *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994), reversing district court's motion to dismiss claims against CEO, and holding that issue of whether defendant CEO, who was authorized to participate in release of financial statements and signed off on statements as correct, exercised actual power or control over company, was for jury).

Citing *Maher*, 144 F.3d at 1305, the Trustee Defendants assert a stricter pleading standard, arguing that Lead Plaintiffs must plead particular facts showing how each of them exercised actual power or control over Oppenheimer and the Fund. Trustees' Br. at 11-12. *But* the facts in *Maher* were completely different from those at hand. In *Maher*, the plaintiff alleged that individual defendants were officers or employees of the defendant company, they had access to information relating to the company that was not available to the public, and one defendant purchased enough stock in the defendant company sufficient to acquire a controlling interest in the defendant company. *Id.* The court in *Maher* noted that the plaintiff had failed to cite any cases where control person liability was found on such a tenuous connection between the alleged control person and the primary violator. *Id.* at 1306. But, as noted above, courts hold that general allegations that individual defendants, by virtue of their executive and managerial positions, had "power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the" primary violators, are sufficient at the pleadings stage. *Siemers,* 2006 WL 2355411, at *14. Lead Plaintiffs have alleged these facts.

The Trustee Defendants also claim that by virtue of being "independent" they cannot be deemed to have the requisite control.  Trustees' Br. at 13.  But they overlook the statutory definition of "control," which means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.  The "power to control or influence" the primary violator is sufficient to establish membership in a corporation's control group. *See, e.g., Howard.,* 228 F.3d at 1065; *In re Convergent Techs. Sec. Litig.,* 108 F.R.D. 328, 342 (N.D. Cal. 1985) (control stems from "the power or influence to direct significant aspects of the management of the corporation").  As demonstrated immediately above, reviewing and signing financial statements can lead to control-person liability, even without culpable participation in the violation.  *See Howard,* 228 F.3d at 1065-66.

### E.     Lead Plaintiffs Have No Duty to Plead Loss Causation and Defendants Cannot Establish Negative Causation.

Loss causation is not an element that must be pled under Sections 11 or 12(a)(2).  *See* 15 U.S.C. § 77(k)(a), 15 U.S.C. § 77l; *Schwab*, 257 F.R.D. at 544.  While defendants may raise negative causation as an affirmative defense, numerous courts refuse to dismiss Sections 11 and 12(a)(2) cases at this early stage on the basis of a negative causation.  *See e.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint."); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion.").

Notwithstanding the premature nature of Defendants' argument, it fails to overcome the pleadings. A complaint may only be dismissed for want of loss causation if it can be said, as a matter of law, that "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *Giant*, 643 F. Supp. 2d at 572 (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003)). The court in *Schwab*, 257 F.R.D. at 547, where plaintiffs set forth allegations nearly identical to the ones at hand, concluded that loss causation "is not limited to the common 'corrective disclosure-price drop' scenario." *Id*. Instead, the *Schwab* court reasoned, plaintiffs may establish loss causation by alleging that either (1) the misstatement or omissions concealed the risk that materialized and lowered the value of the security, or that (2) the "subject" of the misstatement or omission caused the loss. *Id*. (internal citations omitted). Here, just as in *Schwab*, Lead Plaintiffs allege that Defendants "misrepresented the *scope* of the fund's risks, and the undisclosed risks exacerbated the losses." *Id*. Additionally, the "*subject* of the fraudulent statements caused their losses-that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses." *Id*. (emphasis in original).

Conversely, this is not a fee case in which misrepresentations or omissions regarding the use of investment fees had no effect on the net asset value of the mutual fund. *See In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006) (an easily distinguishable fee case cited by Defendants in which disclosure of the total fees and the allocation of the fees would not affect the mutual fund share value because the fees have no relation to the Fund's investment in the underlying securities). Nor is this a case in which Lead Plaintiffs allege that misrepresentations inflated the price of a security which fell to its true value

43

after the disclosure of the truth.  *See In re Qwest Commc'ns Intern., Inc. Sec. Litig.*,  387 F. Supp. 2d 1130, 1148 (D. Colo. 2005) (upholding claim that defendants' false statements concerning Qwest's financial status was a significant, if not primary, cause of its losses).  Instead, Lead Plaintiffs' allegations in this case fall directly into the "materialization of risk" approach firmly established by *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 175 (2d Cir. 2005):

> [T]he complaint alleges "facts that support an inference that [Defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.

*Id*.

As discussed in Section III.B, *supra*, despite Defendants' multiple representations to investors that the Fund's primary objective was to seek a high level of current income by investing mainly in a "diversified portfolio" of high-yield, lower-grade, fixed-income securities that do not involve "undue risk," the Fund abandoned its stated investment policies, significantly increased the number of its riskiest investments and leveraged the Fund to an amount in far excess of its net assets, but failed to disclose the magnitude of the risks associated with those investments to investors.  Unfortunately, the realization of the magnitude of these risks came to fruition, causing the Fund's net asset value to crash when the concealed risks were realized.

By the end of March 2009, the value of the Fund's assets had plummeted to under $400 million from over $2.7 billion just two years earlier.  CCAC ¶ 83.  As *Morningstar* observed, the Fund "trailed 99% of its peers."  CCAC ¶ 7.  As the Second Circuit noted:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a ***zone of risk*** that would be perceived as remote or highly unlikely by one believing the fraud, and ***the loss ultimately suffered is within that zone***, then a misrepresentation or omission as to

> that information may be deemed a foreseeable or proximate cause of the
> loss.

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188, n.6 (2d Cir. 2001) (emphasis added)

(holding plaintiffs identified sufficient evidence of loss causation to avoid summary judgment on

claims regarding material omission of quantified risk).

Defendants "restrict the concept of loss causation too narrowly." *Schwab*, 257 F.R.D. at

546. Indeed, Defendants go to great lengths to describe the function of mutual funds and the

statute that governs the way in which the value of the mutual fund is calculated, ignoring the

dozens of Securities Act Claims against mutual funds that do in fact survive motions to dismiss.

In essence, Defendants' argue that misstatements and omissions regarding a mutual fund are

inactionable under Federal Securities laws because such misstatements and omissions cannot

inflate the net asset value of the fund.[12]  Oppenheimer Br. at 49-50. This argument, however,

completely ignores the well established "materialization of the risk" aspect of loss causation set

forth above. Moreover, this type of erroneous and overly narrow formulation "would effectively

insulate mutual fund companies from claims for a wide range of material misrepresentations

regarding fund policies, risks, and investment decisions." *Schwab*, 257 F.R.D. at 547. In

addition, Defendants cite *Akerman v. Oryx Commc'ns*, 609 F. Supp. 363, 371-72 (S.D.N.Y.

1984), adjudicated at summary judgment, in support of their argument that disclosures by a

---

[12] Defendants' reliance on *In re Williams Sec. Litig. – WCG Subclass* is misplaced, simply because the court's analysis focuses on a Section 10(b) claim at the summary judgment phase, concluding that Plaintiff's expert is unreliable, and therefore Plaintiffs failed to present evidence on the issue of loss causation. 558 F.3d 1130, 1143 (10th Cir. 2009). Similarly, *In re Merrill Lynch Research Reports Securities Litigation* dismissed plaintiff's suit because plaintiffs failed to plead an actionable misrepresentation, notably finding that mutual funds must indeed disclose "investment strategies and risk, mismanagement, organization, capital structure, and distribution arrangements." 289 F. Supp. 2d 429, 434 (S.D.N.Y. 2003).

mutual fund do not affect the share price.  In *Akerman*, however, Oryx's stock did not drop after

the disclosure of earnings, and actually rose above its class period levels.  *Id*. at 370. The court

even noted that the legislative choice of making loss causation an affirmative defense under

Section 11(e) "represents a judgment that the risk of any uncertainty as to causality must fall

upon defendants in order to insure the full disclosure that is the primary goal of the act," thereby

entitling plaintiffs to a "rebuttable presumption that the decline was related to the nondisclosure."

*Id.* at 372.

### F.    Statute Of Limitations Does Not Preclude Lead Plaintiffs' Claims.

Actions for violations of Sections 11 or 12 of the Securities Act must be brought "within

one year after the discovery of the untrue statement or the omission, or after such discovery

should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  The Tenth

Circuit has held that the statute of limitations begins to run "once the investor, in the exercise of

reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin v.

Biomune Systems*, 154 F.3d 1191, 1201 (10th Cir. 1998).  The standard outlined in *Sterlin* sets

forth a two-step process in determining when the statute of limitation period begins to run: 1) the

date when there existed "sufficient storm warnings" to alert a reasonable person to the possibility

that misleading statements or significant omissions had been made; and 2) the period thereafter

during which a reasonable investor should have discovered the facts underlying the alleged

misstatements or omissions.  *Id.*  As discussed in Section III.B.1, *supra*, Defendants' disclosures

regarding the Fund's illiquidity, leverage, and overall risk profile were wholly inadequate.

Indeed, even the Fund's independent analysts did not appreciate the full extent of the

Fund's risk exposure until it was too late.  *See* Section III.B.3, *supra* (discussing *Morningstar*

reports that criticize Defendants for failing to adequately disclose the risks associated with its investments). If sophisticated analysts, like *Morningstar*, did not pick-up on Defendants' purported "storm warnings," no reasonable investor could be charged with such knowledge. *See Mozilo*, 2009 WL 3807124, at *10 (finding that it is difficult for a court to determine, as a matter of law, whether purportedly disclosed information was "readily" or "reasonably" available" to an investor, particularly when the investor is further required to decipher complex raw data in order to fully understand the purported disclosure).[13] Therefore, any purported "storm warnings" materialized only after independent analysts challenged the appropriateness of the Fund's investments and corresponding disclosures. Given that the first analyst reports questioning the propriety of the Fund's investments were released on December 17, 2008, the filing of the initial complaint in the instant action, in February 2009, easily satisfies the one-year statute of limitation. 15 U.S.C. § 77m.

Even assuming, *arguendo*, that Defendants could mount a legitimate challenge to the timeliness of this action, any determination of when the statute of limitations began to run is most appropriately made in the context of summary judgment. *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996)). This is particularly true with respect to Securities Act claims because the question of when a plaintiff should have known of the alleged violation often

---

[13] Defendants once again attempt to rewrite the pleading standards by asserting that a plaintiff "must affirmatively plead compliance with the statute of limitations." Oppenheimer Br. at 56, n.26. Defendants, however, misquote *Piper Acceptance Corp. v. Slaughter*, which held that a plaintiff must "plead affirmatively facts *indicating* compliance with the limitations period." 600 F. Supp. 169, 172 (D. Colo. 1985) (emphasis added). Here, the Complaint clearly sets forth that even as of December 17, 2008, *Morningstar* analysts recognized that no ordinary investor could have appreciated the enormous amounts of undisclosed leverage and enhanced risk caused by the Fund's investments in mortgage-backed securities and various swap transactions.

requires a fact intensive inquiry that is inappropriate at this early-stage of the proceedings. *See Mellette v. Branch*, No. 07-cv-02065-WDM-KMT, 2009 WL 651142, at *6 (D. Colo. Mar. 12, 2009); *California Public Employees' Retirement Sys. v. Chubb Corp.*, No. 00-4285(GEB), 2002 WL 33934282, at *25 (D.N.J. June 26, 2002). Defendants cite the Tenth Circuit's "innocent investor" language set forth in *Anixter v. Home-Stake Prod. Co.* to support their argument, but fail to appreciate the context of that decision. 977 F.2d 1549, 1552 (10th Cir. 1992). In *Anixter*, the Tenth Circuit remanded the case to the trial court because it could not "say with certainty whether the jury's factual finding" supported, as a matter of law, the jury's conclusion that the statute of limitations had been satisfied. *Id.* at 1551. Moreover, even after trial on the merits, the fact-intensive issues surrounding the statute of limitations in securities class actions can remain unresolved. *Id.* Defendants' reliance on *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457 (7th Cir. 1990), is equally misguided. In *DeBruyne*, the trial court granted *summary judgment* to defendants based of plaintiffs' failure to comply with the statute of limitations, but only after plaintiff failed to raise an issue of fact concerning defendants assertions of adequate disclosure. *Id.* at 463-64. Given the already apparent factual dispute concerning the inadequacy of Defendants' disclosures, substantiated by the several *Morningstar* articles cited herein, resolution of this issue is premature, particularly on a motion to dismiss.

## IV.    CONCLUSION.

For the foregoing reasons, Defendants' motions to dismiss the Complaint should be denied in their entirety.

Dated:  January 19, 2010                    Respectfully submitted,

                                            **THE SHUMAN LAW FIRM**


                                               */s/  Kip B. Shuman*
                                            Kip B. Shuman
                                            Rusty Glenn
                                            885 Arapahoe Avenue
                                            Boulder, Colorado  80302
                                            Telephone: (303) 861-3003
                                            Facsimile: (303) 484-4886
                                            E-Mail: kip@shumanlawfirm.com

                                            *Liaison Counsel for the Class*


                                            **LABATON SUCHAROW LLP**
                                            Mark S. Arisohn
                                            Sidney S. Liebesman
                                            Benjamin D. Bianco
                                            Laura Killian Mummert
                                            Erin H. Rump
                                            140 Broadway
                                            New York, New York  10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477

                                            *Counsel for Lead Plaintiffs, Thomas H. Goodman*
                                            *and Errol G. O'Steen, and Lead Counsel for the*
                                            *Class*


                                            **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                            Steve W. Berman
                                            Sean R. Matt
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, Washington  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            *Additional Counsel for Plaintiffs*


                                            49

## **Certificate of Service**

I hereby certify that the foregoing was filed with this Court on January 19, 2010 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.


_____s/  Rusty E. Glenn_____
Rusty E. Glenn