**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane**

Civil Action No. **09-cv-00386-JLK-KMT** (consolidated with **09-cv-00525-JLK-KMT**)

In re Oppenheimer **Champion Fund** Securities Fraud Class Actions

*This document relates to both actions.*

---

**OPPENHEIMER DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

---

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

I.   The Fund Disclosed All The Risks Of Swaps, Including The Fact That Swaps
     Could Have A Leveraging Effect On The Fund's Portfolio ............................................... 3

     A.   The Fund's Swap Risk Disclosures Are Anything But Boilerplate ...................... 3

     B.   The Fund's Disclosures About The Leverage In Its Swap Positions Were
          Not Misleading ..................................................................................................... 6

     C.   The Fund's Disclosures Reflected The Magnitude Of The Leverage In Its
          Swap Positions And Did Not Omit Any Facts Relating To That Subject ............ 8

          1.   Plaintiffs' Magnitude Argument Is Inconsistent With The
               Complaint ................................................................................................. 9

          2.   The Fund Had No Duty To Offer An Opinion About The
               Magnitude Of Risks Or To Calculate And Disclose Its "Net
               Notional Leverage" ................................................................................. 9

          3.   The Fund Disclosures Fairly Described The Risk Of Leverage In
               The Fund ................................................................................................. 14

II.  The Fund's Disclosures Did Not Become False And Misleading By Virtue Of An
     Alleged Failure To Assess And Opine On The Magnitude Of Risk Created By
     The Fund's Swap Transactions ................................................................................... 18

III. The Disclosure Regime Inherent In Plaintiffs' Liability Theory Is Unworkable ............ 21

IV.  Morningstar's After-The-Fact Repudiation Of Its Former Views Is Irrelevant To
     What A "Reasonable Investor" Would Have Known About The Fund ......................... 23

V.   None Of Plaintiffs' Other Allegations About Purported Misrepresentations Or
     Omissions States A Claim .......................................................................................... 24

     A.   Plaintiffs Fail To State A Claim About The Fund's Liquidity And
          Valuation Policies ............................................................................................... 25

     B.   Plaintiffs' Allegations Regarding The Fund's Investments In MBS Fail To
          State A Claim ....................................................................................................... 26

     C.   The Fund Disclosed Its Investments In Companies That Were Financially
          Troubled ............................................................................................................... 28

VI.  Plaintiff O'Steen's Claims Are Time-Barred ............................................................... 29

**TABLE OF CONTENTS**
(continued)

**Page**

VII.    Plaintiffs' Claims Should Be Dismissed Because The Fund's NAV Decline Did Not "Result From" The Alleged Misrepresentations And Omissions ............................ 30

VIII.   Plaintiffs' Section 12 Allegations Fail To State A Claim ................................................ 34

IX.     Plaintiffs' Section 15 Allegations Fail To State A Claim ................................................ 34

X.      Request For Oral Argument .............................................................................................. 35

CONCLUSION ............................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aon Fin. Prods., Inc. v. Societe Generale*,
   476 F.3d 90 (2d Cir. 2007)..................................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................4

*Benzon v. Morgan Stanley Distribs., Inc.*,
   420 F.3d 598 (6th Cir. 2005) ............................................................................ 7-8

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...............................................................................7

*Borow v. nView Corp.*,
   829 F. Supp. 828 (E.D. Va. 1993) .....................................................................11

*Castellano v. Young & Rubicam, Inc.*,
   257 F.3d 171 (2d Cir. 2001)...............................................................................32

*Castillo v. Dean Witter Discover & Co.*,
   No. 97-1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998) ...................................33

*In re Charles Schwab Corp. Sec.Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009)........................................................................32

*In re CIT Group, Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004)..................................................................26

*Conley v. Gibson*,
   355 U.S. 41 (1957)..............................................................................................4

*Credit Suisse First Boston Corp. v. ARM Fin.Group, Inc.*,
   No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001)..................................15

*In re Donald J. Trump Casino Sec. Litig.*,
   793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993)........................10

*DeBruyne v. Equitable Life Assurance Soc'y of the United States*,
   920 F.2d 457 (7th Cir. 1990) .............................................................................29

*Eckstein v. Balcor Film Investors*,
   8 F.3d 1121 (7th Cir. 1993) .................................................................................7

*In re Exabyte Corp. Sec. Litig.*,
   823 F. Supp. 866 (D. Colo. 1993) (Kane, J.) ........................................................28

*In re FX Energy, Inc. Sec. Litig.*,
   Nos. 07-874, 07-938 ...................................................................................................19

*Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ...................................................................................22

*Geisenberger v. John Hancock Distribs., Inc.*,
   774 F. Supp. 1045 (S.D. Miss. 1991) ......................................................................33

*In re Giant Interactive Group, Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009)......................................................................15

*Glazer v. Formica Corp.*,
   964 F.2d 149 (2d Cir. 1992)........................................................................................9

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003).....................................................................26

*Grossman v. Novell*,
   120 F.3d 1112 (10th Cir. 1998) .................................................................................9

*Hanley v. First Investors Corp.*,
   793 F. Supp. 719 (E.D. Tex. 1992).........................................................................33

*In re Harmonic, Inc. Sec. Litig.*,
   No. 00-2287, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006).................................26

*Holtzman v. Proctor, Cook & Co.*,
   528 F. Supp. 9 (D. Mass. 1981) ..............................................................................17

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
   537 F.3d 527 (5th Cir. 2008) ...................................................................................19

*Jojola v. Chavez*,
   55 F.3d 488 (10th Cir. 1995) ...................................................................................27

*J & R Mktg., SEP v. Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008) ...................................................................................18

*Klamberg v. Roth*,
   473 F. Supp. 544 (S.D.N.Y. 1979)..........................................................................10

*Koke v. Stifel, Nicolaus & Co.*,
620 F.2d 1340 (8th Cir. 1980) ..............................................................16

*Kowal v. MCI Commc'ns Corp.*,
No. 90-2862, 1992 WL 121378 (D.D.C. May 20, 1992)........................11

*Lapidus v. Hecht*,
No. 98-3130, 2002 WL 1034042 (N.D. Cal. May 17, 2002).................20

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)..................................................................32

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) ..............................................................18

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996)........................................................................21

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)..................................................................10

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ..........................................................23

*In re PDI Sec. Litig.*,
No. 02-211, 2006 WL 3350461 (D.N.J. Nov. 16, 2006) ................. 10-11

*Pine River Irrigation Dist. v. United States*,
No. 04-01463, 2009 WL 3011223 (D. Colo. Sept. 18, 2009)................32

*In re RAC Mortgage Inv. Corp. Sec. Litig.*,
765 F. Supp. 860 (D. Md. 1991) .......................................................8, 11

*In re Real Estate Assocs. Ltd. P'ship Litig.*,
223 F. Supp. 2d 1109 (C.D. Cal. 2003) ................................................17

*Rodney v. KPMG Peat Marwick*,
143 F.3d 1140 (8th Cir. 1997) .........................................................16, 26

*Rubke v. Capital Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ..............................................................26

*SEC v. Mozilo*,
No. 09-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ..................17

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
  No. 08-1989, 2009 WL 3713524 (N.D. Okla. Nov. 4, 2009) ................................................23

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ...........................................................................................7

*Steinberg v. PRT Group, Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)...................................................................................8

*Tabankin v. Kemper Short-Term Global Income Fund*,
  No. 93 C 5231, 1994 WL 319185 (N.D. Ill. June 23, 1994) ..................................................11

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
  No. 95-0167, 1997 U.S. Dist. Lexis 18485 (S.D.N.Y. Nov. 20, 1997) .............................16, 27

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
  --- F. Supp. 2d ----, 2010 WL 378300 (D.N.M. Jan. 27, 2010) ............................................25

*White v. Heartland High-Yield Mun. Bond Fund*,
  237 F. Supp. 2d 982 (E.D. Wis. 2002)..................................................................................4

## STATUTES

15 U.S.C. § 77k.....................................................................................................................10

15 U.S.C. § 77l......................................................................................................................10

17 C.F.R. § 270.8b-16(a) .......................................................................................................21

## OTHER AUTHORITIES

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire for the Trees* (Dec. 17,
  2008) http://news.morningstar.com/articlenet/article.aspx?id=268433&_QSBPA=Y ...........24

Final Rule, *Registration Form Used By Open-End Management Investment Companies* ...........13

Letter from Paul Schott Stevens, General Counsel of the Investment Company Institute to
  Jonathan G. Katz, Secretary of the Securities and Exchange Commission (Apr. 8,
  1996), http://www.ici.org/policy/comments/96_SEC_RISK_RES_COM .............................12

*Improving Descriptions of Risk By Mutual Funds And Other Investment Companies*, 60
  Fed. Reg. 17172, 17173-74 (Apr. 4, 1995)..........................................................................12

Notice of Proposed Rulemaking, *Registration Form Used By Open-End Management
  Investment Companies* .....................................................................................................13, 14

*Off-The-Page Prospectuses For Open-End Management Investment Companies*, 58 Fed. Reg. 16141, 16145 (Mar. 25, 1993) ........................................................................12

## PRELIMINARY STATEMENT

Stripped of its inflammatory rhetoric, Plaintiffs' opposition crystallizes the legal issues that are at the crux of this case.  When scrutinized in light of the federal securities laws and relevant SEC guidance relating to mutual fund disclosures, Plaintiffs' opposition reveals that their claims are fatally flawed as a matter of law and should be dismissed now in their entirety. The rationale for this conclusion is simple and straight-forward:

There is no factual dispute about the content of Champion Income Fund's (the "Fund's") disclosures regarding the swaps and mortgage-backed securities ("MBS") on which Plaintiffs' Complaint is based.  Plaintiffs do not dispute that the Fund disclosed its plan to invest in those derivatives, disclosed the principal types of risks inherent in those investments, and accurately disclosed the identity and nature of the Funds' holdings of each, including the "notional" amount of each swap.  Plaintiffs do not identify any new or undisclosed risk associated with such investments, nor do they identify any fact relating to those investments that was not disclosed. Most importantly, Plaintiffs fail to allege any undisclosed risk or fact that was responsible for the decline in value suffered by the Fund's shares as a result of the devastating market conditions of late 2008.

Determined to blame Fund disclosures rather than the impact of market forces on disclosed investment positions, Plaintiffs contend that the Fund should have made qualitative and quantitative characterizations which, with the clarity of hindsight, they say would have permitted investors to avoid risks that few experts saw coming.  Thus, they ask the Court to conjure up a legal obligation that purportedly required the Fund to characterize the "magnitude of the risks" created by its disclosed MBS investments and swap transactions, claiming that the Fund either

should have added pejorative adjectives to the portfolio descriptions or adopted and reported a specific calculation of Plaintiffs' own choosing – the so-called "net notional value" calculation. Lacking any legal support whatsoever for this argument, Plaintiffs rely instead on their own characterizations of the Fund as a "conservative" and "stable" investment vehicle that should never have invested in derivatives, ignoring the explicit wording of the Fund's disclosures while demonstrating that their claim is really one for poor investment selection, not inadequate disclosure.  Plaintiffs also repeatedly invoke an after-the-fact critique of the Fund by embarrassed Wall Street analysts at *Morningstar*.  But that critique of the Manager's business judgment does not support Plaintiffs' case, because its author acknowledges that he understood the "magnitude" of the Fund's swap positions as soon as he got around to reviewing the disclosures at issue in this case.

Similarly, Plaintiffs' opposition fails to revive their three subsidiary disclosure arguments – allegations regarding the Fund's liquidity/valuation determinations, the Fund's MBS investments, and the Fund's investments in companies that became financially troubled – from the dispositive arguments advanced in the Oppenheimer Defendants' motion papers and explained below.  No factual disputes about the Fund's disclosures or issues as to the applicable legal principles preclude dismissal of Plaintiffs' claims in their entirety for failure to state a misrepresentation or omission that violates the federal securities laws.

There remain two independent and additional reasons to grant the Oppenheimer Defendants' motion.  Plaintiff O'Steen's claims are time-barred and no amount of further discovery can change that result.  Finally, Plaintiffs cannot demonstrate that they have suffered any compensable damages under the plain language of the Securities Act.  On this issue as well,

Plaintiffs offer no response to the showing the Oppenheimer Defendants made in support of their motion, other than to assert erroneously that the law allows damage claims that do not satisfy the statutory definition of recoverable losses.  Again, there are no factual issues here and the question is ripe for decision as a matter of law now.

For all of these reasons, each of Plaintiffs' claims should be dismissed with prejudice.

**I.      The Fund Disclosed All The Risks Of Swaps, Including The Fact That Swaps Could Have A Leveraging Effect On The Fund's Portfolio**

In the Motion to Dismiss, the Oppenheimer Defendants demonstrated that, contrary to the conclusory allegations of the Consolidated Class Action Complaint and Jury Demand ("Complaint" or "CCAC"), the Fund's disclosures clearly and fully disclosed the material facts relating to its swap investments, including the extent of those investments and the relevant risks. *See* Oppenheimer Defendants' Motion to Dismiss ("MTD") at 23-30.  Unable to challenge the content of the disclosures, Plaintiffs rely on three arguments to contend that they were inadequate.  None can withstand scrutiny and, in fact, they conclusively demonstrate that Plaintiffs have failed to state a claim.

**A.      The Fund's Swap Risk Disclosures Are Anything But Boilerplate**

Plaintiffs ask the Court to disregard the disclosures in their entirety because they are mere "boilerplate descriptions" that provided investors with no meaningful information.  *See* Lead Plaintiffs' Opposition to Defendants' Motions to Dismiss ("Pls. Br.") at 17.  This argument cannot be squared with either the allegations of the Complaint or the plain language of the disclosures themselves.

The problem with true boilerplate disclosures is that they fail to specify facts or risks with sufficient specificity, but here neither Plaintiffs' Complaint nor their brief identifies additional

facts or risks that should have been disclosed.  Thus, it is not surprising that the one case

Plaintiffs cite for this argument does not help them.  In *White v. Heartland High-Yield Municipal*

*Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002), the court merely held that the fund

defendants' general disclosures about the "greater risks" and "limited liquidity" of junk bonds

were not sufficiently tailored to warn investors of the specifically-alleged risk that the fund was

violating its valuation policies.  *Id.* at 986.[1]  By contrast, Plaintiffs here nowhere identify a

particular risk associated with swaps that went unstated.

A plain reading of the Fund's detailed disclosures also refutes Plaintiffs' "boilerplate"

mischaracterization.  Specifically, an investor who merely opened the front cover of the Fund's

prospectus would have seen a prominent disclosure explaining that swaps were one of the three

types of securities in which the Fund would "primarily" invest:

> **WHAT DOES THE FUND MAINLY INVEST IN?**  The Fund invests in a
> variety of high-yield, fixed-income securities and related instruments.  These
> investments primarily include:
> - Lower-grade corporate bonds.
> - Foreign corporate and government bonds.
> - ***Swaps, including single name and index-linked credit default swaps***.

*E.g.*, January 2007 Prospectus at 3 (second emphasis added).

On the very next page – in a section entitled "**WHO IS THE FUND DESIGNED**

**FOR?**" – the Fund explained that investors should be willing to assume the "***greater risks of***

***short term share price fluctuations***" inherent in a junk bond fund whose "***income level will***

***fluctuate***."  *Id.* at 4 (emphases added).  Immediately following that disclosure, in a section

---

[1]      *White* also turned on the Court's application of the pleading standard of *Conley v.
Gibson*, 355 U.S. 41 (1957).  *See White*, 237 F. Supp. 2d at 985 ("it does not appear
beyond doubt that the Funds' alleged disclosures were not misleading").  That standard
has been abandoned.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007).

prominently labeled "**Main Risks of Investing in the Fund**," a bold-faced heading notified investors of the **"RISKS OF DERIVATIVE INVESTMENTS**." *Id.* at 5. After noting that the Fund "can use derivatives to seek increased income," the Fund summarized the risks of derivatives this way:

> If the issuer of the derivative does not pay the amount due, ***the Fund can lose money on the investment***. Also, the underlying investment on which the derivative is based, and the derivative itself, might not perform the way the Manager expected it to perform. If that happens, ***the Fund's share prices could decline*** and ***the Fund could receive less income than expected***. ***Some derivatives may be illiquid***, making it difficult to value them or sell them at an acceptable price. ***Using derivatives can increase the volatility of the Fund's share price.***

*Id.* at 5 (emphases added). Thus, anyone who read the first five pages of the Fund's prospectus would have known that the Fund was not a "conservative" or "stable" investment, but rather a risky junk bond fund that regularly used swap transactions to increase income rather than simply to hedge risks.

To assist investors in understanding swaps and their unique risks, the Fund went on to provide an even more specific and detailed discussion about them. Thus, for example, the Fund explained that swaps are **"*less liquid*,**" "**entail *credit risk*,**" and that their successful use is "***dependent upon the Manager's ability to predict***" the future performance of various asset classes. *E.g.*, May 2007 Champion Fund Statement of Additional Information ("SAI") at 19 (emphases added). The Fund also stated that swaps "***may effectively add leverage to the Fund's portfolio***" because the Fund would be **"*subject to investment exposure on the notional amount of the swap*.**" *Id.* (emphases added).

The Fund also explained the precise risks of credit default swaps and total return swaps that Plaintiffs claim materialized and caused the Fund's losses. For example, the main risk of

selling protection through credit default swaps is that the Fund could be required to pay the par

value of the underlying bond.  *See* CCAC ¶ 49.  The Fund disclosed this risk in clear, plain

English:  "If the Fund is selling credit protection, there is a risk that a credit event will occur and

that the Fund will have to pay par value on defaulted bonds."  *E.g.*, January 2007 Prospectus at

11.

Similarly, the principal risk of total return swaps is that the Fund's manager will be

wrong about how the securities or index underlying the swap will perform.  *See* CCAC ¶ 46.

Once again, however, the Fund disclosed *precisely* this risk:  "Total return swaps could result in

losses if the underlying asset or reference does not perform as anticipated by the Manager."

January 2007 SAI at 19.  In light of these disclosures, Plaintiffs' argument that "The Offering

Documents Were Not Accompanied By Meaningful Risk Disclosures," Pls. Br. at 15, holds no

water.

### B. The Fund's Disclosures About The Leverage In Its Swap Positions Were Not Misleading

Plaintiffs' second theory about swaps is that the "table," *i.e.*, the Statement of

Investments, and the associated disclosures that detailed the risks and notional amounts of the

Fund's swap positions were not framed in the present tense, *i.e.*, they used "may" instead of "do"

or its equivalent.  *See* Pls. Br. at 18.

Specifically, Plaintiffs point to disclosures to the effect that the Fund "may" have off-

balance sheet risk, *i.e.*, leverage.  They argue that this disclosure did not warn investors that the

Fund's swap investments *did* have off-balance sheet risk – even though they acknowledge that

the Fund's disclosures, including the Statement of Investments, detailed each and every current

swap holding and their notional values.  *See* Pls. Br. at 18.  Plaintiffs' argument fails for two reasons:

First, the disclosures made clear that swaps had off-balance sheet risk.  Beyond stating explicitly that swaps "may effectively add leverage to the Fund's portfolio," May 2007 SAI at 19, the Fund explained *how* swaps create leverage.  As Plaintiffs acknowledge, "leverage" is simply finance jargon for the notion that swap investments allow the Fund to receive any gains (and pay for losses) on securities that it does not own.  *See, e.g.*, CCAC ¶ 54.  For instance, a credit default swap creates "leverage" *because* the Fund could be liable to pay the face value of bonds it does not own.  But this very risk was disclosed.  *E.g.*, January 2007 Prospectus at 11.  Because the Fund disclosed that swaps may have leverage, explained how swaps create leverage, and disclosed what swaps the Fund held, Plaintiffs' argument fails.

Moreover, Plaintiffs' argument that saying swap transactions "may" have off-balance sheet risks misled investors is nothing but a quibble about semantics that wrenches one word out of context and ignores both the detailed risk disclosures and the specific statements of present swap positions noted above.  Courts have consistently rejected such efforts to convert "may" into a statement that is misleading.[2]  For example, in *Benzon v. Morgan Stanley Distributors, Inc.*,

---

[2]     Plaintiffs rest their argument on three cases that merely held that once a defendant chooses to disclose a risk, it assumes a duty to disclose all material facts relating to that risk, including existing facts showing that the risk has already come to fruition.  For example, in *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), cited on page 18 of Plaintiffs' brief, the issuer disclosed generally that products liability claims could result in losses, but failed to disclose the *fact*s that numerous customer complaints had already been received and that a lawsuit had already been filed.  *Id.* at 1179; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-87 (9th Cir. 2008) (general risk disclosure that a customer might issue a stop-work order did not satisfy duty to disclose where four stop-work orders had already been received); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127-28 (7th Cir. 1993) (general risk disclosures were insufficient

420 F.3d 598 (6th Cir. 2005), a mutual fund disclosed that "sales personnel *may* receive different compensation for selling each Class of share." *Id.* at 612 (emphasis in original). Just like in this case, the plaintiffs there argued that the word "may" was misleading because "brokers *do* earn more for the sale of Class B shares than other types of shares." *Id.* (emphasis in original). The Sixth Circuit rejected this argument, calling it nothing more than a "semantic quibble." *Id.* "If anything," the court observed,

> the inclusion of this statement in the prospectus . . . served to put prospective investors on notice that there was a possibility that brokers were being compensated more highly for the sale of certain class shares than others, such that investors could pursue that line of inquiry with their financial advisors if they were concerned about broker incentives.

*Id.*; *see also In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991) (argument that disclosure that fluctuating interest rates "may" affect stock value should have said "shall" affect the value was mere "quibbling about semantics"); *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 310-11 (S.D.N.Y. 2000) (rejecting plaintiffs' argument that use of future tense misleadingly implied that events were not currently occurring).

**C.     The Fund's Disclosures Reflected The Magnitude Of The Leverage In Its Swap Positions And Did Not Omit Any Facts Relating To That Subject**

Plaintiffs' third attack on the Funds' swap disclosures is that the Fund failed to disclose "the **magnitude** of the Fund's overall leverage position (i.e. the total dollar amount of potential

---

where prospectus failed to disclose the fact that litigation had already been filed and that distributor was already seeking to withdraw). These unremarkable cases do not support Plaintiffs' semantic argument on the tense of the disclosures, given that Plaintiffs have not identified any undisclosed facts.

losses compared to the Fund's total net assets)." Pls. Br. at 19 (emphasis in original).  This

argument is contrary to the admitted facts and governing law.

      1.    <u>Plaintiffs' Magnitude Argument Is Inconsistent With The Complaint</u>

      Tellingly, Plaintiffs' argument that the Fund failed to disclose the "magnitude" of its

"overall leverage position" makes virtually no reference to the Complaint.  *See* Pls. Br. at 19-20.

In fact, the Complaint does not allege such a theory.  Rather, the Complaint takes the *disclosed*

swap information, performs unstated calculations, and contends the disclosures should have

characterized the *disclosed* swap positions in some unspecified way to say something about

"magnitude."  CCAC ¶¶ 55-57.  The Complaint offers no "hard facts" that were not provided to

investors; to the contrary, it repeats – and simply re-characterizes – the Fund's many swap

disclosures.  If the Complaint sought to allege a failure to disclose something about magnitude, it

was incumbent upon Plaintiffs themselves to aver the "hard facts" that they claim were omitted.

No such allegations grace the Complaint.  No securities claim has ever been recognized in such a

situation because none can be stated.

      2.    <u>The Fund Had No Duty To Offer An Opinion About The Magnitude Of</u>
<u>Risks Or To Calculate And Disclose Its "Net Notional Leverage"</u>

      Even if the Complaint actually alleged a specific failure to disclose the magnitude of risks

associated with the Fund's use of swaps, it would not state a claim.  An omission is actionable

only if the issuer had a duty to disclose the omitted information.  *See, e.g.*, *Grossman v. Novell*,

120 F.3d 1112, 1125 (10th Cir. 1998); *Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir.

1992).  A duty to disclose arises *only* if:  (1) a rule or regulation requires disclosure of the

omitted information; or (2) disclosure of the omitted information is necessary to prevent other

disclosures from being misleading.  *E.g.*, *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).

Plaintiffs satisfy neither of these requirements.

Plaintiffs do not cite, and the Complaint does not allege, a violation of any rule or

regulation that requires funds to disclose the "magnitude" of the risk in any type of investment,

including swaps.  The scope of the private right of action afforded under the '33 Act does not

extend to every characterization or opinion that a plaintiff may desire; rather, the plain language

of the Securities Act covers only misrepresentations about or failures to disclose a material

"fact."  15 U.S.C. §§ 77k(a), 77*l*(a).  Even twenty years ago, the United States District Court for

the Southern District of New York could say that, as a "general rule," a securities claim cannot

be based on the failure to characterize disclosed facts or to offer an opinion based on those facts:

> As a general rule, so long as material facts are disclosed or already known, it is
> not deceptive to fail to "characterize" those facts with "pejorative nouns and
> adjectives," or to fail to verbalize all adverse inferences expressly.  The principle
> underlying these cases appears to be that, ***once the facts are disclosed, a failure
> to articulate adverse inferences from or pejorative descriptions of those facts is
> not materially deceptive: a reasonable person would not be deceived by their
> nondisclosure, since he would be able to draw whatever inferences and append
> whatever characterizations he believed appropriate***.

*Klamberg v. Roth*, 473 F. Supp. 544, 551-52 (S.D.N.Y. 1979) (emphasis added).  More recently,

the United States District Court for the District of New Jersey echoed this well-settled rule,

explaining that:

> The disclosure requirements of section 11 and 10(b) do not anticipate a duty by
> management to draw inferences for investors.  Again, the object of the securities
> fraud laws is disclosure, not business judgment.  ***Business judgment, including
> inferences drawn from fully-disclosed information, rightly remains the province
> of individual investors.***

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 559, 565 (D.N.J. 1992), *aff'd*, 7 F.3d

357 (3d Cir. 1993) (emphasis added); *accord, e.g.*, *In re PDI Sec. Litig.*, No. 02-211, 2006 WL

3350461, at *24 n.35 (D.N.J. Nov. 16, 2006) ("the securities laws do not obligate Defendants to

qualify the disclosed numbers by any adjectives"); *Borow v. nView Corp.*, 829 F. Supp. 828, 838

(E.D. Va. 1993) ("The focus of the securities laws is on the disclosure of facts; characterizations

of or conclusions drawn from those facts are matters that are left to the judgment of investors.");

*Kowal v. MCI Commc'ns Corp.*, No. 90-2862, 1992 WL 121378, at *4 (D.D.C. May 20, 1992)

(same).

Courts have applied this rule to dismiss disclosure claims that, just like the allegations

here, are based on the alleged failure to assess and disclose the "magnitude" of a disclosed risk,

holding that "magnitude" is not an objective fact but a characterization or opinion.  For example,

in *Tabankin v. Kemper Short-Term Global Income Fund*, the fund warned investors that the

devaluation of foreign currencies could cause the fund to suffer losses.  When investors later

sued to recover losses allegedly caused by the fund's failure to disclose "the magnitude of the

risk" of devaluations, the court dismissed the claim, explaining:

> *Nor can investors state a claim for omission of material information where the*
> *offeror fails to quantify the risks identified*.  According to Seventh Circuit
> precedent, [Defendant] was not under a duty to quantify the risk. . . . [T]he
> Seventh Circuit [has] stressed the importance of making disclosures, because
> 'disclosures assist investors in determining the magnitude of risk.'  [The Seventh
> Circuit] did not place the burden of quantifying risks on the offeror of securities.
> Thus, the failure to quantify the risk of devaluation is not an actionable omission.

*Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185, at *2

(N.D. Ill. June 23, 1994) (emphasis added); *see also RAC Mortgage*, 765 F. Supp. at 864

(rejecting claimed failure to disclose the "magnitude" of alleged risks, because "prospectuses

need not characterize a security or a risk").

The subjectivity, and inherent unreliability, of the sort of "magnitude" disclosures demanded by Plaintiffs led the SEC to decline to require mutual funds to make such disclosures. In 1993, the SEC asked for public comment on whether mutual funds should be required to disclose "where the fund fits on a . . . numerical scale from 1 (least risky) to 10 (most risky)[.]" *Off-The-Page Prospectuses For Open-End Management Investment Companies*, 58 Fed. Reg. 16141, 16145 (Mar. 25, 1993). After receiving comments, the SEC elected not to proceed with the proposal.

Two years later, in 1995, the SEC asked for comments on the "relative merits" of requiring mutual funds to disclose "quantitative measures of risk and risk-adjusted performance." *Improving Descriptions of Risk By Mutual Funds And Other Investment Companies*, 60 Fed. Reg. 17172, 17173-74 (Apr. 4, 1995). Numerous commenters responded to the proposal by explaining that it was both unworkable and counterproductive. For example, the Investment Company Institute wrote:

> The Institute [in a prior comment letter] strongly urged the Commission to avoid mandating any form of numerical or quantitative risk disclosure. The Institute Survey offers compelling evidence that a Commission-mandated numerical risk measurement would not provide investors understandable and meaningful information with which to evaluate a fund against their own risk sensitivities and investment objectives – but instead **would mislead, confuse and ultimately harm fund investors**.[3]

After receiving these comments, the SEC abandoned the proposal, and to this day it has refused to require mutual funds to make any sort of quantitative disclosure regarding "aggregate risk exposure." As the SEC wrote:

---

[3] Letter from Paul Schott Stevens, General Counsel of the Investment Company Institute to Jonathan G. Katz, Secretary of the Securities and Exchange Commission (Apr. 8, 1996), http://www.ici.org/policy/comments/96_SEC_RISK_RES_COM (emphasis added).

> [A] number of commenters strongly opposed requiring disclosure of quantitative risk information. These commenters, among other things, questioned the value of quantitative risk measures, suggesting that investors have too wide a range of investment goals and ideas of what "risk" means to be well-served by a single quantitative risk measure. The ICI Risk Survey suggests that investors who use quantitative measures may not understand the measures well enough to use them for the special purposes for which they were designed.
>
> ***Based on these and other considerations, the Commission is not proposing at this time to require funds to use quantitative risk measures***.

Notice of Proposed Rulemaking, *Registration Form Used By Open-End Management Investment Companies*, Release No. IC-22528, 1997 WL 87357, at \*20 (Feb. 27, 1997) (emphasis added); *see also* Final Rule, *Registration Form Used By Open-End Management Investment Companies*, Release No. IC-23064, 1998 WL 107729, at \*20 (Mar. 13, 1998) ("The Commission did not propose to require a fund to disclose information designed to quantify its expected risk levels . . . .").

Rather than mandating that funds attempt to opine about or quantify risks, the SEC has explained that a mutual fund satisfies its risk disclosure obligations by discussing: (1) the risks of the classes of assets within its portfolio, *e.g.*, "stocks" or "bonds"; and (2) the risks of the particular types of securities within that asset class, *e.g.*, "small-cap stocks":

> The Commission notes that a fund could meet the risk disclosure requirements of Form N-1A, as amended, by including in its prospectus a discussion of the risks of the asset class or classes that the fund expects to hold principally, together with a discussion of the risks to the fund of holding specific types of securities within the asset class or classes. Under such an approach, a fund investing in the equity securities of companies with small market capitalizations, for example, would discuss market risk as a general risk of holding equity securities, as well as the specific risks associated with investing in small capitalization companies (*e.g.*, that these stocks may be more volatile and have returns that vary, sometimes significantly, from the overall stock market).

Final Rule, 1998 WL 107729, at *20.  As discussed above, the Fund more than met this regulatory mandate by explaining, among other things, the risks of derivatives and the unique risks posed by swaps.

3.   The Fund Disclosures Fairly Described The Risk Of Leverage In The Fund

Plaintiffs seek to sidestep the Fund's compliance with the relevant disclosure obligations by arguing that the Fund's risk disclosures did not also warn of the magnitude of the Fund's "overall leverage position," which they define, without citation, as "the total dollar amount of potential losses compared to the Fund's total net assets."  Not only is there no regulatory or caselaw precedent mandating such a disclosure, but Plaintiffs offer nothing but their own opinion that this is an appropriate risk measure.  To be sure, it is an inherent – and disclosed – characteristic of swaps that they may contain off-balance sheet risk, but the "total dollar amount of potential dollar losses" is at most a hypothetical metric of overall exposure.  It does not represent a realistic measure of loss, it ignores important differences among types of swaps, and ignores the differential effect of economic and market conditions on different swaps.  The calculation Plaintiffs appear to demand does not, as Plaintiffs contend, assess actual or realistic risk, and they offer no basis on which the Court could conclude otherwise.  As such, Plaintiffs' construct as to "net notional value" does not provide investors with "hard facts" about risk.

Under these circumstances, it is no surprise that the cases advanced by Plaintiffs to support their "magnitude" theory in fact show why their claim lacks merit.  A careful review of those cases demonstrates that each dealt either with:  (1) an operating company's failure to disclose an objective fact; or (2) a mutual fund's failure to disclose a risk inherent in a particular

type of security.  None of the authorities cited by Plaintiffs imposes an obligation on a mutual

fund to disclose the type of information that Plaintiffs claim was misleadingly omitted here.

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL

300733 (S.D.N.Y. Mar. 28, 2001), and *In re Giant Interactive Group, Inc. Securities Litigation*,

643 F. Supp. 2d 562 (S.D.N.Y. 2009) are both easily distinguishable because they involve

operating companies, which, unlike mutual funds, may possess non-public "inside" information

about their businesses that must be disclosed to prevent other disclosures from being misleading.

In *Credit Suisse*, for instance, the issuer sold annuity-like products and invested the sale

proceeds.  The issuer disclosed that its customers could surrender their annuities in return for

payment of their principal, which could create liquidity problems if the issuer invested the sale

proceeds in long-term securities.  The issuer stated that it was hedging this risk by investing the

proceeds of the sales in "securities of shorter duration . . . than the Company's other investment

portfolios."  *Credit Suisse*, 2001 WL 300733, at *2.  The issuer failed, however, to disclose the

*fact* that its customers could demand payment on the annuities with as little as seven days notice.

The nondisclosure of that additional *fact*, the court explained, might have rendered misleading

the suggestion that the company had adequately hedged the liquidity risk by investing in a

portfolio of "shorter duration."  *Id.* at *9.  Thus, as the very sentence that Plaintiffs quote makes

clear, *Credit Suisse* merely held that issuers must disclose "*hard facts* critical to appreciating the

magnitude of the risks described."  *See* Pls. Br. at 19 (emphasis added); *see also In re Giant

Interactive Group*, 643 F. Supp. 2d at 570 (although company disclosed general risks posed by

"gold farming," it failed to disclose the *fact* that it had made a rule change to its online games

that had a significant adverse effect on key financial metrics).

The two mutual fund cases cited by Plaintiffs on pages 19 and 20 of their brief – *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1997) and *In re TCW/DW North American Government Income Trust Securities Litigation*, No. 95-0167, 1997 U.S. Dist. Lexis 18485 (S.D.N.Y. Nov. 20, 1997) – are also inapposite.  In both *Rodney* and *TCW/DW*, fixed-income funds said they expected to maintain portfolios with an "average weighted life" within a certain specified range.  (Investors care about this information because a portfolio's sensitivity to changes in interest rates increases as its "average weighted life" increases.)  But the funds failed to warn investors that the "extension risk" inherent in their mortgage-backed securities could convert those securities from short-term to long-term investments, thereby increasing the average weighted life of the funds' portfolios.  Thus, *Rodney* and *TCW/DW* held that the funds' reference to an expected "average weighted life" carried with it the obligation to disclose additional risks inherent in these securities that could undermine the funds' ability to meet that expectation.[4]

Unlike the plaintiffs in *Rodney* and *TCW/DW*, Plaintiffs here do not allege that the Fund failed to disclose a risk that was inherent in the swaps and, as such, those cases hurt, rather than help, Plaintiffs' cause.  The Fund provided the relevant, objective facts that would permit investors themselves to make appropriate risk assessments, including all of the necessary financial data about the swaps.  The Fund was not obligated to do more.  *See Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1344 (8th Cir. 1980) (holding that a reasonable investor can be

---

[4]      Here, the Fund disclosed the very risk that was at issue in *Rodney* and *TCW/DW*:  "When interest rates rise rapidly, and if prepayments occur more slowly that expected, a short- or medium-term CMO can in effect become a long-term security, subject to greater fluctuations in value."  January 2007 Prospectus at 13.

expected to perform "simple arithmetic"); *Holtzman v. Proctor, Cook & Co.*, 528 F. Supp. 9, 14 (D. Mass. 1981) (same).[5]

Plaintiffs claim that "expert analysis" is needed to calculate the "net notional" value of the Fund's swap positions and suggest that an investor must understand that particular calculation in order to understand the risk of leverage in the Fund. This is like arguing that you need eyeglasses to appreciate a symphony performance. The argument wrongly assumes that investors would need to perform Plaintiffs' precise calculation in order to understand that the Fund's swap investments created significant risks. For example, Plaintiffs complain that the Fund "concealed" its increased exposure to swaps. CCAC ¶ 44(c). But any investor who simply looked at the number of the Fund's swap transactions would have been aware of its increased use of swaps, even if the investor never heard of net notional value and did not understand what a future was.

Similarly, Plaintiffs believe that their net notional value calculation shows "the potential for the Fund to suffer a financial loss that far exceeded its net worth" because the notional value of the Fund's swaps exceeded its total net assets. Pls. Br. at 19. But an investor concerned about a scenario involving all swap positions at the same time would only need to add the notional

---

[5]     The cases Plaintiffs cite on this issue are easily distinguishable. In *SEC v. Mozilo*, No. 09-3994, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009), the relevant numerical disclosures were included in *different* documents filed by *different* issuers, *i.e.*, the documents that contained the relevant information were not sent to the investors or even issued by the company in which they invested. That is why the court concluded that the information was not "readily available" to the issuer's investors. *See id.* at *10. And in *In re Real Estate Associates Ltd. Partnership Litigation*, 223 F. Supp. 2d 1109 (C.D. Cal. 2003), the court concluded that the calculations necessary to understand the disclosure were *not* calculations that "could easily be made" and were not "obvious to anyone conversant in basic mathematics." *Id.* at 1132. Here, by contrast, "basic mathematics" is all that is required.

value of the Fund's swap investments and compare it to the value of the Fund's total net assets –

a figure that is reported in the Fund's Statements of Investments – to see that the aggregate

notional value of the Fund's swaps was bigger than the aggregate value of its net assets in certain

periods.  Plaintiffs' proposed expert calculation is both misleading and unnecessary.

## II.    The Fund's Disclosures Did Not Become False And Misleading By Virtue Of An Alleged Failure To Assess And Opine On The Magnitude Of Risk Created By The Fund's Swap Transactions

Plaintiffs also contend that the extent of leverage in the Fund – according to their own

assessment of it – rendered false and misleading *other* Fund disclosures, including its Investment

Objective, its statements regarding diversification, and its limit on bank borrowing.  This theory

comports neither with the applicable law nor the disclosures themselves.

The duty to disclose a fact to prevent other disclosures from being misleading is a narrow

one.  It applies "only where both the statement made is material, and the omitted fact is material

to the statement in that it alters the meaning of the statement."  *McDonald v. Kinder-Morgan,*

*Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (quotation marks omitted).  In other words, a disclosure

is misleading by omission only if it "misled investors into believing something that was not in

fact true" about a material fact.  *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 395 (6th

Cir. 2008).  The Fund's disclosed use of leverage did not render any other statement misleading.

*First*, Plaintiffs repeatedly refer to the Fund's statement that it would invest in a

"diversified portfolio."  *E.g.*, CCAC ¶¶ 4, 41, 48; Pls. Br. at 26-27.  After receipt of the Motion

to Dismiss, however, Plaintiffs were forced to concede that the Fund's use of the term

"diversified" was not misleading, and they do not suggest how the presence of leverage in the

Fund's disclosed swap positions rendered the diversification goal materially misleading.  *See* Pls. Br. at 26 n.8.

*Second*, Plaintiffs repeatedly wrench out of context a portion of the Fund's Investment Objective that refers to "undue risk."  *E.g.*, CCAC ¶¶ 48, 53, 57; Pls. Br. at 18, 22.  The Investment Objective provides that the Fund's objective is to "seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that the Fund's investment manager . . . believes does not involve undue risk."  January 2007 Prospectus at 3.  Plaintiffs simply ignore the Investment Objective's reference to the Manager's belief, choosing to pretend that the Investment Objective was essentially a guarantee that the Fund would never invest in any investments that turn out badly.

Plaintiffs' after-the-fact judgment that leverage caused the Fund to involve "undue risk" cannot render the Fund's investment Manager's contrary view false and misleading.  The Fund represented that it would invest in securities that the Manager believed did not involve undue risk.  Nothing in the Complaint suggests that statement was untrue or misleading.[6]

*Third*, Plaintiffs assert – without any support – that the Fund's swap investments violated the Fund's limit on bank borrowing.  *See* Pls. Br. at 29.  But as the Oppenheimer Defendants

---

[6]     The Investment Objective, of course, does not even refer to swaps or leverage, and therefore it cannot create a duty to make additional disclosures about the leveraging effects of swaps.  *See, e.g.*, *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 541-42 (5th Cir. 2008) ("Shaw's announcement neither stated nor implied anything about the history of Shaw's relationship with NRG.  Shaw's omission of information about its alleged problems with NRG before August 2002 did not make its announcement untrue or misleading."); *In re FX Energy, Inc. Sec. Litig.*, Nos. 07-874, 07-938, 07-966, 2009 WL 1812828, at *8 (D. Utah June 25, 2009) (holding no duty to disclose that the company was using 2D rather than 3D technology because the allegedly misleading statement did not discuss which type of technology the company was using).

explained in the Motion to Dismiss, this limitation applies only to "borrow[ing] money" from banks or affiliated investment companies, rather than to the economic leverage inherent in some swap transactions.  MTD at 40-41.  Plaintiffs' only response is to assert that swaps involve borrowing from "non-banks" and therefore the motion to dismiss is "disingenuous."  Pls. Br. at 29.  But Plaintiffs are flatly incorrect.  A swap does not involve "borrowing money" from anyone, let alone from a bank.  When a fund enters into a swap, it does not obtain cash from the counterparty to a swap and then promise to pay it back at some future date.  Instead, a swap simply involves transferring a risk from one party to another.  *See, e.g.*, *Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 92 n.1 (2d Cir. 2007).  For instance, as Plaintiffs concede, credit default swaps are like insurance contracts.  *See* CCAC ¶ 49.  But when an individual buys, for example, car insurance, the insurer has not "borrowed money" from its customer; rather, the insurer has simply assumed the risk of paying for an accident.  Thus, the plain language of the borrowing limitation cannot be stretched to cover swaps simply because they might create "leverage."  *See* MTD at 40-41 (citing *Lapidus v. Hecht*, No. 98-3130, 2002 WL 1034042, at *6 (N.D. Cal. May 17, 2002)).[7]  Plaintiffs offer no authority to support their erroneous legal assertion.

*Lastly*, Plaintiffs fall back on the conclusory allegation that the Fund's disclosures, as a whole, somehow portrayed the Fund as a "conservative" and "stable" investment.  CCAC ¶ 2; Pls. Br. at 2.  The Fund never said those words.  Moreover, this vague claim fails because, as

---

[7]     The Fund's disclosures made clear that, under certain circumstances, derivatives may implicate the Fund's policy regarding so-called "senior securities" and that, as a result, the Fund may have been required to segregate assets.  *See, e.g.*, May 2007 SAI at 32. Plaintiffs do not allege this policy was violated.

discussed above, the Fund's disclosures made clear that the Fund intended to take on greater risks in the search for greater returns, a strategy that the Fund explained could expose investors to significant price fluctuations. *See supra* Part I. It simply cannot be said that any investor who read the Fund's prospectus would be left with the impression that it was a "conservative" or "stable" investment.[8]

In sum, Plaintiffs cannot identify any statute or rule that obligated the Fund to opine on, or quantify, the risks of its swap investments. Nor do they identify a material representation that was misleading absent such a disclosure. Therefore, their claims should be dismissed.[9]

## III.   The Disclosure Regime Inherent In Plaintiffs' Liability Theory Is Unworkable

Plaintiffs' claims also find no support in the law because the disclosure regime they require would be unworkable for both funds and investors. Open-end mutual funds like the Fund are sold in continuous offerings pursuant to registration statements that typically are filed once per year. *See, e.g.*, 17 C.F.R. § 270.8b-16(a) (requiring a mutual fund to update its registration statement annually). The registration statement typically includes a fund's prospectus and SAI. *See* MTD at 5. Thus, these documents must be written in a way that will inform investors about the risks that a fund likely will encounter throughout the year. They cannot provide a detailed

---

[8]   It is noteworthy that many funds in fact do characterize themselves, even in their names, as "conservative" or "stable." The Fund did neither and made clear that it was anything but such a low-risk investment vehicle. Plaintiffs' effort to confer such a representation on the Fund is further proof that their hindsight indictment of the Fund fails.

[9]   Plaintiffs also suggest that the Fund must have departed from its stated "investment strategies" because "the average high-yield fund substantially outperformed the Fund in 2008." Pls. Br. at 28. But as the Second Circuit has explained, "[i]t is hardly a sound argument . . . to say that some other unspecified income funds performed better. That is only to say in hindsight that the managers of those funds turned out to be more skillful in their predictions." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996).

examination of the risks associated with specific investments in the fund's portfolio under prevailing market conditions that would be accurate at every point in time.

Plaintiffs' disclosure claims, however, depend upon a system of continuous disclosure in which the prospectus always provides up-to-the-minute assessments of a fund's current portfolio risk. For example, Plaintiffs complain that the Fund's 2008 offering documents did not tell investors that "by the end of 2008," the Fund's leverage position purportedly reached "3.2 times the value of the Fund assets." Pls. Br. at 19. But Plaintiffs do not and, of course, cannot explain how a document drafted in *January* and intended to cover an entire year could possibly tell investors what the Fund's leverage position would be in *December*. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("We do not have a system of continuous disclosure."). Nor do Plaintiffs explain how the Fund can describe in real time the "magnitude" of the risks associated with its portfolio in an annual registration statement, especially when, among other things, the industry has abandoned as unworkable any consensus measure of risk magnitude, individual investors perceive and value risk differently, the portfolio is constantly changing, interest rates and other macroeconomic forces are constantly changing, and the fortunes of particular industries or issuers are constantly changing. Plaintiffs' proposed disclosure regime would of course apply to the entire industry and, even if it were attempted by mutual funds, would therefore place investors in the impossible situation of evaluating continuously changing, non-uniform, risk assessments from all funds, inevitably leading to more data, but less useful information for the market. Plaintiffs' claims, which depend on adoption of this approach, therefore should not proceed.

**IV.    *Morningstar*'s After-The-Fact Repudiation Of Its Former Views Is Irrelevant To What A "Reasonable Investor" Would Have Known About The Fund**

Rather than focus on the language of the disclosures themselves, Plaintiffs spend a great deal of time quoting after-the-fact commentary by *Morningstar*.  In Plaintiffs' view, these missives free them from the obligation to explain how a reasonable investor *who actually read the disclosures* would have been misled by them.  Plaintiffs' heavy reliance on *Morningstar*, even if it were legally permissible,[10] is misplaced for at least two reasons:  (1) the *Morningstar* article Plaintiffs cite admits that the author was not fooled by the Fund's disclosures; rather, he simply did not read them until late 2008; and (2) *Morningstar*'s after-the-fact opinions contradict its earlier endorsement of the Fund.

*First*, Plaintiffs rely heavily on a December 17, 2008 article that allegedly exposes "the misleading nature of the Fund's disclosures" and purportedly shows that *Morningstar* was "misled."  Pls. Br. at 31.  But Plaintiffs omit a crucial passage in which the author admits that, while he did not find anything "unusual" regarding "leverage exposure" on a subset of the Fund's disclosures, *i.e.*, Oppenheimer's website and unidentified marketing materials, that exposure was "clearly identifiable" when he examined the Fund's public filings.  In relevant part, it says:

---

[10]    It is not.  Well-settled law provides, for good reason, that "analyst reports may not be judicially noticed for the truth of the matters contained therein."  *Patel v. Parnes*, 253 F.R.D. 531, 548 (C.D. Cal. 2008); *accord, e.g.*, *In re SemGroup Energy Partners, L.P., Sec. Litig.*, No. 08-1989, 2009 WL 3713524, at *2 (N.D. Okla. Nov. 4, 2009).  That is particularly true with the *Morningstar* article, which largely consists of vented frustration about the fact that the author and investors had to read the Fund's SEC filings in order to find the allegedly undisclosed information.  Whatever disclosure standard is reflected in this perspective, it is not one recognized by the law and therefore cannot support a claim.

*I've searched on Oppenheimer's Web site [and] the supporting shareholder or marketing materials that we've seen*. . . . There's just no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure. . . . *The only clearly identifiable way to figure it out is to examine the funds' SEC filings and meticulously calculate cash bond, swap, futures, and total-return swap exposures (and maybe others depending on the portfolio) for each fund*.[11]

Thus, the article clearly states that *upon actually reading the Fund's SEC filings*, the author was able to calculate the Fund's exposure – a conclusion reinforced by the fact that *Morningstar* itself, like Plaintiffs, has yet to identify a *fact* that was not previously disclosed.

*Second*, by relying exclusively on *Morningstar*'s opinions from late 2008 and 2009, Plaintiffs conceal that in 2007 and most of 2008, before the unprecedented market panic, *Morningstar* fully endorsed the Fund's investment strategies.  *See* MTD at 15 n.9.  Of course, *Morningstar* had access to the same types of SEC filings both before and after the crash.  But it was only after the crash in late 2008, when a strategy it had endorsed ultimately resulted in significant losses, that *Morningstar* experienced a change-of-heart and blamed the Fund.

## V.   None Of Plaintiffs' Other Allegations About Purported Misrepresentations Or Omissions States A Claim

Plaintiffs' brief makes a few arguments about the Fund's liquidity and valuation policies and its investments in MBS and securities issued by certain companies that were in financial distress.  As discussed below, none of these arguments states a claim.

---

[11]     Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire for the Trees* (Dec. 17, 2008), http://news.morningstar.com/articlenet/article.aspx?id=268433&_QSBPA=Y.

**A.      Plaintiffs Fail To State A Claim About The Fund's Liquidity And Valuation Policies**

Plaintiffs allege that the Fund misstated the percentage of its assets that were illiquid and misvalued certain of its investments.  In their Motion to Dismiss, the Oppenheimer Defendants showed that all of these claims fail because the Fund's statements as to illiquidity and valuation were not representations of objective fact but were – and are – subjective assessments reflecting the Manager's business judgment about those matters.  Plaintiffs, however, fail to allege either that these statements did not accurately reflect the Manager's judgment or that the Manager did not believe its representations when it made them.  *See* MTD at 41-46; *see also In re Thornburg Mortgage, Inc. Sec. Litig.*, --- F. Supp. 2d ----, 2010 WL 378300 (D.N.M. Jan. 27, 2010) (holding that beliefs or estimates are not "assertions of fact" under Sections 11 and 12).[12]

In response, Plaintiffs do not argue that they made any allegations regarding the Manager's subjective beliefs.  Nor do they dispute that assessments of liquidity and value involve the exercise of business judgment.  Rather, they argue that under Rule 8(a) they can state a disclosure claim about illiquidity and valuation by presenting the opinions of an unnamed "expert" who – in hindsight – apparently disagrees with the Manager's judgments.  *See* Pls. Br. at 30.  This manufactured difference of opinion, however, is beside the point.  Under any applicable pleading standard, allegations about the Manager's subjective beliefs are necessary to plead the *falsity* of these alleged misstatements.  *See* MTD at 33-34.  Indeed, there are numerous cases in which (1) plaintiffs sue under Section 11 or 12 – but not Section 10(b) – on the theory

---

[12]      As discussed in the Motion to Dismiss, Plaintiffs' claim regarding the Investment Objective likewise fails because Plaintiffs have not pleaded any facts regarding the Manager's subjective beliefs.  *See* MTD at 33-35.

that an opinion was misleading; and (2) the court squarely holds that plaintiffs must plead that the issuer did not subjectively believe the opinion in order to state a claim. *See, e.g.*, *In re Harmonic, Inc. Sec. Litig.*, No. 00-2287, 2006 WL 3591148, at *16 (N.D. Cal. Dec. 11, 2006); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003).[13]  Plaintiffs, however, ignore those decisions.  Because Plaintiffs cannot state a claim with regard to the Fund's liquidity/valuation determinations without alleging that the Manager did not believe those determinations when they were made, their claims fail.[14]

### B.     Plaintiffs' Allegations Regarding The Fund's Investments In MBS Fail To State A Claim

The only allegation about MBS in the Complaint is that the "timing and magnitude" of the Fund's investments in them were inconsistent with the Investment Objective.  CCAC ¶ 68. As the Motion to Dismiss explains, Plaintiffs' claim fails because:  (1) the Fund timely and accurately disclosed the magnitude of its investments in MBS; and (2) Plaintiffs allege, at best, a

---

[13]     Rather than address these cases, Plaintiffs spend all of their time attempting to distinguish one case – *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) – on the ground that the plaintiff brought Section 10(b) claims in addition to Securities Act claims.  *See* Pls. Br. at 30.  *Rubke*, however, is relevant not because of the pleading standard involved, but because the Court recognized that a claim with respect to liquidity necessarily involves subjective determinations that can only be challenged by allegations of fact as to the state of mind of the person whose determinations underlay the liquidity representation.  Plaintiffs' allegations are insufficient under any pleading standard because they do not even purport to address the veracity of the Manager's statements as to liquidity or valuation.

[14]     Plaintiffs' cite *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1998), for the proposition that a fund's violation of an investment policy is material.  *See* Pls. Br. at 29. Unlike here, the plaintiffs in *Rodney* alleged facts showing that an investment policy had been violated.  143 F.3d at 1142-43.  Because Plaintiffs here allege no violation of any restriction on the Fund's investments, *Rodney* is beside the point.

claim for mismanagement, which is not actionable under the securities laws. *See* MTD at 32-33, 35-37.

Rather than attempt to defend the claim they actually pleaded, Plaintiffs' brief makes an entirely new allegation: The Fund failed to disclose the liquidity risks of MBS. Pls. Br. at 24-25. This argument fails for at least three reasons:

*First*, it was not pleaded in the Complaint. As the Tenth Circuit has explained, "in determining whether to grant a motion to dismiss, the district court . . . [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint." *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995). Here, there is not a single statement in the Complaint alleging that the Fund failed to disclose the liquidity risks of MBS.

*Second*, Plaintiffs do not allege any facts suggesting that the risk existed and was material. Instead, they simply cite a case in which a court concluded, in a different context with respect to a different fund, that the liquidity of the mortgage-backed securities market *might* be material. *See* Pls. Br. at 24-25 (discussing *TCW/DW*, 1997 U.S. Dist. LEXIS 18485). That is plainly insufficient to plead material omissions in this case.

*Lastly*, the Fund in fact disclosed the liquidity risks of MBS. Specifically, the Fund told investors that "mortgage-related securities are examples of derivatives the Fund can use" and that "derivatives may be illiquid." 2007 Prospectus at 5. Thus, the lone authority cited by Plaintiffs, *TCW/DW*, is easily distinguishable because the fund in that case did not even mention liquidity risks; instead, the fund there attempted to rely on disclosures about its general valuation policy. *See TCW/DW*, 1997 U.S. Dist. LEXIS 18485, at *27.

**C.     The Fund Disclosed Its Investments In Companies That Were Financially Troubled**

The Complaint alleges that the Fund made "very risky bets" by selling credit protection on bonds issued by AIG, Merrill Lynch, Washington Mutual, Lehman Brothers, Tribune, Citigroup, General Motors, and Ford.  CCAC ¶¶ 50-51.  But the Fund began entering into these swap transactions long before the market collapse in the fall of 2008 and disclosed all of these transactions in its Statements of Investments.[15]  *See* MTD at 30-33.

In their brief, Plaintiffs concede, as they must, that the Fund disclosed these investments. They nevertheless try to manufacture a disclosure claim by arguing that the Fund failed to disclose "the increased risks associated with bonds issued by these severely troubled financial companies."  Pls. Br. at 23.  The Complaint, however, does not allege that the Fund's investments in these particular swaps were material at the time of any of their purchases or that any of these investments actually contributed to the Fund's losses.  Even if Plaintiffs had made such allegations, the theory would fail for two additional reasons:

*First*, the securities laws require issuers to disclose "firm-specific information," not information that is already public.  *E.g.*, *In re Exabyte Corp. Sec. Litig.*, 823 F. Supp. 866, 872 (D. Colo. 1993) (Kane, J.).  The Fund, of course, has no "inside" information about the companies in which it invests; instead it bases its investment decisions on the same public information that is available to other investors.  So, other than the fact that the Fund had sold credit protection on bonds issued by these companies – a fact that was consistently disclosed in

---

[15]     For example, in a quarterly report filed in February 2007, the Fund disclosed that it had sold credit protection on bonds issued by Ford and General Motors.  *See* February 2007 Form N-Q at 23.

the Fund's Statements of Investments – the Fund has no duty to disclose any additional information about these investments.  Nor, for that matter, does the Complaint aver any actual facts regarding the companies or these swaps that any defendant possessed but that Plaintiffs, or the market in general, did not.

*Second*, the disclosure regime inherent in Plaintiffs' demand is, once again, unworkable. Indeed, Plaintiffs appear to be demanding that mutual funds go through their portfolio and detail the unique risks posed by each individual security – and then to continuously update that risk assessment for each of hundreds or thousands of securities.  Plaintiffs, of course, cite no legal rule or statute requiring such elaborate and voluminous real-time disclosures, and their proposed approach is inconsistent with the type of concise, informative disclosures that Form N-1A is required to provide.

## VI.      Plaintiff O'Steen's Claims Are Time-Barred

Plaintiff O'Steen's claims should also be dismissed because they are time-barred. Although Plaintiffs suggest that it would be "premature" to rule on the statute of limitations issue at this stage, Pls. Br. at 47-48, courts can and should dismiss cases on limitations grounds if it is clear from the allegations and judicially noticeable facts that the claims are time-barred.  *See, e.g.*, MTD at 58 (collecting cases).  O'Steen's claims fit that mold because the facts he uses to support his allegations are taken from the very disclosure documents he claims are misleading. *See id.* at 58-63.  Thus, the disclosure documents themselves put O'Steen on notice of his claims, and no further factual discovery can alter that result.[16]

---

[16]      Plaintiffs claim that the Court should not rely on *DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457 (7th Cir. 1990), because that case involved a motion for summary judgment, rather than a motion to dismiss.  Pls. Br. at 48.  The

Plaintiffs do not and cannot dispute the content of the Fund's disclosures.  Instead, they argue that the documents would not have put a reasonable investor on notice of his claims because:  (1) "expert analysis" is required to understand them; and (2) *Morningstar* purportedly did not realize the leveraging effects of the Fund's swap investments until December 2008.  *See* Pls. Br. at 46-47.  For the reasons discussed above, both of these arguments are meritless.  An investor reading the Fund's disclosures over time would see that the Fund significantly increased its exposure to credit default swaps, total return swaps, and MBS more than one year before the first lawsuit in this case was filed.  To the extent that they wanted to quantify that awareness, it would not take "expert analysis" but simple addition to do so.  *See supra* Part I.C.3.  Likewise, *Morningstar* cannot be the relevant measuring stick for inquiry notice because its own articles acknowledge that *Morningstar*'s analysts did not even read the Fund's disclosures until after the market collapsed.  *See supra* Part IV.  Investors like O'Steen are of course charged with knowledge of the actual relevant disclosures.  *See* MTD at 57-58.

## VII.   Plaintiffs' Claims Should Be Dismissed Because The Fund's NAV Decline Did Not "Result From" The Alleged Misrepresentations And Omissions

Plaintiffs' claims should also be dismissed for the independent reason that the face of the Complaint clearly demonstrates that Plaintiffs have suffered no compensable damages under Sections 11(e) and 12(b).  Those statutes define compensable damages as the "depreciation in value" of a plaintiff's securities "resulting from" the alleged misrepresentation or omission.  As

---

Seventh Circuit, however, based its decision on the fund's statement of investments, *i.e.*, documents that this Court may judicially notice right now.  *See* MTD at 6 n.2.  Thus, because *DeBruyne* held that the statute of limitations barred the plaintiffs' claims based upon the same type of information now before the Court, that case is fully applicable here.

explained below, there is no dispute here over the fact that the Fund's disclosures had literally no impact on the value of Plaintiffs' shares; Plaintiffs' alleged damages thus necessarily resulted from poor performance of the Fund's investments.  As a matter of law, their claims should therefore be dismissed.

Plaintiffs do not dispute any part of the Oppenheimer Defendants' showing that the shares of open-end mutual funds, including the Fund, are priced according to a mathematical formula that turns on the value of the fund's net assets.  *See* MTD at 49.  Nor do they argue that any "depreciation in value" of their Fund shares "resulted from" the alleged misrepresentations or omissions about the risks of the Fund as opposed to market forces.  *See* Pls. Br. at 43-44 (acknowledging that the alleged misrepresentations did not inflate the price of the Fund's shares).  Nor do Plaintiffs even refer to, much less analyze, the Securities Act's statutory language or its legislative history.  Indeed, they offer literally nothing to explain how their damages claims here are consistent with the statute, which creates essentially strict liability and does not require proof of reliance specifically *because* of the assumption that issuer representations *would* – in the usual case of a public company's primary or secondary offering – impact the price of shares even for investors who never read the relevant disclosures.  *See* MTD at 52-53.

Plaintiffs' silence on these key points speaks volumes.  In the first instance, it confirms that the question of loss causation in this case is purely legal.  Indeed, Plaintiffs' opposition consists of little more than an assertion that their claims "fall directly into the 'materialization of the risk' approach" to loss causation.  Pls. Br. at 44-45.  The problem for Plaintiffs is that this "approach" is not legally applicable to their claims, as demonstrated by the three cases on which

they base their entire argument.  The cases that Plaintiffs cite for this theory – notably *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) and *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001)[17] – interpreted the distinct and broader "loss causation" requirement under Section 10(b) of the Exchange Act.  Those cases simply had no occasion to address the Oppenheimer Defendants' argument – which hinges on the unique language in Sections 11(e) and 12(b) of the Securities Act applied to allegations that an open-end mutual fund made misrepresentations about the risks of its portfolio.

These Section 10(b) precedents are not persuasive authority for at least three reasons. *First*, as explained at length in the Oppenheimer Defendants' moving papers and ignored by Plaintiffs, the Securities Act and the Exchange Act have radically different language, which gives rise to equally *different* meanings.  Plaintiffs' argument ignores this inconvenient fact and simply asserts without reasoning or explanation that the two statutes should always be interpreted the same way.  *See* MTD at 54-55.  *Second*, the Exchange Act covers only *fraudulent* conduct; the Securities Act, however, is essentially a *strict liability* statute.  Therefore, it is completely appropriate that the Securities Act provides for a narrower concept of causation than the Exchange Act.  *See id.* at 55 n.25.  *Third*, as suggested above, the legislative history of the Securities Act makes clear that Congress passed Sections 11 and 12 (and chose not to include a reliance element in either claim) on the assumption that misrepresentations in a registration

---

[17]     Plaintiffs also cite *In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534 (N.D. Cal. 2009).  The Motion to Dismiss explains in detail why *Schwab* is wrongly decided – points which Plaintiffs also ignore.  *See* MTD at 53-55.  In short, *Schwab* failed to follow the Securities Act's plain language.  This Court has often refused to follow similarly erroneous decisions.  *See, e.g.*, *Pine River Irrigation Dist. v. United States*, No. 04-01463, 2009 WL 3011223, at *16-17 (D. Colo. Sept. 18, 2009).  It should do so again here.

statement or prospectus *would* affect the price of the security through secondary market trading. This rationale is not applicable in the mutual fund context; even Plaintiffs concede that any misrepresentations about the risks of the Fund could not have affected the price of the Fund's shares. *See* Pls. Br. at 43-44.  Plaintiffs can offer no reason, because there is none, to distort the plain language of the statute to cover circumstances in which neither its rationale nor the concerns that motivated Congress to pass it are present. *See* MTD at 53.

Plaintiffs also knowingly misrepresent the Oppenheimer Defendants' argument in suggesting that applying the plain language of Sections 11(e) and 12(b) here would improperly immunize all mutual funds from liability under the "Federal Securities laws." Pls. Br. at 45. This is simply not true.  By using distinct language, Congress plainly made different policy choices about the scope of loss causation with respect to the strict liability causes of action under the Securities Act and fraud claims under the Exchange Act.  Thus, as noted above, Plaintiffs could still pursue their "materialization of risk" theory under the Exchange Act. *See, e.g.*, *Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL 342050, at *6 (S.D.N.Y. June 25, 1998); *Hanley v. First Investors Corp.*, 793 F. Supp. 719, 720 (E.D. Tex. 1992); *Geisenberger v. John Hancock Distribs., Inc.*, 774 F. Supp. 1045, 1051 (S.D. Miss. 1991). Moreover, Plaintiffs could pursue claims under the Securities Act for misrepresentations that actually affect the Fund's NAV.  The only thing they cannot do is sue under the Securities Act for misrepresentations that do *not* affect the NAV, as they have done here.

Whether the "materialization of risk" theory can be used to circumvent the plain language of Sections 11 and 12 is a pure question of law.  The answer is clearly "no," and that is apparent from the face of the Complaint and the text of Sections 11 and 12.  Thus, rather than put off this

issue until some later date as Plaintiffs suggest, *see* Pls. Br. at 43, the Court should decide it now

and dismiss Plaintiffs' claims as a matter of law.

## VIII.   Plaintiffs' Section 12 Allegations Fail To State A Claim

Plaintiffs begin the discussion of their Section 12(a)(2) claims by recognizing that the

Oppenheimer Defendants contest the sufficiency of their "seller" claims with regard to *all*

*defendants* named in this action except OppenheimerFunds Distributor, Inc.  Pl. Br. at 36.

However, in the ensuing pages Plaintiffs' brief makes *no* argument whatsoever to support their

purported Section 12 claim against OFI, presumably because no plausible allegation can be made

that OFI "solicited" the sale of Fund securities.  *See* Pl. Br. 36-39.  As Plaintiffs appear to have

conceded that OFI was not a statutory "seller," their claims under Section 12 against OFI should

be dismissed.

Moreover, for the reasons set forth in Part III.B of the Independent Trustees' Reply Brief,

which is incorporated fully herein, Plaintiffs' Section 12(a)(2) claims against OFI and the

Individual Defendants fail because Plaintiffs have not adequately asserted that those Defendants

are "sellers" within the meaning of the statute.

## IX.   Plaintiffs' Section 15 Allegations Fail To State A Claim

For the reasons set forth in Part III.C of the Independent Trustees' Reply Brief, which is

incorporated fully herein, Plaintiffs' Section 15 claims against OFI and the Individual

Defendants fail because Plaintiffs fail to plead a primary violation of Sections 11 or 12, and

Plaintiffs fail to allege sufficient allegations of control.

**X.      Request For Oral Argument**

The Oppenheimer Defendants respectfully request oral argument on their Motion to Dismiss.  Oral argument is warranted in light of the novelty of the Plaintiffs' theory and the significance of the issues raised.

**CONCLUSION**

For reasons set forth above and in Oppenheimer Defendants' Motion to Dismiss, Plaintiffs' Complaint should be dismissed with prejudice.

Dated this 17th day of February, 2010.

Respectfully submitted,

s/ *Robert N. Miller*
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Tel: 303.291.2300
Fax: 303.291.2400
Email: rmiller@perkinscoie.com


s/ *William K. Dodds*
William K. Dodds
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Tel: 212 698 3500
Fax: 215 698 3599
Email: william.dodds@dechert.com

Matthew Larrabee
Dechert LLP
One Maritime Plaza, Suite 2300
San Francisco, CA 94111
Tel: 415 262 4500
Fax: 415 262 4555
Email: matthew.larrabee@dechert.com

Michael Doluisio
Dechert LLP
2929 Arch Street
Philadelphia, PA 19147
Tel: 215 994 2325
Fax: 215 994 2222
Email: michael.doluisio@dechert.com

Attorneys for Defendants
OppenheimerFunds, Inc., OppenheimerFunds
Distributor, Inc., John V. Murphy, Brian W.
Wixted. Angelo Manioudakis

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on this 17th day of February, 2010, I electronically filed a true and correct copy of the foregoing **OPPENHEIMER DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net
- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net,cindyj@hbsslaw.com
- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com
- **Stephanie Erin Dunn**
  sdunn@perkinscoie.com,sdunn-efile@perkinscoie.com
- **Robert J. Dyer , III**
  bob@dyerberens.com
- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com
- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com
- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com
- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com
- **Christopher J. Keller**
  ckeller@labaton.com,electroniccasefiling@labaton.com
- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,michael.doluisio@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com
- **Robert Nolen Miller**
  rmiller@perkinscoie.com,rmiller-efile@perkinscoie.com
- **Peter G. Rush**
  peter.rush@klgates.com,melissa.neubeck@klgates.com
- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

_s/ Robert N. Miller_
Robert N. Miller
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO  80202-1043
Tel:  303.291.2300
Fax:  303.291.2400
Email:  rmiller@perkinscoie.com

Attorneys for Defendants
OppenheimerFunds, Inc., OppenheimerFunds
Distributor, Inc., John V. Murphy, Brian W.
Wixted, and Angelo Manioudakis