**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge John L. Kane**

Civil Action No. 09-cv-386-JLK-KMT (consolidated with 09-cv-525-JLK-KMT)

In re Oppenheimer Champion Fund Securities Fraud Class Action

---

**DEFENDANTS INDEPENDENT TRUSTEES' REPLY**
**BRIEF IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED**
**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

**K&L GATES LLP**
Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher

70 West Madison Street
Chicago, Illinois  60602
Telephone:   (312) 372-1121
Facsimile:   (312) 827-8000

**DAVIS GRAHAM & STUBBS LLP**
Dale R. Harris

1550 Seventeenth Street
Denver, Colorado  80202
Telephone:   (303) 892-9400
Facsimile:   (303) 893-1379

*Attorneys for Defendants William L. Armstrong,*
*Robert G. Avis, George C. Bowen, Edward L.*
*Cameron, Jon S. Fossel, Sam Freedman, Beverly L.*
*Hamilton, Robert J. Malone and F. William*
*Marshall*

**TABLE OF CONTENTS**

**Page**

I.  Preliminary Statement.................................................................................................. 1

II. Background .................................................................................................................. 1

  A.  Common Factual Background ............................................................................2

III. Argument .................................................................................................................... 6

  A.  Plaintiffs Fail to State a Section 11 or Section 12(a)(2) Claim...............................6

    1.  Defendants Have No Duty to Quantify Level of Risk For Investors...........6

    2.  Quantification of Risk is Inherently a Matter of Opinion, Not Fact, Amounting to "Soft Information," Disclosure of Which is Not Required...................................................................................................9

    3.  Plaintiffs Seek to Hold Defendants Liable to Disclose a "Fact" Defendants Did Not Know......................................................................10

    4.  Plaintiffs' Proposed New Disclosure Standard Proves Unworkable .........11

    5.  Plaintiffs' Other Allegations Fail to State a Claim ...................................14

      a.  The Fund Disclosed the Use and Risks of Leverage .....................14

      b.  No Duty Exists to Disclose Comparisons to Asserted Peer Funds..............................................................................................16

      c.  Plaintiffs Cannot State a Misrepresentation by Hindsight Claim...............................................................................................16

  B.  Plaintiffs Have Failed to Show the Independent Trustees Can be Liable Under Section 12(a)(2) as "Sellers"...................................................................17

  C.  The Complaint Does Not Allege Any Section 15 Claim Against the Independent Trustees .........................................................................................21

    1.  The Complaint Fails to Allege the Independent Trustees Controlled Any Named Defendant .............................................................................21

    2.  The Complaint Does Not Allege an Underlying Securities Act Violation ...................................................................................................24

IV. Conclusion ................................................................................................................ 24

## TABLE OF AUTHORITIES

### Cases

*Albert Fadem Trust v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985 (S.D. Ohio 2004) ... 10, 13

*Allison v. Bank One-Denver*, No. 91-1422, 1994 WL 637403 (D. Colo. Jan. 7, 1994). ............. 18

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................................. 18, 19, 21, 22, 23

*Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008)............................................................................................................................. 23

*Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007) ...................................... 18, 19, 20, 21, 22

*Benzon v. Morgan Stanley*, 420 F.3d 598 (6th Cir. 2005) ................................................................ 8

*Brett v. Community Unit School Dist. No. 303*, No. 08 C 3092, 2009 WL 424546 (N.D. Ill. Feb. 18, 2009)........................................................................................................... 2, 22

*Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008)................................................. 24

*Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801 (D.N.J. Sept. 8, 2008).................................... 19

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999)......................................................... 24

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ...................................................................................... 11

*Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001)..................................................... 12

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................................................... 9

*Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977) ........................................................................ 8

*Graham v. Barriger*, No. 08-9357, 2009 WL 3852461 (S.D.N.Y. Nov. 17, 2009)...................... 22

*Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508 (S.D.N.Y. 2000) ............................................. 22

*Hinsdale v. City of Liberal*, 19 Fed. Appx. 749 (10th Cir. 2001)................................................... 2

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992) ....................... 7, 8, 16

*In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080 (C.D. Cal. 2003) ........................... 20

*In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) .............................. 13, 19

*In re ProNetLink Sec. Litig.*, 403 F. Supp. 2d 330 (S.D.N.Y. 2005) ............................................ 22

*In re Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) .................................... 19, 20, 21

*In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999)............................ 19

*In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006)................................................................................................................. 21

*In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010) .................................................................................................................. 20

*In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992)............................................... 10, 11

*In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ................................................ 17

*In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850 (N.D. Cal. 1993) ....................................... 17

*J & R Marketing v. General Motors Corp.*, 549 F.3d 384 (6th Cir. 2008).................................... 16

*Kowal v. MCI Communications Corp.*, No. 90-2862, 1992 WL 121378 (D.D.C. May 20, 1992) ....................................................................................................................... 7

*Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ............................... 13

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998)............................... 20, 22, 23, 24

*Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009)........................................................... 18

*Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424 (N.D. Ill. April 17, 1984) ................................................................................................................... 21

*Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) .............................................................................................................. 9, 10, 17

*Pinter v. Dahl*, 486 U.S. 622 (1988)............................................................................... 18, 20, 21

*Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir. 1992) ............................................................... 7

*Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449 (D. Md. 2000) .......................................... 8

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) .................................................... 18, 20

*Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156 (9th Cir. 2009)..................................................... 9

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996)............................................... 9, 20

*Sheppard v. TDW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996)................................. 8

*Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185 (N.D. Ill. June 23, 1994) ............................................................................................ 7, 16

*Tatum v. Schwartz*, No. S-06-01440, 2007 WL 419463 (E.D. Cal. Feb. 5, 2007) ................... 2, 22

*Turkmen v. Ashcroft*, 589 F.3d 542 (2d Cir. 2009) ........................................................................ 18

*Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259 (W.D. Okla. 1999) ............................ 13

## Other Authorities

Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009 .............................................................................................................................. 4, 5, 10

Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008 ............................................................................................ 4

Russel Kinnel, *The Eight Most Shocking Losses of the Past 12 Months*, MORNINGSTAR, February 4, 2009 ............................................................................................................... 11

*The American Heritage Dictionary of the English Language* 1082 (3d Ed. 1992) ........................ 3

## Rules

15 U.S.C. § 77k ............................................................................................................................... 12

15 U.S.C. § 77k(a) ............................................................................................................................ 9

15 U.S.C. § 77l(a)(2) ..................................................................................................................... 9, 18

Fed. R. Civ. P. 8(a) .................................................................................................................... 17, 21

## Regulations

SEC Final Rule, *Registration Form Used by Open-End Management Investment Companies*, 1998 WL 107729 (March 13, 1998) ................................................................ 6

SEC Form N-1A, General Instructions, Part C.1.b ........................................................................... 6

Defendants, William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall (collectively, the "Independent Trustees") hereby submit the following Reply Brief in Support of their Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand.[1]

## I.    Preliminary Statement[2]

Plaintiffs were obligated to plead the misstatement or omission of a material fact for their securities laws claims. Neither the Complaint nor Plaintiffs' Opposition to Defendants' Motions to Dismiss (the "Opposition") articulates any such material fact. Instead, the Opposition asks this Court to formulate a new disclosure standard, one that requires an issuer to quantify accurately and disclose an "aggregate risk profile" prognosis for its entire investment portfolio. The securities laws impose no such duty; indeed, the case law and governing regulatory authority state such a disclosure requirement would be inherently unreliable if not dangerous. The Complaint accordingly must be dismissed.

## II.    Background

Virtually none of the salient background is disputed. Either by express admission or conspicuous silence, Plaintiffs concede the factual predicate established by Defendants in their

---

[1]    The Consolidated Class Action Complaint and Jury Demand shall hereinafter be referred to as "CCAC" or "Complaint." The Independent Trustees' Motion to Dismiss shall be referred to as the "Trustees' Motion."

[2]    In the interest of efficiency, the Independent Trustees have sought to avoid repeating the points and authorities of their co-Defendants, OppenheimerFunds, Inc., the OppenheimerFunds Distributor, Inc., John Murphy and Brian Wixted (collectively, the "Oppenheimer Defendants" or "Oppenheimer Def's"), and incorporate herein by reference the Reply Brief in Support of the Motion to Dismiss the Consolidated Class Action Complaint and Jury Demand filed by the Oppenheimer Defendants. (The Independent Trustees and Oppenheimer Defendants shall be referred to collectively as "Defendants.")

opening papers. *See Brett v. Community Unit School Dist. No. 303*, No. 08 C 3092, 2009 WL 424546, at *5 (N.D. Ill. Feb. 18, 2009) ("Plaintiff has failed to respond to a number of arguments defendants assert in their motion to dismiss . . . . [B]ecause plaintiff did not respond to these arguments in defendant's motion, he has waived these claims."); *see also Tatum v. Schwartz*, No. S-06-01440, 2007 WL 419463, at *3 (E.D. Cal. Feb. 5, 2007) (granting motion to dismiss count where plaintiff "tacitly concede[d] this claim by failing to address defendants' argument in her opposition."); *Cf. Hinsdale v. City of Liberal*, 19 Fed. Appx. 749, 769 (10th Cir. 2001) (affirming district court holding that plaintiff abandoned claim by failing to address it in response to defendants' motion for summary judgment) (citations omitted). Plaintiffs' multiple concessions substantially narrow the issues before this Court, as the parties agree to the following background:

### A.    Common Factual Background

Plaintiffs knowingly invested in a "junk bond" fund devoted to high-yield debt instruments. (Trustees' Motion pp. 2, 20). Investors understood "the inherent risks of investing in high-yield debt instruments" and "the inherently risky nature of investing in high-yield debt instruments." (Opposition pp. 3, 4). Investing in each of the following high-yield debt instruments fell squarely within the Fund's announced (*i.e.*, "disclosed") investment policy: credit default swaps ("CDS"), total return swaps ("TRS"), mortgage-backed securities ("MBS") and collateralized mortgage obligations ("CMO"). (Oppenheimer Defendants' Motion to Dismiss ("Opp. Def's Br.") pp. 7, 23-26, 30-31). The Fund clearly announced (*i.e.*, "disclosed") to investors in advance its intention to invest in each of these high-yield debt instruments. (*Id.*)

In addition to disclosing all the types of debt instruments in which the Fund would invest, both prior to and throughout the putative Class Period, the Fund disclosed accurately the magnitude of all investments in these instruments including the full notional amount of risk to

2

the Fund with respect to each such investment. (Oppenheimer Def's Br. pp. 28-30, 32-33). The Fund timely disclosed in detail each of its positions in these instruments and every change in the "greatness in size or extent"[3] of the holdings in each position. (*Id.*) The Complaint never alleges the Fund's investments in CDS, TRS, MBS, or CMO exceeded some limit set forth in the disclosure documents. The Fund also announced (*i.e.* "disclosed") it intended to "use[] . . . derivative investments to try to enhance income." (Opposition p. 27 (quoting CCAC ¶ 41)).

Plaintiffs understood the derivative high-yield instruments of "credit-default swaps, total return swaps, and mortgage backed securities" involved risk. (Opposition pp. 3-4 (quoting CCAC ¶ 45)). The Fund disclosed "the risk and volatility of derivative transactions" (Opposition p. 10), and specifically disclosed the risks accompanying an investment in each of these derivative high-yield debt instruments. (Oppenheimer Def's Br. pp. 26-28, 31-32). For example, the Fund disclosed "what mortgage-backed securities are and the Fund's intention to invest in mortgage-backed obligations." (Opposition pp. 23-24). "Investors" were "aware that the Fund invested in mortgage-backed securities and swaps" and the Fund disclosed the "interest and prepayment risk[s] applicable to mortgage-backed securities." (Opposition pp. 24, 25).[4]

Further, Plaintiffs concede investors were advised and understood "times of economic distress" were "especially" likely to make "[t]he market for lower-grade securities . . . less liquid

---

[3]    "Magnitude" as defined in *The American Heritage Dictionary of the English Language* 1082 (3d Ed. 1992).

[4]    Although the Opposition strains to suggest Defendants "represented an avowed inherent quality of the Fund" (Opposition pp. 27-28), that effort cannot possibly be squared with Plaintiffs' admission they knew **"at least** 60%" of the Funds assets would be devoted to invest in "lower-grade . . . junk . . . ." (emphasis supplied). The Fund announced that it "invests at least 60% of its total assets in high-yield, lower grade, fixed income securities, commonly called 'junk' bonds . . . ." (Opposition p. 26).

. . . ." (Opposition p. 24). Plaintiffs acknowledge the liquidity conditions in the junk bond market turned dramatically worse in the second half of 2008. As the Fund had previously warned, "the market for both bonds and the derivatives became increasingly illiquid as the credit crisis unfolded . . . ." (Opposition p. 12 (quoting Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)).[5]

Plaintiffs, by virtue of the materials cited in the Complaint and the Opposition's conspicuous silence to the Trustees' Motion's emphasis on the prevailing economic conditions, concede the conditions confronting the high-yield debt market in the second half of 2008 reached an unprecedented "crisis" level. Indeed, the Opposition acknowledges a "massive deterioration in the residential mortgage market and an overall crisis in the real estate market . . . ." (Opposition p. 23). Plaintiffs acknowledge the "market not only sailed off into uncharted mania," but that "mortgage-related securities . . . blew up in the crisis." (*See* Eric Jacobson, *Oppenheimer Bond Funds Missed the Forest Fire For the Trees*, MORNINGSTAR, Dec. 17, 2008, *cited in* CCAC ¶ 86); (Opposition p. 10, purporting to quote unidentified MORNINGSTAR article). Perhaps most significantly, Plaintiffs concede the Fund Manager did not understand the Fund to be taking *any* undue risk. Indeed, Plaintiffs insist the "Fund managers 'fail[ed] to appreciate the

---

[5]     The Opposition suggests the Fund was obligated to include "specific risk disclosures related to the inherent illiquidity of the mortgage-backed securities and the collateralized mortgage obligation market." (Opposition p. 24). The Complaint, however, fatally neglects to make any allegation either of these markets was "illiquid," or "inherently illiquid," much less when. Further, Plaintiffs concede the unforeseen credit crisis dramatically impaired the liquidity of these markets. (*See* CCAC ¶ 7 (losses "resulted from heavy exposure to risky mortgage-related securities that blew up in the crisis.")) (purporting to quote unidentified MORNINGSTAR article); (Opposition p. 10) (same).

risks they were taking.'" (Opposition pp. 11, 12 (quoting Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)).

The breadth of the common ground leaves scant room for any alleged misstatement or omission of a material fact. As a consequence, the Opposition struggles to identify any concrete fact the Fund supposedly omitted or misstated, reducing the essence of the Complaint to the following narrowly-themed articulation of a purported omission:

- "[T]he essential allegations of Lead Plaintiffs' claims that Defendants failed to disclose the enormously enhanced risk that was created as a result of the sheer volume of the Fund's investments in mortgage-backed securities and swaps . . . ." (Opposition p. 15).

- "[F]ailure to disclose the magnitude of the portfolio's risk profile created by the Fund's enormous investments in mortgage-backed securities and swap transactions" or the "***magnitude*** of the Fund's overall leverage position . . . ." (Opposition pp. 15, 19) (emphasis supplied).

- "[F]ail[ure] to disclose the aggregate risk profile of the Fund and the extent to which it was exposed to risky mortgage-backed securities and swap transactions." (Opposition p. 33).

The frequency with which Plaintiffs fall back onto "magnitude" of risk allegations makes clear Plaintiffs do not criticize any specific disclosure of the risks involved with investing in the identified instruments (*i.e.*, CMO, TRS, MBS, CDS), or even the disclosures of the magnitude of the actual investments in those instruments. (*See, e.g.*, sample Schedule N-Q entry set forth on p. 16). Rather, Plaintiffs assert that in addition to disclosing the risks of investing in each instrument and all of the details of each such investment, Defendants should have also disclosed the "aggregate risk profile" of the entire portfolio based on the anticipated market conditions. That Plaintiffs supply the Court neither a metric to assess the above-quoted concepts nor any roadmap to perform this assessment is unsurprising, as both the courts and the Securities and

Exchange Commission (the "SEC") have expressly determined that imposing such a disclosure burden upon an issuer would only confuse and mislead investors.

## III. Argument

The Opposition never succeeds in identifying any "fact" the Fund purportedly misstated or omitted. As a consequence, the Complaint fails as a matter of law.

### A. Plaintiffs Fail to State a Section 11 or Section 12(a)(2) Claim

#### 1. Defendants Have No Duty to Quantify Level of Risk For Investors

The securities laws, for good reason, simply do not require issuers to perform much less publish contemporaneous calibrations of risk assessments. The instructions issued by the SEC on the items to be included in the registration statement or prospectus of an open-end mutual fund under Form N-1A make clear no such risk assessments disclosures are required. The SEC instructs that "[t]he prospectus should *help investors to evaluate the risks* of an investment and to decide whether to invest in a Fund . . . ." SEC Form N-1A, General Instructions p. 6, Part C.1.b (emphasis supplied) (attached to the Declaration of Peter G. Rush ("Rush Declaration") as Exhibit A). The SEC's commentary accompanying the final rule amending Rule N-1A makes clear the SEC did not intend for funds to quantify risk as Plaintiffs propose:

> *The Commission did not propose to require a fund to disclose information designed to quantify its expected risk levels,* citing, among other things, the lack of a broad consensus as to what measure of risk would best serve fund investors. Comments submitted in response to the Commission's Risk Concept Release asserted that investors have too wide a range of investment goals and ideas of what "risk" means to be well served by a single quantitative risk measure. In addition, commenters argued that, if the Commission mandated a risk measure, investors might rely on it as a definitive standard despite the lack of general agreement on how to measure risk.

SEC Final Rule, *Registration Form Used by Open-End Management Investment Companies,* 1998 WL 107729, at *20 (March 13, 1998) (emphasis supplied).

6

Courts concur with the position announced by the SEC:

> Nor can investors state a claim for omission of material information where the offeror fails to quantify the risks identified. . . . [Defendant] was not under a duty to quantify the risk . . . . [T]he Seventh Circuit [has] stressed the importance of making disclosures, because "disclosures assist *investors* in determining the magnitude of risk." [The Seventh Circuit] did not place the burden of quantifying risks on the offeror of securities.

*Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 319185, at *2

(N.D. Ill. June 23, 1994) (quoting *Pommer v. Medtest Corp.*, 961 F.2d 620, 624 (7th Cir. 1992)

("Disclosures assist investors in determining the magnitude of risks.")).

Moreover, Plaintiffs complain the Fund should have cast amorphous concepts such as

"aggregate risk profile," "risk magnitude" and "enormously enhanced risk" in a negative light.

However, such castigations fail to provide grounds for a securities law claim:

> The law simply does not impose a duty to disclose pejorative characterizations of a company's operations or business prospects. Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry. The focus of the securities laws is on the disclosure of facts; characterizations of or conclusions drawn from those facts are matters that are left to the judgment of investors.

*Kowal v. MCI Communications Corp.*, No. 90-2862, 1992 WL 121378, at *4 (D.D.C. May 20,

1992) (internal citations and quotations omitted).

Other courts are in accord:

> The disclosure requirements of section 11 and 10b do not anticipate a duty by management to draw inferences for investors. ***Again, the object of the securities fraud laws is disclosure, not business judgment. Business judgment, including inferences drawn from fully-disclosed information, rightly remains the province of individual investors***.

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. 1992) *aff'd*, 7 F.3d 357

(3d Cir. 1993) (emphasis supplied).

7

Like here, plaintiffs in the *Trump Casino* case complained the issuer was obliged to quantify and qualify the risk. The Court refused to impose such a burden, holding that the failure to characterize investments as "excessive," "unprecedented," "unwarranted," and "thinly capitalized" was not actionable because "[a] prospectus . . . is not required to apply pejorative or derogatory descriptors to the investment it is selling." *Id.* at 559 (citing *Goldberg v. Meridor*, 567 F.2d 209, 218 n.8 (2d Cir. 1977));[6] *see also Benzon v. Morgan Stanley*, 420 F.3d 598, 606 (6th Cir. 2005) (holding prospectus was not required to project comparative performance of classes of issued shares where "all of the information necessary to compare the different class shares was in the prospectuses" and the disclosures proposed by plaintiffs were "merely interpretations drawn from the facts presented in the prospectuses, and [did] not actually provide new information."); *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 457-58 (D. Md. 2000) ("[Corporation's] failure to describe the subordinated CMBS [commercial mortgage-backed securities] as 'extremely illiquid' does not render the prospectus misleading. . . . A prospectus need not characterize a security or a risk in pejorative manner.) (internal citations and quotations omitted); *Sheppard v. TDW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (issuer "not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested," including collateralized mortgage obligations) (citation omitted).

---

[6]    The Opposition complains of just that: "Defendants . . . failed to disclose the *excessive* risks these investments added to the Fund's overall risk profile." (Opposition p. 28) (emphasis supplied).

2.   **Quantification of Risk is Inherently a
Matter of Opinion, Not Fact, Amounting to
"Soft Information," Disclosure of Which is Not Required**

The securities laws require the disclosure of material facts, not opinions, projections or

prognoses. *See* 15 U.S.C. § 77k(a) (Section 11) (providing for liability where a registration

statement, when such part became effective, "contained an untrue statement of a material *fact* or

omitted to state a material *fact*") (emphasis supplied); 15 U.S.C. §77l(a)(2) (Section 12)

(providing for liability where a prospectus "includes an untrue statement of a material *fact* or

omits to state a material *fact*") (emphasis supplied); *Glassman v. Computervision Corp.*, 90 F.3d

617, 631 (1st Cir. 1996) ("[T]he federal securities laws focus on the mandatory disclosure of

backward-looking hard information, not forecasts.   A firm has the option to disclose its internal

projections, but is not required to do so.   'The federal securities laws impose no obligation upon

an issuer to disclose forward-looking information such as internal projections, estimates of future

performance, forecasts, budgets, and similar data.'") (quoting *Shaw v. Digital Equip. Corp.*, 82

F.3d 1194, 1209 (1st Cir. 1996)); *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1163 (9th Cir.

2009) ("there is no duty to disclose income projections in a prospectus."); *Panther Partners, Inc.

v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008), *aff'd in pertinent

part*, 2009 U.S. App. LEXIS 20652 (2d Cir. Sept. 17, 2009) ("[I]t is undisputed that 'accurate

statements of historical fact and statements of opinion,' including statements of 'hope, opinion,

or belief about . . . future performance or general market conditions' are non-actionable.")

(citations omitted).   Defendants bear no duty to disclose soft information such as internal

analyses of risk or market conditions.   "The securities laws and the SEC do not require . . . the

disclosure of so-called 'soft information.'   Soft information consists of 'statements of subjective

analysis or extrapolation, such as opinions, . . . projections, estimates, and forecasts.'"   *Albert*

9

*Fadem Trust v. Am. Elec. Power Co., Inc.*, 334 F. Supp. 2d 985, 1004 (S.D. Ohio 2004) (citations omitted).

An assessment of the "magnitude" of risk as well as whether a risk has been "greatly" or "enormously enhanced" at bottom are subjective determinations left to each investor based on his or her own analysis of the facts, namely the actual portfolio holdings and the constantly-changing future market conditions, as well as each investor's own appetite for risk.   The securities laws impose no duty for an issuer to disclose its opinion of the "aggregate risk profile" of a portfolio, an opinion which is likely to be in constant flux.  As detailed in the following section, "[a] rule which required the corporation to disclose its own internal forecasts or otherwise provide the market with the corporation's prediction of its own future would, somewhat paradoxically, be less beneficial to investors than the current SEC policy [in part b]ecause of the inherent imprecision of such 'soft' information." *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1482 (N.D. Cal. 1992).

### 3.   Plaintiffs Seek to Hold Defendants Liable to Disclose a "Fact" Defendants Did Not Know

The Complaint and Opposition assert the issuer failed to comprehend or "appreciate" the purported "enhanced risk" generated by the Fund's investment decisions.  (*See* CCAC ¶ 87 (the "managers fail[ed] to appreciate the risks they were taking") (quoting Andrew Gogerty, *Fund Companies Falling Short on Stewardship*, MORNINGSTAR, Feb. 5, 2009)); (Opposition p. 11 (same).   Indeed, according to the allegations of the Complaint, the Manager was confident in and comfortable with its investment strategy.  (CCAC ¶ 86).  Thus, Plaintiffs sue because the Manager neglected to disclose as a purported "fact," *i.e.*, "enormously enhanced risk," something the Manager did not believe or know.  "Defendants are not expected to know the unknow-able, nor are they expected to disclose it." *Panther Partners*, 538 F. Supp. 2d at 670.  Far from

10

disclosing some internal sense of extraordinary risk, had the Manager announced its internal risk prognosis, the Manager instead would have disclosed confidence in its investment position.[7] This reality proves the sensibility of the SEC policy not to compel issuers to disclose such soft information as such information may have proved "to be less beneficial to investors than the current SEC policy." *In re Verifone*, 784 F. Supp. at 1482.[8]

### 4.    Plaintiffs' Proposed New Disclosure Standard Proves Unworkable

Plaintiffs provide the Court no legal authority -- much less any metric, standard or roadmap -- as to how (or when) to determine a disclosed risk has become so "heightened," "enhanced," "greatly enhanced," or "enormously enhanced," so as to give rise to some purported additional duty to disclose. (Opposition, *e.g.*, pp. 10, 15 & 23). Plaintiffs also supply the Court with no guidance for other supposed disclosure triggers such as a substantial change in "the portfolio's risk profile," or "the aggregate risk exposure of the Fund," whatever those phrases may mean. (Opposition pp. 15, 17). Plaintiffs provide the Court with nothing -- essentially

---

[7]    That Defendants' expectations did not come to fruition in the wake of the credit crisis provides no fodder for a securities claim based on omission or misstatement. Even discounting the causation issues in this regard, Plaintiffs' complaint that "the managers . . . [made] a really bad bet" (Opposition p. 11 (quoting Russel Kinnel, *The Eight Most Shocking Losses of the Past 12 Months*, MORNINGSTAR, February 4, 2009)) may state a mismanagement claim, but provides no fodder for a securities claim. (Oppenheimer Def's Br. pp. 35-37; Trustees' Motion pp. 14-21).

[8]    Plaintiffs' reliance on *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-12046, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) is misplaced. The court held the issuer was obliged "to disclose hard facts critical to appreciating the magnitude of the risks described." *Id.* at *8. There the issuer failed to disclose (or misrepresented) the "hard fact" that the guaranteed investment contracts were redeemable in seven days as opposed to the disclosed 30 days, a fact which radically altered the company's ability to adjust liquidity. Here, Plaintiffs point to no such omitted "hard facts."

asking the Court to write on a blank slate -- to impose some sort of ongoing risk calibration disclosure duty upon issuers amidst volatile markets and changing conditions.

The Opposition begs but never answers the question of just when the Fund crossed the threshold of "enormously enhanced risk," thereby triggering the purported duty to disclose additional information. For instance, at what point did the "multiplying effect that the Fund's swap transactions had on the net leverage of the portfolio . . . [so] vastly enhance[] [the] . . . risk" (Opposition p. 22) so as to give rise to this duty? There is simply nothing within the securities laws requiring issuers to maintain a sort of continuous risk alert system. Plaintiffs cite no law that comes close to imposing such a continuing duty upon an issuer, especially with respect to internal risk assessments. Indeed, the law is to the contrary. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as the news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure.")[9]

Indeed, Section 11 provides for liability only where "the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k (emphasis supplied). Liability may attach under Section 11 only

---

[9]     Plaintiffs' suggestion that a disclosure was required when leverage risks had come to "fruition" (Opposition pp. 18-19) is similarly implausible. Nowhere does the overall Complaint allege some leverage risk was realized. Indeed, nowhere does the Complaint state a default occurred (much less when) whereby the Fund incurred a "loss" of the listed notional amount of the debt instrument (*i.e.*, the leverage). Also, neither the Complaint nor the Opposition bother to answer the question of just how much leverage is too much leverage for a junk bond fund.

where a registration statement contains a misstatement or omission that is false or misleading at the time the registration statement becomes effective. Events occurring subsequent to the effective date do not provide a basis for liability under Section 11. *See, e.g., In re Metropolitan Sec. Litig.,* 532 F. Supp. 2d 1260, 1294 (E.D. Wash. 2007) ("Section 11 imposes liability for misstatements and omissions that were false or misleading at the time the registration statement in question became effective. Transactions or events that occurred after a registration statement's effective date therefore cannot provide a basis for Section 11 liability."); *see also Albert Fadem Trust,* 334 F. Supp. 2d at 1019 (to avoid dismissal of a Section 11 omission claim, plaintiff must allege that defendants were under a duty to disclose the omitted material information, and "that such information existed at the time the prospectus became effective.")[10] Moreover, "[c]laims under Sections 11 and 12 are usually evaluated in tandem, because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)(2). Plaintiffs pleading Sections 11 and 12 claims must state facts showing the allegedly omitted facts both existed and were known or knowable, at the time of the offering." *Lin v. Interactive Brokers Grp., Inc.,* 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (internal quotations omitted).

Plaintiffs allege misleading statements and omissions in the Registration Statements issued August 7, 2006, January 26, 2007 and January 28, 2008. As a consequence, to assess the adequacy of disclosure contained in each of those documents requires that a snapshot in time be

---

[10]     Indeed, Plaintiff concedes that "[w]hen determining whether a statement is material, courts should 'adopt[] the perspective of an investor on the date the registration statement containing the prospectus at issue became effective.'" (Opposition p. 14 (citing *Yuan v. Bayard Drilling Techs., Inc.,* 96 F. Supp. 2d 1259, 1266 (W.D. Okla. 1999))).

taken. The Opposition, for good reason, makes no effort to do that. Indeed, Plaintiffs expressly admit that "[t]hroughout 2006 and in the first half of 2007, the Fund had *few if any* positions in mortgage-backed securities. During the third quarter of 2007, the Fund made its first substantial investments in mortgage-backed securities . . . ." (CCAC ¶ 65) (emphasis supplied). Similarly, Plaintiffs do not allege Defendants entered into any TRS's prior to the third quarter of 2007. (*See* CCAC ¶ 47 (alleging the Fund's total return swap transactions "steadily increased from *third quarter 2007 onward*," and charting total return swap transactions from September 30, 2007 to December 31, 2008)) (emphasis supplied). Such admissions clearly belie any claim the August, 2006 or January, 2007 Registration Statements possibly suffered from misleading statements or omissions about MBS or TRS at the time they were issued. As for the January, 2008 Registration Statement, through its silence and by way of a number of express and adopted statements, the Opposition concedes the market conditions relevant to the Fund changed dramatically in the *latter* part of 2008—long after the January, 2008 Registration Statement became effective.[11]

### 5.   Plaintiffs' Other Allegations Fail to State a Claim

#### a.   The Fund Disclosed the Use and Risks of Leverage

The Opposition's focus on the "leveraging" effect of using derivatives does not give rise to a securities claim because the Fund's disclosures provided detailed information about the leverage that accompanies derivative securities. As set forth in detail in the Trustees' Motion, the Form N-Q Quarterly Schedules and Annual and Semiannual Reports listed the total notional

---

[11]   *See* Trustees' and the Oppenheimer Integrity Funds' Reply Brief in Support of Motion to Dismiss Consolidated Class Action Complaint and Jury Demand for *In re Core Bond Fund*, No. 09-1186, at pp. 11-12; Oppenheimer Def's Br. pp. 1-2, 10-15.

amount of every single CDS, TRS, CMO and MBS, the reference entity and the counter-party thereby disclosing the exact amount of the Fund's potential losses.

The Opposition concedes Defendants issued "disclosures about derivatives generally . . . and statements that explain what credit default and total-return swaps are and the difference between buying and selling credit protection." (Opposition p. 16). The Opposition further concedes the Fund expressly disclosed that "swap agreements may effectively add leverage to the Fund's portfolio because the Fund would be subject to investment exposure on the notional amount of the swap." (Opposition p. 16); (*see also* Oppenheimer Def's Br. pp. 26-28). The Fund further provided a host of disclosures about each and every swap it entered into. Take for example, the sale of CDS. The Opposition concedes the Fund identified each and every CDS it sold, and explained "the Fund would be subject to investment exposure on the notional amount of the swap" in the event of a default. (Opposition p. 16). Moreover, the Opposition admits that the Fund disclosed the full leverage risk (the "notional amount" at risk in the event of default) for every single CDS the Fund sold. The Independent Trustees republish below their chart from the opening Motion to prove the point:

**Credit Default Swap Contracts**

| Swap Counterparty | Reference Entity | Buy/Sell Credit Protection | Notional Amount (000s) | Pay/ Receive Fixed Rate | Termination Date | Premium Paid/ (Received) | Value |
|---|---|---|---|---|---|---|---|
| Lehman Brothers Special Financing, Inc. | Beazer Homes USA, Inc. | Sell | $3,015 | 5.0000% | 9/20/08 | $(301,500) | $(228,681) |

Oppenheimer Champion Income Fund, Jan. 28, 2008 Statement of Additional Information ("SAI") p. 140 (selected portions attached to Rush Declaration as Exhibit B). That lone SAI disclosed all the above information for *277* separate credit default swaps, *256* of which were "*Sell*" swaps, a disclosure that spanned *seven* full pages.

15

The disclosure indicates in no uncertain terms the "leverage" or "investment exposure" to the Fund in the event of default on this instrument is $3,015,000, the "notional amount of the swap" for which "the Fund would be subject to investment exposure." There is nothing else the Fund can conceivably disclose about "the leverage risk" with respect to such instruments. As an aside, the Complaint never alleges a "default" with respect any sold CDS occurred for which "the Fund would be subject to investment exposure."

> **b.     No Duty Exists to Disclose**
> **Comparisons to Asserted Peer Funds**

Contrary to Plaintiffs' suggestion, nowhere did the Fund state it "was not dramatically riskier than its high income/intermediate fund peer group." (Opposition p. 28). Indeed, Plaintiffs' suggestion the Fund had a duty to engage in comparative risk analysis with its peers is without foundation. "[T]here [is no] legal obligation for management to compare itself, unfavorably or otherwise, to industry competitors. Comparison shopping is the responsibility of the reasonable investor." *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. at 559; *see also J & R Marketing v. General Motors Corp.*, 549 F.3d 384, 393-94 (6th Cir. 2008).[12]

> **c.     Plaintiffs Cannot State a**
> **Misrepresentation by Hindsight Claim**

Plaintiffs, having conceded all the above-detailed disclosures, are forced to found their claims solely on the losses sustained by the Fund during the credit crisis. But Plaintiffs may not

---

[12]     Likewise, what constitutes a "severely troubled financial compan[y]" too risky for a junk bond investment (Opposition p. 23) is a decision to be made by the investor. *See, e.g., Tabankin*, 1994 WL 319185, at *2; *see also In re Donald J. Trump Casino*, 793 F. Supp. at 565. Because the Fund openly disclosed each reference entity and counter-party with respect to every single derivative, it was up to the investor to determine the level of junk bond risk with which he or she felt comfortable.

bring a misrepresentation by hindsight claim. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("When a company fails, it does not automatically mean that a violation of the securities laws has occurred. . . . The securities laws do not insulate investors against stock downturns which are caused by events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities.") (quoting district court opinion, *In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 873 (N.D. Cal. 1993) with approval); *see also Panther Partners*, 538 F. Supp. 2d at 668 (stating that "[t]he securities laws do not require clairvoyance in the preparation of offering documents . . . nor do they insure investors against . . . the volatility of the stock market itself.").[13]

## B.  Plaintiffs Have Failed to Show the Independent Trustees Can be Liable Under Section 12(a)(2) as "Sellers"

Plaintiffs seek to prosecute a Section 12(a)(2) claim they insist "provide[s] for absolute liability, even for innocent misstatements" but propose the statement of such a claim be "subject only to the liberal notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which requires [sic] 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" (Opposition p. 13 (quoting Fed. R. Civ. P. 8(a))). The governing standard,

---

[13]  Plaintiffs inadvertently concur with this proposition in arguing against the application of the statute of limitations.  Plaintiffs assert there were insufficient warning signs for any limitations period to begin to run until after reports on the aftermath of the credit crisis were published in December 2008. (Opposition p. 47). If, as the Opposition now suggests, the risk of loss from the openly disclosed investment positions were truly unforeseeable, then such unforeseeable risk cannot provide the predicate for a Securities Act claim premised upon the misstatement or omission of a then-existing material fact. If, on the other hand, those risks of loss from the disclosed investments were foreseeable, the statute of limitations was triggered once the positions were disclosed thereby barring the claims brought by Plaintiff. (Oppenheimer Def's Br. pp. 55-63).

17

however, is not so lax so as to condone the conclusory allegations made by Plaintiffs here. Controlling Supreme Court authority mandates plaintiffs seeking such absolute liability plead "facts" which establish a plausible, rather than simply possible, right to relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007). Various Circuit Courts of Appeals have recognized that *Iqbal* and *Twombly* significantly changed the pleading landscape. *See Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) (requirement complaint plead facts to state a claim plausible on its face "is a significant change, with broad-reaching implications."); *see also Turkmen v. Ashcroft*, 589 F.3d 542, 546, 547 (2d Cir. 2009) (characterizing *Iqbal* and *Twombly* as imposing a "heightened pleading standard.")

To assess the adequacy of the Plaintiffs' attempt to plead seller status, it is necessary to refocus on the buyer-seller relationship.  A Section 12(a)(2) claim may only be asserted against the "seller" of the security.   15 U.S.C. § 77l(a)(2).   The Supreme Court interprets "seller" narrowly to mean either the "owner who passed title," or "the person who successfully solicits the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).[14]

The Independent Trustees neither sold nor solicited for sale any of the Fund's securities, nor can the Opposition point to any allegations to that effect, as "solicitation" requires that a person, at a minimum, directly communicate with and actively solicit the buyer. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); (*see also* Trustees' Motion pp. 6-7).

---

[14]    Although *Pinter* addressed the meaning of "seller" under Section 12(a)(1), courts have concluded that the definition applies to Section 12(a)(2). *Allison v. Bank One-Denver*, No. 91-1422, 1994 WL 637403, at *3 (D. Colo. Jan. 7, 1994). (*See* Trustees' Motion p. 6, n.4).

For example, in *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d at 1296, the court rejected the type of allegations made by Plaintiffs here in holding that "neither the signing of a prospectus, nor the unsupported assertion of solicitation is sufficient to qualify an individual as a 'seller' for the purposes of Section 12," reasoning, "the Supreme Court's recent decision in *Twombly* emphasizes the importance of alleging facts at the pleading stage.   Given that solicitation of a sale is a necessary element of a claim brought under Section 12, the contention that 'the defendant solicited the sale' must be supported by factual allegations at the pleading stage." *See also Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801, at *5 (D.N.J. Sept. 8, 2008) (holding plaintiff failed to raise right to relief above speculative level where complaint "merely recite[d] the elements of a cause of action under Section 12(2) in a conclusory fashion" without supporting factual allegations) (citing *Twombly*, 127 S. Ct. at 1965).

The Opposition ignores the greater weight of case law cited by the Independent Trustees and the Integrity Funds, instead merely listing those district court cases which have held that signing a registration statement is sufficient to deem one a "seller."   Defendants contend the cases cited in the Opposition reach the incorrect conclusion on the "seller" issue in part because they fail to recognize the Supreme Court's edict in *Iqbal* and *Twombly* on the necessity of pleading facts giving rise to a plausible right to relief.[15]

---

[15]     Those cases, including *In re Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) and *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933 (M.D. Tenn. 1999), are cited in the Opposition at pages 37 and 38. Unlike those cases, the *In re Metropolitan* and *Cafaro* courts applied *Twombly* to find allegations of signing a registration statement insufficient. *Sirrom Capital* long-preceded *Twombly*. The *Schwab* court did not cite *Twombly* in concluding that such remote act provides grounds for a Section 12(a)(2) claim. Interestingly, *Schwab* was decided pre-*Iqbal*, the 2009 case in which the Supreme Court made clear the *Twombly* pleading standards

Moreover, none of Plaintiffs' cases examine the *Pinter* court's recognition that something more than status as one who "signs" a registration statement is necessary to impose liability under Section 12(a)(2). The *Pinter* court reached this conclusion because, although Section 11 expressly applies to "collateral participants" such as persons who "sign" a registration statement, "[t]here are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.* at 650 n.26.[16]

In the cases where the *Pinter* decision has been carefully considered, courts have concluded a trustee can be a "seller" based on contractual privity with the purchaser or direct involvement in the solicitation of a purchaser's investment, but not through merely signing a registration statement or prospectus. *See, e.g. Rosenzweig*, 332 F.3d at 871; *see also Shaw*, 82 F.3d at 1216; *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003).

The other allegation relied upon in the Opposition, namely that "governing" the Fund in the role of independent trustee means that the Independent Trustees solicited purchases of shares for their own financial interests, is similarly insufficient to improve Section 12(a)(2) liability. *In re Sonus Networks Sec. Litig.*, No 04-10294, 2006 U.S. Dist. LEXIS 28272, at *34-38 (D. Mass.

---

applied to all cases rather than only those alleging antitrust violations. This may explain why the court in *Schwab* never mentioned *Twombly* nor applied its pleading standards.

[16]    Those cases also do not apply the directive in *Pinter* that section 12(a)(2)'s "purchase from" requirement focuses on a defendant's "***relationship***" with the plaintiff-purchaser. *Pinter*, 486 U.S. at 651. As a result, the existence (or more appropriately, the lack) of any such relationship is never examined in these cases. The Tenth Circuit appears to be in accord with this requirement, stating that a plaintiff must "at a minimum allege *facts* indicating that [a defendant] solicited [the] purchase." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (emphasis supplied); *see also In re Thornburg Mortgage, Inc. Sec. Litig.*, No. 07-0815, 2010 WL 378300 (D.N.M. Jan. 27, 2010) (*citing Maher*'s requirement to plead facts indicating solicitation to conclude that allegations directors created and signed offering documents did not rise to solicitation).

May 10, 2006) (dismissing Section 12(a)(2) claim devoid of factual allegations pertaining to defendants' solicitation efforts). This bare allegation equating "governing" to "soliciting" does nothing to set forth facts demonstrating a plausible right to relief. *See Iqbal*, 129 S. Ct. at 1950; *see also Twombly*, 127 S. Ct. at 1965.[17] The allegation ignores the *Pinter* court's directive to focus on the buyer-seller relationship, it ignores the requisite pleading requirements, and is nothing more than the type of conclusory label most courts rejected even before *Iqbal* and *Twombly* became the governing law.

### C.    The Complaint Does Not Allege Any Section 15 Claim Against the Independent Trustees

#### 1.    The Complaint Fails to Allege the Independent Trustees Controlled Any Named Defendant

The Section 15 claim should be dismissed for a central patent deficiency ignored by the Opposition: the failure to properly allege that the Independent Trustees controlled any of the named Defendants. The Complaint alleges that the Independent Trustees controlled the Fund (CCAC ¶ 33), but the Fund is not a named Defendant. As the Independent Trustees plainly pointed out in their Motion, the law is clear that the asserted "controlled person" must be a named defendant to sustain a Section 15 claim. *See Nelson v. Nat'l Republic Bank of Chicago*, No. 80-6401, 1984 WL 2424, at *8 (N.D. Ill. April 17, 1984) ("[U]nder § 15, no action against the directors of either McCormick or Domicile can be maintained, since neither McCormick or

---

[17]    The *Schwab* case illustrates a deficient analysis. Not only was *Pinter* not examined in depth, the court made no separate analysis of the independent trustees' motion to dismiss the Section 12(a)(2) claim. The court instead cited to pre-*Twombly* case law for the proposition that plaintiffs needed only to satisfy Fed. R. Civ. P. 8(a)'s lenient pleading standards at the motion to dismiss stage, and found the generic allegation of "actively solicit[ing]" sales sufficient. Here, the Independent Trustees maintain that the plaintiffs' failure to set forth any factual allegations against the trustees in *Schwab* should have resulted in dismissal under *Twombly* in that case.

Domicile are parties to this suit, and thus could not be found liable under Section 77k or 77l."); *see also Griffin v. PaineWebber, Inc.*, 84 F. Supp. 2d 508, 516 (S.D.N.Y. 2000); *In re ProNetLink Sec. Litig.*, 403 F. Supp. 2d 330, 337 (S.D.N.Y. 2005).[18] Plaintiffs' failure to address this critical deficiency constitutes an admission that the claim has not been pleaded properly. *See Brett*, 2009 WL 424546, at *5; *see also Tatum*, 2007 WL 419463, at *3.

The Opposition asserts the Independent Trustees can be liable under Section 15 for controlling the Distributor. (Opposition p. 40). Plaintiffs cite paragraphs 17 and 32 for the proposition the Complaint alleges such control over the Distributor. A brief analysis of those paragraphs, however, shows this assertion is erroneous. Paragraph 17 merely identifies the Distributor, while paragraph 32 alleges the Distributor controlled the Fund. Indeed, as the Fund's Statement of Additional Information makes clear, the Board of Trustees governs the *Fund*, not the Distributor. (January 28, 2008 SAI p. 38) (selected portions attached to Rush Declaration as Exhibit B).

Also, the amorphous allegations the Independent Trustees somehow controlled the Manager and other Defendants fall well short of what is needed to set forth a Section 15 claim after *Iqbal* and *Twombly*. A Section 15 claim may not be based on "control person allegations [which] are limited to legal conclusions and therefore are not entitled to the presumption of truth." *Graham v. Barriger*, No. 08-9357, 2009 WL 3852461, at *19 (S.D.N.Y. Nov. 17, 2009) (citing *Iqbal*, 129 S. Ct. at 1949-50);[19] *see also Maher*, 144 F.3d at 1306 (dismissal is appropriate

---

[18]     *See* Trustees' Motion p. 14.

[19]     *Graham* dealt with control person allegations under Section 20(a) of the Securities Exchange Act of 1934. The control person provisions of Section 15 and Section 20(a) are interpreted in the same manner. *Maher*, 144 F.3d at 1305 n.7.

where "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.").[20]

As set forth more fully in the Trustees' Motion, the Section 15 Count is impossible to decipher because it does not define which Defendants are included in the Count, nor does it specify which Defendants purportedly controlled other Defendants.    With regard to the Independent Trustees, the Complaint merely states they attained control by unspecified "direct and/or indirect business and/or personal relationships" with other (unidentified) parties. (CCAC ¶ 115). Such ambiguous, factually devoid pleading cannot support a Section 15 claim. *See Maher*, 144 F.3d at 1306;[21] *see also Iqbal*, 129 S. Ct. at 1949 (mere conclusory allegations without factual support are insufficient to establish a claim for relief).[22]

---

[20]      Plaintiff contends the Complaint demonstrates the requisite control by the Independent Trustees because they signed registration statements, but in *Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365, at *25 (C.D. Cal. July 1, 2008), cited by Plaintiff on the control issue, the court dismissed Section 15 and 20(a) claims because allegations that certain directors signed SEC filings and served on the audit committee "do not present a basis for control liability against these defendants." Moreover, Plaintiffs do not, and cannot, point to any Defendant over which the Independent Trustees allegedly exercised control by virtue of the signing registration statements.

[21]      The Opposition attempts to distinguish *Maher* by asserting the Complaint's general allegations of control show more than the "tenuous connection" between purported control and controlled persons in *Maher*. The Complaint and the facts in *Maher* are more similar than the Opposition admits. The Independent Trustees serve in that capacity, but only with respect the non-defendant Fund. The Independent Trustees are not, and are not alleged in the Complaint to be, trustees, officers or employees of either the Manager or the Distributor.

[22]      Furthermore, it should be undisputed that the Independent Trustees did not control the Manager or Distributor. As set forth in the Trustees' Motion and again, unrebutted by the Opposition, the ICA prohibits conferring independent trustee status on an "interested person," which is defined to include any "affiliated person" of the investment adviser or principal underwriter.   15 U.S.C. § 80a-2(a)(19).   Any argument by Plaintiffs that this is somehow a factual matter misses the point because Plaintiffs have failed to allege any facts underlying their conclusory allegations.    There is no factual matter, only improper allegations subject to

23

### 2.    The Complaint Does Not Allege an Underlying Securities Act Violation

Control person liability cannot be established without proper allegations of a primary violation under Section 11 or 12(a)(2). *See Maher*, 144 F.3d at 1305; *see also Cooperman v. Individual, Inc.*, 171 F.3d 43, 52 (1st Cir. 1999) (control person claim dismissed where plaintiffs failed to properly allege underlying violation); *Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192, 1207-08 (N.D. Cal. 2008) (same).    Plaintiffs have failed to properly allege the requisite underlying violation.

## IV.    Conclusion

For all the foregoing reasons, defendants William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone and F. William Marshall respectfully request that this Court dismiss the Complaint with prejudice.

---

dismissal. *See Iqbal* at 1949 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.")

Dated:   February 17, 2010

Respectfully submitted,

**K&L GATES LLP**

By:

*/s/ Peter G. Rush*
_____

Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher
70 West Madison Street, Suite 3100
Chicago, IL  60602
Telephone:  (312) 372-1121
Facsimile:   (312) 827-8000
E-Mail:  peter.rush@klgates.com
            jeffrey.petersen@klgates.com
            sara.fletcher@klgates.com


**DAVIS GRAHAM & STUBBS LLP**

Dale R. Harris
1550 Seventeenth Street, Suite 500
Denver, CO  80202
Telephone:  (303) 892-9400
Facsimile:   (303) 893-1379
E-Mail:  dale.harris@dgslaw.com

*Attorneys   for   Defendants   William   L.
Armstrong,   Robert   G.   Avis,   George   C.
Bowen, Edward L. Cameron, Jon S. Fossel,
Sam Freedman, Beverly L. Hamilton, Robert
J. Malone and F. William Marshall*

25

## CERTIFICATE OF SERVICE

   I hereby certify that on this 17th day of February, 2010, I electronically filed a true and correct copy of the foregoing **DEFENDANTS INDEPENDENT TRUSTEES' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net,
  cindyj@hbsslaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Peter George Koclanes**
  pkoclanes@shermanhoward.com

- **Aaron Michael Sheanin**
  amv@girardgibbs.com

- **Christina H.C. Sharp**
  chc@girardgibbs.com

- **Gordon W. Netzorg**
  gnetzorg@shermanhoward.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Regina Ames Sandler**
  ras@girardgibbs.com

- **Stephen D. Bunch**
  dbunch@cohenmilstein.com

- **Steven J. Toll**
  stoll@cohenmilstein.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com

- **Karen Jean Cody-Hopkins**
  kjch@lilleylaw.com

- **William K. Dodds**
  william.dodds@dechert.com,luis.lopez@dechert.com

- **Robert J. Dyer, III**
  bob@dyerberens.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Daniel Charles Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Dale R. Harris**
  dale.harris@dgslaw.com,patricia.henson@dgslaw.com

- **Christopher J. Keller**
  ckeller@labaton.com,ejo@labaton.com,aellman@labaton.com,electroniccasefiling@labaton.com

- **Matthew L. Larrabee**
  matthew.larrabee@dechert.com,will.rehling@dechert.com,reginald.zeigler@dechert.com,alice.jensen@dechert.com,muriel.korol@dechert.com,david.burkhart@dechert.com

- **Robert Nolen Miller**
  rmiller@perkinscoie.com

- **Stephanie E. Dunn**
  sdunn@perkinscoie.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

/s/ Peter G. Rush
Peter G. Rush
K&L GATES LLP
70 W. Madison Street
Suite 3100
Chicago, IL  60602
312.372.1121
peter.rush@klgates.com