**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge John L. Kane**

Civil Action No. **09-cv-386-JLK-KMT** (consolidated with **09-cv-525-JLK-KMT**)

IN RE OPPENHEIMER CHAMPION INCOME FUND
SECURITIES FRAUD CLASS ACTIONS

---

**MOTION FOR FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT,**
**APPROVAL OF DISTRIBUTION PLAN, AND AWARD OF ATTORNEYS' FEES**
**AND EXPENSES**

---

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND..........................................4

    A. The Initial Procedural Events.....................................................4

    B. The Class Claims ....................................................................5

    C. The Stage of the Proceedings.....................................................6

        1. Defendants made a substantial production of documents and data, which were thoroughly reviewed by Class Counsel.....................................7

        2. Lead Plaintiffs' well-qualified experts completed a thorough analysis of liability and damages .............................................8

    D. Overview of the Defenses .........................................................9

    E. Settlement Negotiations and the Proposed Settlement ......................9

    F. The Allocation Mediation before Judge Phillips ...........................10

    G. The Settlement Terms ............................................................11

III. ARGUMENT:  THE SETTLEMENT SATISFIES  THE CRITERIA FOR FINAL APPROVAL .........................................................................13

    A. The Standard of Review of a Proposed Class-Action Settlement..............13

    B. The Settlement Should Be Approved as Fair, Reasonable and Adequate to the Class..........................................................14

        1. The proposed Settlement was achieved only after arduous arm's-length negotiations by capable and fully informed counsel and is not the result of collusion.............................................14

        2. The strengths of Lead Plaintiffs' case and the risks of establishing liability support the Proposed Settlement....................................17

            a. Defendants' pending motions could be decided against Lead Plaintiffs....................................................18

            b. Defendants contest the claims of misrepresentation............................18

            c. Defendants maintain they did not violate their investment objectives .....................................................18

            d. Defendants have viable loss-causation defenses................................18

            e. Damages are vulnerable to findings that early statements are not misleading .................................................19

       f.     Damages are susceptible to findings that losses were linked to appropriate investments ....................................................................19

   3.    The amount of the settlement relative to the most realistic recoverable damages........................................................................................20

   4.    The parties' judgment that the settlement is fair and reasonable...................22

C.    Class Reaction to Date Supports Approval................................................23

D.    The Distribution Plan Is Fair and Reasonable and Should be Approved ...................24

E.    The Court Should Affirm Its Certification of the Class.............................27

IV.    CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES SHOULD BE GRANTED ................27

A.    The Legal Standards for Determining Attorneys' Fees in Common-Fund Cases .......28

   1.    The factors considered by the Tenth Circuit...................................29

   2.    Class Counsel obtained substantial benefits for the Class ..............................30

   3.    The novelty and difficulty of the legal and factual questions show that the requested fee is reasonable.................................................................31

   4.    The experience, reputation, and ability of the attorneys and the requisite skill to perform the legal service properly ......................................................32

   5.    Class Counsel agreed to handle the action on a fully contingent basis and dedicated substantial resources precluding other employment.......................35

   6.    The customary fee and awards in similar cases illustrate the reasonableness of the 18.5% request ...............................................36

   7.    Class Counsel dedicated significant time and labor to the action...................37

B.    The Request for Reimbursement of Expenses Is Reasonable....................................40

C.    Lead Plaintiffs Are Entitled to Reimbursement of Reasonable Lost Wages and Expenses ..............................................................................41

V.    CONCLUSION................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alvarado Partners v. Mehta*,
    723 F. Supp. 540 (D. Colo. 1989)...................................................................... *passim*

*Angres v. Small Worldwide PLC*,
    No. 99-K-1254 (D. Colo. June 17, 2003) (Kane, J.)....................................................36

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) (*en banc*)...................................................................17

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979).....................................................................................17

*Blum v. Stenson*,
    465 U.S. 886 (1984).................................................................................................28

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980).................................................................................................27

*Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42*,
    8 F.3d 722 (10th Cir. 1993) ....................................................................................40

*Brown v. Phillips Petroleum Co.*,
    838 F.2d 451 (10th Cir. 1988) ....................................................................28, 29, 37

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ................................................................................24

*Consumers Gas & Oil, Inc. v. Farmland Indus.*,
    863 F. Supp. 1357 (D. Colo. 1993)...................................................................28, 29

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ................................................................................15

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005), *vacated in part on other grounds*,
    443 F.3d 253 (2d Cir. 2006)....................................................................................14

*Diaz v. Romer*,
    801 F. Supp. 405 (D. Colo. 1992).............................................................................13

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994), *overruled on other grounds*,
    536 U.S. 1 (U.S. 2002).......................................................................................28, 37

*Gottlieb v. Wiles*,
    11 F.3d 1004 (10th Cir. 1993) ............................................................................ *passim*

*Grady v. De Ville Motor Hotel, Inc.*,
  415 F.2d 449 (10th Cir. 1969) ........................................................................13

*Hicks v. Morgan Stanley & Co.*,
  2005 U.S. Dist. LEXIS 24890, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ......................28

*Horton v. Leading Edge Mktg.*,
  2007 U.S. Dist. LEXIS 63533 (D. Colo. Aug. 28, 2007) ........................................23

*Horton v. Leading Edge Mktg. Inc.*,
  2008 U.S. Dist. LEXIS 11761 (D. Colo. Feb. 4, 2008) (Nottingham, C.J.) ...........................35

*Hughes Tool Co. v. Trans World Airlines, Inc.*,
  409 U.S. 363 (1973) ....................................................................................17

*In re Cendant Corp. Sec. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ..........................................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ....................................................................15

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................40

*In re King Resources Co. Sec. Litig.*,
  420 F. Supp. 610 (D. Colo. 1976) ..........................................................13, 20, 22

*In re Marsh & McLennan Co. Inc. Sec. Litig.*,
  2009 U.S. Dist. LEXIS 120953, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..............40, 41

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  2007 U.S. Dist. LEXIS 9450, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)........................20, 21

*In re New Mexico Natural Gas Antitrust Litig.*,
  607 F. Supp. 1491 (D. Colo. 1984) ..................................................13, 14, 16, 22

*In re Nortel Networks Corp. Sec. Litig.*,
  539 F.3d 129 (2d Cir. 2008) ..........................................................................39

*In re Novell, Inc. Sec. Litig.*,
  No. 99-995 (D. Utah May 26, 2005) ................................................................36

*In re NTL, Inc. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 13661, 2007 WL 623808 (S.D.N.Y. Mar. 1, 2007) .........................41

*In re Omnivision Techs.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2007) ............................................................24

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  2006 U.S. Dist. LEXIS 71039 (D. Colo. Sept. 28, 2006) ........................................13

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
  2006 U.S. Dist. LEXIS 71267 (D. Colo. Sept. 29, 2006) (Blackburn, J.) ..................31, 37, 39

*In re Rhythms Sec. Litig.*,
  No. 02-35 (D. Colo. April 3, 2009)...................................................................................35, 41

*In re Samsonite Corp. Sec. Litig.*,
  No. 98-K-1878 (D. Colo. July 25, 2000) (Kane, J.) ...............................................................36

*In re Spectranetics Corp. Sec. Litig.*,
  No. 08-02048 (D. Colo. April 4, 2011) (Blackbum, J.).........................................................35

*In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.*,
  2011 U.S. Dist. LEXIS 35857 (S.D.N.Y. Mar. 31, 2011) ...........................................18, 19, 31

*In re Sun Healthcare Group, Inc., Sec. Litig.*,
  No. 99-00269 (D.N.M. Dec. 13, 2004) ...................................................................................36

*In re Toys "R" Us Antitrust Litig.*,
  191 F.R.D. 347 (E.D.N.Y. 2000) ............................................................................................15

*In re United Telecomms. Sec. Litig.*,
  1994 U.S. Dist. LEXIS 9151 (D. Kan. June 1, 1994) ..............................................................36

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y 2005)......................................................................................39

*In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005)......................................................................................41

*Ingram v. Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)..............................................................................................15

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...................................................................................................29

*Jones v. Nuclear Pharmacy, Inc.*,
  741 F.2d 322 (10th Cir. 1984) ...................................................................................... *passim*

*Law v. NCAA*,
  108 F. Supp. 2d 1193 (D. Kan. 2000)......................................................................................24

*Lewis v. Wal-Mart Stores, Inc.*,
  2006 U.S. Dist. LEXIS 87681 (N.D. Okla. Dec. 4, 2006).......................................................36

*Lucas v. Kmart Corp.*,
  2006 U.S. Dist. LEXIS 51420 (D. Colo. July 27, 2006) (Kane, J.)....................................36, 39

*Lucas v. Kmart Corp.*,
  2006 U.S. Dist. LEXIS 51439 (D. Colo. July 27, 2006) .............................................13, 14, 24

*MCI Commc'ns Corp. v. American Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) .............................................................17

*McNeely v. National Mobile Health Care, LLC*,
   2008 U.S. Dist. LEXIS 86741 (W.D. Okla. Oct. 27, 2008)......................36

*Missouri v. Jenkins*,
   491 U.S. 274 (1989).................................................................................38

*Newton v. Fortis Ins. Co.*,
   2006 U.S. Dist. LEXIS 33965 (D. Colo. May 26, 2006).........................24

*Oppenlander v. Standard Oil Co. (Indiana)*,
   64 F.R.D. 597 (D. Colo. 1974) (Finesilver, J.) .......................................30

*Piper v. Chris-Craft Indus., Inc.*,
   430 U.S. 1 (1977).....................................................................................17

*Queen Uno Ltd. P'hip, et al. v. Coeur D'Alene Mines Corp., et al.*,
   No. 97-WY-1431-CB (D. Colo. Aug. 11,1999) (Brimmer, J.)................36

*Rosenbaum v. MacAllister*,
   64 F.3d 1439 (10th Cir. 1995) ................................................................28

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
   74 F.R.D. 337 (N.D. Tex. 1976)..............................................................20

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
   314 F.3d 1180 (10th Cir. 2002) .........................................................12, 13

*Schwartz, et al., v. Celestial Seasonings, Inc. et al.*,
   No. 95-K-1045 (D. Colo. Apr. 25, 2000) (Kane, J.)...............................36

*Stalcup v. Schlage Lock Co.*,
   505 F. Supp. 2d 704 (D. Colo. 2007) (Blackburn, J.).............................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................28

*Uselton v. Commerical Lovelace Motor Freight, Inc.*,
   9 F.3d 849 (10th Cir. 1993) ....................................................................28

*Vaszlavik v. Storage Tech. Corp.*,
   2000 U.S. Dist. LEXIS 21140 (D. Colo. Mar. 9, 2000) (Babcock, J.) ...36

*Vizcaino v. Microsoft*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................35

*West Virginia v. Chas. Pfizer & Co., Inc.*,
   314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ..........17, 20

*Wilkerson v. Martin Marietta Corp.*,
    171 F.R.D. 273 (D. Colo. 1997) ...............................................................................14, 17, 22

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910) ...............................................................................................................13

## STATUTES

15 U.S.C. § 77z-1 ...............................................................................................................16

15 U.S.C. § 78u-4 ...............................................................................................16, 29, 40

15 U.S.C. § 77k ...............................................................................................................25

15 U.S.C. § 77l ...............................................................................................................25

## OTHER AUTHORITIES

Ellen Ryan and Laura Simmons, *Securities Class Action Settlements: 2010 Review and
    Analysis* (Cornerstone Research 2011) ...............................................................................2, 21

Dr. Jordan Milev, Robert Patton, and Svetlana Starykh, *Trends 2010 Year-End Update:
    Securities Class Action Filings Accelerate in Second Half of 2010; Median Settlement
    Value at an All-Time High* (NERA 2010) ...............................................................................21

Court-appointed Lead Plaintiffs Thomas H. Goodman and Errol G. O'Steen ("Lead Plaintiffs") move[1] for final approval of the proposed settlement of the above-captioned action against all Defendants on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated May 19, 2011 (the "Settlement" or "Stipulation").[2]  The Settlement resolves the Class's claims against all Defendants in exchange for Defendants' payment of $52,500,000.  Class Counsel also seeks an award of attorneys' fees and reimbursement of expenses in the amount of 18.5% of the Settlement Fund.[3]

## I.    INTRODUCTION

A multitude of securities class actions are pending against defendant Oppenheimer Funds, Inc., and others associated with nine different Oppenheimer mutual funds.  Only this case and another involving Oppenheimer's Core Bond Fund have settled.[4]  Lead Plaintiffs and their counsel strongly believe that the Settlement is fair and reasonable and in the best interests of the Class as a whole.  While settling at an early stage of the litigation, this case has been efficiently and vigorously litigated.  Prompted initially by a Freedom of Information Act request, Defendants released nearly 80,000 pages of documents to Class Counsel.  By the time of settlement, Class Counsel had spent many hours reviewing and analyzing the documents.

---

[1] Pursuant to D.C.COLO.LCivR. 7.1A, Class Counsel has conferred with Counsel for Defendants before filing this motion.  Although Defendants do not concede liability or wrongdoing or that class certification would be proper if the case were not to settle, Defendants agree that the settlement should be approved and take no position on the request for attorneys' fees and reimbursement of expenses, and the Distribution Plan.  See Stipulation and Agreement of Settlement at ¶¶ 14-15, 17(a), 23(e), 24(a).

[2] The Stipulation was previously filed with the Court.  Dkt. No. 103.  All terms not defined herein have the same definition as stated in the Stipulation.

[3] "Class Counsel" collectively refers to Lead Counsel Labaton Sucharow LLP, additional Class Counsel Hagens Berman Sobol Shapiro LLP, and Liaison Counsel The Shuman Law Firm.

[4] Lead Plaintiff in the Core Bond case is also represented by Class Counsel, and is contemporaneously filing a corresponding motion for final approval of that settlement and for an award of attorneys' fees.

Informed by these efforts, Class Counsel were on equal ground with Defendants, spurring hard-fought settlement negotiations and producing a settlement that is an excellent recovery by any measure.  The settlement amount exceeds the median for securities class actions, both in amount and as a percentage of the estimated recovery.  It far exceeds, for example, the $7.9 million median in the Tenth Circuit since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[5]  Certainly, accepting the Settlement now, with its innovative distribution program that permits certain eligible Class Members to do nothing but cash a check, is far preferable to the risk of possible dismissal, protracted litigation, an uncertain jury verdict and lengthy appeal.

In reaching the determination to settle this action with Defendants, Class Counsel have carefully considered the substantial risks and obstacles to achieving a better result after continued litigation.  As discussed herein and in the accompanying Declaration of Jonathan M. Plasse in Support of Motion for Final Approval of Settlement, Approval of Distribution Plan, and Award of Attorneys' Fees and Expenses ("Plasse Decl."), Lead Plaintiffs faced many factual and legal issues, including disputed issues of falsity, causation and damages that created the risk that Lead Plaintiffs would not be able to prove their claims or establish significant damages at trial.  Defendants vigorously asserted that certain public disclosures and relevant law undercut the allegations and supported their defenses.  As a result, Lead Plaintiffs faced the risk that the trier of fact would favor Defendants' arguments and interpretations of the evidence and absolve them of liability.

---

[5] *See* Ellen Ryan and Laura Simmons*, Securities Class Action Settlements: 2010 Review and Analysis*, at 15 (Cornerstone Research 2011) (charts).  Declaration of Jonathan M. Plasse in Support of Motion for Final Approval of Settlement, Approval of Distribution Plan, and Award of Attorneys' Fees and Expenses, Ex. A.

Class Counsel, who have extensive experience in prosecuting securities class actions, have concluded that the Settlement is an outstanding result under all of the circumstances present here and clearly in the Class's best interest.  This conclusion is well informed, based as it is on, among other things, a comprehensive analysis of the evidence, the legal and factual issues presented, the risk, expense and delay of continuing to litigate through trial (indeed, the other Oppenheimer actions are still at the motion-to-dismiss stage), and counsel's past experience in litigating complex actions similar to the present one.  Significantly, the Lead Plaintiffs, who were appointed by the Court and have been a part of the litigation and settlement process, support Class Counsel's conclusion and believe the Settlement represents a very favorable recovery on behalf of the Class.

Separately, Class Counsel also move for an award of attorneys' fees and reimbursement of expenses.  Class Counsel undertook the representation of the Lead Plaintiffs in this consolidated class action on a contingent-fee basis, and no payment has been made to Class Counsel to date for their services or for the litigation expenses they have advanced on the Class's behalf.  Class Counsel respectfully requests that the Court award them $9,712,500 in attorneys' fees (plus interest) from the settlement common fund created by settling the Class's claims and reimburse their litigation expenses.  Both requests are reasonable.  Class Counsel's percentage fee request of 18.5% of the settlement amount of $52,500,000, plus a proportionate amount of interest earned, is consistent with the decisions of this Court and the Tenth Circuit, and is the appropriate method of compensating counsel for the result they have obtained for the settlement Class.  Indeed, the fee is at the low end of awards in class actions in this Circuit, particularly in view of the substantial risks of bringing and pursuing this litigation and the excellent results achieved for the settlement Class – obtained expeditiously and without expending excessive attorney time or judicial resources.

For all the reasons discussed herein and in the Plasse Declaration, we submit that the proposed Settlement is eminently fair, reasonable and adequate to the Class and merits the Court's approval.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Initial Procedural Events

Beginning on February 24, 2009, a series of proposed class actions were filed in this Court alleging violations of the Securities Act of 1933 (the "1933 Act") in connection with alleged misstatements in the Registration Statements and Prospectuses of the Oppenheimer Champion Income Fund (the "Fund"). Dkt. No. 1. A plethora of additional lawsuits against Oppenheimer involving other Oppenheimer funds were also filed. Other Oppenheimer Funds that are the subject of other litigation are the: AMT-Free Municipal Fund, AMT-Free New York Municipal Fund, California Municipal Fund, New Jersey Municipal Fund, Pennsylvania Municipal Fund, Rochester National Municipal Fund, and Rochester Fund Municipals. Dkt. No. 61 at 2. All told, 32 pending class actions involving these funds were consolidated before this Court, although the Court ordered the Core Bond and Champion Income Fund actions to proceed together albeit independently of the other suits. Dkt. No. 61 at 3.

Pursuant to the PSLRA, on September 25, 2009, the Court appointed Thomas Goodman and Errol O'Steen, individual investors in the Fund, to serve as Lead Plaintiffs and approved Lead Plaintiffs' retention of Labaton Sucharow LLP as Lead Counsel and The Shuman Law Firm as Liaison Counsel. Dkt. No. 76. Hagens Berman Sobol Shapiro LLP has at all times been acting with Lead Counsel as additional counsel.

On October 13, 2009, Lead Plaintiffs filed their Consolidated Class Action Complaint asserting claims under §§ 11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§ 77k, 77l and 77o) (the "Action"). Dkt. No. 80. The Defendants are OppenheimerFunds, Inc., OppenheimerFunds

Distributor, Inc., John V. Murphy, Brian W. Wixted, William L. Armstrong, Robert G. Avis, George C. Bowen, Edward L. Cameron, Jon S. Fossel, Sam Freedman, Beverly L. Hamilton, Robert J. Malone, and F. William Marshall, Jr. (collectively "Defendants"). Defendants moved to dismiss on December 3, 2009. Dkt. Nos. 87-88. The motions are fully briefed and pending.

**B.    The Class Claims**

This Action is brought against Defendants on behalf of all persons or entities who acquired shares of the Oppenheimer Champion Income Fund traceable to a false and misleading Registration Statement and Prospectus for the Fund and who were damaged thereby. The class period is alleged to be January 1, 2006 to December 31, 2008. Consolidated Class Action Complaint ("Complaint" or "CCAC"), ¶ 89.

The Complaint alleges that Defendants actively marketed and sold the Fund as having a primary objective of seeking a high level of current income by investing mainly in a "diversified portfolio" of high-yield, lower-grade, fixed-income securities that "[did] not involve undue risk." CCAC ¶¶ 4, 41. Before 2006, the Fund allegedly adhered to its stated investment strategy and polices. The Complaint further alleges that in 2006 and 2007, without adequate disclosure to investors, the Fund altered its investment policies and significantly increased its positions in highly leveraged, illiquid, off-balance sheet derivatives in the hopes of achieving higher returns. CCAC ¶ 45. Lead Plaintiffs contend that the Fund invested heavily in "extraordinarily risky" mortgage-backed securities ("MBS"), credit-default swaps,[6] and total-return swaps.[7] *Id.* By

---

[6] Credit-default swaps are essentially insurance contracts that insure against the default on debt securities such as corporate bonds. CCAC, ¶ 49. In a credit default swap, two parties enter into a private contract whereby the buyer of the protection agrees to pay the seller premiums over a set period of time. *Id.* In exchange, the seller agrees to pay the buyer in the event a particular pre-defined credit event occurs, such as a default on the underlying security. *Id.*

investing in these purportedly risky securities, the Fund allegedly violated its fundamental investment objectives and numerous representations in its Offering Documents concerning Fund concentration and borrowing limits.[8]  *See*, *e.g.*, CCAC ¶¶ 4, 41.  Lead Plaintiffs contend that Defendants' alleged misstatements and omissions concerning the Fund's true objective and strategy resulted in hundreds of millions of investor dollars pouring into the Fund.  Ultimately, however, the risky investments allegedly caused an 82% drop in the Fund's net asset value ("NAV"), which far exceeded losses in comparable funds during the same time period.  CCAC ¶¶ 78-80.  *See* Plasse Decl. at 3-6 (discussing CCAC's allegations).

## C.    The Stage of the Proceedings

Although a formal stay of discovery under the PSLRA has been in place, within the context of the mediation process, described below, the Parties cooperated in *extensive* informal discovery relating to the claims, defenses, and damages.  Defendants produced key documents relevant to Lead Plaintiffs' liability evaluation and Defendants' defenses.  Defendants also produced critical and detailed financial information that enabled Class Counsel and consulting experts to conduct thorough damages analyses.  The extent of the productions, Class Counsel's detailed review thereof, and the analyses of Lead Plaintiffs' consulting experts allowed Lead Plaintiffs and their counsel to make an extensive and well-informed liability and damages assessment before settling the Action.

---

[7] Total-return swaps are speculative, highly illiquid, and complex agreements between parties to exchange cash flows in the future based on how a set of securities or a particular index performs.  CCAC, ¶ 46.

[8] "Offering Documents" refers to the Fund's Registration Statements, Prospectus Materials, Statements of Additional Information, and Annual Reports.  CCAC ¶¶ 36-38.

### 1.   Defendants made a substantial production of documents and data, which were thoroughly reviewed by Class Counsel

To fully explore the possibility of settlement, Lead Plaintiffs requested a comprehensive production of liability and damage-related documents.  Defendants initially resisted but were prompted by Lead Plaintiffs' Freedom of Information Act request to the Oregon Department of Justice and the Oregon Treasurer in connection with litigation on behalf of the Oregon College Savings Plan Trust that invested in the Core Bond Fund.  Defendants' subsequent electronic document production of the documents they had previously produced to the Oregon Department of Justice comprised over 3661 documents and over 34,300 pages.  Class Counsel loaded the production into an electronic review database, organized a review process and then reviewed each page.  The most relevant documents identified by Counsel's review team included all Prospectuses and related Statements of Additional Information; marketing materials; internal risk guidelines and compliance materials; Trustee Board minutes; minutes of various pertinent committees; monthly risk assessments and a plethora of risk management reports; daily performance reports; analyst papers; and internal e-mail discussions relating to the foregoing.  Plasse Decl., ¶¶ 29-31.

After completing review and analysis of these documents, Class Counsel requested that Defendants produce additional e-mails and un-redacted versions of certain documents, as well as additional material specific to the Champion Income Fund.  Defendants made a supplemental production of about 6914 documents comprising about 43,780 pages, which Class Counsel promptly reviewed.  Plasse Decl., ¶ 32.

Defendants also produced complete transaction data for the Fund.  This critical electronic information included transaction records for all accounts holding or purchasing the Champion Income Fund during the Class Period.  Transactions were coded and a key was supplied so that purchases, redemptions, exchanges, transfers, cash dividends, dividend reinvestments and fees

could be identified.  In addition, Defendants provided a schedule of all dividends payable per share on every date of the Class Period.  Plasse Decl., ¶ 33.

> ## 2. Lead Plaintiffs' well-qualified experts completed a thorough analysis of liability and damages

Before filing the Complaint, Lead Plaintiffs retained consulting experts H. Gifford Fong and Gifford Fong Associates.[9]  Mr. Fong performed a complete forensic analysis of the Champion Income Fund portfolio during the class period, including a detailed review of all total return and credit-default-swap positions; mortgage-backed securities and other investments; concentration analysis; illiquidity limit review; duration analysis; spread risk assessment; leverage calculations; performance and benchmarking analyses; and a review of pricing accuracy.  The project, which consumed over 700 man-hours, involved extracting all of the Fund's holdings data from SEC filings; identifying CUSIP numbers for all of the investments; validating all of the data; and then running the foregoing forensic analyses.  Declaration of H. Gifford Fong, Exhibit 1hereto, ¶ 6.  Mr. Fong's work was included in the Complaint, more specifically in the swap, MBS and leverage tables appearing at paragraphs 47, 52, 55, 56 and 63.  Plasse Decl., ¶¶ 35-36.

Lead Plaintiffs also retained the services of consulting damages expert Candace Preston, a founding principal of Financial Markets Analysis, Inc., who has more than 25 years of experience in the finance arena.  Based upon Defendants' transaction data, Ms. Preston ran detailed, "bottoms up" damages calculations under §§ 11 and 12 of the 1933 Act.  Ms. Preston also analyzed the impact of various defense arguments relating to shortened liability time

---

[9] Mr. Fong, the Editor of the Journal of Investment Management, is an expert in fixed income portfolio management and financial engineering.  He serves as an advisor to the Securities Exchange Commission on risk analysis and pricing issues and as an advisor to the Federal Reserve and United States Treasury for the third-party repurchase program relating to the financial crisis, where Mr. Fong values complex mortgage-backed securities, collateralized debt obligations and other asset-backed securities.  Plasse Decl., ¶ 34.

periods, permissible levels of swap investments, the general market decline resulting from the financial crisis, and damages caused by declines in the Fund's corporate-bond investments. Ms. Preston also reviewed many of the Fund's risk-management and internal-control reports and advised Lead Plaintiffs about the documents' impact on the claims.  Plasse Decl., ¶ 37; Declaration of Candace Preston, Exhibit2 hereto, at 1-6.

### D.     Overview of the Defenses

In the pending motions to dismiss, and during settlement discussions, Defendants asserted a number of arguably credible defenses to the alleged claims.  For example, Defendants contend that the Fund disclosed its intent to make the MBS and swap investments, the principal risks inherent in these securities, that swaps would be used for speculative purposes, and, on a quarterly basis, detailed information about every single MBS and swap investment in the Fund's portfolio.  Defendants also contend that the Fund disclosed every quarter the notional value of each and every swap it held.  Consequently, Defendants assert that investors were fully informed of the Fund's investments and the attendant risks.  According to Defendants, there thus were no misrepresentations or omissions of material fact in any of the Offering Documents and no cognizable damages.  Dkt. No. 87 at 23-30.  Defendants also assert that the Complaint is time-barred (Dkt. No. 87 at 55-60); the individual defendants are not "sellers" subject to liability under the Securities Act (Dkt. No. 87 at 63-64, Dkt. No. 88 at 6-10); Lead Plaintiffs will be unable to prove loss causation (Dkt. No. 87 at 47-55); and any purported undisclosed and improper change in investment strategy occurred late in the Class Period, materially decreasing alleged damages.

### E.     Settlement Negotiations and the Proposed Settlement

The $52,500,000 Settlement resulted from numerous discussions between the Parties and three full-day mediation sessions during the summer and fall of 2010, during which the highly

regarded Honorable Layn R. Phillips (retired) served as mediator.  Defendants requested a combined mediation that included both this Action and the Core Bond Fund Action.  Judge Phillips was chosen based on his esteemed background and experience in resolving highly-complex and contentious securities litigation.  Plasse Decl., ¶¶ 39-40.

After exchanging separate opening mediation briefs and responsive briefs relating to both Actions, the Parties participated in a lengthy, confidential two-day mediation session on July 19 and 20, 2010, before Judge Phillips.  Although productive in airing each side's views on liability and damages, these mediation sessions did not produce an agreement.  The parties informed the Court, and the Court lifted the short-pending stay it had placed on consideration of the motions to dismiss.  Plasse Decl., ¶ 40; *see generally* Declaration of Layn R. Phillips, Exhibit 3 hereto.

Lead Plaintiffs' work continued, and the Parties eventually agreed to hold another mediation session.  After exchanging supplemental mediation submissions, the Parties held a third day of mediation with Judge Phillips on November 9, 2010.  This session was successful and resulted in Lead Plaintiffs and Defendants entering into a Memorandum of Understanding (the "MOU") that set forth the material terms of the proposed settlements of both this Action and the Core Bond Fund Action.  The MOU provided for the Defendants to pay a total sum of $100 million to settle both Actions, making an allocation between the two cases necessary.  The final terms of the Settlements were negotiated over the following six months, resulting in the Stipulation now presented to the Court for final approval.  Plasse Decl., ¶ 41.

**F.     The Allocation Mediation before Judge Phillips**

As noted, the combined mediation and MOU determined a total settlement sum of $100 million for both the Champion Income Fund and the Core Bond Fund Actions.  Lead Plaintiffs and Class Counsel therefore believed it was prudent to engage wholly independent counsel to resolve the allocation issues between the two cases.  To remove any potential for conflict,

Plaintiffs' Counsel retained the law firms of Klafter Olsen & Lesser LLP ("Klafter") to represent the interests of the Core Bond Fund Class, and Goldenberg Schneider & Groh, LPA ("Goldenberg") to represent the interests of the Champion Income Fund Class in allocating the settlement amount between the Actions.  To further resolve the allocation issue, Class Counsel again called upon Judge Phillips to conduct a binding mediation on the proper allocation.  Plasse Decl., ¶ 42.

Klafter and Goldenberg spent six weeks familiarizing themselves with the evidence and working with the damages expert.  They then submitted mediation briefs to Judge Phillips advocating their respective positions and making a suggested allocation of the settlement amount.  Judge Phillips held a binding mediation solely on the issue of allocation on February 25, 2011, during which he determined that the combined settlement fund would be allocated as 52.5% for the benefit of the Champion Income Fund Class and 47.5% for the benefit of the Core Bond Fund Class.  Plasse Decl., ¶¶ 43-44; Declaration of Jeffrey S. Goldenberg, Exhibit 4 hereto, ¶ 2; Declaration of Jeffrey Klafter, Exhibit 5 hereto, ¶ 2; Phillips Decl., Exhibit 3 hereto, ¶¶ 16-18.

## G.     The Settlement Terms

The Settlement creates a common fund in the amount of $52.5 million for the benefit of the Champion Income Fund Class, all of which will be paid out with no residual returned to Defendants.  In exchange for Defendants' payment, the Class agrees to release all claims, alleged or that could be alleged, that arise out of the facts, disclosures, allegations, and losses, etc., set forth in the Complaint or at issue in the Action, as well as claims relating to the prosecution, defense and settlement of the Action, as against all Released Defendant Parties, which includes

Defendants and certain third-parties.  Stipulation ¶¶ 1(x); (y).[10]  The Settlement is expressly

conditioned on the entry of several orders by this Court, including the proposed judgment finally

approving the Settlement, which will bar contribution and indemnification claims.  *See*

Stipulation ¶¶ 23 and 25(c), Exhibit B.

The Settlement's terms are embodied in the Stipulation and a supplemental letter agree-

ment concerning the circumstances under which the level of requested exclusions from the

Settlement (the "Opt-Out Threshold") could cause Oppenheimer to terminate the Settlement.

Stipulation ¶ 23(d).  As is commonly done, the letter agreement remains private in order to keep

the Opt-Out Threshold confidential and to avoid an intentional trigger by a large shareholder.

Other than the Opt-Out Threshold, the Stipulation recites all substantive provisions of the letter

agreement.

---

[10] The full definition of "Released Claim(s)" was set forth in the settlement notice to Class members and means "all claims, demands, rights, actions, suits, or causes of action of every nature and description, whether known or unknown (including Unknown Claims, as defined herein), whether the claims arise under federal, state, statutory, regulatory, common, foreign or other law, whether foreseen or unforeseen, and whether asserted individually, directly, representatively, derivatively, or in any other capacity, that the Releasing Plaintiff Parties: (1) asserted in the Complaint or the Action as against the Released Defendant Parties; (2) have asserted, could have asserted, or could assert in the future, in any forum against the Released Defendant Parties that are based upon, arise out of, or relate in any way to the facts, matters, transactions, allegations, claims, losses, damages, disclosures, filings, or statements set forth in the Complaint or at issue in the Action; or (3) have asserted, could have asserted, or could assert in the future relating to the prosecution, defense, or settlement of the Action as against the Released Defendant Parties.  Released Claim(s) does not include:  (1) claims to enforce the Settlement or (2) the rights of the Champion Income Fund in any derivative claim filed or asserted against the Released Defendant Parties prior to the date of this Stipulation."

"'Released Defendant Parties' means (1) any and all of the Defendants and/or their current or former attorneys, auditors, officers, directors, employees, partners, subsidiaries, affiliates, related companies, parents, insurers, heirs, executors, representatives, predecessors, successors, assigns, trustees, or other individual or entity in which any Defendant has a controlling interest; and (2) broker-dealers or financial advisers of any Class Member.  For the avoidance of doubt, the Champion Income Fund is included in the definition of Released Defendant Parties."

### III.    ARGUMENT:  THE SETTLEMENT SATISFIES
### THE CRITERIA FOR FINAL APPROVAL

**A.    The Standard of Review of a Proposed Class-Action Settlement**

Approval of a proposed settlement is within the sound discretion of the Court.  *Rutter &*

*Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002); *Jones v. Nuclear*

*Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).  A class-action settlement is entitled to final

approval under Rule 23(e) of the Federal Rules of Civil Procedure where it is "fair, reasonable

and adequate."  *Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993); *Jones*, 741 F.2d at 324

("the trial court must approve a settlement if it is fair, reasonable and adequate").  In both

*Gottlieb* and *Jones*, the Tenth Circuit identified four factors that a district court should consider

in assessing whether a proposed class action settlement is fair, reasonable and adequate:

    (i)      whether the proposed settlement was fairly and honestly negotiated;

    (ii)     whether serious questions of law and fact exist, placing the ultimate outcome of
             the litigation in doubt;

    (iii)    whether the value of an immediate recovery outweighs the mere possibility of
             future relief after protracted and expensive litigation; and

    (iv)    the judgment of the parties that the settlement is fair and reasonable.

*Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324; *see Rutter*, 314 F.3d at 1188 (affirming test);

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 71039, at *15 (D. Colo.

Sept. 28, 2006); *Alvarado Partners v. Mehta*, 723 F. Supp. 540, 546-48 (D. Colo. 1989)

(applying settlement approval factors to securities class action).[11]  Additional relevant factors

---

[11] Courts have long held that the settlement of disputed claims is favored as a public policy
matter, *see*, *e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Grady v. De Ville
Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969), particularly in the context of class-action
litigation.  *See also Diaz v. Romer*, 801 F. Supp. 405, 407 (D. Colo. 1992) (in approving class
action settlement, court explained that a "consensual resolution of a dispute is always
preferred").  For these reasons, in evaluating the fairness of the settlement, courts should neither
decide the merits of the case nor substitute their judgment for that of the parties who negotiated

may include:  (i) the risk of establishing damages at trial; (ii) the extent of discovery and the current posture of the case; (iii) the range of possible settlement; and (iv) the reaction of class members to the proposed settlement.  *In re New Mexico Natural Gas Antitrust Litig*., 607 F. Supp. 1491, 1504 (D. Colo. 1984); *Wilkerson v. Martin Marietta Corp.,* 171 F.R.D. at 284 (citing *New Mexico*).  Evaluation of these factors supports approval of the Proposed Settlement.

**B.     The Settlement Should Be Approved as Fair, Reasonable and Adequate to the Class**

The four *Gottlieb/Jones* factors indicate that the settlement is fair, reasonable and adequate.  Lead Plaintiffs believe the Settlement is in the best interests of the Class.

**1.     The proposed Settlement was achieved only after arduous arm's-length negotiations by capable and fully informed counsel and is not the result of collusion**

Where a settlement results from arm's-length negotiations between experienced counsel, "the Court may presume the settlement to be fair, adequate and reasonable."  *Lucas v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 51439, at *22 (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)).  In addition, protracted, difficult settlement negotiations signify the absence of collusion.  *See, e.g., Lucas*, 2006 U.S. Dist. LEXIS 51439, at *22 (citing *Wilkerson v. Martin Marietta Corp.,* 171 F.R.D. at 284); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336-37 (S.D.N.Y. 2005) (noting that discussions appeared to break down more than once), *vacated in part on other grounds*, 443 F.3d 253 (2d Cir. 2006).  The Settlement here is the product of extensive arm's-length, informed, non-collusive negotiations that occurred between the Parties over the span of multiple months and with the assistance and guidance of Judge Phillips, and resulted from vigorous advocacy by the Parties.  *See* Phillips Decl., Exhibit 3 hereto,

---

the settlement. *Lucas v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 51439, at *23 (D. Colo. July 27, 2006) (citing *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997)); *see In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976) (the court "need not, and should not, decide the merits of the controversy").

¶¶ 6, 19-20; Plasse Decl., ¶ 74.  As Judge Phillips explains, "I observed first-hand that these were hard-fought litigations and negotiations, which resulted in significant recoveries for the classes …." Phillips Decl. ¶ 19.

The final terms of the Stipulation were negotiated over a contentious several months, resulting in the Stipulation that this Court preliminarily approved on June 1, 2011 (Dkt. No. 107).  Throughout those discussions, all parties were represented by counsel with extensive experience in securities litigation in general and securities class actions in particular.  Class Counsel, for example, brought to the bargaining table many years of experience in litigating securities-fraud class actions and negotiating class-action settlements that have been approved by courts throughout the country.  Plasse Decl., ¶¶ 74, 92-95.  *See supra* at 7-9, 9-10.

The use of an experienced mediator like Judge Phillips further suggests the absence of collusion.  *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("[p]arties colluding in a settlement would hardly need the services of a neutral third party to broker their deal"); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000).

Moreover, Class Counsel's extensive factual and legal investigation gave them a thorough understanding of the strengths and weaknesses of the case at the time of the settlement discussions.  Class Counsel reviewed almost 80,000 pages of documents – indeed, what they needed to thoroughly evaluate Defendants' conduct.  *See supra* at 7.  With the benefit of these documents, they employed their own extensive forensic expertise and obtained detailed expert analyses from an expert in fixed income portfolio management and financial engineering and from a valuation expert.  *See supra* at 8.  These investigations amply prepared Class Counsel to negotiate with the Defendants well informed of the strengths and weaknesses of their respective

positions.  As such, Lead Plaintiffs possessed "the desired quantum of information necessary to achieve a settlement."  *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977).

In short, the Parties settled only after extensive analysis by Class Counsel and their experts, the exchange of comprehensive mediation statements that honed the issues, and three full days of mediation before Judge Phillips.  There is no evidence that the Proposed Settlement is not the product of informed, fair and honest negotiations among experienced counsel.

Finally, to ensure that settlement-class members "whose rights may not have been given adequate consideration during the settlement negotiations" were protected from a collusive settlement, Class Counsel issued notice to absent settlement-class members in the manner ordered by this Court and required by Rule 23, due-process principles and the pertinent provisions of the PSLRA (*see* 15 U.S.C. § 77z-1(a)(7) and 15 U.S.C. § 78u-4(a)(7)).  *Cf.*, *Alvarado Partners*, 723 F. Supp. at 546-47.[12]  Counsel selected a qualified and experienced claims administrator, Epiq Class Action & Claims Solutions ("Epiq"), who has mailed copies of the Court-approved Notice of Pendency and Proposed Settlement of Class Action for Identified Purchasers and Notice of Pendency and Proposed Settlement of Class Action for Unidentified Purchasers (collectively "Notice") to all known settlement-class members and published the court-approved summary notice in the *Investor's Business Daily* and over PRNewswire.  Plasse Decl., ¶ 103; Declaration of Claims Administrator Exhibit 6 hereto ("Epiq Decl.").  The Notice informs settlement-class members of the terms of the Settlement; the Distribution Plan for the allocation of proceeds of the Settlement; the nature of the settled claims; the estimated per share recovery; the status of the litigation; the date, time and place of the hearing on the motions to approve the Settlement and award attorneys' fees; the parameters of the fee application; and the procedure allowing them to

---

[12] *See also In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. at 1497 (citing *inter alia Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)).

comment on, object to or request exclusion from the Settlement.  *Cf., Alvarado Partners*, 723 F. Supp. at 547.  Counsel's adherence to this well-established procedure protects the rights of absent settlement-class members.  *See id.*

### 2.   The strengths of Lead Plaintiffs' case and the risks of establishing liability support the Proposed Settlement

The second *Gottlieb/Jones* factor is whether there were "serious questions of law and fact … placing the ultimate outcome of the litigation in doubt."  *Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324; *see also Alvarado Partners*, 723 F. Supp. at 546.  At the time they reached the Settlement, Class Counsel believed that this was a strong case.  They nevertheless recognized that they faced numerous risks and uncertainties[13] – and were well aware that many other securities class actions have been prosecuted in the belief that they were meritorious, only to lose on summary judgment, at trial or on appeal.[14]  The most salient of these risks and uncertainties, which were considered by Class Counsel and informed their recommendation to support the Settlement, are discussed below and outlined in the Plasse Declaration.

---

[13] *Cf., Wilkerson*, 171 F.R.D. at 285 ("the one constant about litigation, based on my experiences as a trial attorney and now as a judge, is that the ultimate jury result is uncertain, unknown and unpredictable"); *West Virginia v. Chas. Pfizer & Co., Inc.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced"), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

[14] Plaintiffs have won huge judgments at trial, only to lose on appeal.  *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (action dismissed following 11 years of litigation and a $30 million judgment for plaintiffs following trial that was largely affirmed by the first appellate panel); *MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979); *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973) (reversing treble damage judgment for over $145,000,000 – in action begun in 1961); *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1 (1977) (reversing Second Circuit's award of damages under Williams Act in amount of $25,793,365 after eight years of litigation).

### a.     Defendants' pending motions could be decided against Lead Plaintiffs

Pending before this Court are Defendants' motions to dismiss.  The following sections illustrate the risk that these motions could have been decided against Lead Plaintiffs, a factor that weighed in favor of settlement.

### b.     Defendants contest the claims of misrepresentation

Defendants argue that Lead Plaintiffs cannot allege or prove that Defendants misrepresented the risk of investing in MBS and swaps to investors.  Defendants maintain that they disclosed all of the Fund's investments, had no duty to characterize or quantify the risks in those holdings, and, because Defendants disclosed their investment in MBS and swaps, the Class must bear the risk for at least a portion of the losses attributable to those securities.  Further, Defendants assert that they always believed the Fund's investments were appropriate, and concluded that the investments offered adequate returns for the risks involved.  Defendants also contend that the Fund's investments were appropriate at the time they were made and that they cannot be held liable for failure to predict the future.  There is a material risk that these arguments would resonate with a jury, and that the Court could find a failure to plead an actionable misrepresentation.  Plasse Decl., ¶ 64.

### c.     Defendants maintain they did not violate their investment objectives

Defendants also maintain that the Fund did not violate any of its disclosed investment policies and that breaches of internal guidelines cannot be the basis of liability.  Defendants contend that the Fund did not hold excessive illiquid or misvalued securities, and given the subjective valuation of these securities, Lead Plaintiffs could not prove that Defendants did not subjectively believe their valuations were appropriate when made.  Plasse Decl., ¶ 65.

### d.     Defendants have viable loss-causation defenses

Defendants' loss-causation defenses also present substantial hurdles.  Defendants contend that the Fund's NAV decline resulted not from any purported misstatements or omissions but

from an unprecedented, world-wide credit crisis and resulting panic that was unforeseen by government officials, economists, and the Fund's portfolio managers.  Although Lead Plaintiffs and their experts have persuasive arguments to the contrary, overcoming this defense is not a foregone conclusion.  Plasse Decl., ¶ 66.

Indeed, a recent decision highlights the risks Defendants' dismissal argument posed to Lead Plaintiffs' claims.  Plaintiffs in *In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.*, 2011 U.S. Dist. LEXIS 35857 (S.D.N.Y. Mar. 31, 2011), asserted claims under §§ 11 and 12 of the Securities Act that were not unlike Lead Plaintiffs' claims here.  As here, the *State Street* defendants were a mutual fund or parties associated therewith who sought dismissal on loss-causation grounds.  *Id.* at *19-20.  The court "reluctantly" granted the motion, concluding that defendants' misstatements did not inflate the mutual fund's shares, nor did revelation of the truth trigger Plaintiffs' losses.  *Id*. at *25-27, 32, 35.  The court hence dismissed plaintiffs' securities claims with prejudice.  *Id*. at *35.  While Lead Plaintiffs believe the *State Street* decision is flawed, it certainly highlights the risk that the Court could have dismissed their claims in whole or in part on loss-causation grounds.  Settlement avoided that risk.

### e.      Damages are vulnerable to findings that early statements are not misleading

Lead Plaintiffs faced a material risk that a jury could find that they proved that Defendants issued false statements, but only late in the class period.  Indeed, Defendants assert that the Class Period must begin much later than proposed in the Complaint.  If made, such a finding could substantially reduce the amount of the Class's damages.  Plasse Decl., ¶ 67.

### f.      Damages are susceptible to findings that losses were linked to appropriate investments

Defendants claim that a large percentage of losses in the Fund were attributable to corporate bond investments to which Lead Plaintiffs do not link any misrepresentations or

omissions.  If true, this claim could significantly reduce Lead Plaintiffs' estimated damages.

Damages may be further reduced to the extent that only a *portion* of the investments in MBS and

swaps were inappropriate because the Funds were authorized to invest in some percentage of

these vehicles.  Plasse Decl., ¶ 68.

### 3.    The amount of the settlement relative to the most realistic recoverable damages

The third *Gottlieb/Jones* factor for evaluating the adequacy of a class-action settlement,

*i.e.*, whether the value of an immediate recovery outweighs the mere possibility of future relief

after protracted and expensive litigation (*see Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324;

*Alvarado Partners*, 723 F. Supp. at 546) also indicates that the proposed Settlement is fair,

reasonable and adequate.  As many courts have noted, "[t]he bird in the hand is to be preferred to

the flock in the bush and a poor settlement to a good litigation."  *E.g.*, *Rubenstein v. Republic*

*Nat'l Life Ins. Co.*, 74 F.R.D. 337, 347 (N.D. Tex. 1976).  *See also Alvarado Partners*, 723 F.

Supp. at 547; *King Resources*, 420 F. Supp. at 625; *West Virginia v. Chas. Pfizer & Co., Inc.*,

314 F. Supp. at 743-44.

In considering whether to enter into the Settlement, Lead Plaintiffs weighed the value of

an immediate settlement against the prospect that significant proceedings remained ahead,

including additional discovery, class certification briefing, summary judgment briefing, *Daubert*

motions, trial preparation and, of course, a trial.  Lead Plaintiffs also considered the risks

inherent in litigating a securities class action through trial and the particular risks at issue in this

Action as further detailed above and in the Plasse Declaration.

In light of these risks, the proposed Settlement of $52,500,000 represents a very

meaningful recovery of the damages allegedly suffered by the Class and is well within the range

of what is considered fair, reasonable and adequate.  With the diligent assistance of Candace

Preston, Class Counsel have estimated the *most realistic* Class recovery at trial, taking into

consideration defense arguments relating to liability period limits, permissible levels of swap and MBS investments, corporate bond losses and losses attributable to general market forces. Based on that analysis, Class Counsel estimate that the Settlement provides a recovery in the range of 15% to 17% of their most realistic damages model. Plasse Decl., ¶ 45. This is a very favorable result. *See*, *e.g.*, *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 242 & n.22 (3d Cir. 2001) (approving settlement that amounted to 9.25 % of total damages, and citing studies showing average recoveries in securities fraud litigation ranging from 9-14 % of total damages*), In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007), at *33, 2007 WL 313474, at *10 (finding that a recovery representing 6.25% of damages was "at the higher end of the range of reasonableness of recovery in class actions securities litigations"). A study by National Economic Research Associates ("NERA"), an economic consulting firm that frequently provides expert analysis to defendants, states that in 2010, the median percentage of investor losses recovered in shareholder class action settlements was 2.4%. *See* Dr. Jordan Milev, Robert Patton, and Svetlana Starykh, *Trends 2010 Year-End Update: Securities Class Action Filings Accelerate in Second Half of 2010; Median Settlement Value at an All-Time High*, at 25 (NERA 2010), Exhibit B to Plasse Decl. Furthermore, the median percentage of investor losses recovered in shareholder class-action settlements between 2002 and 2010 ranged between 2.2% and 3.1% each year. *Id.*

The Settlement also far exceeds the median settlement amount for securities class actions. More than 80% of securities class actions settled during the 15-year period after passage of the PSLRA settled for less than $25 million. Ellen Ryan and Laura Simmons, *Securities Class Action Settlements: 2010 Review and Analysis*, at 3 Figure 3 (Cornerstone Research 2011), Exhibit A to Plasse Decl. Further, the median settlement for class actions asserting claims under §§ 11 or 12(a)(2) of the Securities Act, but not § 10(b) of the Exchange Act, is only $3.6 million.

*Id*. at 9.  It also far exceeds the $8.1 million median for securities class-action settlements in the Tenth Circuit in 2010 and the $7.9 million median through 2009.  *Id.* at 15.

### 4.        The parties' judgment that the settlement is fair and reasonable

The final factor highlighted in *Gottlieb* for assessing the adequacy of any settlement – the parties' own view of the settlement (*Gottlieb*, 11 F.3d at 1014; *Jones*, 741 F.2d at 324) – also weighs heavily in favor of the determination that the Settlement should be approved.  The Settlement has the full support of the Lead Plaintiffs.  Class Counsel believe the Settlement provides an excellent recovery to the Class in the exercise of their judgment based on extensive knowledge of the facts of the case and the legal issues facing the Class, as well as judgments about the strengths and weaknesses of the claims.  After an extensive analysis, Class Counsel concluded that the terms of the Settlement Agreement are fair, just, and adequate to Lead Plaintiffs and the Class.[15]  *See* Plasse Decl., at 15-20.  Judge Phillips also "unreservedly recommend[s the settlement] as the result of hard-fought negotiations and as an accurate reflection of the risks and potential rewards of the settled claims."  Phillips Decl. ¶ 6.

Class Counsel are, of course, extremely well-versed in the facts and legal issues to be tried in this case, having undergone discovery, including reviewing tens-of-thousands of pages of documents produced by the Defendants in this case, and engaging in extensive expert analysis. *Id*.  Given their backgrounds and their extensive experience and success in prosecuting class

---

[15] Lead Plaintiffs have merged their discussion of the four additional factors suggested in *In re New Mexico Natural Gas Antitrust Litig*. and *Wilkerson v. Martin Marietta Corp*., *see supra* at 13, into the previous discussion.  The "risk of establishing damages at trial" is discussed *supra* at 19.  Plaintiffs discuss the "extent of discovery and the current posture of the case" *supra* at 6, 15.  Next, while any discussion of the "reaction of class members to the proposed settlement" is preliminary because the deadline for objections and exclusions is August 31, 2011, Lead Plaintiffs discuss this factor *infra* at 23.

actions,[16] their judgment is entitled to substantial weight.  *E.g.*, *Wilkerson*, 171 F.R.D. at 288-89;

*Alvarado Partners*, 723 F. Supp. at 548 (the "views and experience of counsel are legitimate

factors to consider"); *In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. at 1506;

MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.633 at 321-22.  *Cf.*, *King Resources*, 420 F.

Supp. at 625 ("[c]ourts have consistently refused to substitute their business judgment for that of

counsel, absent evidence of fraud or overreaching").

       In light of the substantial recovery to the Class, the arm's-length nature of the

negotiations, the involvement of an independent and highly experienced mediator, and the

participation of sophisticated counsel and class representatives throughout the litigation, the

proposed Settlement is more than fair, reasonable and adequate to merit final approval.

## C.    Class Reaction to Date Supports Approval

       The Court's Order preliminarily approving settlement and providing for notice was

entered on June 1, 2011, and directed Class Counsel, no later than July 15, 2011, to cause the

mailing of the Notice to all Class Members who could be identified with reasonable effort.[17]  To

date, Epiq has mailed 236,662 notices to potential Class Members.  Plasse Decl., ¶ 103; Epiq

Decl., Ex.6, ¶ 22.  The Court also ordered Class Counsel to publish the Summary Notice once in

*Investor's Business Daily* and transmit over PRNewswire, which has also been done.  Dkt. No.

107 at 5, 7-8; Epiq Decl. ¶¶ 25-26.  In addition, the Notice and the Proof of Claim were posted

on the dedicated settlement's website and the website of Class Counsel.  Epiq Decl. ¶¶ 37-42.

---

       [16] Class Counsel attach their biography and résumés as exhibits to their individual
declarations that document their respective firms' time and expenses in this Action.

       [17] This was a substantial undertaking.  As detailed in the Epiq Decl., Exhibit 6 hereto, Epiq
developed a mailing list and generated personalized record of fund transactions for thousands of
class members using names, addresses and transactional data provided by certain of the
defendants and brokers/nominees who responded to a vigorous campaign.  Accordingly, a large
segment of the class will not need to complete a claim form to recover.  Epiq has essentially
done this for them.  Unidentified class members do need to complete a claim form.  Epiq Decl.
¶¶ 6-20.

This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1); *see also Horton v. Leading Edge Mktg.*, 2007 U.S. Dist. LEXIS 63533, at *14-16 (D. Colo. Aug. 28, 2007) (approving similar notice regimen). To date, the parties have received five objections from individual Class Members. See Plasse Decl., ¶ 104. Class Counsel will address all the objections received as part of their reply papers (due by September 15, 2011), which will be filed after the August 31, 2011 deadline for objecting or requesting exclusion from the Class has passed.

### D.   The Distribution Plan Is Fair and Reasonable and Should be Approved

Lead Plaintiffs have also proposed a plan to distribute the proceeds of the Settlement among Class Members, which was created with the assistance of Financial Markets Analysis. Plasse Decl., ¶ 48; Preston Decl., Exhibit 2 hereto, ¶ 12. The plan was set forth in full in the Notice mailed to the Class. The objective of the proposed Distribution Plan is to equitably pay the Settlement proceeds to those Class members who suffered economic losses as a result of the alleged false and misleading statements. The $52,500,000 in cash, less attorneys' fees and any expenses awarded by the Court, notice and administration expenses, and any tax expenses payable from the Settlement Fund (the "Net Settlement Fund"), will be distributed to Authorized Claimants in accordance with the Plan of Distribution. Stipulation, ¶ 13.

Assessment of the adequacy of a plan of distribution in a class action is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair, reason-able and adequate. *Lucas*, 2006 U.S. Dist. LEXIS 51439, at *28; *Law v. NCAA*, 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000); *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992); *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2007); *see also Newton v. Fortis Ins. Co.*, 2006 U.S. Dist. LEXIS 33965, at *6-7 (D. Colo. May 26, 2006) (applying standard). "An

allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Lucas*, 2006 U.S. Dist. LEXIS 51439, at *29 (quoting *In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001)).  A plan that distributes settlement funds to class members based on the extent of their injuries or the strength of their claims is reasonable.  *See id.* at *29; *Omnivision*, 559 F. Supp. 2d at 1045.

The goal of an equitable plan is fairness to the class as a whole.  Based on the damages provisions of Sections 11 and 12 of the Securities Act, the proposed Distribution Plan in this case is fair and falls within the mainstream of allocation plans routinely approved by courts.  Each Class Member's share of the settlement proceeds is calculated in a two-step process and each will recover based on the larger of their Section 11 or Section 12 recognized losses.

The first step calculates Section 11 and Section 12 "Trading Losses" as follows, pursuant to the Securities Act:

> *Section 11 Trading Losses*.  Pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, for shares purchased between January 1, 2006 and December 31, 2008, and:

>> (1) sold prior to December 31, 2008, a Class Member's Trading Loss will be the lesser of (a) the Net Asset Value ("NAV") of the shares on the date of purchase minus the NAV on the date of sale; or (b) the NAV of the shares on the date of purchase minus $1.70 (the NAV on December 31, 2008).

>> (2) held as of the close of trading on December 31, 2008, a Class Member's Trading Loss will be the NAV on the date of purchase minus $1.70 (the NAV on December 31, 2008).

>> (3) disposed of after December 31, 2008, a Class Member's Trading Loss is calculated in the same way as for shares retained as of December 31, 2008.

> *Section 12 Trading Losses*.  Pursuant to Section 12 of the Securities Act, 15 U.S.C. § 77l, for shares purchased between January 1, 2006 and December 31, 2008, and:

>> (1) sold prior to December 31, 2008, a Class Member's Trading Loss will be (a) the NAV on the date of purchase; (b) plus interest that could have been earned from the date of purchase through the date of sale at a rate equal to the

weekly average/one year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System for the calendar week preceding the date of such purchase compounded annually ("Interest"); (c) less any dividends received from the date of purchase through the date of sale on those shares; and (d) less the NAV on the date of sale.

(2) held as of December 31, 2008, a Class Member's Trading Loss will be (a) the NAV on the date of purchase; (b) plus Interest that could have been earned from the date of purchase through December 31, 2008; (c) less any dividends received through December 31, 2008 on shares purchased between January 1, 2006 and December 31, 2008; and (d) less $1.70 (the NAV on December 31, 2008).

(3) disposed of after December 31, 2008, the Trading Loss is calculated in the same way as for shares retained as of December 31, 2008.

The second step calculates "Recognized Losses" by discounting the Trading Losses based upon when the Class Member purchased his or her shares. Class Counsel, after consulting with their damages consultant, and considering defenses raised by the Defendants, believe that claims for purchases of Champion Income Fund shares between January 1, 2006 and March 31, 2007 should be discounted in varying amounts because these claims are subject to the defense that the Fund had not yet acquired significant amounts of the risky derivatives complained about in this Action as of March 31, 2007. Plasse Decl., ¶ 50. Consequently, Recognized Losses for purchases of these shares will be discounted as indicated below:

(1) Purchases of shares from January 1, 2006 to December 31, 2006: Recognized Loss equals 5% of Trading Losses (as calculated in the first step above).

(2) Purchases of shares from January 1, 2007 to March 31, 2007: Recognized Loss equals 50% of Trading Losses (as calculated in the first step above).

(3) Purchases of shares from April 1, 2007 to December 31, 2008: Recognized Loss equal 100% of Trading Losses (as calculated in the first step above).

A Class Member is eligible to receive a distribution from the Net Settlement Fund only if he or she has a net loss, after all profits from transactions in Champion Income Fund shares during the Class Period are subtracted from all losses.

This distribution methodology is adequately explained in the Notice sent to Class Members.  It was prepared in consultation with Lead Plaintiffs' damages consultant, tracks the theory of damages asserted by Lead Plaintiffs and is fair, reasonable and adequate to the Class as a whole.  *See* Plasse Decl., ¶¶ 51-52.

**E.      The Court Should Affirm Its Certification of the Class**

In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiffs requested that the Court certify the Class for settlement purposes so that notice of the proposed Settlement, the final approval hearing and the rights of Class Members to request exclusion, object or submit proofs of claim could be issued.  In its Order Preliminarily Approving Settlement and Providing for Notice, entered on June 1, 2011, this Court certified the Class for settlement purposes.  Nothing has changed to alter the propriety of the Court's certification and, for all the reasons stated in the Lead Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Settlement (Dkt. No. 104), incorporated herein by reference, Lead Plaintiffs now request that the Court reiterate its prior certification (i) of the Class for purposes of carrying out the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3); and (ii) Lead Plaintiffs as Class Representatives, as well as its prior appointment of Class Counsel.

**IV.      CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES SHOULD BE GRANTED**

Class Counsel's efforts have resulted in an excellent Settlement that confers a substantial monetary benefit on the Class.  For that effort, Class Counsel seek attorneys' fees in the amount of 18.5% of the Settlement Fund, which will include interest as earned by the Settlement Fund, and reimbursement of $398,643.39 in litigation expenses (including Lead Plaintiffs' expenses), plus interest as earned by the Settlement Fund.  The amount of this request was explained in the Notices mailed to potential Class Members.  Epiq Decl. Exs. B-E.[18]

---

[18] To the extent there are objections to the fee and expense requests, they will be addressed in Class Counsel's reply papers, which must be filed with the Court by September 15, 2011.

For the reasons set forth below and in the accompanying papers, consistent with other awards in this District, Class Counsel respectfully submit that the application for attorneys' fees and expenses is reasonable and should be granted in its entirety.[19]

**A.    The Legal Standards for Determining Attorneys' Fees in Common-Fund Cases**

Courts have long recognized that attorneys who represent a class and achieve a benefit for class members are entitled to be compensated for their services, and that where a class plaintiff successfully recovers a settlement fund, the costs of litigation should be spread among the fund's beneficiaries. Thus, attorneys who obtain a recovery for a class in the form of a common fund are entitled to an award of fees and expenses from that fund as compensation for their work. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

"The common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. at 478). In addition, courts have recognized that awards of fair attorneys' fees from a common fund should serve to encourage skilled counsel to represent those who seek redress for damages inflicted on classes of persons. *See Hicks v. Morgan Stanley & Co.*, 2005 U.S. Dist. LEXIS 24890, at *27, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("[t]o make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding").[20]

The Supreme Court has suggested that where counsel has created a common fund, an attorneys' fee should be determined on a percentage-of-recovery basis. *See Blum v. Stenson*, 465

---

[19] The Plasse Declaration describes, among other things, the substantial efforts of Class Counsel in litigating and resolving the Action, the significant risks Class Counsel faced in prosecuting the Action on a contingent fee basis, and other matters relevant to this fee and expense application. Class Counsel respectfully incorporate that document herein.

[20] Indeed, the Supreme Court has repeatedly emphasized the importance of private securities class actions. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("[t]his Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission").

U.S. 886, 900 n.16 (1984) ("under the 'common fund doctrine,' … a reasonable fee is based on a percentage of the fund bestowed on the class").  The Tenth Circuit also favors the percentage method, as opposed to the lodestar method, for awarding attorneys' fees in a common-fund case.  In *Gottlieb v. Barry*, 43 F.3d 474, 484 (10th Cir. 1994) (awarding 22.5% of $44 million settlement), *overruled on other grounds Devlin v. Scardelletti*, 536 U.S. 1, 6 (U.S. 2002), the Circuit Court explained that a percentage method for setting a fee "is less subjective than the lodestar plus multiplier approach," matches the marketplace most closely thus providing better incentive to counsel, and is better suited where class counsel "was initially retained on a contingent fee basis."  *Id*.; *see also Uselton v. Commerical Lovelace Motor Freight, Inc.*, 9 F.3d 849, 853 (10th Cir. 1993) (accepting the propriety of the percentage approach "rather than lodestar" in the awarding of attorneys' fees); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1444-45 (10th Cir. 1995) (same).  In *Consumers Gas & Oil, Inc. v. Farmland Indus.*, 863 F. Supp. 1357, 1361 (D. Colo. 1993), the court made the point – in the context of a discussion on the common-fund doctrine – that when attorneys' fees are premised on a contingent recovery, "a percentage fee is customary if not universal."[21]

In sum, this authority indicates that the percentage method under the circumstances now before this Court is preferred over other methods, including the lodestar approach, for arriving at a fair and reasonable fee award.

## 1.     The factors considered by the Tenth Circuit

To determine the reasonableness of a request for attorneys' fees in a common fund case, the Tenth Circuit has adopted the factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor involved; (2) the novelty and difficulty of
> the questions; (3) the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment by the attorney
> due to acceptance of the case; (5) the customary fee; (6) any

---

[21] The percentage method also comports with the PSLRA, which states that "[t]otal attorneys fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."  15 U.S.C. §78u-4(a)(6).

> prearranged fee-this is helpful but not determinative; (7) time
> limitations imposed by the client or the circumstances; (8) the
> amount involved and the results obtained; (9) the experience,
> reputation, and ability of the attorneys; (10) the undesirability of
> the case; (11) the nature and length of the professional relationship
> with the client; and (12) awards in similar cases.

*Brown*, 838 F.2d at 454-55.

The weight to be given to each of the *Johnson* factors varies from case to case, and each factor is not always applicable in every case.[22]  In a common fund case, the greatest weight should be given to the monetary results achieved for the benefit of a class.  The monetary results are often considered to be "decisive."  *Brown*, 838 F.2d at 456.  The time and labor involved also is a relevant factor, but is usually assigned a lesser weight than the results achieved for the benefit of the class.  *Id*.  As discussed below, under the factors set forth in *Johnson*, Class Counsel's requested fee is fair and reasonable and should be awarded by the Court.

### 2.      Class Counsel obtained substantial benefits for the Class

"While other criteria in determining reasonable attorney fees are legitimate considerations, the amount of the recovery, and end result achieved, is of primary importance."  *Oppenlander v. Standard Oil Co. (Indiana)*, 64 F.R.D. 597, 605 (D. Colo. 1974) (Finesilver, J.).  Class Counsel's efforts here have resulted in a substantial economic benefit for Class Members, but importantly this result was achieved with efficiency and without the need of persistent Court intervention or the expenditure of excessive judicial resources.  Once the Action was consolidated and Lead Plaintiffs and Class Counsel were appointed, Counsel took the initiative and actively pursued their investigation of the claims even while a formal discovery stay was in place and while briefing Defendants' motions to dismiss.  This strong effort was key in achieving timely, immediate results for the Class.

As mentioned, the Settlement creates a Settlement Fund of $52,500,000.  With the skilled assistance of Financial Markets Analysis, Class Counsel have estimated the Class's likely recovery at trial in order to assess the value of the case, taking into consideration certain defense

---

[22] Here, the seventh, tenth and eleventh factors are not relevant to the Court's consideration.

arguments that may have been credited by a jury relating to liability periods, how to credit sales, permissible levels of swap and MBS investments, and discounts for corporate bond losses and losses attributable to general market forces.  Based on this analysis, as discussed above, Class Counsel estimate that the Settlement provides a recovery in the range of 15% to 17% of its estimate of the Class's most realistic damages analyses under §§ 11 and 12 of the 1933 Act, respectively.  Plasse Decl. ¶ 45.

In contrast, to Class Counsel's knowledge, none of the other pending proposed class actions consolidated before the Court concerning Oppenheimer, other than the Core Bond Fund case, have achieved any recovery for their classes.  All have pending motions to dismiss. Furthermore, as discussed above, class action settlements typically recover much less.  *See supra* at 21; Plasse Decl. ¶¶ 55-60.

The $52,500,000 Settlement here provides a very favorable result and one that should be given great weight by the Court in assessing attorneys' fees.

### 3.      The novelty and difficulty of the legal and factual questions show that the requested fee is reasonable

The novelty and difficulty of the legal and factual issues presented, the second *Johnson* factor, fully support the reasonableness of the requested attorneys' fees.  As the Court noted in *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 71267, at *17 (D. Colo. Sept. 29, 2006) (Blackburn, J.), "There are few simple class action cases involving securities law.  This area of law may not be novel, but it generally is complex and difficult."

Here, the Action is one of a limited number of successful mutual-fund cases.  As a securities class action, it was inherently complex with difficult legal and factual issues – from the legal hurdles posed by Defendants' defenses of truthful disclosures to the factual intricacies of the investments at issue (MBS, credit default swaps, leveraging).  It also raised novel legal issues that are evolving and posed significant challenges and risks.  Specifically, the Settling Parties had very different views about whether Lead Plaintiffs would be able to prove loss causation based on the Fund's NAV decline.  Defendants argued, and would have continued to press, that the losses resulted not from purported misstatements or omissions but from an unprecedented,

world-wide credit crisis and resulting panic unforeseen by government officials, economists, or the Fund's portfolio managers.  (Dkt. No. 87 at 47-55.)  It was also unclear whether the Court would agree with Judge Holwell in *In re State Street Bank*, 2011 U.S. Dist. LEXIS 35857, at *35, 2011 WL 1206070, at *10 (*see supra* at 19), and dismiss the claims in whole and/or in part for failure to adequately plead loss causation.  Plasse Decl. ¶ 66.

The substantial Settlement Amount is a reflection that Lead Plaintiffs, through Class Counsel's hard work and willingness to invest substantial amounts of time and money, overcame significant legal and factual obstacles in order to achieve an immediate recovery for the Class – before materialization of risks concomitant to Defendants' motions to dismiss.  In short, there is no doubt that this case presented novel and difficult questions of law, and this factor strongly supports approval of the fee request.

**4.     The experience, reputation, and ability of the attorneys and the requisite skill to perform the legal service properly**

The third and ninth *Johnson* factors also strongly support the fee request.  Class Counsel's efforts have resulted in an excellent result for Class Members, but importantly, as discussed herein and in the Plasse Declaration, this result was achieved with effectiveness and diligence that, Class Counsel respectively submits, has saved judicial resources.

Class Counsel have significant experience litigating and trying large, complex class action cases and, in particular, cases involving claims against mutual funds.  *See* Plasse Decl. ¶¶ 93-94.  Counsel respectfully submits that this expertise particularly came to bear during the investigation of the claims and defenses, and in obtaining documents and data through the FOIA process and from Defendants despite the PSLRA discovery stay and without the need for court intervention.  The information gathered was instrumental in achieving the largest settlement possible.

Labaton Sucharow is among the nation's preeminent law firms in class action securities litigation and has successfully litigated and tried numerous class actions on behalf of major institutional investors.  *See e.g. In re Countrywide Sec. Litig.*, No. C 07-5295 (C.D. Cal.) (representing the State of New York and New York City Pension Funds and achieving a

settlement of more than $600 million); *In re American International Group, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio and Ohio Police & Fire Pension Fund and reaching proposed settlements of up to approximately $1 billion); *In re General Motors Corp. Sec. and Deriv. Litig.*, MDL No. 1749 (E.D. Mich.) (representing Deka Investment GmbH and Deka International S.A., Luxembourg and achieving a settlement of $303 million); *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-1501 (N.D. Ala.) (representing New Mexico State Investment Council, the New Mexico Educational Retirement Board and the State of Michigan Retirement System and achieving settlements valued at approximately $670 million). Labaton Sucharow also litigated the class action in the Bank of America/Nations sub-track of *In Re Mutual Funds Investment Litigation*, MDL-1586 (D. Md.), where a global class, derivative, and ERISA settlement was recently approved by the court. Plasse Decl. ¶ 93.

Likewise, Hagens Berman is among the most experienced and skilled practitioners in the securities litigation field, and has long and successful track records in such cases. It is a nationally-recognized law firm, with offices in ten cities, and has been rated by the *National Law Journal* in the top ten of plaintiffs' firms in the country. The firm has extensive experience litigating complex class actions asserting claims of securities, investment fraud, product liability, tort, antitrust, consumer fraud, employment, environmental, and ERISA cases. Moreover, the fact that Hagens Berman has demonstrated a willingness and ability to prosecute complex cases such as this was undoubtedly a factor that encouraged Defendants to engage in settlement discussions, and added valuable leverage in the negotiations, ultimately resulting in the recovery for the Class. Indeed, as sole lead counsel, Hagens Berman recently settled a class-action securities lawsuit against the Charles Schwab Corporation and associated defendants alleging misconduct similar to that of Defendants in the present case. *In re Charles Schwab Corp. Secs. Litig.*, No. C 08-01510 WHA (N.D. Cal.) (Alsup, J.). The two settlements in that case on behalf of federal and California classes exceeded $235 million. Hagens Berman is also co-lead counsel in a ground-breaking drug-pricing case against the world's largest pharmaceutical companies,

resulting in a victory at trial.  The court approved or is in the process of approving a total of $338 million in settlements.  *In re Pharm. Industry Average Wholesale Price Litig.*, No. 01-CV-12257-PBS (D. Mass.).  Hagens Berman was lead counsel in a racketeering case against McKesson for drug-pricing fraud that settled for $350 million on the eve of trial.  *New England Carpenter's Health Benefits Fund, et al. v. McKesson Corp.*, No. 05-CV-11148-PBS (D. Mass.).  Hagens Berman was co-lead counsel in ERISA litigation against Enron, which recovered in excess of $250 million, the largest ERISA settlement in history.  *In re Enron Corp. Secs. & ERISA Litig.*, No. 01-cv-3913 (S.D. Tex.).  Hagens Berman obtained summary judgment in a class action to recover deceptive service fees and settled the case for $123.4 million.  *In re Expedia Hotel Taxes & Fees Litig.*, No. 05-2-02060-1 SEA (Sup. Ct. of Wash. King Cnty.).  Plasse Decl. ¶ 94.

Kip B. Shuman of The Shuman Law Firm has served as either plaintiff's lead counsel or liaison counsel in virtually every major securities class action in this district in the last 17 years.  As such, the Shuman Law firm is highly experienced in litigating these matters.  Some of the more notable Colorado-based cases that Mr. Shuman has materially participated in include: *Rasner v. FirstWorld Communications Inc.*, Case No. 00-K-1376 (D. Colo.) (co-lead counsel) ($25.925 million recovered); *In re Tele-Communications Inc. Sec. Litig.*, Case No. 97CV421 (Colo.) (co-lead counsel) ($26.5 million recovered); *In re Samsonite Corp. Sec. Litig.*, Case No. 98-K-1878 (D. Colo.) (co-lead counsel) ($24 million recovered); *Angres v. Smallworldwide PLC*, Case No. 99-K-1254 (D. Colo.) (co-lead counsel) ($9.85 million recovered); *Croker v. Carrier Access Corp.,* Case No. 05-cv-1011–LTD-OES (co-lead counsel) ($7.4 million recovered); *In re Qwest Communications Int'l Sec. Litig.*, Case No. 01-cv-1451-REB-CBS (D. Colo.) (liaison counsel) ($445 million recovered); *In re Spectranetics Corp. Sec. Litig.*, Case No. 08-cv-02048-REB-KLM (D. Colo.) (liaison counsel) ($8.5 million recovered); *Garza v. J.D. Edwards & Co.*, Case No. 99-N-1744 (D. Colo.) (liaison counsel) ($15 million recovered); and *In re ICG Communications Sec. Litig.*, Case No. 00-cv-1864-REB-BNB (D. Colo.) (liaison counsel) ($18 million recovered).  Plasse Decl. ¶ 95.

Counsel's knowledge and experience was a key factor contributing to the successful prosecution of the Action.

###### 5.    Class Counsel agreed to handle the action on a fully contingent basis and dedicated substantial resources precluding other employment

The fourth and sixth *Johnson* factors also support approval of the requested fee.  Class Counsel accepted this case on a purely contingent fee basis,[23] which means not only that Class Counsel would not be paid for their time unless they recovered money for their clients, but also that Class Counsel, and other counsel who contributed to the prosecution of the Action, had to risk $382,143.39 for litigation expenses.  Plasse Decl. ¶¶ 99-100; Exhibits 7B, 8B, 9B hereto.  This investment would have been uncompensated, which was not the case for Defendants' counsel, if the case had been dismissed as a result of Defendants' motions to dismiss or at the class-certification, summary-judgment or trial stage.  Courts have recognized this real risk by awarding fees that may exceed the amount billed to the case.  "In common fund cases, 'attorneys whose compensation depends on their winning the case [] must make up in compensation in the cases they win for the lack of compensation in the cases they lose.'"  *Vizcaino v. Microsoft*, 290 F.3d 1043, 1051 (9th Cir. 2002) (quoting *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300-01 (9th Cir. 1994)).  As is true in virtually all contingent litigation, working on this Action for thousands of hours also impacted Class Counsel's ability to take on additional contingent matters.

The contingent nature of Class Counsel's representation, the preclusion of other employment and the consistency of the request with the agreement reached with Lead Plaintiffs all favor approval of the request for attorneys' fees.

---

[23] Pursuant to agreements with Lead Plaintiffs, Labaton Sucharow agreed to litigate the Action on a contingency basis and to not seek attorneys' fees greater than 25% of a future recovery.  The fact that Class Counsel is seeking a fee percentage well below that authorized by their clients further demonstrates the overall reasonableness of the fee request.

6.      **The customary fee and awards in similar cases illustrate the reasonableness of the 18.5% request**

An analysis of the fifth and twelfth Johnson factors also demonstrates that the requested fee is reasonable.

This Court and others in this District have frequently awarded attorneys' fees of much more than 18.5%, with frequent awards of 30% (or more), of the settlement fund for prosecuting class actions. *See, e.g., In re Spectranetics Corp. Sec. Litig.*, No. 08-02048 (D. Colo. April 4, 2011) (Blackbum, J.) (fee equal to 28% of recovery) (Ex. 5 to Appendix of Unpublished Decisions ("AUD"), filed herewith); *In re Rhythms Sec. Litig.*, No. 02-35 (D. Colo. April 3, 2009) (Kane, J.) (fee equal to 30% of settlement fund) (AUD Ex. 3); *Horton v. Leading Edge Mktg. Inc.*, 2008 U.S. Dist. LEXIS 11761, at *8 (D. Colo. Feb. 4, 2008) (Nottingham, C.J.) (stating that counsel's request for a fee of 23% was "less than the customary contingency fee of one-third of the recovery, and on the low end of the range of fees granted by federal courts in common fund cases"); *Lucas v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 51420, at *18-19 (D. Colo. July 27, 2006) (Kane, J.) (awarding requested 19.85% fee and noting the "customary fee award of 30% of the fund under the percentage of the fund approach").[24]

Other courts in the Tenth Circuit have also recognized the reasonableness of attorney fees awards that reflect similar percentages of recovery. *See, e.g., McNeely v. National Mobile Health Care, LLC*, 2008 U.S. Dist. LEXIS 86741, at *46 (W.D. Okla. Oct. 27, 2008) ("[f]ees in the range of at least one-third of the common fund are frequently awarded in class action cases of this general variety," citing cases and awarding a 33% fee); *Lewis v. Wal-Mart Stores, Inc.*, 2006

---

[24]   *See also Angres v. Small Worldwide PLC*, No. 99-K-1254 (D. Colo. June 17, 2003) (Kane, J.) (awarding fees of 33⅓% of the recovery) (AUD Ex. 1); *Vaszlavik v. Storage Tech. Corp.*, 2000 U.S. Dist. LEXIS 21140 at *4 (D. Colo. Mar. 9, 2000) (Babcock, J.) (awarding 30% fee, noting, "[f]ees for class action settlements generally range from 20% - 50%" and "class action fee awards are typically 30% of the fund created by the settlement"); *In re Samsonite Corp. Sec. Litig.*, No. 98-K-1878 (D. Colo. July 25, 2000) (Kane, J.) (awarding 25% of settlement fund) (AUD Ex. 4); *Schwartz, et al., v. Celestial Seasonings, Inc. et al.*, No. 95-K-1045 (D. Colo. Apr. 25, 2000) (Kane, J.) (awarding 33.33% of settlement fund) (AUD Ex. 8); *Queen Uno Ltd. P'hip, et al. v. Coeur D'Alene Mines Corp., et al.*, No. 97-WY-1431-CB (D. Colo. Aug. 11,1999) (Brimmer, J.) (fee of 30% of recovery) (AUD Ex. 7).

U.S. Dist. LEXIS 87681, at *4 (N.D. Okla. Dec. 4, 2006) ("[a] contingency fee of one-third is relatively standard in lawsuits that settle before trial and, given the length and complexity of this lawsuit, it is a reasonable percentage for a contingency fee").[25]

Here, Class Counsel are seeking an award of 18.5% of the common fund.  In short, the attorneys' fees awarded in similar class-action cases by the District of Colorado and within the Tenth Circuit show that the request here is fair and reasonable.  The fifth and twelfth factors support the request.

### 7.    Class Counsel dedicated significant time and labor to the action

The amount of time and labor Class Counsel dedicated to the prosecution and settlement of the Action[26] shows that the requested fee is reasonable.  In class actions that create a common fund, however, counsel's time investment is assigned less weight than the results achieved for the class's benefit.  *Brown* , 838 F.2d at 456.[27]

The Plasse Declaration details the myriad projects undertaken by Class Counsel to prosecute the claims against Defendants, the time and labor spent, and the creativity of that effort.  The number of hours Class Counsel expended on the Action litigation (4466.81 hours with a resulting lodestar of $2,109,323.45) attests to their extensive, but economical, efforts.[28]

---

[25] *See also In re Novell, Inc. Sec. Litig.*, No. 99-995 (D. Utah May 26, 2005) (fee equal to 30% of recovery) (AUD Ex. 2); *In re Sun Healthcare Group, Inc., Sec. Litig.*, No. 99-00269 (D.N.M. Dec. 13, 2004) (fee equal to 30% of recovery) (AUD Ex. 6); *In re United Telecomms. Sec. Litig.*, 1994 U.S. Dist. LEXIS 9151 (D. Kan. June 1, 1994) (fee of 33⅓% of recovery).

[26] Class Counsel's efforts will not end with the filing of these motion papers or even at the Settlement Hearing.  The administration of the Settlement is a mammoth undertaking and will continue to require Class Counsel's oversight and involvement as the tens of thousands of Class Member's claims are processed.  Before the settlement proceeds are distributed, Class Counsel will present a motion to the Court seeking authorization.  Class Counsel will not seek additional attorneys' fees for this time.

[27] The lodestar method, which focuses on the time spent and lodestar generated, is more appropriate for statutory attorney fee award cases that involve shifting the burden of the prevailing party's attorneys' fees to the losing party for remedial purposes, than for cases such as this that involve a sharing of the burden among those benefited by the litigation.  *See, e.g., Gottlieb v. Barry*, 43 F.3d at 483 n.5 (noting that the U.S. Supreme Court has always awarded fees in common-fund cases on a percentage-of-the-fund basis).

[28] The lodestar calculation includes time of attorneys and professional support staff.  "[T]ime spent by paralegals and support staff properly may be considered as part of the first *Johnson* factor.  Time spent by paralegals and other professionals frequently is billed to clients by the

Plasse Decl. ¶ 77.   As set forth in greater detail in the Plasse Declaration, Class Counsel, among other things:

- investigated and analyzed the claims at issue, including a review of all relevant public information, and engaged in extensive research of the applicable law with respect to the claims and defenses asserted by Defendants;

- filed a detailed and particularized consolidated class action complaint after conducting an extensive factual investigation;

- pursued a Freedom of Information Act ("FOIA") request with the Oregon Department of Justice and the Oregon Treasurer in connection with litigation on behalf of the Oregon College Savings Plan Trust that invested in the Core Bond Fund;

- requested, reviewed and analyzed almost 80,000 pages of key documents produced by Defendants, despite the PSLRA stay of discovery, which were also reviewed by Lead Plaintiffs' experts and instrumental in reaching the Settlement;

- retained and consulted with portfolio experts H. Gifford Fong and Gifford Fong Associates concerning a complete forensic analysis of the Fund portfolio during the Class Period, as well as analysis of key documents produced by Defendants;

- vigorously defended motions to dismiss;

- retained and consulted with damages experts at Financial Markets Analysis, Inc. in order to analyze Fund transaction data and documents produced by Defendants to assess damages under §§ 11 and 12 of the 1933 Act on both a FIFO and LIFO basis and consider the impact of various defense arguments relating to shortened liability time periods, permissible levels of swap investments, the general market

---

hour, and the assistance of such professionals is indispensable in a case like this case." *Stalcup v. Schlage Lock Co.*, 505 F. Supp. 2d 704, 707 (D. Colo. 2007) (Blackburn, J.); *see also In re Qwest,* 2006 U.S. Dist. LEXIS 71267, at *15 (same).

decline resulting from the financial crisis, and damages caused by declines in the Fund's corporate bond investments;

- engaged in extensive settlement negotiations with Defendants, including three formal in-person mediation sessions before Judge Phillips;

- worked with wholly independent counsel to resolve the allocation issues between the Actions, culminating in an allocation mediation session before Judge Phillips; and

- documented the Settlement and oversaw an extensive notice and administration process.  Plasse Decl. ¶ 97.

Assuming a $9,712,500 attorneys' fee (plus interest), Class Counsel's lodestar of $2,109,323.45, at Class Counsel's regular current rates, would yield a "multiplier" of approximately 4.6.[29]  This lodestar multiplier is appropriate compensation to Class Counsel given the significant result achieved.  It also reflects Class Counsel's efficient work.  To reach this point, cases such as this typically involve many discovery disputes that either must be mediated by the court or resolved by extensive motion practice, and motion practice concerning class discovery and certification – none of which was required here because of Class Counsel's innovative efforts.  Plasse Decl. ¶ 78.

Multipliers on counsel's lodestars vary according to the facts of the litigation, the settlement and the reviewing court.  In *In re Qwest*, 2006 U.S. Dist. LEXIS 71267, at *21, the court

---

[29] The Supreme Court has recognized that in cases such as this, where counsel's entitlement to attorney's fees must await the conclusion of the case several years after the services are rendered, courts typically offset the delay in payment by either basing the award on current, instead of historical, billing rates, or by adjusting historical fees to account for their present value (*i.e.*, by awarding prejudgment interest on the fee award).  *Missouri v. Jenkins*, 491 U.S. 274, 282-84 (1989).

The rates used by Plaintiffs' Counsel here are commensurate with those used by peer defense-side law firms litigating matters of a similar magnitude.  (*See* sample of defense firm billing rates gathered by Labaton Sucharow from recent bankruptcy court filings, Exhibit 10 hereto.)  As was explained by the Court in *Lucas v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 51420, at *13, "the relevant community for purposes of determining a reasonable billing rate for Class Counsel likely consists of attorneys who litigate nationwide, complex class actions…. This rate would be significantly higher than the rate prevailing in Denver."

explained that "[l]ead counsel who create a common fund for the benefit of a class are rewarded with fees that often are at least two times the reasonable lodestar figure, and in some cases reach as high as five to ten times the lodestar figure." The Second Circuit recently ruled that a $34 million fee, representing a 2.04 multiplier was "toward the lower end of reasonable fee awards." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 134 (2d Cir. 2008). In *WorldCom*, the court noted case law indicating that "multipliers of between 3 and 4.5 are common." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 357 (S.D.N.Y 2005) (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d at 123).

In short, the reasonableness of the requested attorneys' fee is confirmed by a lodestar "cross-check." Class Counsel submit that the remaining *Johnson* factor, the time and labor involved, readily supports approval of the requested attorneys' fee.

**B.     The Request for Reimbursement of Expenses Is Reasonable**

In addition to a reasonable attorneys' fee, Class Counsel respectfully seek reimbursement in the amount of $398,643.39 (including Lead Plaintiffs' expenses), plus interest, for litigation expenses incurred in connection with prosecuting the Action. Plaintiffs' Counsel seeking reimbursement have submitted declarations attesting to the accuracy of their expenses. It is well-established that such expenses are compensable in a common-fund case if particular costs are the type normally billed by attorneys to paying clients. *See, e.g., Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42*, 8 F.3d 722, 725-26 (10th Cir. 1993).

Plaintiffs' Counsel's declarations, annexed as Exhibits 7-9 to this motion, itemize the various categories of expenses incurred and Class Counsel submit that these expenses were reasonably and necessarily incurred in prosecuting the claims and achieving the proposed Settlement. Class Counsel further submit that these expenses, which include costs such as expert and consultant fees, mediation fees, electronic legal research, photocopying, postage, meals and transportation are the type for which "the paying, arms' length market" reimburses attorneys and should therefore be reimbursed from the Settlement Fund. *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004).

The Notices advised potential Class Members that Class Counsel would seek reimbursement of expenses of up $650,000, plus interest.  Epiq Decl. Exs. B-E.  The expenses sought here are well below this "cap."  Accordingly, Class Counsel submit that the expense request is fair and reasonable and should be granted.

**C.     Lead Plaintiffs Are Entitled to Reimbursement of Reasonable Lost Wages and Expenses**

The PSLRA, 15 U.S.C. §78u-4(a)(4), limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." Here, as explained in the Declarations of Thomas H. Goodman and Errol G. O'Steen, Exhibits 11 and 12 to this motion, Lead Plaintiffs are seeking $9000 and $7500, respectively, in lost wages and expenses related to their active participation in this Action.  Plasse Decl. ¶ 101.

Many cases have approved reasonable payments to compensate class representatives for the time and effort devoted by them on behalf of a class.  Recently in *In re Marsh & McLennan Co. Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 120953, at *61, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009), the court awarded $144,657 to the New Jersey Attorney General's Office and $70,000 to the Ohio Funds, which was requested "to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class."  The court held that their efforts were "precisely the types of activities that support awarding reimbursement of expenses to class representatives."  2009 U.S. Dist. LEXIS 120953, at *62, 2009 WL 5178546, at * 21.  Similarly, in *In re Rhythms Sec. Litig.*, No. 02-35 (D. Colo. April 3, 2009) (AUD Ex. 3), this Court granted the lead plaintiff's request for reimbursement and awarded $135,084.  *See also In Re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 collectively to eight lead plaintiffs, for having "fully discharged their PSLRA obligations and … been actively involved throughout the litigation … communicat[ing] with counsel throughout the litigation, review[ing] counsels' submissions, indicat[ing] a

willingness to appear at trial, and … kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws").[30]

Messrs. Goodman and O'Steen are not professional plaintiffs. They sought to become lead plaintiff in this case to represent the Class and in order to ensure that the Class obtained the largest possible recovery. (*See* Goodman and O'Steen Decls.) Mr. Goodman is seeking reimbursement at the rate of $45 per hour for the 200 hours he spent pursuing the claims on the Class's behalf. Mr. O'Steen is seeking reimbursement at the rate of $50 per hour, based upon his standard hourly rate for irrigation repair, for the 150 hours he spent pursuing the claims on the Class's behalf.

Accordingly, Class Counsel and Lead Plaintiff submit that the $16,500 sought, based on Lead Plaintiffs' involvement in the Action from inception to settlement at a fair hourly rate, is eminently reasonable and should be granted.

## V.    CONCLUSION

For the reasons stated herein and in the Plasse Declaration, it is respectfully submitted that the proposed Settlement merits final approval by this Court, the proposed Distribution Plan should be approved, and Class Counsel's request for attorneys' fees and expenses should be granted.

Dated: July 29, 2011

THE SHUMAN LAW FIRM

*s/ Kip B. Shuman*
Kip B. Shuman
Rusty Glenn
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone:  (303) 861-3003
Facsimile:  (303) 484-4886

---

[30] Some courts have narrowly construed the scope of compensable costs and expenses, but this has largely been because of insufficient explanation of the request. *See, e.g., In re NTL, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 13661, at *35, 2007 WL 623808 at *10 (S.D.N.Y. Mar. 1, 2007) (declining award, holding that "[w]ithout a better explanation for claims of $200-800 per hour of 'lost wages,' the Court should decline to award such amounts"). As submitted here, Lead Plaintiffs substantiate their requests and submit that the decisions approving reasonable compensation for time devoted are more consistent with the PSLRA's purpose and language.

E-Mail:  kip@shumanlawfirm.com

*Liaison Counsel for the Class*

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Christopher J. Keller
Nicole M. Zeiss
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
Sean R. Matt
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

*Additional Class Counsel*

## **Certificate of Service**

I hereby certify that the foregoing was filed with this Court on July 29, 2011 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

_s/ Rusty E. Glenn_
Rusty E. Glenn